UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ALBERT SANTANA

Petitioner,

v.

9:11-CV-00105

(NAM/TWD)

WILLIAM LEE,

Respondent.

---

APPEARANCES: OF COUNSEL:

ALBERT SANTANA
04-B-3269
Petitioner *pro se*
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582

HON. ERIC T. SCHNEIDERMAN
Attorney General for the State of New York
Counsel for Respondent
120 Broadway
New York, New York 10271

LISA FLEISCHMANN, ESQ.
ALYSON J. GILL, ESQ.

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

### I. INTRODUCTION

This matter has been referred to this Court for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Northern District Local Rule 72.3(c), by the Hon. Norman A. Mordue, Senior United States District Judge.

Presently before this Court is the Second Amended Petition of Petitioner Albert Santana, seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Dkt. No. 39.) Petitioner brings

this proceeding challenging a judgment of conviction entered on November 24, 2004, after a jury trial in the Onondaga County Court. Petitioner was convicted of Murder in the Second Degree (N.Y. Penal Law § 125.5(3)), two counts of Attempted Robbery in the First Degree (N.Y. Penal Law §§ 110.00, 160.15(2)), two counts of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03(2)), and Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02(4)). (Dkt. No. 51 at 72.)[1]

On November 24, 2004, Petitioner was sentenced to:

> (1) a determinate sentence of fifteen years followed by five years post-release supervision on the Attempted Robbery in the First Degree charge (Count Four);
>
> (2) a determinate sentence of fifteen years followed by five years post-release supervision on Criminal Possession of a Weapon in the Second Degree (Count Five) to run concurrent with the sentence on Count Four;
>
> (3) a minimum of twenty-five years and a maximum of life on the Murder in the Second Degree charge (Count Six) to run consecutively to the sentences on Counts Four and Five;
>
> (4) a determinate sentence of fifteen years followed by five years post-release supervision on the Attempted Robbery in the First Degree charge (Count Seven) to run current with the sentence imposed on Count Six but consecutive to the sentences imposed on Counts Four and Five;
>
> (5) a determinate sentence of fifteen years followed by five years post-release supervision on Criminal Possession of a Weapon in the Second Degree (Count Eight) to run concurrent with the sentences imposed on Counts Six and Seven, but consecutive to the sentences imposed on Counts Four and Five; and

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

> (6) a determinate sentence of seven years followed by five years post-release supervision on the Criminal Possession of a Weapon Third Degree charge (Count Nine) to run concurrent with the sentences imposed on Counts Four and Five.

*Id*. The sentence imposed totaled forty years to life imprisonment with five years post-release supervision. *Id*.

Petitioner's conviction was affirmed by the Appellate Division Fourth Department ("Appellate Division"), and leave to appeal to the New York Court of Appeals was denied on February 24, 2009. *People v. Santana*, 865 N.Y.S.2d 452 (4th Dep't 2008), *lv. denied*, 876 N.Y.S.2d 713 (2009). Petitioner is currently incarcerated in Green Haven Correctional Facility pursuant to this conviction. (Dkt. No. 39.)

Petitioner has raised three grounds for habeas review:

> (1) He was deprived of due process as a result of the prosecution's *Brady* violation in failing to disclose the pending felony charges against the key prosecution witness, Anthony Edwards. (Dkt. No. 39 at ¶¶ 17-20.)
>
> (2) He was deprived of effective assistance of counsel in connection with a plea offer and defense counsel's failure to use impeachment evidence. *Id*. at ¶¶ 21-22.
>
> (3) The prosecution violated the Confrontation Clause, the witness-advocate rule, and the rules prohibiting hearsay by calling a witness who recounted the prosecution's position as to informant Tyree Allen's credibility. *Id*. at ¶¶ 23-25.

For the reasons discussed below, the Court recommends that Petitioner's Second Amended Petition be denied and dismissed in its entirety.

## II. FACTUAL BACKGROUND

On October 23, 2003, Petitioner, who had been stationed at Fort Drum in Watertown,

New York before his discharge from the United States Army, came to the City of Syracuse with two friends in a black leased pickup truck to retrieve a 2002 blue Ford Taurus, New York registration CLD-3283, which was in a local repair shop. (T. at 586-88; 598.)[2] Petitioner asked his friend, Kahmilah Archer ("Archer"), if he and his friends, Derrick Alexander ("Alexander") and Shaun McKnight ("McKnight"), could stay overnight at her home, and she agreed. *Id*. After arriving at Archer's house, Petitioner, his friends, and Archer went to the housing project known as Hilltop at 1181 Fayette Street in Syracuse to pick up Archer's sister, Nicole. *Id*. at 589-93. While they were all sitting in the truck at the housing project, Petitioner asked Archer if people were making money selling drugs there. *Id*. at 592-93.

**A. October 24, 2003, Shooting at 628 Gifford Street**

At approximately 3:15 p.m. the following day, Yakheed Williams ("Williams"), who had been a drug dealer for nine or ten years and had a criminal record, was smoking and selling marijuana with friends in front of 628 Gifford Street in Syracuse. *Id*. at 435-36, 461-64. Williams noticed a bluish color Taurus drive by and an occupant in the back glaring at him really hard. *Id*. at 436-37. Williams described the occupant as a light skinned male with a funny shaped head. *Id*. at 437. At trial, Williams identified the occupant as Petitioner and when asked, testified that he was able to recognize him because of his funny shaped head. *Id*. at 445.

According to Williams, when the Ford Taurus drove by the second time, Petitioner asked him if he had weed and Williams indicated he did and motioned Petitioner to come over. *Id.* at 441. The Taurus pulled up about three houses down, and Petitioner and a tall dark male got out.

---

[2] The Trial Transcript is found at Dkt. Nos. 51-4 through 51-7. Citations to the Trial Transcript will be referenced herein as "T" and the page numbers set forth in that document will be used.

*Id*. at 443.  The tall male stayed by the car and Petitioner went towards Williams.  *Id*.  As Petitioner got closer, Williams noticed a bulge in the pocket of Petitioner's hoody, and that Petitioner had his hand in the pocket.  *Id*. at 444-45.  Petitioner had no expression on his face.  *Id*.  Williams, concerned that Petitioner intended to rob him, eased back up on the porch as Petitioner came closer.  *Id*.  at 446.

Williams testified that he asked Petitioner what was going on and what he needed, and Petitioner pulled out a gun and said "I'll take everything dog."  *Id*. at 447.  Williams jumped over the porch railing and ran toward the house.  *Id*.  Williams heard the first bullet whiz by him as he got in toward the house.  *Id*. at 449.  He felt wood chips hit his face.  *Id*.  Williams ran into the home of John Goodenough ("Goodenough"), who lived there with his family.  *Id*. at 451, 525.  He ran into a room in which Goodenough was having a birthday party for his grandchild.  *Id*. at 527.  Williams saw a number of children, a newborn, and three or four adults in the room and told everyone to get down.  *Id*.  at 451, 528.  A second shot was fired, and after the shooting had ended, Goodenough found two bullet holes in his home.  *Id*. at 529-30.  Williams waited about five minutes to make sure the shooter was gone, then told one of the women to call the police, but not to mention his name and left the scene.  *Id.* 452-53, 528-29.  Williams spoke with police the following day and gave a statement.  *Id*. at 454.

Syracuse police officers were dispatched to a shots fired call at 3:18 p.m. and went to the 628 Gifford Street address.  *Id*. at 396-98.  The police found two shell casings at the scene, one on the front porch and one near the driveway.  *Id*. at 400-03.  Goodenough, who was not present when the police arrived, subsequently found a bullet embedded in the wall of his home and informed police who retrieved the bullet.  *Id*. at 530-31, 536.

On the day of the shooting, Kristin Moore ("Moore") left work at 3:00 p.m. and drove to Gifford Street to purchase marijuana. *Id*. at 762. As she went up to a porch, a black male came close to her and fired three times into the house causing everyone to scatter. *Id*. at 763. Moore described the shooter as tall and thin, wearing a gray hooded sweatshirt, with short hair, an oval shaped face, and very dark, not light skin. *Id*. at 766. Moore was pushed off the stairs because everyone was scattering. *Id*. at 767. She heard a young child, who was hiding behind a car, yell out a license plate number. *Id*. Moore took a marker out of her pocket and wrote license plate number CLD-3283 and blue Taurus on the porch railing. *Id.* at 536, 545. The police discovered the information written on the railing. *Id*. at 403.

**B.     October 24, 2003, Shooting at 1815 East Fayette Street**

On the afternoon of October 24, 2003, sixteen year old, Tyresha Nicholson ("Nicholson"), who had been driving around with her aunt, called her seventeen year old boyfriend, Daquan Phillips ("Phillips") and told him she was coming to see him and would sit in the car and talk to him for a while. (T. at 749- 752.) Phillips stood outside the car and spoke for a while with Nicholson, who was in the passenger seat. *Id*. at 753. Phillips then left to speak with a young man. *Id*. Nicholson continued talking to her aunt with her back to Phillips, who was about fifteen feet behind the car. *Id*. at 753-54, 757.

Nicholson looked back at Phillips every once in a while and saw him talking to a young man whom she did not recognize. *Id*. 754-55. Nicholson was pretty sure the young man was black. *Id.* at 755. The second time she looked back, she saw Phillips and the young man trying to push each other. *Id*. at 755-56. Nicholson could not tell if they were trying to get away from one another or playing but then heard something go pop and looked back and saw Phillips fall

and two young men run to the passenger side of what Nicholson thought to be a bluish or grayish color car parked behind her aunt's car. *Id*. at 756-57, 759. One of them was the young man with whom Phillips had been struggling. *Id.* at 757. Nicholson described the other young man as black. *Id*. at 758. The young men got in the car and took off. *Id.*

Syracuse resident, Ernest Wilson ("Wilson"), drove down East Fayette Street at around 3:30 p.m. on the day of the shooting, on his way home from work. *Id*. at 635-36. He saw a guy standing alone on the street and four young black men who came up to him. *Id*. at 638, 647. It looked to Wilson like they stabbed him, but he wasn't sure. *Id*. Wilson did not see a gun or hear a gun shot. *Id*. at 650. He saw the guy who had been standing alone go down and a young black woman run up to him, kneel down and start hollering. *Id*. at 647. Wilson saw the four young men who had been around Phillips when he fell get into a car. *Id*. Wilson wrote down the license plate number CLD-3283 on his hand. *Id.* at 639-42. When Wilson got home, he called the police. *Id*.

Another Syracuse resident, Anthony Edwards ("Edwards"), was riding around in his silver Suburban on the afternoon of the shooting. *Id*. at 814. As he was driving on East Fayette Street towards downtown, Edwards saw two guys wrestling beside the road near the funeral home next to the Hilltop apartment complex and stopped. *Id.* at 815. Edwards described the two as black males, one light skinned and one dark skinned. *Id*. at 816. Edwards heard a pop and saw the dark skinned male fall to the ground, stumble a bit and back up and fall against an iron railing fence by the apartments. *Id.* Edwards saw the light skinned male leave and get in the back seat of a blue car. *Id.* at 816-17. Edwards saw two black males sitting in the car when the light skinned male got in, one in the driver's seat and the other on the passenger's side. *Id.* at

818.

Edwards picked up a piece of an envelope from his dashboard and wrote down the licence plate number of the blue car. *Id.* at 817. Because he was not sure he had written the number correctly, he followed the car until it stopped at a red light, saw the licence plate number clearly, and wrote the number on the piece of envelope. *Id*. at 817.

Edwards turned the corner so the occupants of the car would not think he was following them and called the police on his cell phone. *Id*. at 819-821. He told the police that someone had just been shot on Fayette Street and gave them the license plate number. *Id.* Edwards indicated he did not want to get involved and hung up the phone as soon as he gave them license number. *Id*. at 819. Edwards did not give the police his name when he called. *Id*. at 821. When the police called him back, Edwards did give them his name. *Id*. Edwards ended up giving the police a statement and ultimately turned over the envelope to the police. *Id*. at 822, 832-33. On direct examination at trial, Edwards described the shooter as a light skinned male wearing big clothes and having a round face coming down to a little point. *Id*. at 819-20. On cross-examination, Edwards, for the first time, identified Petitioner as the light skinned male he had seen. *Id*. at 834.

At approximately 3:35 p.m. on October 24, 2003, the Syracuse Police received a dispatch call for shooting injuries in front of 1815 East Fayette Street in Syracuse. (T. at 606-07.) Police Officer Rossillo ("Rossillo"), who was only two blocks away, responded to the call. *Id*. at 607. Rossillo found Phillips lying on his side on a grassy area between the sidewalk and the road, barely breathing. *Id*. Phillips was surrounded by a small group of people, several of whom began yelling that he had been shot. *Id*. Phillips, whose breathing was very labored, indicated to

Rossillo that he did not know who shot him. *Id*. at 608. Phillips told Rossillo that he had been shot in the torso, and that the person who shot him was in a dark car. *Id*. at 609. He could not communicate any further because of his condition. *Id*. at 608. Phillips died from the gunshot wound. *Id*. at 900-01.

**C. Investigation and Arrest**

At 3:54 p.m. the afternoon of the shootings, Onondaga County Deputy Sheriff Thomas Praschunus ("Praschunus"), who had received information regarding the shooting on East Fayette Street and a description of the vehicle involved, saw a blue Ford Taurus on Route 81 South while on road patrol duty. (T. at 659-60.) When he got behind the car, Praschunus was able to see that the license plate number on the vehicle was CLD-3283. *Id*. at 660. Praschunus and another deputy stopped the car, which was being driven by Petitioner's friend, Alexander. *Id*. at 660. Petitioner's other friend, McKnight, was a passenger. *Id*. at 660-61.

Two days later, Petitioner became a third suspect in the case. *Id.* at 690. Petitioner lived in Maryland, and with the assistance of Maryland police, Syracuse police officers who had traveled to Maryland, searched a 2003 Ford pickup that had been recovered on October 25, 2003, near Petitioner's mother's home. *Id*. at 690, 743-44. The police recovered a rental agreement in Petitioner's name, his Maryland driver's license, and a military ID card in the glove compartment. *Id*. at 696-97, 702.

When the 2002 blue Ford Taurus with license plate number CLD-3283 was processed by the police, a white customer sticker with Petitioner's name written on it was found on the windshield above the registration, and a Fort Drum pass, gray and red hooded sweatshirts, a blue ski mask, and a repair bill from Sam's Auto body were also found. *Id*. at 675-76.

A Firearms Examiner for the Syracuse Police Department compared the 380 shell casings found at the scene of the Gifford Street and Fayette Street shootings and was unable to establish conclusively that they were fired from one weapon. *Id*. at 610, 617-18, 721-24. However, he was able to determine that the projectiles taken from Gifford Street and the one removed from Phillip's body were all 380 caliber full metal jacket projectiles. *Id*. at 725-26.

A warrant for second degree murder was issued on Petitioner on October 27, 2003. *Id*. at 733. After local law enforcement officials had exhausted all of their leads in a search for Petitioner, they enlisted the help of the U.S. Marshals Service and maintained contact with the Prince George Police Department in Maryland. *Id*. at 735-36. Petitioner ultimately surrendered himself in Prince George County, Maryland and waived extradition. *Id.* at 737.

**D.     Informant Tyree Allen**

In October of 2003, Federal Public Defender, Lisa Peebles ("Peebles") began representing Tyree Allen ("Allen") on a charge of Possession With Intent to Distribute Crack Cocaine in violation of 18 U.S.C. § 841-A.[3] (T. at 848-50.) Allen's federal sentencing guideline range was calculated between forty-one and fifty-six months.[4] *Id*. at 850          .

When Peebles met with Allen after he had pleaded guilty in June of 2004, he gave her some information that led her to contact the Assistant United States Attorney ("AUSA") on Allen's case and tell him that she believed there might be some information the government

---

[3] Allen had prior criminal convictions including convictions for criminal facilitation, aggravated harassment, and criminal possession of a controlled substance in the fifth degree. *Id*. at 904-05, 917-19.

[4] The statutory maximum penalty under the statute under which Allen pleaded guilty is thirty years. *Id.* at 858. However, Peebles testified that as long as the guidelines were constitutional, they would apply in Allen's case. *Id*.

would be interested in that would ultimately assist Allen at sentencing. *Id*. at 851-52. Peebles

was contacted by both the AUSA and Onondaga County District Attorney's office. *Id*. at 852

They held a meeting with Allen, who agreed to testify against Petitioner. *Id*. Peebles explained

that if a defendant who pleads guilty, or is found guilty, after trial has information that could

substantially assist a federal or local prosecutor, the government is able to move for a downward

departure under the sentencing guidelines after the testimony is given, which then frees the court

from the constraints of the sentencing guidelines. *Id*. at 853. According to Peebles, Allen was

required to provide truthful cooperation, full and complete cooperation, in order to warrant any

kind of downward departure. *Id*. at 854.

Allen testified that he was in protective custody with Petitioner in the Justice Center in

Syracuse in or about June of 2004. (T. 866-70.) Allen taught Petitioner to play chess. *Id*. at 871.

Allen recalled Petitioner being jumped by a few guys while the two had been in 4-C pod at the

Justice Center and asked Petitioner why he had been jumped. *Id*. 871-72. According to Allen,

Petitioner told him that the guys thought he had killed someone. *Id*. at 872.

Allen continued to talk to Petitioner about the incident while they were playing chess over

the course of a couple of weeks. *Id*. at 873. At trial, Allen testified that Petitioner had told him

a friend of his got out of the car to get marijuana at a location Allen recognized as Hilltop on East

Fayette Street. *Id*. at 873, 876. Petitioner got out after him to rob the guy from whom his friend

was going to get the marijuana, and when the guy wouldn't give up what he had, Petitioner shot

him and left the scene. *Id*. at 874, 878.

According to Allen, Petitioner told him that his friends were in one vehicle and he and his

brother-in-law were in another when they got on the highway to leave Syracuse after the

shooting. *Id*. at 878. Petitioner saw a helicopter overhead and from his rear-view mirror saw that the guys in the car behind him were pulled over. *Id.* at 878-79. Petitioner kept going back to his hometown. *Id*. at 879. Allen testified that Petitioner told him that he had ultimately turned himself in because he was causing problems for people in his home town. *Id*. at 880.

Allen, who had been incarcerated for thirteen months, acknowledged that his motivation to testify was to get less time, hopefully time served. *Id*.

## III. DIRECT APPEAL AND POST-CONVICTION STATE COURT PROCEEDINGS

### A. Direct Appeal

The issues raised by Petitioner on his direct appeal to the Appellate Division included: (1) prosecutor's violation of the witness-advocate rule, bolstering the credibility of jailhouse informant Allen's testimony by suggesting it had been corroborated, and calling Peebles who recounted the prosecutor's representations as to the informants "truthful" cooperation; (2) insufficiency of the evidence to establish Petitioner's guilt beyond a reasonable doubt and verdicts against the weight of the evidence; (3) prosecutor's violation of Petitioner's Fourteenth Amendment due process rights by his repeated improper and inflammatory remarks during summation; and (4) an excessively harsh and excessive sentence. (Dkt. No. 51 at 4-60.)

In affirming the judgment of conviction, the Appellate Division rejected Petitioner's contention that the County Court had erred in allowing the prosecutor to present Peebles' testimony, and found that the only ground that had been preserved for review with regard to Peebles' testimony was that it was directed at a collateral issue, and that ground lacked merit. The Court found that even if the other grounds had been preserved for review they were without merit because Peebles had testified only that pursuant to his cooperation agreement, Allen was

required to provide truthful testimony, and did not implicitly testify concerning his credibility or usurp the jury's function to assess credibility. *People v. Santana*, 865 N.Y.S.2d 452, 453 (4th Dep't 2008). The Court also concluded that the prosecution was properly allowed to elicit the bolstering aspect of the cooperation agreement because Petitioner had raised the issue of the informant's credibility. *Id.* The Appellate Division rejected Petitioner's argument that the prosecutor had engaged in misconduct on summation by vouching for Allen's credibility because the prosecutor's comments were a fair response to the defense counsel's attack on Allen's credibility in his summation. *Id.*

The Court concluded that Petitioner had failed to preserve for review his remaining contentions with respect to alleged prosecutorial misconduct on summation and declined to exercise its power to review the contentions as a matter of discretion in the interest of justice. *Id*. The Court also found that Petitioner had failed to preserve for appeal his challenges to the sufficiency of the evidence and sentence. *Id*.

The Court of Appeals denied leave to appeal on February 24, 2009. *People v. Santana*, 876 N.Y.S.2d 713 (2009).

**B. Section 440.10 Motion Regarding Ineffective Assistance of Counsel**

On May 18, 2010, Petitioner moved *pro se* to vacate his conviction and for a new trial pursuant to N.Y. Criminal Procedure Law ("CPL") § 440.10 on the grounds of ineffective assistance of counsel. (Dkt. No. 51 at 187.) Petitioner argued that his attorney had been ineffective: (1) by failing to provide him with constitutionally mandated advice on whether to accept the prosecution's twenty-two years to life plea offer and failing to advise him as to his maximum sentencing exposure upon conviction; (2) failure to object to the prosecution's

introduction of prejudicial testimony from Peebles that bolstered Allen's credibility and failure to object to the prosecution's prejudicial summation regarding Allen; and (3) failure to move to dismiss at the close of the prosecution's case based upon the insufficiency of the evidence resulting in the Appellate Division deeming a meritorious issue unpreserved for appellate review. (Dkt. No. 51 at 189-90, 212.)

The motion was denied by the Hon. Joseph E. Fahey, Onondaga County Court Judge, in a Decision/Order entered on September 16, 2010.[5] (Dkt. No. 51 at 225-228.) The court found that denial of the motion on the ground that counsel did not properly advise Petitioner with regard to accepting a plea offer was warranted by CPL § 440.30(4)(d) which provides that upon considering the merits of the motion, the court may deny it where an allegation of fact essential to support the motion (i) is contradicted by a court record or other official court document, or is made solely by defendant and unsupported by any other affidavit or evidence, and (ii) under these and all other circumstances attending the case, there is no reasonable possibility that such allegation is true. *Id*. at 226. The court also analyzed Petitioner's ineffective assistance of counsel argument under relevant Sixth Amendment case law and concluded that Petitioner's

---

[5] Petitioner moved to renew on April 14, 2011. (Dkt. No. 51 at 229.) The new facts relied upon by Petitioner in seeking renewal were transcripts of pre-trial court proceedings referenced by the County Court in its Decision/Order denying Petitioner's § 440.10 motion and a conversation he allegedly had with defense counsel regarding the plea offer during jury selection. *Id*. at ¶¶ 5-12, 16. The motion to renew was denied by the Hon. William D. Walsh, Onondaga County Court Judge, in a September 9, 2011, Decision/Order. (Dkt. No. 51-1 at 41-45.) The denial was based on State procedural grounds including Petitioner's failure to include the alleged discussion with counsel during jury selection on direct appeal or in his § 404.10 motion (CPL § 440.10(3)(c)); failure to preserve the claim for appellate review prior to sentencing (CPL § 440.10(3)(a)); the claim was unsubstantiated and contradicted by the court record or other official document (CPL § 440.30(4)(d)(i)); or there was no reasonable possibility that it was true (CPL § 440.30(4)(d)(ii)). *Id.* at 44. The record does not reflect the filing of a request for leave to appeal the denial of the motion to renew to the Appellate Division.

Sixth Amendment right to the assistance of counsel had not been violated. *Id*.

The court rejected Petitioner's assertion regarding Peebles' testimony and the prosecutor's prejudicial summation on the grounds that the Appellate Division had addressed the issue of Peeble's testimony on Petitioner's direct appeal. *Id* at 226-27. The court also rejected Petitioner's argument that his counsel was ineffective for failing to move to dismiss at the close of the prosecutor's case on the ground that sufficient facts appeared on the record of the proceeding underlying the judgment to permit adequate review on appeal. *See* § 440.10(2)(c).

On March 22, 2011, Petitioner moved for permission to appeal to the Appellate Division from Judge Fahey's Order. (Dkt. No. 51-1 at 46-47.) The Appellate Division granted leave, and Petitioner was represented by counsel on the appeal. *Id*. at 51-1 at 1-6. The only issue raised on the appeal was that the County Court had erred in failing to hold an evidentiary hearing on the plea offer issue. *Id*. at 62, 65-66.

In a Memorandum and Order entered on December 21, 2012, the Appellate Division unanimously affirmed the County Court Order. *Id*. at 163-64. *See People v. Santana*, 956 N.Y.S. 2d 751 (4th Dep't 2012). The Appellate Division concluded that the County Court had properly exercised its discretion in denying Petitioner's motion without a hearing "on the ground that the allegations in support of the motion are made solely by [Petitioner], that those allegations are unsupported by other evidence and that, under all circumstances, there is no reasonable possibility that such allegations are true." *Santan*a, 956 N.Y.S.2d at 752. The Appellate Division noted that Judge Fahey, who had decided Petitioner's § 440.10 motion, had also presided over his criminal trial and was therefore familiar with the facts.

The Hon. Eugene Pigott of the Court of Appeals denied Petitioner's leave to appeal from

the Appellate Division Order on March 22, 2013. *People v. Santana*, 965 N.Y.S.2d 799 (2013).

### C. Section 440.10 Motion Regarding the Prosecution's Failure to Turn Over Information Regarding Edwards' New York Arrests and Guilty Plea

On or about May 7, 2012, Petitioner moved *pro se* to vacate his conviction and for a new trial pursuant to CPL § 440.10 on the grounds that the prosecution violated the rules of discovery at CPL § 240.45 by failing to turn over all information regarding eye witness Edwards' prior arrests and convictions as requested by defense counsel, in violation of Petitioner's right to due process under the Fourteenth Amendment. (Dkt. No. 51-2 at 29, 42-43, 74-75, 83.) Specifically, Petitioner claimed that the prosecution had failed to disclose that Edwards had several arrests in the year leading up to Petitioner's trial and had pleaded guilty to Criminal Possession of Stolen Property in the Third Degree (N.Y. Penal Law § 165.50), a Class D felony.[6] *Id*. at 29-30, 55-58. Petitioner's motion was also construed by the County Court to include a claim of ineffective assistance of counsel based upon defense counsel's alleged failure to fully cross-examine Edwards regarding his criminal history.

Petitioner's motion papers revealed that as a part of the plea agreement on the charges pending against him on July 29, 2004, under which Edwards pleaded guilty, Edwards had agreed to make set restitution payments through October 31, 2005. *Id*. at 55-56. If the payments were made, Edwards would be given a three-year conditional discharge, and if not, he would receive a sentence of five years' probation. *Id*. at 56. In support of his motion, Petitioner submitted a

---

[6] Criminal disposition information from the New York Unified Court System submitted by Petitioner reveals that on January 30, 2004, Edwards had been arrested and charged with two counts of Criminal Possession of Stolen Property in the Fourth Degree (N.Y. Penal Law § 165.45). *Id*. at 79. He was arrested and charged with Criminal Possession of Stolen Property in the Third Degree (N.Y. Penal Law § 165.50) on February 3, 2004. *Id*. at 80.

transcript showing that the restitution payments were made, and Edwards was sentenced to a three-year conditional discharge on December 21, 2005. *Id*. at 68, 71.

Petitioner also raised as grounds for vacating his conviction that: (1) the prosecutor had told the jury Edwards had not been convicted of a crime since he was nineteen or twenty years old; and (2) Edwards had responded "no, not that I know, no" when asked on cross-examination if he had ever been convicted of a felony.[7] *Id*. at 40-41.

Petitioner's defense counsel did not respond to Petitioner's letters of December 20, 2011, and September 10, 2012, asking for an affidavit or a letter affirming that the information regarding Edwards' New York conviction was never turned over to him. Therefore, the only evidence submitted by Petitioner regarding whether the information had been turned over was his own supposition that since his counsel had not cross-examined Edwards on those arrests and the plea, he must not have been aware of them. *Id*. at 42-43, 83, 87-90. In opposition to Petitioner's motion, the prosecution argued that Petitioner had failed to submit evidence supporting his claim that Edwards' rap sheet listing the New York arrests and guilty plea had not been turned over to defense counsel, and that the evidence supported the conclusion that the rap sheet had been given to Petitioner's counsel. (T. 51-2 at 104.) The prosecution pointed out that before opening statements, the trial court ordered the prosecution to give the defense either a NYSID sheet or certified copies of all witnesses' convictions, and since the prosecution's file contained no certified copies of the Florida convictions on which he was questioned extensively by defense counsel, defense counsel must have had the rap sheet that included both the Florida convictions

---

[7] Edwards December 21, 2005, sentencing transcript submitted by Petitioner, suggests that it had been Edwards' understanding that there was not going to be a felony conviction because he had paid restitution. (T. 51-2 at 68.)

and New York arrests and guilty plea. *Id*. at 104-05.

The prosecution asserted that: (1) because Petitioner's factual claims were unsupported by any other evidence and were not supported by the record, his motion could be denied without a hearing; (2) Edwards was not offered a deal in exchange for his testimony; (3) Edwards never agreed to willingly testify and was under subpoena at the time of Petitioner's trial; (4) Edwards had consistently told authorities he did not want to be involved with the prosecution and did not want to testify and had never been called upon to identify the shooter because he had repeatedly denied seeing the shooter; (5) the prosecution had a solid case against Petitioner without Edwards' testimony, and Edwards was called as a witness to give cumulative testimony regarding the license plate and his call to the police; and (6) Edwards had never identified Petitioner as the shooter until defense counsel's cross-examination at trial. *Id*. at 101-02.

Petitioner's motion was denied by the Hon. Thomas J. Miller, Onondaga County Court Judge, in a Decision/Order dated February 13, 2013. *Id*. at 117-128. Judge Miller found that in light of defense counsel's knowledge of Edwards' past criminal history in Florida, there was no basis to conclude that the prosecution had failed to turn over information regarding Edwards' pending New York charges in contravention of their statutory duty. *Id*. at 123. Judge Miller further found that even if he were to accept Petitioner's argument and determine that the prosecution failed to turn over information regarding Edwards' pending charges, Petitioner had failed to establish a reasonable possibility that the failure to disclose the information contributed to the verdict because Edwards' testimony was largely cumulative. *Id*. at 123-24.

The Appellate Division denied Petitioner's motion for permission to appeal from Judge Miller's Order on May 28, 2013. *Id*. at 245.

### D. Petitioner's Federal Habeas Corpus Proceeding

Petitioner filed his original Petition for a writ of habeas corpus on January 31, 2011. (Dkt. No. 1.) Petitioner subsequently filed a letter motion, dated July 14, 2011, requesting a stay in light of his pending § 440.10 motion arguing ineffective assistance of counsel. (Dkt. No. 8.) The Court granted the unopposed stay request by Text Order dated August 12, 2011. By letter of July 6, 2012, Petitioner informed the Court that he had filed the § 440.10 motion based upon the prosecution's failure to turn over information regarding Edwards' prior convictions. (Dkt. No. 17.) On July 19, 2012, Petitioner requested a further stay and permission to include his new claim regarding the failure to turn over the information on Edwards in his original Petition. (Dkt. No. 18.) The Court issued a Text Order on July 25, 2012, informing Petitioner that he would be required to file an amended petition to add a new claim, and that he would have to first file a request to have the stay lifted. On April 24, 2013, Petitioner moved to lift the stay and file an April 19, 2013, amended petition which included new claims for ineffective assistance of counsel with respect to the alleged plea offer and the prosecution's *Brady* violation with regard to failing to turn over information on Edwards' New York arrests and guilty plea. (Dkt. Nos. 23 and 23-1.) The following day, April 25, 2013, Petitioner filed a motion for a stay until proceedings on his § 440.10 motion regarding the alleged failure to turn over information were completed. (Dkt. No. 24.)

Following Petitioner's September, 13, 2013, request that the Dkt. No. 24 motion be disregarded because exhaustion was complete (Dkt. No. 26), the Court issued an Order (Dkt. No. 27) lifting the stay and granting Petitioner leave to file his amended petition. (Dkt. No. 23.) On January 29, 2014, Petitioner filed another motion for leave to amend his petition. (Dkt. No. 31.)

On May 29, 2014, Petitioner filed a motion to amend his proposed amended petition (Dkt. No. 36) and a motion to expand the record. (Dkt. No. 37.) By Decision and Order dated July 16, 2014, the Court granted Petitioner leave to file the amended petition at Dkt. No. 36-1 and directed that it be docketed as Second Amended Petition. (Dkt. No. 40.) The Second Amended Petition was docketed as Dkt. No. 39. The motion to enlarge the record was denied. (Dkt. No. 40.)

Respondent thereafter filed his Answer, state court records, and Memorandum of Law. (Dkt. Nos. 49, 51-52.) On January 27, 2015, the Court granted Petitioner's request (Dkt. No. 53) for an extension of time to file a traverse and directed that it be filed by March 20, 2015. (Dkt. No. 54.) Petitioner filed a Traverse/Reply on March 13, 2015. (Dkt. No. 55.)

## IV. STANDARD OF REVIEW

### A. Exhaustion Requirement under the Antiterrorism and Effective Death Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs applications of incarcerated state court defendants seeking federal habeas corpus relief. *See* 28 U.S.C. § 2254. Before a federal court may consider an application for habeas corpus relief pursuant to 28 U.S.C. § 2254, the petitioner must generally have exhausted all the remedies available in the courts of the state in which he or she was convicted.[8] 28 U.S.C. § 2254(b)(1)(A); *see also Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1399 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas

[8] Exhaustion may be excused where it appears that "there is an absence of available state corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." *See* 28 U.S.C. § 2254(b)(1)(B)(i)-(ii).

relief."); *Jones v. Murphy*, 694 F.3d 225, 246-47 (2d Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1247 (2013) ("Under AEDPA, a prisoner in custody pursuant to a state court judgment must generally exhaust state court remedies before seeking federal habeas corpus review.").

"Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoner's federal rights." *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011) (citation and internal quotation marks omitted); *Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*) (proper exhaustion requires that both the factual and legal premises of claim be "fairly presented" to the state court). "Passage through the state courts, in and of itself, 'is not sufficient.' *Picard* [*v. Connor*, 404 U.S. 270, 275 (1971)]. To provide the State with the necessary 'opportunity,' the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and 'giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.' *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)."[9] *Wilens v. Superintendent of Clinton Correc. Fac.*, No. 11-CV-1938 (JFB), 2014 WL 28995, at *5, 2014 U.S. Dist. LEXIS 182111, at *13 (E.D.N.Y. Jan. 2 2014).[10] Petitioner bears the burden of proving exhaustion. *Colon v. Johnson*, 19 F. Supp. 2d 112, 119-20 (S.D.N.Y. 1998) (citations omitted).

---

[9] Petitioner must seek discretionary review where it is available at the highest state court and raise the same federal constitutional claims. *O'Sullivan*, 526 U.S. at 847-48.

[10] Copies of unreported cases cited herein will be provided to Petitioner. *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

## B. Procedural Default

A state prisoner's procedural default in the state courts will also bar federal review unless the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he or she can demonstrate that the failure to consider the claim will result in a miscarriage of justice.[11] *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A procedural default occurs in one of two ways. "First, if the state prisoner fails to exhaust his state remedies in a manner in which, were he to return to the state courts with his unexhausted claim, those courts would find the claim barred by the application of a state procedural rule," [the habeas court] must deem the claim procedurally defaulted." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (citation and internal quotation marks omitted). "Alternatively, a procedural default occurs if the state court's rejection of a federal claim rests on a state law ground such as the operation of a state procedural rule that is both independent of the federal question and adequate to support the judgment . . . , [and] the last state court rendering a judgment in the case clearly and expressly states that its judgment rest on a state procedural bar." *Id*. (citations and internal punctuation and quotation marks omitted). A

---

[11] A petitioner may demonstrate cause with "a showing that the factual or legal basis for a petitioner's claim was not reasonably available to counsel, . . . or that some interference by state officials made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel." *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Only if a petitioner can establish cause need a court proceed to consider prejudice, which requires a showing of "actual prejudice resulting from the errors of which [petitioner] complains." *United States v. Frady*, 456 U.S. 152, 168 (1982) (internal quotation marks omitted). A fundamental miscarriage of justice involves showing that the petitioner is actually innocent of the crime. *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003).

petitioner's procedural default precludes federal habeas review "if the last state court rendering a judgment in the case rests its judgment on the procedural default." *Harris v. Reed*, 489 U.S. 255, 262 (1989). Where a state court has expressly relied on a procedural default, federal habeas review is foreclosed even if the state court also addressed the merits of the federal claim. *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (federal habeas review barred where state held claim "not preserved for appeal" but then ruled on the merits of the claim "in any event").

**C. Review of State Court Decisions on the Merits Under the AEDPA**

Under the AEDPA, an application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Recognizing the principle that "[s]tate courts are adequate forums for the vindication of federal rights. . . ., AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, ___U.S. ___, 134 S.Ct. 10, 15-16 (2013); *see also Cullen,* 131 S.Ct. at 1398 ("This is a difficult to meet [ ] . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt . . . .") (citation and internal quotation marks omitted).

"For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). Under the

AEDPA, a summary disposition by a state court constitutes a disposition on the merits.

*Harrington v. Richter*, 562 U.S. 86, 99 (2011). Where AEDPA's deferential standard of review applies, "[a] state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence." *Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 131 S.Ct. 1693 (2011). "[A] state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 291 (2010).

In determining whether a state court has adjudicated a claim "on the merits," a federal habeas corpus court must classify the state court decision as either (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law; or (2) fairly appearing to rest primarily on state procedural law. *Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006). Decisions in the first category are deemed to have been made "on the merits" of the federal claim. *Id*.

A decision "on the merits" is contrary to clearly established federal law when it is either contrary to Supreme Court precedent on a question of law or opposite to a relevant Supreme Court case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citation and internal quotation marks omitted). "[F]ederal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). "[C]ircuit precedent

does not constitute clearly established Federal law, as determined by the Supreme Court . . . and cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, ___ U.S. ___, 132 S.Ct. 2148, 2155 (2012) (citation and internal quotation marks omitted).

A state court unreasonably applies federal law when it correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner. *Lockyer*, 538 U.S. at 75. An erroneous application of federal law is not necessarily an unreasonable one.[12] *Williams,* 529 U.S. at 413. "It is settled that a federal habeas corpus may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson*, ___ U.S. ___, 133 S.Ct. 1990, 1992 (2013) (quoting *Richter*, 562 U.S. at 101). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.

Federal habeas corpus review is limited to determining whether petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. §§ 2241(c), 2254(a); *see also Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). Federal habeas relief does not "lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Petitioner has the burden of proving by a preponderance of the evidence that he is in

[12] Nevertheless, as interpreted by the Second Circuit, "although some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Mask v. McGinnis*, 252 F. 3d 85, 89 (2d Cir. 2001).

custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *see also Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S.Ct. at 786. Where a claim has been adjudicated on the merits by a state court, federal habeas review is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S.Ct. at 1398.

## V. ANALYSIS

### A. Prosecution's Alleged Failure to Disclose Edwards' New York Arrests and Guilty Plea

Petitioner seeks to have his conviction and sentence vacated on the grounds that the prosecution failed to turn over impeachment evidence showing prior arrests and a guilty plea by Edwards in violation of his Fourteenth Amendment due process rights as recognized in *Brady v. Maryland*, 373 U.S. 83 (1963). (Dkt. No. 39 at ¶¶ 13, 17-20.) As noted above, the Onondaga County Court denied Petitioner's § 440.10 motion for that relief, and the Appellate Division denied leave to appeal. (Dkt. No. 51-2 at 117-128, 245.)

#### 1. Timeliness of Petitioner's *Brady* Violation Claim

A petitioner must file an application for a writ of habeas corpus within one year of his conviction becoming final. 28 U.S.C. § 2244(d)(1). A conviction becomes final for AEDPA purposes "when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s]," that is ninety days after the final determination by the state court. *Williams v. Artuz,* 237 F.3d 147, 150 (2d Cir. 2001) (citation and internal quotation marks omitted).

The statute of limitations is tolled from the time post-conviction motions like Petitioner's § 440.10 motion addressing the prosecution's alleged *Brady* violation are filed until leave to appeal is denied. 28 U.S.C. § 2244(d)(2); *see also Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000). A post-conviction challenge does not reset the start of any limitations period because a post-conviction motion does not start the one-year period running anew. *Id*. at 16-17. "A state-court collateral attack on a conviction cannot toll an already expired limitations period." *Bell v. Herbert*, 476 F.Supp. 2d 235, 244 (W.D.N.Y. 2007) (citing *Smith*, 208 F.3d at 13, 17.)

The New York Court of Appeals denied Petitioner leave to appeal from the judgment of conviction on February 24, 2009. *See Santana*, 876 N.Y.S.2d 713. The judgment of conviction became final on May 26, 2009, leaving Petitioner one year from that date, or until May 26, 2010, to file a habeas corpus petition. *See* 28 U.S.C. § 2244(d)(1)(A).

When Petitioner filed his first § 440.10 motion arguing ineffective assistance of counsel on May 18, 2010 (Dkt. No. 51 at 187), there were eight days remaining on the one-year statute of limitations. The filing of the motion tolled the statute of limitations until Judge Pigott denied Petitioner's motion for leave to appeal to the Court of Appeals from the Fourth Department's affirmance of the denial of his first § 440.10 motion on March 22, 2013. *See Santana*, 965 N.Y.S.2d 799. Petitioner's initial habeas corpus Petition, dated January 18, 2011, was filed on January 31, 2011, during the period in which the statute of limitations was tolled for Petitioner's first post-conviction motion. (Dkt. No. 1.)

Respondent has argued that when leave to appeal to the Court of Appeals was denied on Petitioner's first § 440.10 motion, thereby ending the toll attributable to that motion, there were

only six days remaining on the one-year statute of limitations, rendering Petitioner's first and second amended petitions, dated April 19, 2013, and May 23, 2014, respectively, untimely. (Dkt. No. 52 at 31-32.) Respondent fails to take into account that Petitioner filed his second § 440.10 motion, the motion arguing a *Brady* violation, on May 17, 2012, while the statute of limitations was tolled for his initial § 440.10 motion. (Dkt. No. 51-2 at 29-44, 97.) The *Brady* violation motion was denied on February 13, 2013. *Id*. at 117-128. A timely motion for leave to appeal was made to the Appellate Division, *id*. at 129, and the Appellate Division did not deny leave to appeal until May 28, 2013. *Id*. at 245. Therefore, the one-year statute of limitations remained tolled until May 28, 2013, rendering Petitioner's first amended petition in which he initially asserted his *Brady* claim, dated April 19, 2013, and filed on April 24, 2013, timely. *See Dupont v. Phillips*, No. 05-CV-3426 (NGG), 2006 WL 1455462, at * 2, 2006 U.S. Dist. LEXIS 32197, at * 8-9 (E.D.N.Y. May 22, 2006) (toll was not lifted upon Court of Appeals' denial of application to appeal from Second Department denial of error coram nobis petition due to the fact that petitioner filed his § 440.10 motion prior to that date, and it was still pending at the time of the denial); *Dominguez v. Portuondo*, No. 02-CV-5885 (PKC), 2004 WL 2002930, at * 3, 2004 U.S. Dist. LEXIS 17894, at * 7 (S.D.N.Y. 2004) (where the pendency of two post-conviction applications overlapped, the AEDPA statute of limitations was tolled during their pendency).

The *Brady* claim in the Second Amended Petition, dated May 23, 2014, and filed on May 29, 2014 (Dkt. Nos. 36-1 and 40), related back to the *Brady* claim asserted in the timely filed on first amended petition and was therefore also timely. (Dkt. No. 23-1.) *See Fama v. Commissioner*, 235 F.3d 804, 815 (2d Cir. 2000) (holding that Fed.R.Civ.P. 15(c), which

provides when an amendment to a pleading relates back to the original pleading in the case, governs motions to amend petitions where the statute of limitations under the AEDPA has run); *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

2. Review of Petitioner's *Brady* Claim on the Merits

Respondent also contends that Petitioner's *Brady* claim should be dismissed on the merits.[13] The Court agrees.

"[T]o the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation grounded in the 14th Amendment to disclose that evidence to the defendant." *DiSimone v. Phillips*, 461 F.3d 181, 192

---

[13] Petitioner brought his second § 440.10 motion under CPL § 240.45 which, *inter alia*, requires the prosecution to turn over information on witnesses' pending criminal actions and criminal convictions to defense counsel. CPL § 240.45(b)(c). In its determination that Petitioner's motion failed on the merits because he had failed to establish a "reasonable possibility" that the failure to disclose the information on Edwards' New York arrests and guilty verdict contributed to the verdict, the County Court relied upon *People v. Jackson*, 578 N.Y.S.2d 483 (1991), which dealt with a state law *Rosario* discovery claim, rather than a Fourteenth Amendment *Brady* claim. Because *Rosario* claims are grounded in state law, they are not cognizable on federal habeas review. *See Chebere v. Phillips*, No. 04 Civ. 296(LAP), 2013 WL 5273796, at * 31 n.19, 2013 U.S. Dist. LEXIS 157697, at * 71-72 n.19 (S.D.N.Y. Sept. 18, 2013) (failure to turn over *Rosario* material is not a basis for federal habeas review). However, Petitioner's motion papers make it clear he also intended to assert a *Brady* violation in his § 440.10 motion, (Dkt. No. 51-2 at 45-52), and the state court was aware that Petitioner had asserted a *Brady* claim. *Id*. at 119. Furthermore, in *Jackson*, the New York Court of Appeals explained that one of the reasons for its holding that a defendant who seeks to vacate a conviction under § 440.10 "must demonstrate a reasonable possibility that the failure to disclose the *Rosario* material contributed to the verdict," *id*. at 490, was that it was the standard currently in use for *Brady* material and allowed for "a certain congruence in the treatment of *Rosario* and *Brady* claims raised by way of CPL 440.10 motions." *Id*. Therefore, the Court finds that the state court decision "fairly appears to rest on federal law or to be interwoven with federal law," *Jimenez*, 458 F.3d at 145, entitling the state court determination to the deferential review afforded under the AEDPA.

(2d Cir. 2006) (citation and internal punctuation and quotation marks omitted); *see also Giglio v. U.S.*, 405 U.S. 150, 154 (1972) ("A finding of materiality of the evidence is required under *Brady*. . . ."). To establish a *Brady* violation, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

The Supreme Court test for a *Brady* violation requires the district court to ask "whether the petitioner has established the prejudice necessary to satisfy the materiality inquiry." *DiSimone,* 461 F.3d at 196. "The touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as resulting in a verdict worthy of confidence." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

a.      County Court's Factual Determination Regarding Disclosure of Edwards' New York Arrests and Guilty Plea

On his *Brady* violation § 440.10 motion, the only evidence presented by Petitioner in support of his claim that the prosecutors failed to turn over impeachment information on Edwards' New York arrests and guilty plea was his own speculation, based largely upon his defense counsel's failure to use the information to impeach Edwards on cross-examination, that it was not provided. (Dkt. No. 51-2 at ¶¶ 52-60.) The County Court's conclusion that the

prosecution had turned over the information was based upon the following evidence: (1) prior to opening statements, the trial court had ordered the prosecution to provide the defense with either a NYSID sheet or certified copy of all convictions for each prosecution witness; (2) the prosecution's indication that its file contained Edwards' rap sheet which referenced both his Florida convictions and the matters pending in New York; (3) and defense counsel's knowledge of the Florida convictions during the trial.[14] *Id*. at 122-23. In addition, the County Court noted that Edwards' testimony revealing he had not been eager to testify for the prosecution and had been told by his own attorney that he did not have to cooperate with the prosecution, supported the prosecution's position that Edwards had not been offered a deal in exchange for his testimony.[15] *Id*. at 123-24.

---

[14] As noted above, in its opposition to Petitioner's motion, the prosecution indicated that because its file contained only the rap sheet and not certified copies of Edwards' Florida conviction, compliance with the trial court's order would have required turning over the rap sheet. (Dkt. No. 51-2 at 104.) The prosecution reasoned that since defense counsel knew of the Florida convictions, he must have had Edwards' rap sheet. *Id*.

[15] According to the prosecution, Edwards never willingly agreed to testify and was under subpoena. (Dkt. No. 51-2 at 101.) Throughout his trial testimony, Edwards made it clear that he had not wanted to get involved and testified that the police had not asked him to describe the individuals involved in the shooting because he had made it clear he did not want to get involved. (Dkt. No. 51-6 at 23-24.) On cross-examination, when asked if he wanted to look at a statement he had given police, Edwards testified:

> No. You don't got to show me. I'm just saying, at my house I didn't do too much talking. Downtown I did. Just like I'm gonna say again, I didn't wanna get involved with this because you know, I told my lawyer, I said, I feel kind of bad. I really do feel bad because I saw the guy who shot the guy. I did. And that's him there, sitting at that table right there [indicating Petitioner].

*Id*. at 26.

On habeas review, the County Court's factual determination that Edwards' rap sheet containing information on the New York arrests and guilty plea was given to defense counsel is presumed to be correct "a presumption that may be rebutted only by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The County Court's factual determination can be shown to be unreasonable only if "reasonable minds could not disagree that the court misapprehended or misstated material aspects of the record in making its finding." *Cardoza v. Rock,* 731 F.3d 169, 178 (2d Cir. 2013). The Court finds that neither standard has been met.

Petitioner has argued that the County Court's failure to hold an evidentiary hearing on the issue of whether defense counsel was advised of Edwards' New York arrests and guilty plea provides grounds for vacating his conviction. (Dkt. No. 55 at ¶ 34.) The Supreme Court has recognized that the Constitution does not compel states to provide post-conviction proceedings for relief. *Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 402-03 (2001) (citing cases). Accordingly, federal habeas relief is not available to address alleged procedural errors, including the allegedly erroneous failure to hold an evidentiary hearing, in state post-conviction proceedings. *See Word v. Lord*, 648 F.3d 129, 132 (2d Cir. 2011) (per curiam) ("[A]lleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a postconviction mechanism for seeking relief."); *Millington v. Lee*, No. 11 Civ. 499(LGS)(DCF), 2015 WL 1402133, at * 10, 2015 U.S. Dist. LEXIS 188542, at * 25 (S.D.N.Y. Aug. 14, 2014) (finding that petitioner's claim regarding the state's failure to hold an evidentiary hearing in his post-conviction proceeding was not cognizable in a federal habeas proceeding because alleged errors in post-conviction proceedings are not grounds for § 2254

review); *West v. Uhler*, No. 9:12-cv-01611-JKS, 2014 WL 3895235, at *7, 2014 U.S. Dist. LEXIS 109386, at * 22 (N.D.N.Y. Aug. 8, 2014) (same).

b. Materiality of Edwards' New York Arrests and Guilty Plea

As discussed above, the test of materiality established by the Supreme Court for purposes of determining *Brady* violations is "whether in [the] absence [of the undisclosed evidence the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *See Kyles*, 514 U.S. at 434.

The County Court concluded that even if it were to accept Petitioner's assertion that the prosecution failed to turn over impeachment evidence, Petitioner failed to establish a reasonable possibility that the failure to turn over the information contributed to the guilty verdict, given that Edwards' testimony against Petitioner was largely cumulative. (Dkt. No. 51-2 at 123-24.) The court noted Williams' testimony identifying Petitioner as the shooter on Gifford Street and stating he got into a blue vehicle before leaving the scene; the number of the license plate written down by Moore at the Gifford Street shooting; two witnesses who observed the shooting on East Fayette Street and saw the shooter entering a blue vehicle before leaving the scene; Wilson's recording of the license plate of the blue vehicle; and Allen testifying that Petitioner admitted killing a drug dealer on East Fayette Street. *Id*. *See Leka*, 257 F.3d at 104 ("materiality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted.").

The Court finds the County Court's determination on the merits of Petitioner's *Brady* claim to be well supported by the evidence in the record and in accord with *Brady*. The Court

also concludes that even if the information regarding Edwards' New York arrests and guilty plea was not turned over to defense counsel, Petitioner was not deprived of a fair trial as a result, nor was the verdict thereby rendered unworthy of confidence. *See Leka*, 257 F.3d at 104. Furthermore, given the overwhelming evidence against Petitioner, it cannot be said that the prosecutor's statement in his summation to the effect that Edwards' only criminal conduct was many years ago in Florida "had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994).

### B. Plaintiff's Claim of Inadequate Assistance of Counsel in Connection with An Alleged Plea Offer and Failure to Impeach a Witness

#### 1. <u>Ineffective Assistance of Counsel</u>

In his § 440.10 motion seeking to have his conviction vacated on ineffective assistance of counsel grounds, Petitioner stated in his supporting Affidavit that before trial, the prosecutor had offered him a plea of twenty-two years to life in full satisfaction of the charges against him. (Dkt. No. 51 at ¶ 33.) According to Petitioner, defense counsel failed to provide him with any advice on accepting the plea and never told him he should accept the plea or that it would in his best interest to do so. *Id*. at ¶ 34. Petitioner also claimed that defense counsel had never explained the strengths or weaknesses of his case or informed him of the maximum sentence he faced if he was convicted. *Id*. at ¶ 35. Petitioner submitted no evidence of the claimed plea offer beyond his own assertion that such a plea had been offered. *Id*. at 189-99. Nor did Petitioner provide specific details regarding when the plea offer had been made, the manner in which it was conveyed by the prosecutor, or his counsel's alleged failure to advise him with regard to the plea bargain. *Id*. Petitioner stated in his Memorandum of Law that had he "been alerted to his

chances at trial, or advised that it was in his best interest to accept the plea bargain, he would have accepted the prosecution's offer and pled guilty." *Id*. at 207. However, the state evidentiary record is devoid of support for that statement.

The § 440.10 motion was denied by the County Court in part under CPL § 440.30(4)(d) which provides that upon considering the merits of a § 440.10 motion, the court may deny the motion without a hearing where an allegation of fact essential to support the motion (i) is contradicted by a court record or other official court document, or is made solely by defendant and unsupported by any other affidavit or evidence, and (ii) under these and all other circumstances attending the case, there is no reasonable possibility that such allegation is true. *Id*. at 226. The court also found there was no evidence that Petitioner's Sixth Amendment right to counsel had been violated. *Id*. The Appellate Division made the same findings under CPL § 440.30(4)(d) as the County Court.[16] *Santan*a, 965 N.Y.S.2d at 752.

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const., amend VI.

---

[16] There appears to be a split of authority in the Second Circuit as to whether the denial of a motion pursuant to § 440.30(4)(d) is an "independent and adequate" state procedural bar or a merits based decision. *See, e.g.*, *Ahmed v. Portuondo*, No. 99-cv-5093, 2002 WL 1765584, at 1-2, 2002 U.S. Dist. LEXIS13953, at * 7 (E.D.N.Y. July 26, 2002) ("Where "trial court, on the CPL § 440 motion, . . . relied on the adequate and independent state law ground that petitioner failed to support [his] claim with any evidence or sworn affidavits beyond his own," citing § 440.30(4)(d), petitioner's habeas claim is "subject to a procedural bar."); *see contra*., *Skinner v. Duncan*, No. 01 Civ. 6656, 2003 WL 21386032, at * 28 (S.D.N.Y. June 17, 2001) (Peck, M.J) ("Because § 440.30(4)(d) specifically states that '[u]pon considering the merits of the motion, the court may deny it without a hearing' . . ., it is a "merits based decision, not a procedural bar." The Court tends to agree with those decisions finding the decision to be merit based and for the reasons set forth herein concludes that the failure to hold an evidentiary hearing provides no basis for habeas relief.

"[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The Sixth Amendment right to counsel extends to the plea-bargaining process and sentencing. *Lafler v. Cooper*, ___ U.S. ___,132 S.Ct. 1376, 1384 (2012). To prevail on an ineffective assistance of counsel claim in connection with a guilty plea, a habeas petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a showing that his or her counsel's performance was deficient, and that the deficient performance caused actual prejudice to the petitioner. *Hill v. Lockhart*, 474 U.S. 52 (1985).

The Supreme Court has found the *Strickland* test applicable to claims of ineffective assistance of counsel in connection with the consideration of plea offers that lapse or are rejected. *See Missouri v. Frye*, ___ U.S. ___, 132 S.Ct. 1399, 1408 (2012) (while declining to specifically define and enumerate the Sixth Amendment obligations of counsel in the context of lapsed or rejected plea offers, the Court held, "as a general rule, counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused.")

The transcripts of pre-trial proceedings submitted by Petitioner reveal no plea offer or plea negotiations, and the prosecutor has denied that an offer of twenty-two years to life was ever made to Petitioner. (Dkt. No. 51-1 at 10-23, 31.) Petitioner has offered nothing more than his own claim that the offer was made. The Court therefore finds that the state court's factual determination that there was no reasonable possibility that Petitioner's allegation regarding a plea offer was true has not been rebutted by clear and convincing evidence by Petitioner in this

proceeding. *See Bierenbaum*, 607 F.3d 36, 48 (2d Cir. 2010). It is thus presumed to be correct and found by the Court to be reasonable in light of the evidence. *Id*.

Given the absence of evidence of a plea offer, there is no factual basis for a determination that Petitioner's defense counsel provided ineffective assistance of counsel with respect thereto under the standard set forth in *Strickland*. Therefore, the Court concludes that Petitioner is not entitled to habeas relief on his Sixth Amendment ineffective assistance of counsel claim.

2. Failure to Impeach a Witness

The County Court construed Petitioner's § 440.10 *Brady* motion to include a Sixth Amendment claim of ineffective assistance of counsel based upon defense counsel's failure to fully cross-examine Edwards regarding his prior criminal history. (Dkt. No. 51-2 at 124.) The state court denied the motion on the grounds that the record evidence failed to support Petitioner's claim with regard to the Edward's cross-examination and showed that defense counsel "was thoroughly familiar with the underlying facts of the case, made sufficient pretrial motions, delivered appropriate opening and closing statements, raised appropriate objections, cross-examined the prosecution witnesses, and effectively presented a defense witness in furtherance of a reasonable trial strategy in the face of strong opposing evidence." *Id*. at 124-27.

Petitioner's own Affidavit refutes a Sixth Amendment ineffective assistance claim with regard to Edward's cross-examination:

> 10. Also, during the cross-examination of eyewitness Anthony Edwards, my attorney meticulously asked him about each of his prior arrests which were all in Florida and at least twenty years old. Here is a vivid example of my attorney's thorough and aggressive nature regarding witnesses' prior arrests

> [transcript of a portion of defense counsel's cross-examination of Edwards]. To assume that my lawyer was made aware of Mr. Edward's pending felony matter this Court would also have to believe that such competent counsel totally contravened his usually thorough approach by completely overlooking such a glaring possible motivation for a first time in-court identification.

*Id*. at 85. Petitioner presented no evidence that defense counsel's cross-examination of Edwards was deficient. Furthermore, he failed to establish prejudice as a result of the cross-examination for the same reasons he failed to establish prejudice with regard to the prosecutor's alleged *Brady* violation. Therefore, the Court concludes that Petitioner's Sixth Amendment claim of ineffective assistance of counsel with regards to the Edwards' cross-examination provides no basis for habeas relief under the standards set forth in *Strickland*.

### C. Prosecutor's Alleged Violation of the Confrontation Clause, Witness-Advocate Rule, and Hearsay Rule in Allowing Peebles' Testimony

Petitioner contends that the prosecution violated the Sixth Amendment Confrontation Clause, the witness-advocate rule, and the hearsay rule by calling Peebles to testify regarding the cooperation agreement witness Allen entered into with the AUSA and prosecution. (Dkt. No 39 at ¶¶ 23-25.) Petitioner raised these claims on direct appeal to the Appellate Division. (Dkt. No. 51 at 30-34.) The Appellate Division, in the last-reasoned state court opinion on the issue, held that the claims were procedurally barred because they had not been preserved at trial and, alternatively, that the claims had no merit.[17] *Santana*, 865 N.Y.S.2d at 453.

---

[17] As noted above, when the state court has expressly relied on a procedural default, federal habeas review is barred even if, as in this case, the state court addressed the merits of the federal claim. *Green*, 414 F.3d at 294.

1. Petitioner's Claims Relate to Peebles' Testimony are Procedurally Barred

Federal habeas review is barred where the last-reasoned opinion of the state court "rest[s] not only on an independent procedural bar under state law, but also one that is 'adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (quoting *Jiminez*, 458 F. 3d at 138). To be considered adequate, a state procedural bar must be one that "is firmly established and regularly followed by the state in question in the specific circumstances presented in the instant case." *Id*. at 192 (quoting *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006).

The New York preservation rule has been determined to be an adequate and independent state law ground precluding federal habeas review. *See Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007) ("[I]n accordance with New York case law, application of the state's preservation rule is adequate i.e., firmly established and regularly followed"); *see also Dell'Aera v. James*, No. 12-CV-00344 (JFB), 2012 WL 6632673, at * 9, 2012 U.S. Dist. LEXIS 180290, at * 26 (E.D.N.Y. Dec. 20, 2012) ("New York's preservation doctrine that in order to preserve a particular issue for appeal, a party must specifically alert the trial court to that issue at the time it arises is firmly established and regularly followed."); *People v. Rodriguez*, 850 N.Y.S.2d 26, 26 (1st Dept. 2008) (Confrontation Clause claims must be preserved through specific contemporaneous objections at trial).

The Court finds that the preservation rule relied upon by the state court constituted an independent and adequate state procedural ground that bars federal habeas review of Petitioner's claims related to Peebles' testimony in this case.[18] In order to avoid the bar, Petitioner must

[18] Furthermore, having considered the factors set forth in *Cotto v. Hebert*, 331 F.3d 217, 240 (2d Cir. 2003), the Court concludes that the Appellate Division did not apply the

"demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice" that would allow the federal habeas court to review the claims on their merits. *Coleman*, 501 U.S. at 750.

To demonstrate cause for a procedural default, a petitioner must establish that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," for example, by showing that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials . . . made compliance impracticable." *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citing *Reed v. Ross*, 468 U.S. 1, 16 (1984) and quoting *Brown v. Allen*, 344 U.S. 443, 486 (1953)). "[A] defense counsel's ineffectiveness in failing to properly preserve for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel." *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001). Furthermore, any such ineffective assistance claim must itself have been exhausted in state court before it can be used to support a finding of cause for default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

To demonstrate prejudice, a petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

---

preservation rule in an exorbitant manner.

A miscarriage of justice is demonstrated only in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray,* 477 U.S. at 496; *see also House v. Bell*, 547 U.S. 518, 537 (2006) (to overcome procedural default based on a miscarriage of justice, petitioner must demonstrate that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.")

Petitioner has failed to demonstrate cause for the default, making it unnecessary for the Court to consider prejudice. Petitioner has also failed to demonstrate a miscarriage of justice. Therefore, the Court finds that federal habeas review of Petitioner's claims related to Peebles' testimony are barred.

2. The Merits

Even if this Court were to consider the merits of Petitioner's Confrontation Clause,[19] witness-advocate rule, and hearsay rule claims, habeas relief would not be warranted. As the Appellate Division found on Petitioner's direct appeal, Peebles "did not testify that she or any prosecutor believed [Allen] or his account of defendant's crimes to be credible. Rather, she testified only that, pursuant to his cooperation agreement, [Allen] was required 'to provide truthful cooperation' at defendant's trial in order to receive a downward departure in his federal sentence." *Santana*, 865 N.Y.S.2d at 453; *see also* Dkt. No. 51-6 at 40-58. Furthermore, as noted by the Appellate Division, when Peebles testified, Allen had not yet given his testimony, so

[19] The Sixth Amendment's Confrontation Clause provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend, VI.

that she could not and did not offer any opinion on whether Allen had provided such "truthful cooperation." *Id.* Based upon the foregoing, this Court concludes that the Appellate Division correctly found that Peebles did not implicitly testify concerning Allen's credibility in violation of the Confrontation Clause.

The witness-advocate rule is found in Rule 3.7 of the New York State Rules of Professional Conduct, N.Y. Comp.Codes R. & Regs. Tit. 22, § 1200.00. The rule sets forth restrictions concerning when an attorney may act as an advocate in a matter in which he or she is likely to become a witness. Federal habeas review is limited to determining whether the petitioner is in custody in violation of the Constitution, laws or treaties of the United States. *See* 28 U.S.C. §§ 2241(c), 2254(a). Hearsay rules are state evidentiary rules, and "federal habeas review of state court evidentiary rulings [is] limited to determining whether the alleged error rose to the level of a constitutional violation." *George v. Lord*, 334 F. Supp. 2d 327, 333 (E.D.N.Y. 2004). Inasmuch as Petitioner's Confrontation Clause claim is found to be without merit, there is no basis for federal habeas review of Petitioner's witness advocate rule and hearsay rule claims.

**WHEREFORE**, based upon the foregoing, it is hereby

**RECOMMENDED**, that the Second Amended Petition for a writ of habeas corpus (Dkt. No. 39) be **DENIED** and **DISMISSED**. The Court finds that Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) (2006) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, the Court recommends that no certificate

of appealability issue with respect to any of Petitioner's claims; and it is hereby

**ORDERED**, that the Clerk's Office provide Petitioner with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: April 21, 2015
Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge


Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Saleh A. AHMED, Petitioner,
v.
Leonard A. PORTUONDO, Respondent.

No. 99 CV 5093(NG).
July 26, 2002.

Following affirmance of his conviction for second degree murder and criminal possession of weapon and denial of his post-conviction motions, petitioner sought writ of habeas corpus. The District Court, Gershon, J., held that: (1) federal habeas court could not review state trial court's determination that trial counsel was not ineffective for failing to call potential witnesses; (2) petitioner's claim for the first time in his habeas corpus petition that trial counsel was ineffective for failing to request mental examination was procedurally barred from habeas review; (3) trial counsel was not ineffective for failing to cross-examine detective; (4) trial counsel was not ineffective for failing to obtain the criminal record of prosecution witness; (5) trial counsel was not ineffective for failing to investigate a prior burglary in murder defendant's apartment building; (6) prosecutor's closing comments implying that defendant fabricated his testimony in order to force court to submit lesser included offenses to jury did not require reversal; and (7) trial court's instruction to the jury, which petitioner alleged impliedly agreed with the prosecutor that the lesser included charges were not valid, did not warrant reversal of conviction.

Petition denied.

West Headnotes

**[1] Habeas Corpus 197 422**

197 Habeas Corpus
197I In General
197I(D) Federal Court Review of Petitions by State Prisoners
197I(D)6 State's Reliance on or Waiver of Procedural Bar or Want of Exhaustion
197k422 k. State Court Decision on Procedural Grounds, and Adequacy of Such Independent State Grounds. Most Cited Cases

**Habeas Corpus 197 450.1**

197 Habeas Corpus
197II Grounds for Relief; Illegality of Restraint
197II(A) Ground and Nature of Restraint
197k450 Federal Review of State or Territorial Cases
197k450.1 k. In General. Most Cited Cases

Federal habeas courts may not review state court decisions that are based on adequate and independent state grounds.

**[2] Habeas Corpus 197 365**

197 Habeas Corpus
197I In General
197I(D) Federal Court Review of Petitions by State Prisoners
197I(D)4 Sufficiency of Presentation of Issue or Utilization of State Remedy
197k362 Particular Remedies or Proceedings
197k365 k. Coram Nobis,

Post-Conviction Motion, or Similar Collateral Proceedings. Most Cited Cases

Federal habeas court could not review state trial court's determination that trial counsel was not ineffective for failing to call potential witnesses, where state court had relied on the adequate and independent state ground that petitioner failed to support the claim with any evidence or sworn affidavits beyond his own, and petitioner failed to fully identify any potential witnesses and failed to supply any substantial information regarding the potential testimony of these witnesses.

**[3] Habeas Corpus 197 ⚷363**

197 Habeas Corpus
197I In General
197I(D) Federal Court Review of Petitions by State Prisoners
197I(D)4 Sufficiency of Presentation of Issue or Utilization of State Remedy
197k362 Particular Remedies or Proceedings
197k363 k. Review by Highest State Court. Most Cited Cases

**Habeas Corpus 197 ⚷378**

197 Habeas Corpus
197I In General
197I(D) Federal Court Review of Petitions by State Prisoners
197I(D)4 Sufficiency of Presentation of Issue or Utilization of State Remedy
197k374 Availability and Effectiveness of State Remedies
197k378 k. Availability at Time of Petition. Most Cited Cases

To satisfy exhaustion requirement, that before federal court may review claim raised in petition for habeas corpus, petitioner must exhaust that claim in the state courts, petitioner must have presented the substance of his federal claims to the highest court of the pertinent state, and if petitioner has failed to exhaust claim and no longer has any remedy available in state courts, claim will be deemed exhausted but procedurally barred.

**[4] Habeas Corpus 197 ⚷365**

197 Habeas Corpus
197I In General
197I(D) Federal Court Review of Petitions by State Prisoners
197I(D)4 Sufficiency of Presentation of Issue or Utilization of State Remedy
197k362 Particular Remedies or Proceedings
197k365 k. Coram Nobis, Post-Conviction Motion, or Similar Collateral Proceedings. Most Cited Cases

**Habeas Corpus 197 ⚷378**

197 Habeas Corpus
197I In General
197I(D) Federal Court Review of Petitions by State Prisoners
197I(D)4 Sufficiency of Presentation of Issue or Utilization of State Remedy
197k374 Availability and Effectiveness of State Remedies
197k378 k. Availability at Time of Petition. Most Cited Cases

Petitioner's claim for the first time in his habeas corpus petition that trial counsel was ineffective for failing to request mental examination was procedurally barred from habeas review, where petitioner failed to present the claim in postconviction motion in state court, and he no longer had any remedy available in the state courts for the claim.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1765584 (E.D.N.Y.)
**(Cite as: 2002 WL 1765584 (E.D.N.Y.))**

**[5] Criminal Law 110 ☜1925**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1925 k. Examination of Witnesses. Most Cited Cases
        (Formerly 110k641.13(6))

Trial counsel was not ineffective for failing to cross-examine detective regarding her police report describing a broken lock and chain on murder defendant's apartment door, where defendant himself never testified about a broken lock and chain on his apartment door, or how it affected his mistaking his wife for burglar, and defendant failed to demonstrate how eliciting the fact from the officer would have affected jury's decision. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ☜1905**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1905 k. Discovery. Most Cited Cases
        (Formerly 110k641.13(6))

**Criminal Law 110 ☜1935**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1935 k. Impeachment or Con-

tradiction of Witnesses. Most Cited Cases
        (Formerly 110k641.13(6))

Trial counsel was not ineffective for failing to obtain the criminal record of prosecution witness, where at trial, counsel directed his cross-examination of witness towards casting doubt on the reliability of witness' identification of defendant as defendant exited the apartment building on the morning of the killing, and that decision did not lack strategic or tactical justification, and witness' criminal record contained only one conviction for a misdemeanor that occurred 17 years prior to defendant's trial, so it was unlikely that the jury would have been affected by this evidence, even assuming it had been admitted by the trial judge. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ☜1891**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1891 k. Preparation for Trial. Most Cited Cases
        (Formerly 110k641.13(6))

Trial counsel was not ineffective for failing to investigate a prior burglary in murder defendant's apartment building, which defendant alleged would have supported his defense that he shot his wife because he mistook her for a burglar, where defendant failed to provide any evidence, beyond his own allegations, that a prior burglary occurred, or that it would provide any basis for his mistaking his wife for a burglar. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ☜1171.1(2.1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

110k1171 Arguments and Conduct of Counsel
110k1171.1 In General
110k1171.1(2) Statements as to Facts, Comments, and Arguments
110k1171.1(2.1) k. In General. Most Cited Cases

To show that prosecutor's arguments constituted misconduct sufficient to require reversal, defendant must demonstrate that the alleged misconduct during summation caused substantial prejudice to defendant, and to make determination regarding the alleged prejudice, court will consider gravity of the misconduct, curative measures taken by trial court, and certainty of conviction absent the improper comments; the allegedly improper comments must be reviewed within the context of the entire trial, and court must also take into account defense counsel's remarks to see if prosecutor's remarks were invited, and did no more than respond substantially in order to "right the scale."

**[9] Habeas Corpus 197 ⚷497**

197 Habeas Corpus
197II Grounds for Relief; Illegality of Restraint
197II(B) Particular Defects and Authority for Detention in General
197k497 k. Prosecutorial and Police Misconduct; Argument. Most Cited Cases

Prosecutor's closing comments implying that defendant fabricated his testimony in order to force court to submit lesser included offenses to jury were unlikely to have caused murder defendant substantial prejudice and were unlikely to have affected jury's verdict, and thus, comments did not require federal habeas relief, where the prosecutor's comments were in response to defense counsel's implication that defendant did not intentionally kill his wife, court gave curative instruction, and there was strong evidence of guilt.

**[10] Habeas Corpus 197 ⚷498**

197 Habeas Corpus
197II Grounds for Relief; Illegality of Restraint
197II(B) Particular Defects and Authority for Detention in General
197k498 k. Instructions. Most Cited Cases

Trial court's instruction to the jury that "the law requires that when the Judge submits to the jury a greater crime such as murder in the second degree, he must also submit to the jury in the alternative any other lesser crimes included" did not warrant federal habeas relief, where the instruction was one of many contained in a lengthy, detailed, and thorough jury charge, and the jury was instructed that it was not to take any of the court's statements or questions as "indicative that [the court has] any opinion in this case one way or another."

**[11] Habeas Corpus 197 ⚷498**

197 Habeas Corpus
197II Grounds for Relief; Illegality of Restraint
197II(B) Particular Defects and Authority for Detention in General
197k498 k. Instructions. Most Cited Cases

Petitioner, in order to obtain habeas corpus relief on a jury charge claim, must demonstrate not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to petitioner by Fourteenth Amendment; contested instruction may not be viewed in isolation, but must be viewed in the context of the charge as a whole to determine whether the ailing instruction by itself so infected entire trial that resulting conviction violated due process. U.S.C.A. Const.Amend. 14.

Pro se, for plaintiff.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1765584 (E.D.N.Y.)
**(Cite as: 2002 WL 1765584 (E.D.N.Y.))**

Morgan J. Dennehy, for defendant.

ORDER

GERSHON, District J.

**\*1** On May 30, 1995, after a jury trial in New York Supreme Court, Kings County (Kriendler, J.), *pro se* petitioner was convicted of Murder in the Second Degree (N.Y. Penal Law § 125.25(1)) and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01(1)). He was sentenced to concurrent terms of twenty-five years to life for the murder count and one year for the weapon possession count.

Petitioner, by counsel, appealed his conviction to the Appellate Division, Second Department, claiming that he was denied his right to a fair trial when the prosecutor argued during summation that petitioner fabricated his testimony in order to force the court to submit lesser included crimes to the jury. Petitioner further claimed that the court augmented the error by instructing the jury that it was required by law to submit the lesser included crimes.

Petitioner also filed a *pro se* supplemental brief arguing that he was deprived of effective assistance of trial counsel because counsel: (1) failed to interview potential defense witnesses; (2) failed to investigate a prior burglary in petitioner's apartment building; (3) did not meet with petitioner until the day of trial; (4) failed to effectively cross-examine a witness; and (5) failed to obtain the criminal record of a witness. Petitioner additionally claimed that the evidence was insufficient to prove his guilt beyond a reasonable doubt.

The Appellate Division affirmed the conviction on October 6, 1997. *People v. Ahmed,* 243 A.D.2d 482, 664 N.Y.S.2d 559 (2d Dep't 1997), *lv. denied,* 91 N.Y.2d 888, 669 N.Y.S.2d 2, 691 N.E.2d 1028 (1998). The court held that petitioner failed to preserve his

insufficient evidence claim, and in any event the claim lacked merit. The court stated:

> The defendant failed to preserve for appellate review his argument that the evidence was legally insufficient to establish the intent element of the charge of murder in the second degree (*see,* CPL 470.05(2)). In any event, viewing the evidence in the light most favorable to the prosecution (*see, People v. Contes,* 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt (*see, People v. Hogan,* 219 A.D.2d 672, 631 N.Y.S.2d 405; *People v. Ruiz,* 211 A.D.2d 829, 622 N.Y.S.2d 97).

The Appellate Division held that, to the extent petitioner based his ineffective assistance of counsel claim on matters not in the record, the claim was not reviewable. To the extent that the claim was reviewable, the court held that the claim lacked merit. The court further held that petitioner's remaining claims were either unpreserved for appellate review or did not warrant reversal.

Petitioner, acting *pro se,* then moved in Supreme Court, Kings County, to vacate his conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10(1)(h). Petitioner claimed that he was denied effective assistance of trial counsel because counsel failed to: (1) contact seven potential defense witnesses; (2) investigate a prior burglary in petitioner's apartment building; (3) effectively cross-examine a prosecution witness; (4) investigate the criminal history of a prosecution witness; and (5) advise petitioner of a plea offer. Petitioner further claimed that the evidence was insufficient to support his murder conviction. The court denied petitioner's motion to vacate, holding that, pursuant to CPL § 440.30(4)(d), petitioner's ineffective assistance of counsel claims were unsupported by sufficient sworn allegations of fact other than his own, that petitioner failed to demonstrate how defense counsel's alleged failures preju-

Page 6

Not Reported in F.Supp.2d, 2002 WL 1765584 (E.D.N.Y.)
**(Cite as: 2002 WL 1765584 (E.D.N.Y.))**

diced petitioner, and that there was no reasonable possibility that petitioner's allegations were true. The court further held that petitioner received effective assistance of counsel, and that petitioner failed entirely to substantiate his claim that defense counsel failed to convey a plea offer. Finally, the court held that, pursuant to the Appellate Division's decision, petitioner's insufficient evidence claim was procedurally barred. Petitioner was denied leave to appeal this decision by the Appellate Division on May 26, 1999.

***2** Petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner claims that he was denied effective assistance of trial counsel, that the evidence was insufficient to support his murder conviction, that the prosecutor's argument on summation that petitioner fabricated his testimony in order to force the court to submit lesser included crimes to the jury was improper, that the court's charge to the jury regarding lesser included crimes was erroneous, and that the sentence imposed by the trial court was excessive. For the reasons stated below, the petition is denied.

*Facts*

There was no dispute at the trial as to whether petitioner had shot and killed his wife, only whether the evidence demonstrated that he intended to do so. The evidence, including testimony of petitioner, taken in the light most favorable to the prosecution, established the following: Petitioner awoke in the morning to a noise in the apartment, shot his wife five times in the head, neck, and hand, and then left the apartment without seeking medical treatment for his wife. Petitioner claimed that he "automatically" mistook his wife for an intruder and fired the shots, even though petitioner lived with his wife and two children. T.Tr. at 424. Expert testimony indicated that petitioner's wife was in a "cringing" or "bent over" position when one of the bullets entered her body, T.Tr. at 325–326, that petitioner's wife suffered multiple "blunt impact injuries," T.Tr. at 337, and that her body hitting the floor after being shot could not by itself have caused the "blunt impact injuries." T.Tr. at 336–337. Ballistics evidence indicated that the bullets fired in the apartment were found in multiple locations. The gun was never retrieved because. according to petitioner, he lost the gun sometime after leaving the apartment. Petitioner testified that he was dressed only in his underwear when he woke up, but petitioner was seen exiting the apartment building shortly after the shooting dressed in a sport coat and pants. Additionally, after shooting his wife and leaving the apartment, petitioner went to a mosque, and then went to work, telling his boss that he was late because he had come from his brother's house in Queens.

*Claims Subject to Bar*

[1][2] Federal courts may not review state court decisions that are based on adequate and independent state grounds. *Fama v. Commissioner of Correctional Services,* 235 F.3d 804, 809 (2d Cir.2000). *See Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Here, the trial court, on the CPL § 440 motion, in rejecting petitioner's claim that his trial counsel was ineffective for failing to call a number of potential witnesses, relied on the adequate and independent state ground that petitioner failed to support this claim with any evidence or sworn affidavits beyond his own. Petitioner, both in this petition and in his CPL § 440.10 motion, not only fails to fully identify any potential witnesses, but also fails to supply any substantial information regarding the potential testimony of these witnesses. Therefore, petitioner's claim that counsel was ineffective based on failure to call potential defense witnesses is subject to a procedural bar and, in any event, is without merit.

***3** Likewise, petitioner's insufficient evidence claim is procedurally barred. The Appellate Division expressly held petitioner's claim that the evidence was insufficient to establish his guilt was unpreserved under CPL § 470.05(2). In fact, petitioner concedes that respondent "correctly argued" that counsel failed to comply with the contemporaneous objection requirement of § 470.05(2). The fact that the Appellate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Division expressed an alternative holding on the merits does not defeat the procedural bar. *See Fama,* 235 F.3d at 811 n. 4; *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990).

[3][4] In addition, before a federal court may review a claim raised in a petition for habeas corpus, a petitioner must exhaust that claim in the state courts. *See Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991). In order to satisfy the exhaustion requirement, "a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.' " *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (quoting *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir.1990)). If a petitioner has failed to exhaust a claim and no longer has any remedy available in the state courts, the claim will be deemed exhausted but procedurally barred. *Bosset,* 41 F.3d at 828; *Grey,* 933 F.2d at 120. Here, petitioner claims for the first time in his habeas corpus petition that trial counsel was ineffective for failing to request a CPL § 730 mental examination. Since petitioner failed to present this claim in his CPL § 440.10 motion, he no longer has any remedy available in the state courts for this claim. Therefore, the claim is exhausted but procedurally barred from habeas review. *See Bosset,* 41 F.3d at 829.

In sum, petitioner's claims that counsel was ineffective for failing to call potential witnesses, that the evidence was insufficient to establish petitioner's guilt, and that counsel failed to request a CPL § 730 examination, are procedurally barred from habeas corpus review unless petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Fama,* 235 F.3d at 809. *See Coleman,* 501 U.S. at 749–750. He has failed to do so.

*Excessive Sentence*

Petitioner claims that the sentence imposed by the trial court was excessive. This claim is procedurally barred because petitioner failed to raise this claim both on direct appeal and in his motion to vacate judgment, and raises it here for the first time. Further, it is not cognizable on habeas corpus review because the sentence falls within the range set by state statute. N.Y. Penal Law §§ 70.00(2)(a), 70.00(3)(a)(i). *See White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992); *Ross v. Gavin,* 1996 U.S.App. LEXIS 15358, *1 (2d Cir.1996) (quoting *White,* 969 F.2d at 1383).

*Ineffective Assistance of Counsel*

When asserting an ineffective assistance of counsel claim, a petitioner must demonstrate both that counsel's performance was below an objective standard of reasonableness and that, but for counsel's deficient performance, the outcome of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If a petitioner fails to demonstrate either that counsel's performance was deficient or that the result would have been different, the ineffective assistance of counsel claim fails. *Strickland,* 466 U.S. at 700. Whether counsel's performance was reasonable is to be viewed in light of the totality of the circumstances. *Strickland,* 466 U.S. at 688. *See United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987). Moreover, counsel's "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are...strategic in nature," and ordinarily cannot support a claim of ineffective assistance of counsel. *Nersesian,* 824 F.2d at 1321; *United States v. Eisen,* 974 F.2d 246, 266 (2d Cir.1992). *See United States v. Luciano,* 158 F.3d 655, 661 (2d Cir.1998); *Strickland,* 466 U.S. at 689 (citation omitted).

***4** [5] Petitioner raises three ineffective assistance of counsel claims that are not procedurally barred. First, petitioner claims that counsel should have cross-examined Detective DeCastro regarding her police report describing a broken lock and chain on petitioner's apartment door. However, petitioner himself never testified about a broken lock and chain on his apartment door, or how it affected his mistaking his wife for a burglar. Petitioner fails to demonstrate how eliciting the fact from the officer would have affected the jury's decision.

Page 8

Not Reported in F.Supp.2d, 2002 WL 1765584 (E.D.N.Y.)
**(Cite as: 2002 WL 1765584 (E.D.N.Y.))**

[6] Petitioner's second claim is that counsel failed to obtain the criminal record of prosecution witness Nicholas Catalano. At trial, counsel directed his cross-examination of Catalano towards casting doubt on the reliability of Catalano's identification of petitioner as petitioner exited the apartment building on the morning of the killing. Catalano's criminal record, which petitioner attaches to his petition, contains only one conviction for a misdemeanor that occurred 17 years prior to petitioner's trial. It is unlikely that the jury would have been affected by this evidence, even assuming it had been admitted by the trial judge. Thus, counsel's decision to focus on the reliability of Catalano's testimony did not lack “strategic or tactical justification” and does not support petitioner's claim. *Luciano,* 158 F.3d at 661.

[7] Petitioner's final ineffective assistance of counsel claim is that counsel failed to investigate a prior burglary in petitioner's apartment building. Petitioner contends that this information would have supported his defense that he shot his wife because he mistook her for a burglar. However, since petitioner fails to provide any evidence, beyond his own allegations, that a prior burglary occurred, or that it would provide any basis for his mistaking his wife for a burglar, there is no basis for concluding that trial counsel was ineffective in his preparation.

Moreover, petitioner fails to demonstrate that counsel's behavior, viewed in the totality of the circumstances, fell “outside the wide range of professionally competent assistance.” *Strickland,* 466 U.S. at 690. Counsel, *inter alia,* made several pre-trial and post-trial motions, made numerous timely objections, and subjected the prosecution's witnesses to significant cross-examination. Therefore, as petitioner has not made an adequate showing either that counsel's performance was deficient or that, but for counsel's performance the outcome would have been different, petitioner's ineffective assistance of counsel claim is rejected.

*Prosecutorial Misconduct*

[8] Petitioner claims he was denied a fair trial by the prosecutor's remarks to the jury during summation. A petitioner faces a heavy burden when arguing that a prosecutor's arguments constituted misconduct sufficient to require reversal. *See United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Petitioner must demonstrate that the alleged misconduct during summation caused substantial prejudice to the petitioner. *Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991). When determining whether the prosecutor's comments caused a petitioner to suffer such prejudice, the court will consider the gravity of the misconduct, the curative measures taken by the trial court, and the certainty of conviction absent the improper comments. *See United States v. Millar,* 79 F.3d 338, 343 (2d Cir.1996). The allegedly improper comments must be reviewed within the context of the entire trial. *Young,* 470 U.S. at 12. Furthermore, in examining the prosecutor's remarks, the court “must also take into account defense counsel's remarks.... [I]f the prosecutor's remarks were ‘invited,’ and did no more than respond substantially in order to ‘right the scale,’ such comments would not warrant reversing a conviction.” *Young,* 470 U.S. at 12–13.

***5** [9] Petitioner claims that the prosecutor during summation implied that petitioner fabricated his testimony in order to force the court to submit lesser included offenses to the jury. In reference to petitioner's testimony, the prosecutor stated:

> What was the purpose of [petitioner's] testimony? To cut his losses, to minimize his involvement in this thing because the evidence against him is quite clear. So, now [petitioner] gets up on the stand and puts his own spin on things. Well, Ladies and Gentlemen, the evidence shows [petitioner] executed his wife and calmly walked away but once he gave that version the Judge now becomes obligated to submit to you what is known as a lesser included offense. It

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

doesn't mean there is any validity to these offenses. It doesn't even mean you have to consider them. It only means they are given to you as the Judge is required to give—

T.Tr. at 516.

Counsel then objected, and the court directed the jury to "disregard the [prosecutor's] statement." T.Tr. at 517.

The prosecutor's comments during summation were in response to counsel's implication during summation that petitioner did not intentionally kill his wife. *See Young,* 470 U.S. at 12–14. In questioning the prosecution's proof of the petitioner's intent, counsel stated:

Now, under our law when one does an act which causes the death of another, and the Judge will charge you there are many degrees of a crime, sometimes it's a lesser included. The Court will charge you on what they say are lesser included offenses. I suggest to you at this time that, and I will repeat it, that this [petitioner] is not guilty of the original charge of murder in the second degree. In other words, causing the death of a human being with intent to cause her death.

....

So I ask you to listen very carefully to all of the Judge's charges with respect to the elements of each and every offense being submitted to you for your consideration.

....

So, what I suggest to you is when the Judge charges you in this case that you listen very carefully to the law that he gives you and all of the lesser included offenses....

T.Tr. at 479–486.

The prosecutor's comments, taken in this context, were unlikely to have caused petitioner substantial prejudice or affected the jury's verdict. *See Gonzalez,* 934 F.2d at 424; *Morrison v. McClellan,* 903 F.Supp. 428, 431 (E.D.N.Y.1995). They were not so egregious as to deny petitioner a fair trial. *See Millar,* 79 F.3d at 343–344; *Strouse v. Leonardo,* 928 F.2d 548, 557 (2d Cir.1991). In light of the court's curative instruction and the strong evidence of petitioner's guilt, the prosecutor's comments during summation did not deny petitioner a fair trial.

*Jury Charge*

[10] Petitioner claims that the trial court's instructions to the jury were improper and violative of his due process rights. Respondent contends that petitioner's jury charge claim is procedurally barred. While it is true that petitioner failed to object to the jury charge at trial, it is unclear whether the Appellate Division based its ruling on procedural bar. Thus, this court may review the merits of the claim.

***6** [11] Petitioner, in order to obtain habeas corpus relief on a jury charge claim, must demonstrate "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the [petitioner] by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368. (1973). The contested instruction may not be viewed in isolation, but must be viewed in the context of the charge as a whole to determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp,* 414 U.S. at 147. Here, petitioner fails to demonstrate that the contested instruction was erroneous, much less that it violated his due process rights.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Petitioner claims that the trial court, in instructing the jury, impliedly agreed with the prosecutor that the lesser included charges were not valid. The contested portion of the court's jury instruction stated:

> Now, members of the Jury, the law requires that when the Judge submits to the jury a greater crime such as murder in the second degree, he must also submit to the jury in the alternative any other lesser crimes included.
>
> ....
>
> As required by law, I'm submitting to you for your consideration the lesser included offenses of manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide.
>
> T.Tr. at 545–546.

The instruction was one of many contained in a lengthy, detailed, and thorough jury charge. *See Cupp,* 414 U.S. at 147. Moreover, earlier in the jury charge, the court expressly stated that the jury was not to take any of the court's statements or questions as "indicative that [the court has] any opinion in this case one way or another." T.Tr. at 532. Viewed in the context of the jury charge as a whole, it did not violate petitioner's constitutional rights. *See Cupp,* 414 U.S. at 150.

*Conclusion*

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.

As petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.

SO ORDERED.

E.D.N.Y.,2002.
Ahmed v. Portuondo
Not Reported in F.Supp.2d, 2002 WL 1765584 (E.D.N.Y.)

END OF DOCUMENT



H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Hector CHEBERE, Petitioner,
v.
William PHILLIPS, Respondent.

No. 04 Civ. 296(LAP).
Sept. 18, 2013.

*MEMORANDUM & ORDER*
LORETTA A. PRESKA, Chief Judge.

***1** *Pro se* petitioner, Hector Chebere ("Chebere" or "Petitioner") filed a Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, on September 6, 2003, seeking relief from his 1998 conviction in the Supreme Court of the State of New York. (Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, ("Petition" or " § 2254 Petition") [dkt. no. 2].) On Nov. 2, 2011, Magistrate Judge Debra C. Freeman issued a Report & Recommendation, recommending that the Petition be denied. ("R & R" or "Report") [dkt. no. 28]. For the reasons set forth below, the R & R is adopted and the Petition is DENIED.

BACKGROUND

I. *Petitioner's Conviction*

Upon a jury verdict, Petitioner was found guilty of two counts of Murder in the Second Degree, in violation of N.Y. Penal Law § 125.25[1] and [3], one count of Robbery in the First Degree, in violation of N.Y. Penal Law § 160.15[2], one count of Robbery in the Second Degree, in violation of N.Y. Penal Law § 160.10[1], and one count of Kidnapping in the Second Degree, in violation of N.Y. Penal Law § 135.20. (R & R at 9.) He was sentenced to 22 years to life on both murder counts, 12 and one-half to 25 years for first-degree robbery, five to 15 years for second-degree robbery, and eight and one-third to 25 years for second-degree kidnapping, all sentences to run concurrently. (*Id.* at 2.)

II. *Petitioner's Motions Prior to this Habeas Petition*

On August 1, 2001, Petitioner filed a direct appeal, and the Appellate Division unanimously affirmed the judgment convicting Petitioner. (R & R at 9.) In addition to filing a direct appeal, Petitioner, proceeding *pro se,* filed a motion to vacate his conviction pursuant to New York C.P.L.R. § 440.10(1) ( "Section 440") on April 3, 1999. (*Id.* at 11.) The trial court denied Petitioner's Section 440 motion in its entirety. (*Id.* at 12.)

In July 1999, while Petitioner's motion to vacate was pending, Petitioner pursued Freedom of Information Law ("FOIL") requests for evidence to support his motion, specifically asking that the District Attorney of Bronx County ("DA's Office") disclose documents relating to Nick Quinones, one of the prosecution's witnesses at Petitioner's trial. (R & R at 14.) The DA's Office did not disclose all the documents, although it disclosed 481 documents. (*Id.*) Petitioner then filed an Article 78 Petition challenging the DA's Office's position that certain documents were appropriately withheld. (*Id.*) The Court dismissed the Article 78 petition, and did not require any further disclosure from the DA's Office. (*Id.*)

On December 8, 2003, Petitioner moved to renew his prior Section 440 motion to vacate on the ground that his FOIL litigation had, according to Petitioner, revealed evidence that the prosecutor had in fact withheld exculpatory evidence. (R & R at 14.) The trial court denied Petitioner's motion to renew on the ground that he had not presented any newly discovered evidence. (*Id.* at 15.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

***2** Although the trial court initially dismissed Petitioner's Article 78 challenging the DA's Office's decision to withhold certain documents, the Appellate Division reversed in 2004, and remanded the matter for an *in camera* inspection of the withheld the documents. (R & R at 15.) The trial court inspected the documents and determined that only certain documents were exempt from disclosure under FOIL. (*Id.*)

On May 5, 2006, Petitioner moved, for a second time, to renew his motion to vacate his conviction under Section 440. (R & R at 16.) The trial court denied Petitioner's motion. (*Id.* at 17.)

By letter dated December 12, 2007, Petitioner submitted a second FOIL request requesting documents about Quinones. (R & R at 17.) The City Department of Investigation ("DOI") denied his request. Petitioner appealed the denial, and DOI denied his appeal. (*Id.* at 18.)

III. *The Habeas Petition*

Petitioner's Section 2254 petition asserted thirteen claims: (1) Petitioner's conviction was against the weight of the evidence and/or was based on insufficient evidence (§ 2254 Petition Attachment at 1); (2) Petitioner's conviction was based upon the "false" testimony of James Venson, which was the result of prosecutorial misconduct and violated Petitioner's due process rights (*id.*); (3) Petitioner was improperly prejudiced by the introduction of unnecessarily excessive evidence of his purported involvement in the drug trade (*id.*); (4) Petitioner was improperly cross-examined about highly prejudicial and non-probative allegations that he had abused his pregnant girlfriend (*id.*); (5) the trial court unjustifiably limited Petitioner's trial counsel's summation (*id.*); (6) the trial court's alibi instruction was improper because it failed to explain that Petitioner "had no burden to prove that he was not the person who committed the crime" (*id.*); (7) Petitioner's sentence was excessive (*id.*); (8) the prosecution withheld *Brady* materials regarding its alleged agreements with cooperating witnesses (*id.*); (9) the prosecution elicited false testimony from cooperating witnesses (*id.*); (10) Petitioner received ineffective assistance of trial counsel because his counsel did not, prior to trial, adequately investigate the crime scene or interview certain witnesses (*id.* at 2); (11) the double jeopardy clause prevents Petitioner from being retried (*id.*); (12) Petitioner was denied a "full and fair" hearing regarding the prosecution's alleged withholding of *Brady* material, in violation of his due process rights (*id.*); and, (13) Petitioner received ineffective assistance of counsel when his trial counsel failed to explore fully the circumstances surrounding Nick Quinones' testimony (*id.*).

IV. *The Report & Recommendation*

On November 1, 2011, United States Magistrate Judge Debra Freeman issued a Report & Recommendation. In the Report, Judge Freeman divided Petitioner's claims according to when they had been raised previously in other motions, if at all. (R & R at 24–25.) Judge Freeman determined the following: the first five claims were made by Petitioner on his direct appeal, claims 8 through 11 were raised by Petitioner in his Section 440 Motion, and the last two claims were newly added for this habeas petition. (*Id.* at 24.) Judge Freeman concluded that each of the claims should be dismissed, either as procedurally barred, non-cognizable, or without merit. (*Id.* at 25.)

V. *Petitioner's Objections*

***3** By letter dated April 2, 2013, Petitioner filed objections to the Report. (Petitioner's Objection to Magistrate Judge's Report and Recommendation ("Petitioner's Objections") [dkt. no. 32].) In his objections to the Report, Petitioner states that he objects to "each and every recommendation contained in said R[ & ]R." (Petitioner's Objections at 1.) However, Petitioner does not present this Court with new arguments. Overall, Petitioner's Objections to the Report consist of a reiteration of the claims he had pre-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

viously made in his § 2254 Petition.

ANALYSIS

I. *Standard of Review*

When reviewing a magistrate judge's Report and Recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *Id.; see United States v. Male Juvenile,* 121 F.3d 34, 38 (2d. Cir.1997). When a party makes conclusory or general objections, or simply reiterates the original arguments, the Court will review the report only for clear error. *See, e.g., Frankel v. City of New York,* Nos. 06 Civ. 5450 & 07 Civ. 3436, 2009 WL 465645, at *2 (S.D.N.Y. Feb.25, 2009).

II. *Individual analysis of Petitioner's Claims*

A. *Claims Raised by Petitioner on his Direct Appeal*

1. *Claim 1: Insufficient or Against the Evidence*

Petitioner's first claim contains two allegations: (1) challenging the weight of the evidence, and (2) challenging the sufficiency of the evidence. (§ 2254 Petition, Attachment at 1.) In the Report, Judge Freeman evaluates each allegation and recommends dismissal, (R & R at 29.) Since the weight of the evidence allegation is a claim grounded in state law, it is not available for federal review. 28 U.S.C. § 2254(a) (permitting habeas federal review if Petitioner alleges he is in custody in violation of "the Constitution or laws or treaties of the United States"). As to the alleged insufficiency of the evidence, applying the standard of review set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Petitioner can be granted habeas relief only if this Court finds that, when viewing the evidence most favorably to the prosecution, no rational jury could find guilt beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner's claim does not survive this highly deferential standard of review.

In his objections to the Report, Petitioner reiterates the same argument of allegedly insufficient testimonies. such constitutes an independent state-law procedural ground. *See People v. Chebere,* 292 A.D.2d 323, 740 N.Y.S.2d 25, 26 (1st Dep't 2002). The New York preservation rule at issue, which requires specific contemporaneous objections to be raised to a trial court's ruling before challenging them in an appeal is considered, is adequate. *See* New York C.P.L.R. § 470.05(2).

***4** To allow the habeas review nonetheless, Petitioner must show cause and prejudice or a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750. Cause is some objective factor, external to the defendant, which impeded Petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Petitioner must show that: (1) "the factual or legal basis for a claim was not reasonably available to counsel"; (2) "some interference by state officials made the Petitioner's compliance [with the procedural rule] impracticable"; or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994). In order to show prejudice, Petitioner must demonstrate that the alleged constitutional error worked to his "actual and substantial disadvantage." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Because Petitioner did not raise an ineffective assistance claim in trial court, he cannot raise it now under the New York preservation rule. Because Cir.1998). This Court finds that Petitioner's claim fails because the evidence presented at trial of his involvement in the drug trade was probative of an element of the alleged crimes.

The Report also advises dismissal of Petitioner's

challenge of the cross-examination performed on him regarding the alleged abuse of his ex-girlfriend (Claim 4). (R & R at 38.) Since this cross-examination did not provide the basis for conviction or serve to remove a reasonable doubt as to Petitioner's involvement in the victim's murder, Petitioner's challenge to it is invalid. *Dunnigan,* 137 F.3d at 125. The questioning cannot provide the basis for habeas relief because the questions did not give rise to a fundamentally unfair trial, violating Defendant's right to due process. *Id.*

4. *Claim 5: Summation*

The Report recommends dismissal of Petitioner's claim that the trial court had unjustifiably limited his trial counsel's summation at the close of trial. (R & R at 39.) Summation is not evidence, and a trial judge has "broad discretion" to limit both the scope and duration of a criminal defendant's summation. *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). Petitioner was not impeded in any way from attacking the evidence that was actually presented at trial, and the summation's limitation was only targeted at the defense's insinuations of prosecutorial misconduct. (R & R at 40.) Using the standard of review set forth in AEDPA, this Court finds proper the Appellate Division's dismissal of the claim, because its rejection of Petitioner's challenge to the trial court's limitation of his counsel's summation cannot be deemed contrary to, or an unreasonable application of, clearly established federal law.

5. *Claim 6: Improper Jury Instructions*

Petitioner alleges that the trial court failed to instruct the jury of the proper burden of proof regarding Petitioner's alibi defense and that consequently his due process rights were violated. (§ 2254 Petition, Attachment at 1.) The Report recommends this Court dismiss the improper jury instruction claim for the same reasons the second claim has been rejected. (R & R at 41.) New York courts have consistently held that claims challenging jury instructions must be preserved by specific objections at trial. *People v. Iannelli,* 69 N.Y.2d 684, 685, 512 N.Y.S.2d 16, 504 N.E.2d 383 (1986). This claim should be dismissed as procedurally barred because Petitioner has not shown cause nor demonstrated a fundamental miscarriage of justice.

***5** Although Petitioner objects to this finding, this Court does not find a reiteration of his § 2254 Petition arguments to be persuasive.

6. *Claim 7: Excessive Sentence*

The Report finds no federal basis for Petitioner's claim of excessive sentence and therefore recommends for it to be dismissed. (R & R at 42.) In order to state a cognizable Eighth Amendment cruel and unusual punishment claim, Petitioner must point to a specific statute and allege it to be unconstitutional. *See United States v. Dawson,* 400 F.2d 194, 200 (2d Cir.1968). Petitioner does not point to a statute, and his sentence does not fail to comply with state law, therefore his claim does not qualify for habeas relief.

B. *Claims Raised by Petitioner in his Section 440 Motion*

1. *Claim 8: The Alleged Withholding of* Brady *Material*

Petitioner claims that the prosecution withheld cooperation agreements in contravention of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (§ 2254 Petition, Attachment at 1.) The Report recommends dismissal of this claim by referring to Judge Patterson's dismissal of almost identical claims and arguments made by one of Petitioner's co-defendants, Cesar Martinez, in his own *Brady* claim. (R & R at 44.)

If evidence favorable to the accused is suppressed upon request, his due process rights are violated where the evidence is material either to guilt or to punishment, regardless of the good faith or bad faith of the prosecution. *Brady,* 373 U.S. at 87. Mere speculation of evidence being withheld, however, is "insufficient

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

to warrant habeas relief." *Mallet v. Miller,* 432 F.Supp.2d 366, 377 (S.D.N.Y.2006). Judge Freeman conducted an independent *in camera* review of the materials in response to Petitioner's two FOIL requests and concluded that Petitioner's *Brady* claim had failed. (R & R at 46.) Additionally, when responding to an identical claim made by one of Petitioner's co-defendants, Cesar Martinez, Judge Patterson reasoned that the odds of Quinones, getting a plea agreement were "nil" because the prosecution had nothing to give him in return at the time of the trial. *Martinez v. Phillips,* No. 04 Cv. 8617, 2009 U.S. Dist. LEXIS 34847, at *79–80, 2009 WL 1108515 (S.D.N.Y. Apr. 24, 2009). Petitioner has failed to present this Court with evidence that materials were improperly withheld under the *Brady* standard.

2. *Claim 9: Prosecutorial Misconduct for Eliciting Allegedly False Testimony*

The Report recommends dismissal of Petitioner's claim that the prosecution elicited false testimony from one or more cooperating witnesses because it lacks merit. (R & R at 47.) Petitioner has failed to demonstrate that Quinones actually had a cooperation agreement with the government with respect to Petitioner's case, and the state court's rejection of Petitioner's claim did not contradict or unreasonably apply established federal law. For these reasons, Petitioner's claim fails.

3. *Claim 10: Ineffective Assistance of Trial Counsel for Failure to Conduct an Adequate Investigation*

***6** The Report advises dismissal of this claim because the state court's rejection of that claim was not contrary to or an unreasonable application of established federal law. (R & R at 48.) Petitioner's ineffective assistance claim makes four allegations upon which the claim rests: (1) counsel's alleged failure to consult with Petitioner until two days before trial, (2) counsel's alleged failure to visit the crime scene, (3) counsel's alleged failure to interview witnesses, and (4) counsel's alleged failure to investigate the circumstances around Quinones' testimony. (*Id.* at 49–54.)

For an ineffective assistance claim to be successful, counsel's conduct must have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to demonstrate ineffectiveness, Petitioner must show both that: (1) his counsel's performance was deficient to such a degree that the "representation fell below an objective standard of reasonableness," (*id.* at 688), and (2) this deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," (*id.* at 694).

Petitioner's allegation that his counsel failed to consult with Petitioner until two days before trial contradicts the state court's finding based on the proceedings that took place weeks before trial that counsel had met with Petitioner well before trial. (*See* Sandusky Aff., Ex. 4 (Order, dated Dec. 19, 1999 ("12/19/99 Order")), at 3–4 (noting that counsel's "comprehensive understanding of the case" during those pre-trial proceedings made it "obvious that [counsel] had already met and extensively conferred with his client to prepare a defense").) Accordingly, this Court finds that allegation without merit.

The state court rejected Petitioner's second allegation that his counsel's failure to visit the crime scene constituted ineffective assistance because Petitioner's defense was based on a purported alibi. (12/19/99 Order at 4.) This Court affirms the state court's conclusion finding Petitioner's allegation without merit because Petitioner was not able to show that had his counsel visited the crime scene, Petitioner's trial would have had a different outcome.

Petitioner's third claim of ineffective assistance

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

because of his counsel's alleged failure to interview unnamed witnesses is also dismissed, as recommended by the Report. (R & R at 53.) Without evidence to the contrary, the Court must presume that Petitioner's counsel chose for strategic reasons not to interview or call unspecified witnesses. *United States ex rel. Walker v. Henderson,* 492 F.2d 1311, 1314 (2d Cir.1974) (holding that the "decision to call or bypass particular witnesses is peculiarly a question of trial strategy which courts will practically never second-guess" when considering an allegation of ineffective assistance of counsel). Not only has Petitioner not disclosed any information concerning the identity or even existence of these witnesses, he has not shown that he suffered prejudice from his counsel's failure to interview them and has not shown that the verdict would have been altered had the interviews taken place.

***7** Lastly, the Report recommends dismissal of Petitioner's allegation that he suffered from ineffective assistance due to his counsel's alleged failure to investigate the surroundings of Quinones' testimony. (R & R at 53.) Petitioner has not come forth with any evidence that further investigation on the circumstances surrounding Quinones' testimony would have revealed that he was a government informant. Petitioner's allegation fails both prongs of the *Strickland* test.

In his objections to the Report, Petitioner attempts to make his second claim, the allegedly false testimony of James Venson, an additional issue of ineffective assistance. (Petitioner's Objections at 3.) However, this claim is rejected for the same reasons Petitioner's ineffective assistance claim based on his counsel's failure to investigate the surroundings of Quinones' testimony fails, namely, that Petitioner has not come forth with any evidence showing that such testimonies were suspicious and that the claims fail to satisfy either prong of the test articulated in *Strickland.*

Petitioner's ineffective assistance claim is dismissed on the merits. None of Petitioner's allegations give rise to claims upon which habeas relief can be granted.

4. *Claim 11: Double Jeopardy*

Petitioner claims that the prosecution's alleged misconduct at trial should preclude the government from retrying the case should he receive relief from judgment of the conviction. (R & R at 54.) This claim is dismissed because Petitioner does not face a second trial, and this Court is not ordering a new trial.

C. *Newly Added Claims*

1. *Claim 12: Alleged Denial of Due Process Rights in Connection with Efforts to Obtain Purported* Brady *Material*

Petitioner claims that his right to due process was violated when the trial court failed to conduct an *in camera* inspection of the prosecution's files. (§ 2254 Petition, Attachment at 1.) The Report recommends dismissal of this claim both procedurally and on the merits. (R & R at 55 ("This claim is unexhausted but should be dismissed on the merits nonetheless.").)

When a defendant does not require a particular file, but merely makes a general request for exculpatory material under *Brady,* it is up to the State to decide what information to disclose. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 59, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) ("Defense counsel has no constitutional right to conduct his own research of the State's files to argue relevance."). Judge Freeman has reviewed Petitioner's supposed evidence that documents were withheld and has conducted an *in camera* review of the documents without finding any exculpatory evidence or anything that suggests any was ever withheld. (R & R at 56.) Petitioner's failure to show that any exculpatory evidence would have been disclosed had the trial court conducted an *in camera* review fails to demonstrate a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

violation of Petitioner's due process rights. *Ritchie,* 480 U.S. at 58 (noting that, where trial court failed to conduct an *in camera* review of certain confidential documents, the conviction would stand if subsequent review revealed that "the nondisclosure was harmless beyond a reasonable doubt"). Accordingly, Petitioner's due process claim is without merit.

2. *Claim 13: Ineffective Assistance of Counsel Based Upon Failure to Explore the Circumstances Surrounding Quinones' Testimony*

***8** Petitioner alleges that he received ineffective assistance because his counsel "failed to fully explore the circumstances [under which] Quinones testified." (Sandusky Aff., Ex. 19 (Affirmation in Support Motion to Amend FRCP Rule 15d, dated Nov. 5, 2007), at 34–39.) In the Report, Judge Freeman explains that if this claim is a reiteration of Claim 10, it should be rejected on the same grounds, namely, that the state court's rejection of the claim was not contrary to or a reasonable construction of established federal law. (R & R at 57.)

If, however, Petitioner challenges (1) trial counsel's failure to subpoena certain documents and request *in camera* review of certain documents withheld by the prosecution' and (2) the adequacy of counsel's cross-examination of Quinones at trial, then Petitioner's claim is unexhausted but the Report advises this court to dismiss it on the merits nonetheless. (R & R at 57.)

Petitioner's failure to demonstrate the actual existence of material evidence that was not disclosed prior to his trial prevents him from prevailing on the first allegation. Petitioner's counsel cannot be faulted for failing to obtain documents that Petitioner has not shown existed. The defense counsel's "vigorous cross-examination (and re-cross)" of Quinones does not support Petitioner's allegation of ineffective counsel. (R & R at 58.) Additionally, the allegation fails the two-prong *Strickland* test. As such, this Court dismisses Petitioner's unexhausted claim on its merits.

Petitioner's objections to the Report maintain both the *Brady* material claims as well as the ineffective assistance claims. In his objections, some of the previous claims are shuffled around to fall under one of these two categories. For example, Petitioner claims that the allegedly false nature of the testimonies at his trial would have been exposed by an effective counsel and should therefore be added as an additional ineffective counsel allegation. (Petitioner's Objections at 5.) Petitioner also argues that his trial counsel failed to preserve a viable due process claim. (*Id.* at 16.) As to the *Brady* material, Petitioner does not present this Court with any evidence that would contradict Judge Freeman's findings. Petitioner's arguments for his *Brady* material claim only consist of speculation and do not rely on any evidence. Accordingly, this Court finds all of Petitioner's objections without merit as they constitute a reiteration of Petitioner's original § 2254 Petition.

CONCLUSION

Having reviewed the Judge Freeman's Report and Petitioner's objections, I find Petitioner's objections to be without merit, and I find the balance of the Report to be well-reasoned and thoroughly grounded in the law. Accordingly, it is hereby ORDERED that the Report [dkt. no. 28] is adopted in all respects and Petitioner's request to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2254 is [dkt. no. 2] DENIED.

***9** SO ORDERED.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge.

This habeas proceeding was commenced in 2003 [FN1] and has been on the Court's "suspense docket" for most of the time since then, based on this Court's decisions to permit *pro se* petitioner Hector Chebere ("Petitioner") to exhaust certain claims in the state courts before proceeding with those claims here (*see*

Page 8

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

Orders, dated May 11, 2004 (Dkt.6) (granting stay of these proceedings), and June 8, 2006 (Dkt.8) (continuing the stay)), and to amend his petition to assert those additional claims following his efforts to exhaust them (*see* Order, dated Apr. 8, 2008 (Dkt.15) (granting motion for leave to amend)); *see also* Amended Petition, dated Feb. 13, 2008 ("Am.Pet.") (Dkt.13)).

> FN1. Although the Petition was not docketed until January 15, 2004, Petitioner signed it on September 6, 2003, and, where *apro se* litigant is incarcerated at the time a suit is commenced, the date on the pleading itself is generally considered the filing date. *See* *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (*pro se* prisoner litigant's complaint considered "filed" as of date of delivery to prison officials for transmittal to court), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994).

In his Amended Petition, Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1998 conviction in the Supreme Court of the State of New York, Bronx County. (*See* Am. Pet.) Upon a jury verdict, Petitioner was found guilty of murder, robbery, and kidnapping, based upon his alleged involvement in the killing of Damian Blanding ("Blanding") on June 10, 1993, in New York City. (*See id.*) For these crimes, Petitioner was sentenced to 22 years to life imprisonment and is currently incarcerated at the Green Haven Correctional Facility in Stormville, New York. (*See id.*)

## *BACKGROUND*

### A. *Petitioner's Trial*

Petitioner was tried along with two co-defendants, Cesar Martinez ("Martinez") and Theodore Simpson ("Simpson"), in a three-week trial conducted in October 1998. The alleged crimes, pre-trial proceedings and trial underlying Petitioner's conviction are accurately and thoroughly summarized in an Opinion and Order of the Court (Patterson, J.), denying the habeas petition of Petitioner's co-defendant and half-brother, Martinez, *see* *Martinez v. Phillips,* No. 04 Cv. 8617(RPP), 2009 U.S. Dist. LEXIS 34847, at *2–25, 2009 WL 1108515 (S.D.N.Y. Apr. 24, 2009), as well as in Petitioner's brief in support of the direct appeal of his conviction (Affidavit of Robert R. Sandusky, III, Esq., dated Sept. 8, 2008 ("Sandusky Aff") (Dkt.19), Ex. 7 (Brief for Defendant–Appellant, dated Aug. 1, 2001 ("Direct Appeal Mem.")), at 3–25). The key facts relevant to this habeas proceeding are summarized below.

#### 1. *The Prosecution's Case*

##### a. *Testimony of Jose Caban*

Jose Caban ("Caban"), who had a cooperation agreement under which he would not be prosecuted for the killing of Blanding if he served as a cooperating witness at Petitioner's trial, testified that, in April 1993, he acquired approximately $15,000 worth of heroin to sell and asked Petitioner to "cut" the heroin to prepare it for sale. (*Id.* at 6–7.) According to Caban, after Petitioner cut the heroin, Petitioner and Caban tried to sell it in New York City, but were generally unsuccessful. (*Id.* at 7.) Caban testified that, after a few weeks of slow sales, Petitioner arranged to have Blanding sell the heroin in Ohio. (*See id.* at 7–8; Transcript of Trial, conducted Oct. 6–28, 1998 ("Trial Tr.") (Dkts.17–18, 20–22), at 762–66.)

***10** Caban further testified that, about six weeks after Blanding was given the heroin to sell in Ohio, Blanding returned to New York City by bus, arriving shortly after midnight on the morning of June 10, 1993. (Direct Appeal Mem., at 8–9; *see also id.* at 18–19.) Caban testified that he, Petitioner, and others (including Martinez, Simpson, Rafael Ortiz ("Ortiz"), and Lyland Roland ("Roland")) were all waiting for Blanding at the bus station when Blanding arrived. (Direct Appeal Mem., at 8–9.) Petitioner, Caban, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Ortiz surrounded Blanding, took Blanding's gun and approximately $2500 from him, and pushed him into their black van. (*Id.* at 9.) When asked where the rest of the money was, Blanding claimed that he had spent it, but promised that he would “work it off.” (Trial Tr., at 835–36 (trial testimony of Caban); Direct Appeal Mem ., at 9.)

According to Caban's testimony, Petitioner, Caban, and the others then decided to kill Blanding. (*See id.* at 9–10.) Caban testified that they drove Blanding to the Whitestone Bridge, which connects Queens and the Bronx, and parked underneath the bridge. (*Id.* at 10.) According to Caban, Petitioner then took a gun from Ortiz and walked out of Caban's view with Martinez and Blanding. (*See id.* at 10–11.) Caban testified that he heard five gunshots (*see id.* at 10–11; *see also id.* at 19 (autopsy indicated that Blanding had been shot five times at close range)), and, further, that both Petitioner and Martinez told him that Martinez had killed Blanding (*id.* at 10, 11).

Caban also testified, over Petitioner's objection, about Petitioner's significant involvement in the narcotics trade. (*See id.* at 50.) In particular, Caban testified that he “knew [Petitioner] used to cut [drugs]” (*id.* (citing Trial Tr., at 730)), and that Petitioner had a group of cohorts who sold drugs for him (*id.* (citing Trial. Tr., at 748, 750, 761–63)).

**b.** ***Testimony Corroborating Caban's Account***

In addition to Caban's testimony, the prosecution introduced testimony from James Venson (“Venson”), Fred Brown (“Brown”), and Nick Quinones (“Quinones”), further supporting the prosecution's claim that Petitioner was involved in Blanding's killing, and countering Petitioner's anticipated defense (*see* Background Section A(2), *infra* ) that he was not in New York City at the time of the murder.

Venson testified that, about a month prior to Blanding's death, Venson had multiple conversations with Petitioner, Simpson, and Martinez, in which they had discussed “sending the dope to Ohio to make more money.” (Trial Tr., at 599–601, 681; *see also* Direct Appeal Mem., at 15–16.) Venson also testified that he had seen Petitioner and Martinez in the Bronx, in a black van, on one or two occasions in the week before Blanding's death. (*Id.* at 16.)

Brown testified that he saw Petitioner on June 9, 1993, in the Bronx, and that Petitioner claimed to have heard that Blanding had stolen $2,000 of Petitioner's money. (Trial Tr., at 453–56.[FN2]) Brown also testified that he saw Petitioner in the Bronx the next morning (*i.e.*, the day of the shooting), at about 11:00 a.m. (Direct Appeal Mem., at 15.)

FN2. Although citing to Brown's trial testimony, which indicates that Petitioner claimed Blanding had stolen $2,000 from him (*see* Trial Tr. at 453–56), Petitioner's appellate brief indicates the amount allegedly stolen was $1,000 (*see* Direct Appeal. Mem., at 14).

***11** Quinones testified that he met Petitioner in 1996 at the Bronx House of Detention, where Quinones was being held on narcotics and homicide charges. (*See id.* at 18.) According to Quinones's testimony, Petitioner told Quinones that Petitioner and his associates had killed Blanding because Blanding owed them money. (*Id.*) Quinones further testified that Petitioner had proposed a plan in which Quinones and Petitioner would provide alibis for each other. (*Id.*)

**2.** ***Petitioner's Case***

At trial, Petitioner presented evidence that, at the time of Blanding's shooting, he was in Schenectady, which is a three hour drive from New York City. (*See* Trial Tr., at 1437.) Helen DiMatteo (“DiMatteo”), a private duty nursing assistant and day care provider, testified that Petitioner lived at her home in Schenectady from the spring of 1993 until the spring of 1994

and that, on June 9, 1993, she celebrated Petitioner's birthday, with him, in her home, with dinner and cake. (Direct Appeal Mem., at 21.) Likewise, Petitioner testified that he moved to Schenectady in March 1993, and was living there in June 1993. (*Id.* at 22.) He testified that he was not in New York City on June 9 or 10, 1993. (*Id.*)

Petitioner also testified that he knew Caban only “by face,” and that he was not friends with Caban. (*Id.* at 22.) According to Petitioner's testimony, Petitioner never agreed to sell heroin with Caban. (*Id.* at 23.) Although Petitioner acknowledged meeting Quinones at the Bronx House of Detention, he denied ever asking Quinones to be an alibi witness for him. (*Id.* at 24.)

On cross examination, the prosecution asked Petitioner about his alleged past involvement in narcotics trafficking (*id.* at 50), including whether Petitioner had sent two other individuals—in addition to Blanding—to sell drugs in Ohio (*see id.*). The prosecution also asked, over Petitioner's objection, whether Petitioner had abused his former girlfriend during her pregnancy. (*See id.* at 53.)

**3. *The Prosecution's Rebuttal Case***

Supplementing the testimony it initially presented regarding Petitioner's whereabouts at or around the time of the murder, the prosecution, in its rebuttal case, introduced testimony from Rochelle Fralin (“Fralin”), Petitioner's former girlfriend and the mother of his child. (*See id.* at 24.) Fralin testified that she had seen Petitioner in the Bronx every day, during the two-week period prior to Blanding's death. (*Id.*) She specifically testified that she saw Petitioner in the Bronx at about 8:00 p.m. on June 9, 1993, only a few hours before Blanding arrived in New York from Ohio. (*See id.* at 24; Trial Tr., at 1590–92.)

**4. *Petitioner's Summation***

During summation, Petitioner's counsel attacked the credibility of the prosecution's witnesses, as well as the conduct of prosecutors themselves. (*See generally* Trial Tr., at 1720–39.) Petitioner's counsel characterized the prosecution's case as a “shameless desperate search for corroboration where they made deals” (*id.* at 1720), and argued that the prosecution had “shamefully exploit[ed]” its witnesses in a “disgusting” manner (*id.* at 1721). Petitioner's counsel further argued that the prosecutor's office was “reckless in [its] investigation,” that the prosecution's decision to present the testimony of incredible witnesses was “shameful” and “disgusting,” and that the prosecution's case was “totally lacking integrity.” (*Id.* at 1721–22.)

***12** When, during summation, Petitioner's counsel specifically attacked the prosecution's decision to elicit testimony from Venson, the Court sustained the prosecution's objection to such remarks:

> Mr. DuBoulay [Petitioner's counsel]: Can you trust this prosecution who puts a guy on the stand with a whole story where the guy is not even there[?] What kind of investigation did they do? Did they even look at his rap sheet? I looked at his rap sheet. If you don't even look at a guy['s] rap sheet-come on. How are you going to put a guy on the stand on a matter so important like this [it's] reckless—
>
> Ms. Florio [for the prosecution]: Objection.
>
> Mr. DuBoulay: I'm talking about the office, Judge.
>
> The Court: No. No you can't. Don't. Make it about the witnesses. That's fine [,] but [do] not impugn[ ] the integrity of another attorney or prosecutor [,] that's not right.
>
> Mr. DuBoulay: Judge, I'm talking about the office.
>
> The Court: No. No. Don't talk—No. Talk about the witnesses.

Mr. DuBoulay: Let's talk about the integrity of the case.

The Court: Let's talk about the witnesses in the case.

(Trial Tr., at 1731–32.)

When, on summation, Petitioner's counsel later questioned the reliability of Brown's testimony during summation, the Court again sustained the prosecution's objection to purported "attacks" against prosecutor's office:

[Mr. DuBoulay]: [Fred Brown] gives you the ludicrous story that [Petititioner] came up to him and starts crying [t]o him ... about [Blanding] ripped off somebody. Ridiculous. Years later he comes up and says that. This searching, the desperate attempt. That's the kind of evidence you're presented with.

Ms. Florio: Objection.

Mr. DuBoulay: That's the kind of evidence—

The Court: Just focus on the evidence, not make it a personal attack to the D.A.'s office .... Don't refer to the district attorney's office. Refer to the witness. Refer to the evidence and just as the assistant district attorney cannot impugn[ ] your integrity, you can't impugn[ ] the D.A.'s office['s]. Just stick with the witnesses and to the evidence. Let's just focus there.

(Trial. Tr., at 1739–41.)

**5. *The Jury Charge***

With respect to Petitioner's alibi defense, the jury charge contained the following instruction:

Now, as I go to the specific charges in the case, you'll notice that the first element that I list, [that I] give you [in] each of the charges[,] deals, in essence, with the question of whether as you deliberate as to each defendant, whether that defendant was correctly identified as being involved in the crime, [the] so-called identification element, if you will, and indeed one defendant, [the Petitioner], introduced testimony that he was somewhere else when the crime allegedly took place.

That's what [Petitioner] contends that the evidence should lead you to conclude, that he could not have committed these crimes because at the time of the incident he was in Schenectady, New York, not down here [in the Bronx]. This is known as an alibi defense.

***13** You're obligated to consider and evaluate the testimony and the credibility of the alibi witness, Mrs. Helene DiMatteo, as you would the testimony of any other witness. If you are satisfied that her evidence as to alibi creates a reasonable doubt as to the guilt of [Petitioner], that is that the prosecution hasn't disproved the alibi defense beyond a reasonable doubt, then [Petitioner is] entitled to be acquitted.

By the same token, of course, you understand that if the People have satisfied you from their witnesses beyond a reasonable doubt that [Petitioner] was one of those present during the killing of Damian Blanding, they will, of necessity, have disproved the alibi.

(Trial Tr., at 1866–67; *see also* Direct Appeal Mem., at 63–64.) At trial, Petitioner raised no objection to the jury charge. (Trial Tr., at 1886.)

**6. *Verdict and Sentence***

Petitioner and his two co-defendants, Martinez and Simpson, were each found guilty of two counts of Murder in the Second Degree, in violation of N.Y. Penal Law § 125.25[1] and [3] (intentional and felony murder), one count of Robbery in the First Degree, in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

violation of N.Y. Penal Law § 160.15[2], one count of Robbery in the Second Degree, in violation of N.Y. Penal Law § 160.10[1], and one count of Kidnapping in the Second Degree, in violation of N.Y. Penal Law § 135.20. (*See* Direct Appeal Mem., at 25.) On November 30, 1998, Petitioner was sentenced to 22 years to life on both murder counts, 12 and one-half to 25 years for first-degree robbery, five to 15 years for second-degree robbery, and eight and one-third to 25 years for second-degree kidnapping. (*Id.; see also People v. Chebere,* 292 A.D.2d 323, 740 N.Y.S.2d 25, 26 (1st Dep't 2002)). All of the sentences were to run concurrently. (*See* Direct Appeal Mem., at 25.)

**B. *Petitioner's Direct Appeal***

On August 1, 2001, Petitioner filed a direct appeal, arguing that: (1) his conviction was against the weight of the evidence (*id.* at 26–41, 740 N.Y.S.2d 25); (2) his conviction was based upon the patently false testimony of Venson, which was the result of prosecutorial misconduct and violated Petitioner's due process rights (*id.* at 42–49, 740 N.Y.S.2d 25); (3) he was improperly prejudiced by the introduction of excessive evidence of his purported involvement in the drug trade (*id.* at 49–53, 740 N.Y.S.2d 25); (4) he was improperly cross-examined about highly prejudicial and non-probative allegations that he had abused his pregnant girlfriend (*id.* at 53–57, 740 N.Y.S.2d 25); (5) the trial court unjustifiably prevented Petitioner's trial counsel from attacking the prosecution's case during summation (*id.* at 58–62, 740 N.Y.S.2d 25); (6) the trial court's alibi instruction was improper because it failed to explain that Petitioner "had no burden to prove that he was not the person who committed the crime" (*id.* at 63–66, 740 N.Y.S.2d 25); and (7) his sentence was excessive (*id.* at 67–69, 740 N.Y.S.2d 25).

The Appellate Division unanimously affirmed the judgment convicting Petitioner. *Chebere,* 740 N.Y.S.2d at 26 (citing *People v. Martinez,* 287 A.D.2d 353, 731 N.Y.S.2d 183 (1st Dep't 2001)). The court rejected Petitioner's arguments about the weight of the evidence on the ground that those arguments were "similar to arguments previously rejected by this Court on the [appeals of Petitioner's co-defendants Martinez and Simpson]," and the court found "no reason to reach a different result here." *Id.; see also People v. Simpson,* 284 A.D.2d 238, 728 N.Y.S.2d 135 (1st Dep't 2001). The court thus concluded that "[t]he verdict [against Petitioner] was based on legally sufficient evidence and was not against the weight of the evidence." *Chebere,* 740 N.Y.S.2d at 26.

***14** The court also held that the evidence at trial of Petitioner's purported involvement in the drug trade had not been unnecessarily excessive or unduly prejudicial, and noted that "[u]nder the circumstances of the case, an effort to limit or sanitize this evidence would have unduly restricted its probative value." *Id.* The court similarly concluded that the prosecution's cross-examination of Petitioner's concerning his alleged abuse of his girlfriend did not deprive him of a fair trial, as the cross-examination on this issue "had a good faith basis and was relevant to [Petitioner]'s credibility." *Id.*

The court was also unpersuaded by Petitioner's argument that the trial court had improperly limited defense counsel's summation; the court found that Petitioner's trial counsel had been "making an argument that was not based on the evidence and amounted to personal attacks on the prosecutor," and further found that Petitioner's trial counsel had nevertheless "received ample latitude to argue the point he was seeking to advance." *Id.*

Finally, the court found that Petitioner's two remaining claims—*i.e.*, that his conviction was based upon the false testimony of Venson, which was the result of prosecutorial misconduct, and that the trial court's alibi instruction was improper—were unpreserved. The court declined to review these claims in the interest of justice, but noted that "[w]ere [the court] to review these claims, [the court] would reject them." *Id.*[FN3]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. The court summarily rejected Petitioner's request for a reduction of his sentence. *Id.*

The parties do not appear to have supplied this Court with Petitioner's application for leave to appeal to the Court of Appeals. Nevertheless, Respondent concedes that Petitioner sought review of the Appellate Division's decision with respect to every claim that Petitioner had raised before that court. (*See* Sandusky Aff. ¶ 18.) The Court of Appeals summarily denied leave to appeal on June 14, 2002. *See People v. Chebere,* 98 N.Y.2d 673, 746 N.Y.S.2d 462, 774 N.E.2d 227 (2002).

**C. *Petitioner's Section 440 Motion To Vacate***

In addition to filing a direct appeal, Petitioner, proceeding *pro se,* also sought to set aside his conviction through a series of collateral motions and petitions. In fact, even before he filed his direct appeal, Petitioner, on April 3, 1999, filed a motion to vacate his conviction pursuant to N.Y.C.P.L. § 440.10(1). (*See* Sandusky Aff, Ex. 1 (Affidavit in Support of Motion to Vacate Judgment CPL 444.10, dated Apr. 3, 1999 ("Pet. 440 Mtn."")).) Petitioner's Notice of Motion included a bare recitation of six statutory grounds for vacating the judgment against him, quoting nearly verbatim N.Y.C.P.L. § 440.10(a), (b), (c), (f) and (h). (*See id.*) It appears, however, from Petitioner's submissions, both in the state court and here, that he intended to raise only three claims in this motion,[FN4] specifically, that the judgment against him should be vacated because: (1) the prosecution allegedly withheld exculpatory evidence regarding its alleged agreements with cooperating witnesses, in violation of, *inter alia, Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*see* Pet. 440 Mtn., ¶¶ 6–8); (2) the prosecution knowingly elicited false testimony from cooperating witnesses about the absence of any agreement to cooperate in the prosecution of Petitioner (*see id.* ¶¶ 11–13, 28); and (3) Petitioner received ineffective assistance of trial counsel because his counsel did not, prior to trial, adequately investigate the crime scene or interview certain witnesses, including Oscar Diaz ("Diaz"), who purportedly had exculpatory information,[FN5] and Quinones (*see id.* ¶¶ 20–27).

FN4. *See* Pet. 440 Mtn. (setting forth three point headings with supporting arguments on each of those three points); *see also* Motion To Amend F.R.C.P. Rule 15(d), dated Nov. 5, 2007 ("Pet.Amend.Mtn.") (Dkt.12) (indicating Petitioner's desire to pursue a total of 13 claims on habeas, including three claims from his initial Section 440 motion).

FN5. According to Petitioner, Diaz had information that directly contradicted the testimony of Caban, the prosecution's key witness. (*See* Sandusky Aff, Ex. 5 (Affidavit in Support of Application for Leave to Appeal C.P.L. 8460.15, dated May 18, 2001 ("440 Appeal Aff") (unpaginated)), at 11.) In particular, Caban purportedly told Diaz, prior to Petitioner's trial, that "the two people involved in the crime with [Caban] [were] not [Petitioner], but [were] two brothers from around the same neighborhood. However, [Caban] was afraid to reveal the identity of these two brothers because they were free in society and he feared that if he gave them up to the police, they would cause himself or his family harm." (*Id.*) Petitioner claimed that, in light of this information, he had repeatedly urged his trial counsel to interview Diaz prior to trial, but counsel had failed to do so. (*Id.*) Petitioner also claimed that the District Attorney had attempted to interview Diaz prior to trial, but that Diaz had refused to speak with prosecutors, hoping to speak with defense counsel instead. (*Id.* at 11–12).

***15** The trial court denied Petitioner's Section 440 motion in its entirety. (*See* Sandusky Aff, Ex. 4 (Order, dated Dec. 19, 1999 ("12/19/99 Order")), at 4.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

With respect to Petitioner's claims of prosecutorial misconduct—*i.e.,* the alleged withholding of *Brady* material and eliciting of false testimony-the court found that Petitioner's submissions were "facially insufficient," as Petitioner had failed to submit any evidence in support of the accusations he made. (*Id.* at 1–2.) The court also found that Petitioner had failed to provide any evidentiary support for his ineffective assistance of counsel claims, and, further, found that trial counsel appeared to have been adequately prepared throughout the pre-trial and trial proceedings:

> [Petitioner] makes several other complaints against counsel: that he did not meet with [Petitioner] until two days before the trial; that he failed to visit the scene of the crime; and that he failed to investigate [Petitioner's] alibi defense. The trial transcript, however, does not support these allegations. Before the trial, the case was transferred to me for pre-trial hearings. With the defendant present in court, counsel participated in several lengthy pre-trial conferences and ultimately the hearing itself. Counsel was fully prepared for the conferences and the hearing and had a comprehensive understanding of the case. It was obvious that he had already met and extensively conferred with his client to prepare a defense.
>
> When the trial commenced almost two weeks later, counsel had a coherent strategy, made cogent legal arguments and competently cross examined each of the prosecution witnesses. The trial lasted over three weeks and, contrary to the [Petitioner]'s allegations, counsel not only considered an alibi defense but called an alibi witness, Helene DiMatteo. The [Petitioner]'s motion contains no affidavits from any other alibi witnesses and fails to name any others as potential alibi witnesses. He thus has failed to demonstrate that any other witnesses exist (*see People v. Aiken,* 45 N.Y.2d 394, 408 N.Y.S.2d 444, 380 N.E.2d 272). Even had he provided any such names, he has also failed to show that counsel did not have a strategic or other legitimate explanation in not calling them to testify. (*See People v. Ford,* 46 N.Y.2d 102; *People v. Newton,* 192 A.D.2d 44).
>
> Finally, as for [Petitioner]'s claim that counsel failed to visit the crime scene, even if true, [Petitioner] has not established that it would be even marginally relevant for his attorney to have visited a four year old crime scene beneath the Whitestone [B]ridge in order to adequately prepare his defense.

(*Id.* at 3–4.) The Court also noted that, to the extent Petitioner faulted his trial counsel for failing to interview Diaz before trial, the record indicated that counsel did interview Diaz after trial and, further, that Petitioner had declined to make any post-verdict motion based upon the information obtained in that post-trial interview. (*Id.* at 3.)

***16** Petitioner requested leave to appeal the trial court's denial of his motion to vacate, challenging the denial of his three claims, and arguing that the trial court should have either (1) held an evidentiary hearing, or (2) held Petitioner's motion in abeyance while Petitioner pursued Freedom of Information Law ("FOIL") requests for evidence to support his motion. (*See* 440 Appeal Aff, at 4, 10–11.) Petitioner's failure to provide evidence to support his motion to vacate, he argued, was the result of the state's failure to provide such evidence to him in response to his pending FOIL requests. (*See id.* at 11.) The Appellate Division denied this request for leave to appeal. *See People v. Chebere,* No. M–3217, 2001 N.Y.App. Div. LEXIS 7285 (1st Dep't June 28, 2001).

**D. *Petitioner's First FOIL Request and Article 78 Petition***

In July 1999, while Petitioner's motion to vacate was pending, Petitioner requested, pursuant to FOIL, that the District Attorney of Bronx County ("DA's Office") disclose documents relating to Quinones. (*See* Sandusky Aff, Ex. 3.) Although the DA's Office

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

disclosed 481 documents (which were "already part of the public record"), it withheld others (Sandusky Aff, Ex. 6), and Petitioner then filed an Article 78 petition challenging the position of the DA's Office that certain documents were appropriately withheld (*see* Sandusky Aff, Ex. 9). The Bronx County Supreme Court dismissed the Article 78 petition and did not require any further disclosure by the DA's Office at that time. (*See* Sandusky Aff., ¶ 19.)

**E. *Petitioner's First Motion To Renew His Section 440 Motion***

On December 8, 2003, following the trial court's denial of Petitioner's Article 78 petition (which was later reversed by the Appellate Division, *see infra* ), Petitioner moved to renew his prior Section 440 motion to vacate, on the ground that his FOIL litigation had, according to Petitioner, revealed evidence that the prosecutor had in fact withheld exculpatory evidence. (*See* Sandusky Aff, Ex. 11 (Memorandum of Law, dated Dec. 3, 2003), at 3–4 .) In particular, Petitioner argued that the DA's Office's admission that it had notes of interviews with Quinones, coupled with its refusal to disclose those notes, evinced a *Rosario* violation.[FN6] (*See id.* at 4, 213 N.Y.S.2d 448, 173 N.E.2d 881.)

FN6. In *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (N.Y.1961), the New York Court of Appeals held that a criminal defendant is entitled to examine any prior statement of a witness called by the prosecution, where the prior statement relates to the subject matter of the witness's testimony, *id.* at 289–91, 213 N.Y.S.2d 448, 173 N.E.2d 881. That rule was later codified as New York Criminal Procedure Law § 240.45(1)(a). If the prosecution fails to disclose so-called *Rosario* material, the defendant may be entitled to a reversal of the conviction or some other sanction, depending on the circumstances of the failure to disclose and the content of the material. *See People v. Martinez,* 71 N.Y.2d 937, 940, 528 N.Y.S.2d 813, 524 N.E.2d 134 (N.Y.1988); *see also* N.Y.Crim. Proc. § 240.70.

The trial court denied Petitioner's motion to renew on the ground that he had not come forward with any "newly discovered evidence" that would alter the court's determination of the underlying motion to vacate, *see* N.Y. C.P.L.R. § 2221(e)(2). (*See* Sandusky Aff, Ex. 13, at 2–3 (concluding that the motion to renew was "predicated upon newly discovered evidence that [Petitioner] has yet to discover").) The court noted, however, that, if Petitioner's "pending Article 78 proceeding [should] yield the information sought, [Petitioner] may have a basis to renew [his] motion to vacate." (*Id.* at 3, 213 N.Y.S.2d 448, 173 N.E.2d 881.)

**F. *Subsequent Rulings on Petitioner's First FOIL Request***

***17** As noted above (*see* Background Section D, *supra* ), the Bronx Supreme Court initially dismissed the Article 78 petition in which Petitioner had challenged the decision of the DA's Office to withhold various documents in response to his FOIL request. In 2004, however, the Appellate Division reversed this trial court ruling and remanded the matter for an *in camera* inspection of the withheld documents. *See Chebere v. Johnson,* 3 A.D.3d 365, 770 N.Y.S.2d 357, 358 (1st Dep't 2004). Following remand, the trial court (Ruiz, J.S.C.) inspected the withheld documents and concluded that only certain of those documents were exempt from disclosure under FOIL as work product and/or for "witness safety" reasons—specifically, "the NYSIS sheet of the witness [Quinones], notes apparently taken by ADA Florio in preparation for trial, references to Social Security Numbers, residences, names of the witnesses' family or friends and their personal information, names of Probation Officers, documents relating to travel arrangements made for Quinones during trials [,] and material from Florida." (Sandusky Aff, Ex. 14 (Order, dated Nov. 22, 2004 ("11/22/04 Order")), at 6 (emphasis omitted).) [FN7] The

DA's Office then produced a number of documents to Petitioner, in redacted form.[FN8]

FN7. In its ruling, the trial court made clear that, although Petitioner's FOIL request had "intermingled ... *Brady* demands ... in an apparent attempt to prepare a motion pursuant to CPL 440, ... those issues do not bear on the instant motion." (*Id.* at 4.) Rather, the court explained, the "only matter of concern" to the court was Petitioner's FOIL request. (*Id.* at 4–5.) Nevertheless, the court noted that Petitioner's alleged *Brady* violations "strain[ed] credulity." (*Id.* at 5–6.)

FN8. Respondent provided a copy of this production to this Court, *in camera*, via letter dated October 14, 2010.

**G. *Petitioner's Second Motion to Renew His Section 440 Motion***

On May 5, 2006, Petitioner moved, for a second time, to renew his motion to vacate his conviction. (*See* Sandusky Aff, Ex. 15 (Notice of Motion, dated May 5, 2006).) In this motion, Petitioner reiterated his claims regarding the prosecution's alleged withholding of *Brady* material related to Quinones's testimony, and explained how Quinones's own trial testimony supported Petitioner's belief that Quinones had been offered "gifts" or other compensation for his testimony against Petitioner. (*See* Sandusky Aff, Ex. 15 (Affidavit in Support of Notice of Motion, dated May 5, 2006), ¶¶ 9–14.) Petitioner also raised a seemingly new argument, based on the double jeopardy clause of the Fifth Amendment: according to Petitioner, the alleged misconduct of the prosecutors during and after trial barred the state from retrying Petitioner for Blanding's death in the event that Petitioner's motion to vacate was granted. (*See id.* ¶¶ 20–29 (alleging misconduct); *see* Sandusky Aff, Ex. 15 (Memorandum of Law, dated May 5, 2006) at 22–25.)

The trial court denied Petitioner's motion in its entirety. (*See* Sandusky Aff, Ex. 18.) The court found that Petitioner had failed to identify any new facts in support of his claims, as required to support a motion to renew. (*See id.,* at 6; *see also* N.Y.C.P.L.R. § 2221(e)(2).) The court explained that, while the prosecution had produced additional documents in connection with Petitioner's FOIL request, Petitioner had failed "to establish that the People withheld any item that fell within the class of discoverable documents that the People were required to turn over at trial." (Sandusky Aff, Ex. 18, at 5.) The court further held that Petitioner's contention that the prosecution had only disclosed notes from one of two interviews of Quinones by the DA's Office was contradicted by the record, as "the trial transcript conclusively establishes that [Petitioner's] trial counsel cross-examined ... Quinones concerning" the interview that Petitioner alleged had not been disclosed. (*Id.*) On January 25, 2007, Petitioner sought leave to appeal this decision to the Appellate Division, but leave was denied on July 19, 2007. (Sandusky Aff., ¶¶ 35–36.)

**H. *Petitioner's Second FOIL Request***

***18** By letter dated December 12, 2007, Petitioner submitted a FOIL request to the New York City Department of Investigation ("DOI") requesting documents about Quinones. (*See* Notice of Motion for Leave to Conduct Discovery Pursuant to Title 28 U.S.C. 2254 Rule 6(a), dated Jan. 15, 2010 ("Pet. Discovery Mtn.") (Dkt 25), Ex. A.) The DOI denied Petitioner's request, explaining that the DOI "ha[d] no substantiated allegations concerning Nick Quinones." (Pet. Discovery Mtn., Ex. B.) The DOI further determined that any other material concerning Quinones in the DOI's possession would be exempt from disclosure under FOIL, pursuant to New York Public Officers Law § 87(2)(b), because such disclosure would constitute an unwarranted invasion of personal privacy. (*Id.*) Petitioner appealed this determination, arguing that DOI could not properly withhold documents based on Public Officers Law § 87(2)(b) without demonstrating legitimate safety concerns.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

(Pet. Discovery Mtn., Ex. C (citing *Chebere,* 3 A.D.3d 365, 770 N.Y.S.2d 357).) The DOI denied Petitioner's appeal, stating: "To the extent DOI has additional responsive documents in its possession that have not already been provided to you," the disclosure of such documents "would reveal, *inter alia,* unsubstantiated allegations of misconduct and identities of witnesses and confidential information those witnesses provided." (Pet. Discovery Mtn., Ex. D (citations omitted).)

**I. *The Habeas Petition and Amended Petition***

Petitioner commenced this habeas action on September 6, 2003, by filing a Petition in which he sought to raise all of the claims that he had raised on direct appeal, as well as all of the claims he had raised in his Section 440 motion to vacate. (*See* Petition Under 28 USC § 2254 for Writ of Habeas Corpus by a Person in State Custody, dated Sept. 6, 2003 (Dkt.2).) [FN9] The Court then granted Petitioner leave to exhaust certain additional claims in state court, which were, at the time, the subject of the further state court proceedings described above. (*See* Dkts. 6, 8.) On November 5, 2007, apparently upon completion of his efforts to exhaust, Petitioner filed a Motion to Amend to add these additional claims, and two others. (*See* Pet. Amend. Mtn., at 8–39 (summarizing proposed amendments).) In his motion papers, Petitioner made clear that he intended to raise before this Court all the claims he had raised on direct appeal (*see* Background Section B, *supra* ), all the claims he had raised in his Section 440 motion to vacate and related motions to renew (*see* Background Sections C, E, G, *supra* ), as well as two new claims: (1) that Petitioner was denied a "full and fair" hearing regarding the prosecution's alleged withholding of *Brady* material, both before and after trial, in violation of Petitioner's due process rights (*see* Pet. Amend. Mtn., at 19–32); and (2) that Petitioner was denied the effective assistance of counsel when his trial counsel failed "to fully explore the circumstances [under which] Quinones testified" [FN10] (*id.* at 33–39). This Court granted Petitioner's motion to amend on December 27, 2007. (*See* Dkt. 10)

FN9. As mentioned above, although the Court's docket reflects a filing date of January 15, 2004, the Court deems the Petition to have been filed on September 6, 2003. (*See* n.1, *supra.*)

FN10. Petitioner argued, among other things, that his trial counsel did not vigorously attempt to obtain purported *Brady* material from the prosecution and did not adequately probe the fact that, only minutes after Petitioner was put in a cell next to Quinones's cell, Quinones was "suspiciously" moved to a cell next to Caban's. (*See id.*)

***19** Petitioner filed his Amended Petition on February 13, 2008 (*see* Am. Pet.), and Respondent filed an opposition on September 9, 2008 (*see* Sandusky Aff; *see also* Memorandum of Law, filed Sept. 9, 2008 ("Resp.Mem.") (annexed to Sandusky Aff.)). Although Petitioner did not file a reply to Respondent's opposition papers, he did file a motion for leave to conduct discovery of documents that, according to Petitioner, had been withheld from him in contravention *of Brady.* (*See* Pet. Discovery Mtn.) The Court granted Petitioner's motion in part, but only to the extent that the Court ordered Respondent to produce certain documents to the Court for *in camera* review to determine whether those documents constituted *Brady* material. (*See* Order, dated Sept. 17, 2010 (Dkt.27), at 6–7.) Respondent submitted these documents to the Court on October 14, 2010.

## *DISCUSSION*

**I. *APPLICABLE LEGAL STANDARDS***

**A. *Statute of Limitations***

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (2000); *see also* *Williams v. Artuz,* 237 F.3d 147, 150–51 (2d Cir.2001) (citations omitted) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or—if the prisoner elects not to file a petition for certiorari—[the expiration of] the time to seek direct review via certiorari").[FN11]

FN11. The limitations period may alternatively begin to run on the following dates: (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence. *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

Here, Petitioner's habeas petition was timely filed, as it was filed within one year of the date upon which Petitioner's conviction became final. *See* 28 U.S.C. § 2244(d)(1)(A). On June 14, 2002, the Court of Appeals denied Petitioner's request for leave to appeal the Appellate Division's affirmance of his conviction, *see* *People v. Chebere,* 98 N.Y.2d 673, 746 N.Y.S.2d 462, 774 N.E.2d 227 (2002), and, 90 days later, on September 12, 2002, Petitioner's conviction became final for the purposes of the relevant limitations period, *see* *Williams,* 237 F.3d at 151. The Petition was timely filed on September 6, 2003, less than one year from that date; Respondent does not contend otherwise.

**B. *Exhaustion***

A federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see also* *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Doresy v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the ' "opportunity to pass upon and correct alleged violations of ... prisoners' federal rights." *Picard,* 404 U.S. at 275 (citing *Wilwording v. Swenson,* 404 U.S. 249, 250, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971)). There are several ways by which a petitioner can fairly present a federal claim to the state appellate court, including by citing the relevant provisions of the federal Constitution in his appellate brief. *See* *Davis v. Strack,* 270 F.3d 111, 122–23 (2d Cir.2001). Once the state courts are apprised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (citation omitted).

***20** In this case, despite this Court's granting of a lengthy stay of these proceedings to enable Petitioner to exhaust his claims, Petitioner has nonetheless still presented a "mixed" petition, *i .e.,* one that presents both exhausted and unexhausted claims. *See* *Rhines v. Weber,* 544 U.S. 269, 271, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). In particular, Petitioner's final two claims, raised for the first time in his Amended Petition, have not been exhausted in the state courts. When ruling on a mixed petition, the Court may dismiss the entire petition outright. *See* *id.* at 277–78. Alternatively, as was previously done here, the Court may, in its discretion, stay the proceedings and hold the petition in abeyance, so as to permit the petitioner to return to the state courts to exhaust any unexhausted claims, assuming an avenue for exhaustion is still available. *See id.* If, however, the petitioner does not show good cause for his failure to exhaust any unexhausted claims, or if those claims are plainly meritless,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

then the issuance of a stay (or, as in this case, a further stay), would be an abuse of the Court's discretion. *See id.* at 277. Where a court "determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.* at 278. Under AEDPA, the Court may also dismiss any unexhausted claims on the merits. *See* 28 U.S.C. § 2254(b)(2); *see also, e.g., Aparicio v. Artuz,* 269 F.3d 78, 91 n. 5 (2d Cir.2001).

In this case, I recommend that the Court proceed to consider Petitioner's claims, and that it dismiss the unexhausted claims on their merits, under 28 U.S.C. § 2254(b)(2).

**C. *Standard of Review***

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA. *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

***21** 28 U.S.C. § 2254(d). In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 73–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.' " *Wiggins v. Smith,* 539 U.S. 510, 520–21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams v. Taylor,* 529 U.S. at 409). Under this "difficult to meet" standard, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter,* ––– U.S. ––––, ––––, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (citing *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)). In order to be entitled to habeas relief, the petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

Page 20

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

jurists could disagree' on the correctness of the state court's decision" in light of clearly established federal law.[FN12] *Id.* at 786 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).

FN12. The Supreme Court has emphasized that "clearly established [f]ederal law" refers only to the " 'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.' " *Carey v. Musladin,* 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (quoting *Williams v. Taylor,* 529 U.S. at 412); *see also Rodriguez v. Miller,* 537 F.3d 102, 106–07 (2d Cir.2008) (*"Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions."). Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief. *Id.* (citing *Musladin* ); *see also Knowles v. Mirzayance,* 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.") (internal quotation marks omitted).

## II. *PETITIONER'S CLAIMS*

Petitioner appears to assert 13 grounds for habeas relief. The first seven mirror those brought on direct appeal:

(1) Petitioner's conviction was against the weight of the evidence, and/or was based on insufficient evidence;

(2) Petitioner's conviction was based upon the patently false testimony of James Venson, which was the result of prosecutorial misconduct and violated Petitioner's due process rights;

(3) Petitioner was improperly prejudiced by the introduction of unnecessarily excessive evidence of his purported involvement in the drug trade;

(4) Petitioner was improperly cross-examined about highly prejudicial and non-probative allegations that he had abused his pregnant girlfriend;

(5) the trial court unjustifiably limited Petitioner's trial counsel's summation;

***22** (6) the trial court's alibi instruction was improper because it failed to explain that Petitioner "had no burden to prove that he was not the person who committed the crime" (Direct Appeal Mem., at 63–66); and

(7) Petitioner's sentence was excessive.

Petitioner's next four claims are based on the claims he raised in his Section 440 motion to vacate his conviction and in his subsequent motions to renew that motion:

(8) the prosecution withheld *Brady* material regarding its alleged agreements with cooperating witnesses;

(9) the prosecution elicited false testimony from cooperating witnesses;

(10) Petitioner received ineffective assistance of trial counsel because his counsel did not, prior to trial, adequately investigate the crime scene or interview certain witnesses; and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(11) the double jeopardy clause prevents Petitioner from being retried.

Finally, Petitioner asserts two new claims in his motion to amend his habeas Petition-claims that:

(12) Petitioner was denied a "full and fair" hearing regarding the prosecution's alleged withholding of *Brady* material, in violation of his due process rights; and

(13) Petitioner received ineffective assistance of counsel when his trial counsel failed to explore fully the circumstances surrounding Quinones's testimony.

Each of these claims should be dismissed, either as procedurally barred, non-cognizable, or without merit.

**A. *Claims Raised by Petitioner on His Direct Appeal***

**1. *Claim 1: Weight and Sufficiency of the Evidence***

On direct appeal, Petitioner first argued that his conviction was "against the weight of the evidence," without directly challenging the sufficiency of the evidence. (*See* Direct Appeal Mem., at 26–41.) The Appellate Division nevertheless interpreted Petitioner's argument on this point to raise challenges to both the weight and the sufficiency of the evidence, and denied both of those claims on the merits. *See Chebere,* 740 N.Y.S.2d at 26 ("The verdict [against Petitioner] was based on legally sufficient evidence and was not against the weight of the evidence.") Accordingly, this Court will similarly interpret the Amended Petition to assert claims challenging both the weight and sufficiency of the evidence. *See generally McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (holding that court should read *pro se* submissions "liberally and interpret them to raise the strongest arguments they suggest") (internal quotation marks omitted).

A "weight of the evidence" claim, however, is not cognizable on federal habeas review, as it is grounded entirely in state law. It originates from New York Criminal Procedure Law § 470.15(5), which permits an appellate court to reverse or modify a conviction where the court determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." *See also People v. Bleakley,* 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (N.Y.1987). Federal habeas review is not available where there is simply an error of state law. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or laws or treaties of the United States"); *see also Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted). Thus, to the extent Petitioner is now attempting to raise his "weight of the evidence" claim in this habeas proceeding, the claim must be dismissed. *See, e.g., Douglas v. Portuondo,* 232 F.Supp.2d 106, 116 (S.D.N.Y.2002) ("A federal habeas court cannot address 'weight of the evidence' claims because ... the 'weight of the evidence' argument is a pure state law claim ... for which habeas review is not available.") (internal quotation marks and citations omitted); *Kearse v. Artuz,* No. 99 Civ. 2428(TPG), 2000 U.S. Dist. LEXIS 12649, at *2, 2000 WL 1253205 (S.D.N.Y. Sept. 5, 2000) (summarily dismissing challenge to verdict as against the weight of the evidence on the ground that "[d]isagreement with a jury verdict about the weight of the evidence is not grounds for federal habeas corpus relief").

***23** Petitioner's claim challenging the legal sufficiency of the evidence should also be dismissed, under the standard of review set forth in AEDPA. The Due Process Clause of the 14th Amendment prohibits conviction "except upon proof beyond a reasonable

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). On a federal constitutional claim challenging whether the evidence adduced at trial was sufficient to support the verdict, a petitioner "bears a heavy burden ... because the government receives the benefit of having all permissible inferences drawn in its favor." *Dixon v. Miller,* 293 F.3d 74, 81 (2d Cir.2002) (internal quotation and citations omitted). Habeas relief is warranted only if the Court finds that, when viewing the evidence most favorably to the prosecution, no rational jury could find guilt beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Farrington v. Senkowski,* 214 F.3d 237, 240–41 (2d Cir.2000) (citing *Jackson,* 443 U.S. at 324). Such an inquiry "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " *Jackson,* 443 U.S. at 318–19 (quoting *Woodby v. Immigration & Naturalization Serv.,* 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). Rather, under established Supreme Court law, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

Here, Caban testified in detail about his own involvement, together with Petitioner, in the killing of Blanding. (*See* Background Section A(1)(a), *supra.*) Based on his briefing to the Appellate Division, Petitioner makes no argument that Caban's testimony, if true, is legally insufficient to prove the elements of the crimes for which Petitioner was convicted. (*See* Direct Appeal Mem., at 26–41.) Rather, Petitioner merely maintains that Caban's testimony—as that of a cooperating witness—was not credible and was insufficiently corroborated by other evidence. (*See id.*) The jury, however, was entitled to credit the testimony of any witness presented at trial. *See Gruttola v. Hammock,* 639 F.2d 922, 928 (2d Cir.1981) (rejecting insufficient evidence claim raised by habeas petitioner because jury was entitled to believe prosecution's witness). Moreover, Caban's testimony *was* corroborated, by the testimony of Venson, Brown, and Quinones. (*See* Background Section A(1)(b), *supra.*) In any event, the law is clear that even a lack of corroboration of a cooperating witness's testimony cannot support a constitutional legal insufficiency claim. *United States v. Florez,* 447 F.3d 145, 155 (2d Cir.2006) ("[T]he government's failure to corroborate a [cooperating] witness's testimony raises a question as to the weight a jury might choose to give that testimony, not its legal sufficiency to support a conviction."); *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989) (stating that "any lack of corroboration goes only to the weight of the evidence, not to its sufficiency").

***24** As a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have credited Caban's testimony and found the essential elements of the charged crimes beyond a reasonable doubt, *see Jackson,* 443 U.S. at 319, it cannot be said that the Appellate Division's rejection of Petitioner's legal insufficiency claim was "contrary to," or an "unreasonable application of" established federal law. 28 U.S.C. § 2254(d). Accordingly, I recommend that this claim be dismissed.

**2. *Claim 2: "Patently False" Testimony of Venson***

On direct appeal, Petitioner also argued that the prosecutor intentionally elicited false testimony from Venson regarding hearing incriminating conversations between Petitioner and his accomplices, knowing that testimony to be false, and that such conduct violated Petitioner's federal due process rights.[FN13] (*See* Direct Appeal Mem., at 42–49.) The Appellate Division did not specifically address the merits of this claim; rather, after addressing other claims, the court rejected this one by stating that "[Petitioner]'s remaining contentions are unpreserved and we decline to review them in the interest of justice." *Chebere,* 740 N.Y.S.2d at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

26. As discussed below, this decision of the Appellate Division gives rise to a procedural bar that precludes this Court from reviewing the claim in a habeas proceeding.[FN14]

FN13. In the section of Petitioner's appellate brief addressing Venson's testimony, Petitioner appeared to assert separate claims challenging (1) the prosecutor's alleged misconduct, and (2) the alleged violation of Petitioner's due process rights. (*See* Direct Appeal Mem., at 42–49.) Here, the analysis of these claims collapses, as habeas relief is only warranted on a prosecutorial misconduct claim where the prosecutor's conduct was "so egregious as to violate the [petitioner]'s due process rights." *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998).

FN14. The fact that the Appellate Division also held that, if it were to review this claim, it would reject it, *id.,* does not alter the fact that the claim is procedurally barred from habeas review. *See Guity v. Ercole,* 07 Civ. 0728(RPP), 2007 U.S. Dist. LEXIS 82064, at *22, 2007 WL 3284694 (S.D.N.Y. Nov. 6, 2007).

Federal habeas review of a claim is not available where the question has been decided by a state court, and the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The state law ground may be substantive or procedural. *Id.*

In evaluating whether the state court has found a claim to be procedurally defaulted under state law, this Court must look to the last reasoned state court opinion. *See Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). To determine whether the state law ground on which the state court rested was "truly an *independent* basis for decision or merely a passing reference, such reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 809 (2d Cir.2000) (emphasis added) (internal quotation marks and citation omitted); *see also Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997) (to preclude federal review, the state court "must 'clearly and expressly state[ ] that its judgment rest[ed] on a state procedural bar' ") (citation omitted). To be deemed *adequate,* the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state in question, *see Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991), and must not have been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (internal quotation marks and citation omitted).

***25** Here, the last-reasoned state court decision is that of the Appellate Division, and it is clear from the face of that decision that Petitioner's due process claim arising from Venson's testimony was rejected as unpreserved. *See Chebere,* 740 N.Y.S.2d at 26. This constitutes an "independent" state-law procedural ground; indeed, this Court has explicitly held that "the Appellate Division's decision that [a][p]etitioner's remaining contentions were 'unpreserved' is sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue." *Guity v. Ercole,* 2007 U.S. Dist. LEXIS 82064, at *22, 2007 WL 3284694 (citing *Harris v. Reed,* 489 U.S. 255, 265, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)).[FN15] Further, New York's preservation rule, requiring that parties raise specific contemporaneous objections to a trial court's rulings before challenging them on appeal, *see* N.Y.C.P.L. § 470.05(2), affords an "adequate" basis for the Appellate Division's decision. *See generally Garcia v. Lewis,* 188 F.3d 71, 79 (2d Cir.1999); *Alvardo v. Burge,* No. 05 Civ. 1851(AKH), 2006 U.S. Dist. LEXIS 46708, at *6, 2006 WL 1840020 (S.D.N.Y. June 30, 2006)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

("[F]ailure to object is not merely technical; the requirement of timely objection allows the trial court to consider potential errors and correct them in a timely fashion, when it most counts."). New York courts have repeatedly held that, in the absence of objections during trial, a criminal defendant's due process and prosecutorial misconduct claims will be unpreserved for appellate review. *See People v. Harris,* 98 N.Y.2d 452, 491, 749 N.Y.S.2d 766, 779 N.E.2d 705 (N.Y.1998); *People v. Hooper,* 288 A.D.2d 948, 732 N.Y.S.2d 207, 208 (4th Dep't 2001), *lv. denied* 97 N.Y.2d 755, 742 N.Y.S.2d 615, 769 N.E.2d 361 (N.Y.2002); *see also* Resp. Mem., at 11–10 (citing cases).

FN15. *See also Walker v. Brown,* No. 08–CV–1254 (BMC), 2009 U.S. Dist. LEXIS 59384, at *32, 2009 WL 2030618 (E.D.N.Y. July 10, 2009) (holding that Appellate Division had decided petitioner's "remaining contentions" on independent and adequate state grounds where the Appellate Division had deemed those contentions "unpreserved for appella[te] review"); *Cephas v. Ercole,* No. 07 Civ. 6048(NRB), 2008 U.S. Dist. LEXIS 35343, at *21, 2008 WL 1944837 (S.D.N.Y. Apr. 29, 2008) (holding that claim was precluded from habeas review by the Appellate Division's conclusion that "Defendant's remaining contentions are unpreserved"); *Parreno v. Annetts,* No. 04 Civ. 10153(GWG), 2006 U.S. Dist. LEXIS 11065, at *26–27, 2006 WL 689511 (S.D.N.Y. Mar. 20, 2006) (same).

Finally, there is no basis for the Court to find that the state's preservation rule was inappropriately applied in this case. *See Cotto,* 331 F.3d at 240. At trial, although one of Petitioner's co-defendants moved to strike Venson's testimony as incredible as a matter of law, Petitioner specifically declined to join in that motion. (*See* Trial Tr., at 1604–05; *see also id.* at 1802–05 (failing to object during prosecution's explanation of Venson's testimony during summation).) No party objected to, or moved to strike, Venson's testimony on the ground that it was perjured, that the prosecution had suborned perjury, or that the prosecutor's conduct in eliciting the testimony had violated the defendants' due process rights. (*See id.* at 1604–05.) There is thus nothing in the record that suggests that the trial court had any opportunity to consider the due process claim that Petitioner raises here. On this record, Petitioner's claim should be held to be procedurally barred from federal habeas review. *See, e.g., Harripersaud v. Barkley,* No. 04–CV–4035 (NGG)(KAM), 2006 U.S. Dist. LEXIS 17317, at *18, 22–24, 2006 WL 467951 (E.D.N.Y. Feb. 27, 2006) (holding that due process claim based upon alleged prosecutorial misconduct was procedurally barred where the Appellate Division had rejected that claim as unpreserved).

***26** Where a claim has been decided by the state court on an independent and adequate state law ground, the habeas court is precluded from reviewing the defaulted claim unless either (1) "the petitioner can demonstrate cause and prejudice for the default," *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (citations omitted); *accord Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 633 (2d Cir.2001) (citations omitted), or (2) the "failure to consider the [defaulted] claim will result in a fundamental miscarriage of justice," *Coleman,* 501 U.S. at 750 (internal quotation marks and citations omitted). In this instance, Petitioner cannot overcome the procedural bar because he cannot demonstrate cause and prejudice, or a fundamental miscarriage ofjustice.

"Cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier, All* U.S. 478, 488 (1986); *see also Ayuso v. Artuz,* No. 99 Civ. 12015(AGS)(JCF), 2001 U.S. Dist. LEXIS 2504, at *23–26, 2001 WL 246437 (S.D.N.Y. Mar. 7, 2001);

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Williams v. Artus,* 691 F.Supp.2d 515, 525 (S.D.N.Y.2010). Thus, cause for a default exists where a petitioner can show that (1) "the factual or legal basis for a claim was not reasonably available to counsel," (2) " 'some interference by state officials' made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett,* 41 F.3d at 829 (citation omitted). "Prejudice" requires a petitioner to demonstrate that the alleged constitutional error worked to his *"actual* and substantial disadvantage." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original); *accord Femia v. United States,* 47 F.3d 519, 524 (2d Cir.1995).

Petitioner has not shown cause for his failure to preserve his due process claim arising from Venson's trial testimony. Although Petitioner might have argued that his trial counsel was ineffective for failing to object to that testimony, Petitioner made no such argument in state court and thus cannot advance such a theory here, as "cause" for his procedural default. *See Murray,* 477 U.S. at 488–89 (holding that an ineffective assistance claim cannot be successfully asserted as cause for a procedural default if that claim has not been separately exhausted and would itself be barred). As Petitioner cannot show cause for his procedural default, this Court need not reach the question of whether Petitioner can show prejudice. *See Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice.").

As noted above, the Court may also excuse a procedural default where the petitioner "can demonstrate a sufficient probability that [the habeas court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (citing *Coleman,* 501 U.S. at 750). This exception, however, is quite narrow; it is "concerned with actual as compared to legal innocence." *Sawyer v. Whitley,* 505 U.S. 333, 339–40, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Thus, to meet this standard, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray, 411* U.S. at 496. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id.* at 327 (citations omitted).[FN16]

FN16. It is rare that a petitioner will be able to satisfy the actual innocence standard; indeed, "in virtually every case, the allegation of actual innocence has been summarily rejected." *Schlup,* 513 U.S. at 324 (citation omitted).

***27** In this case, Petitioner has also failed to show any probability that this Court's failure to review his claim would result in a fundamental miscarriage of justice, as he has offered no new evidence, scientific or otherwise, showing his actual innocence. As Petitioner has not demonstrated that he can overcome the procedural bar to this Court's consideration of his due process claim arising from Venson's testimony, I recommend that this claim be dismissed.[FN17]

FN17. Because this claim is procedurally barred, this Court need not address its merits. The Court notes, however, that this Court (Patterson, J.) found a nearly identical claim, as raised by Petitioner's co-defendant Martinez, to be meritless, in *Martinez v. Phillips,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

2009 U.S. Dist. LEXIS 34847, at *58, 62–64, 2009 WL 1108515.

**3. *Claims 3 and 4: Challenges to Evidentiary Rulings***

Petitioner's third and fourth claims, raised on direct appeal, challenge the trial court's decisions (1) to admit supposedly “unnecessarily excessive” evidence of Petitioner's purported involvement in the drug trade, and (2) to permit the prosecution to ask Petitioner questions, on cross examination, about whether he had abused his pregnant girlfriend.[FN18] (*See* Direct Appeal Mem., at 49–57.) Petitioner cannot prevail on either of these claims.

FN18. In asserting these claims on direct appeal, Petitioner cited to the Fifth and 14th Amendments to the United States Constitution, thereby suggesting that these alleged evidentiary errors violated Petitioner's due process right to a fundamentally fair trial. (*See* Direct Appeal Mem. at 49, 53.) Thus, these claims appear to be exhausted for the purpose of habeas review; Respondent does not contend otherwise. (*See* Resp. Mem., at 15–17.)

As a threshold matter, mere errors of state evidentiary law are not cognizable on habeas review. *See* 28 U.S.C. § 2254(a); *see also* *Estelle v. McGuire,* 502 U.S. at 68. This Court may only review a state court's evidentiary ruling if it was so egregious that it rendered the petitioner's trial fundamentally unfair, in violation of his constitutional right to due process. *See* *Chambers v. Mississippi,* 410 U.S. 284, 302–03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Rosario v. Kuhlman,* 839 F.2d 918, 924–25 (2d Cir.1988) ( “[E]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ [should] issue *only* where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial.”) (emphasis in original) (quotation marks and citation omitted); *Schurman v. Leonardo,* 768 F.Supp. 993, 1001 (S.D.N.Y.1991) (same) (citation omitted); *Copes v. Schriver,* No. 97 Civ. 2284(JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct.22, 1997) (explaining that a habeas petitioner “must demonstrate that the alleged evidentiary error violated an identifiable constitutional right, and, in doing so, a petitioner bears a heavy burden because evidentiary errors generally do not rise to constitutional magnitude”) (citation omitted).

Where purportedly prejudicial evidence is “probative of [an] essential element in the case, its admission does not violate the defendant's right to due process.” *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (internal quotation marks and citation omitted). “For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been ‘sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.’ “ *Id.* (quoting *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992)).

**a. *Evidence of Petitioner's Prior Involvement in the Drug Trade***

***28** With respect to evidence of Petitioner's prior involvement in the drug trade, it is essentially undisputed that such evidence was probative of an element of the alleged crimes—*i.e.,* the element of identification. The prosecution sought to prove that, as an associate of Caban and others in the drug trade, Petitioner was involved in Blanding's murder, while Petitioner maintained that he knew Caban only “by face,” had never agreed to sell heroin with Caban, and had never met Blanding. (*See* Direct Appeal Mem., at 22–23.) As Respondent contends, the evidence of Petitioner's prior involvement in the narcotics trade was “thoroughly interconnected with the testimony of several witnesses, establishing how the witnesses, [P]etitioner, his co-defendants, and Blanding all knew one another, and was thereby relevant and probative in proving the identities of the guilty parties.” (Resp. Mem., at 16.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Petitioner appears to concede that the evidence of his prior involvement in the drug trade was probative, but he nevertheless contends that the volume of such evidence—"far in excess of what was necessary to [support] the prosecution's theory of the case"—rendered its admission unconstitutional. (*Id.* at 49.) This argument fails. First, much of Petitioner's defense focused on the purported lack of credibility of a number of the prosecution's witnesses, rendering more reasonable the prosecution's approach of introducing cumulative evidence of Petitioner's alleged in involvement in Blanding's murder. Second, Petitioner points to no clearly established federal law under which probative evidence of uncharged crimes must be limited to "what [is] necessary to [support] the prosecution's theory" (*id.* at 49; *cf. Jones v. Conway,* 442 F.Supp.2d 113, 131 (S.D.N.Y.2006) ("[T]he Supreme Court has not held that the use of uncharged crimes would violate the Due Process Clause, [and thus] the Appellate Division's rejection of this claim is hardly either contrary to or an unreasonable application of clearly established Supreme Court law")); indeed, in this case, the Court cannot discern how the duplication or repetition of concededly probative evidence could be said to give rise to a fundamentally unfair trial. Finally, the trial court in this case *excluded* a good deal of additional evidence about Petitioner's prior drug-dealing, in an apparent effort to limit undue prejudice. (*See* Resp. Mem. at 16 (citing Trial Tr., at 1231–42, 1341–50).)

In affirming Petitioner's conviction, the Appellate Division held that "[e]vidence of [Petitioner's] extensive involvement in the drug trade was highly probative of motive, was inextricably interwoven with the narrative of events, and was necessary background to explain the relationship among the defendants and their relationship with the victim." *Chebere,* 740 N.Y.S.2d at 26. The court further found that the elicited evidence concerning Petitioner's involvement in the drug trade was not "excessive," and that "effort[s] to limit or sanitize this evidence would have unduly restricted its probative value." *Id.* Viewing Petitioner's trial as a whole, this Court cannot conclude that the Appellate Division's reasoning was contrary to established federal law, or that its decision rejecting Petitioner's claim constituted an unreasonable application of federal law. Certainly, Petitioner has not demonstrated that the trial court's admission of certain evidence of Petitioner's involvement in the drug trade deprived him of a fundamentally fair trial.

**b.** ***Cross–Examination of Petitioner Regarding His Alleged Abuse of His Girlfriend***

***29** Petitioner has likewise failed to demonstrate a basis for disturbing the Appellate Division's decision, insofar as it rejected Petitioner's due process challenge to the scope of his cross-examination. Specifically, the Appellate Division concluded that the "cross-examination of [Petitioner] concerning his alleged abuse of his girlfriend did not deprive him of a fair trial," as that cross-examination "had a good faith basis and was relevant to [Petitioner's] credibility." *Id.* The court also noted that Petitioner had answered the prosecution's only questions on that subject in the negative, and the trial court had then permitted no further inquiry on the topic. *Id.*

Improper questioning does not violate the federal due process clause unless it is " 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " *Dunnigan,* 137 F.3d at 125 (quoting *Johnson v. Ross,* 955 F.2d at 181). In this instance, the prosecution asked Petitioner a total of four questions regarding whether he had abused his pregnant girlfriend; Petitioner answered the first three questions in the negative, and the trial court sustained Petitioner's objection to the fourth. (*See* Trial Tr. at 1574; Direct Appeal Mem. at 54–55.) Accordingly, the only testimony the jury heard was that Petitioner had not abused his pregnant girlfriend. Such questioning, while potentially prejudicial, does not appear to have "provide[d] the basis for conviction," nor to have served to remove a reasonable doubt as to Petitioner's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

involvement in Blanding's murder. *See Dunnigan,* 137 F.3d at 125 (internal quotation marks omitted). This questioning therefore cannot provide the basis for habeas relief: the questions did not give rise to a fundamentally unfair trial, and, accordingly, the Appellate Division did not unreasonably apply clearly established federal law in upholding the trial court's rulings that allowed the prosecution to ask these questions.

For the foregoing reasons, I recommend that the Court dismiss Petitioner's claims challenging the trial court's evidentiary rulings permitting both evidence of Petitioner's alleged prior drug-dealing and cross-examination questions about abuse of his girlfriend.

**4. *Claim 5: Trial Court's Limitations on Petitioner's Summation***

Petitioner contends that the trial court unjustifiably limited his trial counsel's summation at the close of trial. During summation, Petitioner's counsel argued that the prosecution's case was "totally lacking integrity," and that the prosecution had been "reckless in their investigation" and presented patently incredible testimony as part of a "shameless desperate search for corroboration where they made deals." (Trial Tr., at 1720–22.) Such conduct was, according to Petitioner's counsel's summation, "shameful" and "disgusting." (*Id.* at 1721–22.) Following objections by the prosecution, the trial judge directed defense counsel not to "impugn[ ] the integrity of another attorney or prosecutor." (*Id.* at 1731.) The court further stated that defense counsel "can't impugn the D.A.'s office" (*id.* at 1741), and instructed defense counsel to "focus on the evidence, not make it a personal attack [against] the D.A.'s office" (*id.* at 1740).

***30** On direct appeal, the Appellate Division rejected Petitioner's claim regarding the trial court's limitation on Petitioner's summation, concluding that counsel had been "making an argument that was not based on the evidence and amounted to personal attacks on the prosecutor," and further that counsel had "received ample latitude to argue the point he was seeking to advance." *Chebere,* 740 N.Y.S.2d at 26. This Court reviews the Appellate Division's rejection of this claim under the standard of review set forth in AEDPA.

The 14th Amendment "require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense," *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and a criminal defendant's summation is an essential part of that defense, *see Herring v. New York, 411* U.S. 853, 862 (1975). The summation is not evidence, however, *see United States v. Arboleda,* 20 F.3d 58, 61 (2d Cir.1994), and the trial judge has "broad discretion" to limit both the scope and duration of a criminal defendant's summation:

> The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion.

*Herring,* 422 U.S. at 862.

In this instance, the trial court's limitation on Petitioner's comments about the District Attorney's office did not violate Petitioner's constitutional rights. As the Appellate Division concluded, Petitioner "received ample latitude" to question the integrity of the prosecution's case during summation (and throughout trial), and, indeed, the jury heard Petitioner's counsel characterize the prosecution's case as "totally lacking integrity" and the result of a "shameless desperate search." (Trial Tr., at 1720–22.) Petitioner was not impeded in any way from attacking the evidence that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was actually presented at trial—*e.g.,* the testimony of Venson and Brown—as the trial court's limitation was aimed only at insinuations of prosecutorial misconduct. Especially in light of the Supreme Court's observation that the trial judge has "great latitude in controlling the duration and limiting the scope of closing summations," *Herring,* 422 U.S. at 862, the Appellate Division's rejection of Petitioner's challenge to the trial court's limitation of his counsel's summation cannot be deemed contrary to, or an unreasonable application of, clearly established federal law. This claim should therefore be dismissed.

**5. *Claim 6: The Trial Court's Alibi Instruction***

Petitioner contends that the trial court's jury charge failed to inform the jury of the proper burden of proof regarding Petitioner's alibi defense; according to Petitioner, this purportedly defective jury instruction violated his due process rights. (*See* Direct Appeal Mem., at 63–66.) As with Petitioner's second claim (his due process claim arising from Venson's allegedly perjured testimony), the state court rejected Petitioner's jury charge claim on the ground that it had not been preserved at trial. *Chebere,* 740 N.Y.S.2d at 26. This constitutes an independent and adequate state law ground for the Appellate Division's denial of the claim, precluding review by this Court. (*See* Discussion Section II(A)(2), *supra; Burwell v. Superintendent of Fishkill Corr. Facility,* No. 06 Civ. 787(JFK), 2008 U.S. Dist. LEXIS 52676, at *19–20, 2008 WL 2704319 (S.D.N.Y. July 10, 2008) (where Appellate Division had rejected petitioner's jury charge claim as unpreserved, such claim was procedurally barred on habeas review).) New York courts have consistently held that claims challenging jury instructions must be preserved by specific objections at trial, *see People v. Iannelli,* 69 N.Y.2d 684, 685, 512 N.Y.S.2d 16, 504 N.E.2d 383 (N.Y.1986); *see also* Resp. Mem., at 23 (citing cases), and the Court discerns no basis for concluding the state's preservation rule was inappropriately applied in this case, *see Cotto,* 331 F.3d at 240.

***31** Petitioner cannot overcome the procedural bar with respect to his jury charge claim. As with his second claim, discussed above, Petitioner has not shown cause for his failure to preserve his jury charge claim at trial. He also has not shown any probability that the Court's failure to review his jury charge claim would result in a fundamental miscarriage of justice, as he has offered no new evidence of actual innocence. Therefore, I recommend that Petitioner's jury charge claim be dismissed.

**6. *Claim 7: Excessive Sentence***

Petitioner argues that his 22–year minimum sentence for second-degree murder was excessive in light of his minor, prior criminal record. (*See* Direct Appeal Mem., at 67–69.) The Appellate Division summarily rejected this claim, *see Chebere,* 740 N.Y.S.2d at 26, but, in any event, it is not a cognizable federal claim and should be dismissed here, on that basis.

To the extent this claim may be read to challenge Petitioner's sentence as constituting cruel and unusual punishment under the Eighth Amendment, Petitioner's claim is not cognizable on habeas review. In order to state a cognizable Eighth Amendment claim, a petitioner must generally allege that the statute under which he was sentenced is itself unconstitutional. *See United States v. Dawson,* 400 F.2d 194, 200 (2d Cir.1968) (stating that "when a statute provides for punishment thought to be violative of the [Eighth] [A]mendment the constitutionality of the statute itself must be attacked") (citations omitted). In this case, Petitioner has made no such attack on the validity of the relevant statute.

In the absence of a challenge to the relevant statute itself, an excessive sentence claim may only be maintained if the sentence imposed fails to comply with state law. *See White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) ("No federal constitutional issue is presented where ... the sentence is within the range prescribed by state law.") (citation omitted). In this case, Petitioner was convicted of Murder in the Sec-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 30

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

ond Degree, pursuant to New York Penal Law § 125.25[1] and [3], which, by the statute's terms, is a class A–I felony. The permitted range for a sentence under this statute is 15 to 25 years imprisonment, *see* N.Y. Penal Law § 70.00(3)(a)(i), and Petitioner's sentence falls within this range. Thus, no Eighth Amendment issue is implicated by Petitioner's sentence, and Petitioner's excessive sentence claim should be dismissed.

**B.** ***Claims Raised in Petitioner's Section 440 Motion***

**1.** ***Claim 8: The Alleged Withholding of Brady Material***

For his eighth claim, Petitioner contends that the prosecution committed prosecutorial misconduct by withholding witness cooperation agreements, in contravention of *Brady.* (*See, e.g.,* Pet. 440 Mtn., ¶¶ 6–7, 11–13, 28.) FN19 The state court, in rejecting Petitioner's original motion to vacate, denied this claim under Section 440.30(4)(d) (*see* 12/19/99 Order, at 2), which provides that the state court may deny a motion to vacate without a hearing if "[a]n allegation of fact essential to support the motion (i) is contradicted by a court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true," N.Y.Crim. Proc. § 440.30(4)(d). In rejecting both Petitioner's first and second motions to renew, the state court again denied this claim, under Section 2221(e)(2), which provides that a motion for leave to renew must "be based upon new facts not offered on the prior motion that would change the prior determination or shall demonstrate that there has been a change in the law that would change the prior determination," and, in the alternative, under Section 440.30(4)(d). (*See* Sandusky Aff, Exs. 13, 18.)

FN19. To the extent Petitioner also intended to raise a claim that the prosecution withheld *Rosario* materials, such a claim cannot be reviewed by this Court. *Rosario* claims are grounded in state law; as such, they are not cognizable on federal habeas review. *See Martinez,* 2009 U.S. Dist. LEXIS 34847, at *70, 2009 WL 1108515 (stating that "the failure to turn over Rosario material is not a basis for [federal] habeas relief, as the Rosario rule is purely one of state law," and dismissing *Rosario* claim).

***32** Respondent correctly acknowledges that courts in this circuit are split as to whether the state court's denial of a claim under Section 440.30(4)(d), which is arguably a merits-based determination, constitutes an independent and adequate state-law ground for decision, sufficient to bar federal habeas review. (*See* Resp. Mem., at 31–32 and n.6; *see also, e.g., Washington v. Cuomo,* No. 06 CV 6477(CBA), 2009 U.S. Dist. LEXIS 97981, at *9–10, 2009 WL 3379076 (E.D.N.Y. Oct. 19, 2009) (noting split of authority); *Lopez v. Ercole,* No. 09 Civ. 1398(PAC)(AJP), 2010 U.S. Dist. LEXIS 39274, at *62–66, 2010 WL 1628994 (S.D.N.Y. Apr. 21, 2010) (Report & Recommendation) (collecting cases).) Similarly, it is unclear whether a denial under Section 2221(e)(2), which also requires consideration of the merits, constitutes an independent and adequate state law ground. In this instance, however, the Court need not decide whether a denial under either Section 440.30(4)(c) or Section 2221(e)(2) gives rise to a procedural bar, because Petitioner's underlying *Brady* claim fails on the merits, in any event.

It is well established that "the mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief." *Mallet v. Miller,* 432 F.Supp.2d 366, 377 (S.D.N.Y.2006) (citing *Strickler v. Greene,* 527 U.S. 263, 286, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Here, Petitioner has not shown that any evidence was actually withheld from him improperly, before trial. He does argue, however, that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

certain statements made in response to his FOIL requests, as well as other circumstantial evidence, suggest that the prosecution concealed a cooperation agreement with Quinones. In particular, Petitioner argues that the existence of documents reflecting "interviews" with Quinones and "deals" made with him—as described in Justice Ruiz's November 22, 2004 Order—demonstrate that such documents were improperly withheld in contravention of *Brady.* (Pet. 440 Mtn., ¶¶ 56–71 (citing 11/22/04 Order.)) Arguments nearly identical to these were raised by Petitioner's co-defendant Martinez, in support of his nearly identical *Brady* claim. *See Martinez,* 2009 U.S. Dist. LEXIS 34847, at *70–83, 2009 WL 1108515. In a well-reasoned analysis, the Court (Patterson, J.) dismissed Martinez's *Brady* claim, and, for the reasons set forth below, the Court should follow Judge Patterson's analysis and dismiss Petitioner's *Brady* claim, as well.

Martinez, like Petitioner, argued that the prosecutors had violated *Brady* by failing to turn over documents and statements concerning Quinones. *Id.* at *70. To support this claim, Martinez pointed to Justice Ruiz's finding, in his Order dated November 22, 2004, that the government "acknowledges notes taken during interviews of Quinones ... [which] refer to the witness Quinones and reports generated through interrogation of, or 'deals' made, with him." *Id.* at *76–77 (quoting 11/22/04 Order). Martinez argued that this finding evinced a *Brady* violation in two ways. First, Martinez claimed that he received only one interview of Quinones, but Justice Ruiz's use of the plural "interviews" made clear that there was more than one interview. *Id.* at *77. The factual record before Judge Patterson indicated, however, that two transcribed interviews of Quinones were disclosed to Martinez—and to Petitioner—before trial. *Id.* Second, Martinez argued that Justice Ruiz's reference to "deals" demonstrated that there had been a deal between prosecutors and Quinones to secure Quinones's testimony against Martinez and/or Petitioner. *Id.* at *78–79. Judge Patterson rejected this argument, as the record reflected two *other* deals Quinones had made—one related to a September 12, 1993 murder, and another related to a January 1996 narcotics sale. *Id.* Thus, Judge Patterson concluded, Justice Ruiz's reference to "deals" did not suggest that Quinones had made a deal to testify against Martinez. *Id.* at *79. Rather, as Judge Patterson explained, Quinones's criminal history suggested that "the prosecution had nothing to give Quinones in return for his testimony at the time of [Martinez's and Petitioner's] trial ..., so the likelihood of a plea agreement involving his testimony in this case is nil." *Id.* at *79–80.

***33** Martinez also argued that the "suspicious cell transfers" of Petitioner and Quinones at the Bronx House of Detention should have resulted in documents being generated, and that such documents had been improperly withheld. *Id.* at *81–82. Judge Patterson found this "sheer speculation" insufficient to support a Brady claim. *Id.* at *81–82 (citing *United States v. Upon,* 856 F.Supp. 727, 746 (E.D.N.Y.1994); *Mallet v. Miller,* 432 F.Supp.2d 366 (S.D.N.Y.2006).) Finally, Judge Patterson rejected a laundry list of other "reasons" to believe, according to Martinez, that the prosecution had withheld exculpatory material concerning Quinones's testimony, *see id.* at *80–81 n. 8,[FN20] on the ground that none of these reasons "provide[d] a basis for a plausible showing that [the government] suppressed a cooperation agreement." *Id.*

FN20. The reasons set forth by Martinez included: "1) Respondent's responses to his and co-defendant Chebere's FOIL requests, in which Respondent allegedly admitted that it withheld documents; 2) the prosecutor's alleged threats to force Quinones to testify in the Arthur Massey case (which did not involve Petitioner), the Michael Smith attempted murder and robbery case in which Petitioner was convicted, and the instant case; 3) the prosecutor's alleged threats to Juan Ortiz, not a witness in this case, to testify falsely against Louis Bracero for the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

murder of German Morales (a completely unrelated matter); 4) the prosecutor's alleged dismissal from her job at Respondent's office for impeding a criminal investigation; 5) Respondent's alleged history of engaging in prosecutorial misconduct; 6) Quinones' allegedly unclear answer to a question at trial; 7) Quinones' trial testimony that he would lie to get out of jail, 8) the lack of questioning of police detectives about Quinones, 9) Quinones' placement into a jail cell next to Chebere, and 10) the lack of an adequate trial record concerning *Rosario* issues." *Id.* at *80–81 n. 8, 213 N.Y.S.2d 448, 173 N.E.2d 881.

Petitioner's arguments, by and large, mirror those of Martinez, and should be rejected for the same reasons. The Court has also conducted an independent *in camera* review of the materials that were responsive to Petitioner's two FOIL requests, but were withheld by the DA's office (*see* Background Section I, *supra* ), and finds that none of those documents should have been produced under *Brady*, nor do any of the documents suggest that any additional *Brady* material was withheld. For these reasons, Petitioner's *Brady* claim fails.

**2. *Claim 9: Prosecutorial Misconduct for Eliciting of Allegedly False Testimony***

Petitioner also raised his ninth claim, that the prosecution elicited false testimony from one or more cooperating witnesses, in his Section 440 motion, and, as with Petitioner's eighth claim, the state court rejected this claim under Section 440.30(4)(d). (*See* 12/19/99 Order) Once again, however, the Court need not decide whether the state court's denial of this claim under Section 440.30(4)(c) gives rise to a procedural bar, as Petitioner's underlying claim, in any event, lacks merit.

Petitioner maintains that the prosecution "sat by silently" while "informant witnesses," presumably including Quinones, falsely testified that they received no "promises" or compensation in return for their trial testimony against Petitioner; according to Petitioner, the prosecution should have corrected this false testimony.[FN21] (*See* Pet. 440 Mtn., ¶ 7.) Yet a key logical requirement of Petitioner's claim is that the purported cooperating witnesses's testimony was actually false. If the testimony was *not* false, then the prosecution was clearly under no obligation to correct it. Because, as noted above (*see* Discussion Section II(B)(1), *supra* ), Petitioner has failed to demonstrate that Quinones in fact had a cooperation agreement with the government with respect to Petitioner's case, the state court's rejection of Petitioner's claim of prosecutorial misconduct was neither contrary to, nor an unreasonable application of, established federal law. Accordingly, I recommend that this claim be dismissed.

FN21. Although Petitioner's initial Section 440 motion does not specifically name these "informant witnesses" (*see generally* Pet. 440 Mtn.), Petitioner's Motion to Renew the Section 440 Motion suggests that one of these witnesses is Quinones (*see* Sandusky Aff, Ex. 15 (Notice ofMotion), ¶¶ 3–21).

**3. *Claim 10: Ineffective Assistance of Trial Counsel for Failure To Conduct an Adequate Investigation***

***34** Petitioner claims that he was deprived of the effective assistance of trial counsel by his counsel's supposed failure to investigate the crime scene and to interview certain witnesses prior to trial. (*See* Pet. 440 Mtn., ¶¶ 17–28.) In his Section 440 motion to vacate, Petitioner argued, in particular, that his trial counsel's performance was constitutionally inadequate because trial counsel did not consult with Petitioner until two days before trial, failed to "visit the scene of the crime and interview[ ] witnesses and alibi witnesses," "refused to take heed" of the fact that an informant (*i.e.*, Quinones) had been placed in the cell next to Petitioner's at the Bronx House of Detention, and "refused to investigate" Quinones's role. (*See* Pet. 440 Mtn., ¶¶ 20, 21, 24.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The state court, in rejecting Petitioner's motion to vacate, denied this claim under Section 440.30(4)(d). (*See* 12/19/99 Order) The court rejected Petitioner's allegation that trial counsel did not consult with Petitioner until two days before trial; to the contrary, the court noted that Petitioner's counsel had appeared at several lengthy pre-trial conferences and hearings, and that counsel's "comprehensive understanding of the case" during those pre-trial proceedings made it "obvious that [counsel] had already met and extensively conferred with his client to prepare a defense." (*Id.* at 3.) Furthermore, the court found that, at trial, "counsel had a coherent strategy, made cogent legal arguments and competently cross examined each of the prosecution witnesses." (*Id.*) The court noted that counsel did in fact present an alibi defense at trial, and that Petitioner had not identified any *other* alibi witnesses that should have been called. (*See id.* at 3–4.) The Court also found no reason to fault counsel for failing to visit the crime scene, as Petitioner had shown no reason why such a visit would have been relevant to his defense. (*See id.* at 4.)

As with Petitioner's eight and ninth claims (*see* Discussion Sections II(B)(1)(2), *supra* ), the Court need not decide whether this denial under Section 440.30(4)(c) gives rise to a procedural bar, because, as set forth below, the state's court rejection of that claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

**a.** ***Counsel's Alleged Failure to Consult with Petitioner Until Two Days Before Trial***

The right to counsel in criminal prosecutions is grounded in the Sixth Amendment. Because the Constitution "envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results [,] ... 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). Counsel can deprive a criminal defendant of this right "simply by failing to render 'adequate legal assistance.' " *Id.* at 686 (citation omitted).

***35** In order for counsel to be deemed constitutionally "ineffective," however, counsel's conduct must have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* Petitioner can demonstrate such ineffectiveness by showing both that: (1) his counsel's performance was deficient to such a degree that the "representation fell below an objective standard of reasonableness," *id.* at 688, and (2) this deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. The Court may reject an ineffective assistance of counsel claim for failure to satisfy either of these prongs of the *Strickland* standard, without reaching the other. *See id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Petitioner's claim that his counsel failed to meet with him until two days before trial is contradicted by the state court's factual findings, which are presumed correct in the absence of clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e) (1). The state court's rejection of this claim was based on the court's own assessment of counsel's preparation for proceedings that took place weeks before trial; the court concluded, from its observation of counsel's performance at those proceedings, that it was "obvious" that counsel had conferred with Petitioner well before trial in order to plan an adequate defense. (*See* 12/19/99 Order, at 3.) Petitioner has come forward with no evidence to contradict that finding, much less "clear and convincing" evidence. The Court should therefore defer to the state court's factual findings and reject Petitioner's contention that counsel did not meet

with Petitioner sufficiently in advance of trial.

**b.** ***Counsel's Alleged Failure To Visit the Crime Scene***

The state court also properly rejected Petitioner's claim that his counsel's failure to visit the crime scene rendered his performance constitutionally ineffective. As the state court concluded, Petitioner made no showing that a visit by counsel to the crime scene could, in any way, have helped counsel to prepare Petitioner's defense, which was based on a purported alibi. In other words, there is no reasonable probability that a visit to the crime scene, years after Blanding's killing, would have had any impact on outcome of Petitioner's trial. *See Strickland,* 466 U.S. at 694. Thus, to the extent Petitioner's ineffective assistance claim rests upon counsel's purported failure to visit the crime scene, the claim should be dismissed.

**c.** ***Counsel's Alleged Failure To Interview Witnesses***

Petitioner further claims that his counsel failed to interview witnesses prior to trial, including Diaz and unspecified alibi witnesses. (*See* Pet. 440 Mtn., ¶ ¶ 20, 24–25.) Petitioner offers no affidavits from these witnesses, or any other proof as to how they would have testified. Nonetheless, he contends that Diaz would have provided sworn testimony that Quinones was an informant who had been planted by the District Attorney next to Petitioner's cell. (*See id.* ¶ 24.) This is insufficient to demonstrate ineffective assistance of counsel.

***36** "[A]ctions or omissions [by counsel] that 'might be considered sound trial strategy' do not constitute ineffective assistance." *United States v. Berkovich,* 168 F.3d 64, 67 (2d. Cir.1999) (quoting *Strickland,* 466 U.S. at 689). Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and Petitioner "must overcome the presumption" that counsel's action may have been trial strategy. *Strickland,* 466 U.S. at 689 (citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "Counsel's decision to interview witnesses is a strategic decision." *Byas v. Keane,* No. 97 Civ. 2789, 1999 U.S. Dist. LEXIS 12315, at *18, 1999 WL 608787 (S.D.N.Y. Aug. 12, 1999); *accord Lamorte v. United States,* 73 F.Supp.2d 406, 409 (S.D.N.Y.1999). Similarly, the "decision to call or bypass particular witnesses is peculiarly a question of trial strategy which courts will practically never second-guess" in considering an allegation of ineffective assistance of counsel. *United States ex rel. Walker v. Hen derson,* 492 F.2d 1311, 1314 (2d Cir.1974) (internal citation omitted); *accord United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998).

Without any evidence to the contrary, the Court must presume that Petitioner's counsel chose for strategic reasons not to interview or call certain witnesses identified by Petitioner. In particular, counsel may have decided not to pursue and present testimony from Diaz because, despite Petitioner's conclusory assertions as to Diaz's belief that Quinones was cooperating with the government, there was little reason to believe, at the time of trial, that Diaz actually had knowledge of Quinone's status. In this regard, the Court notes that Petitioner has not provided any particular basis for Diaz's supposed belief that Quinones was an "informant," nor has he submitted to the Court any affidavit from Diaz which would allow the Court to ascertain the potential strength of Diaz's hypothetical testimony. Further, the fact that Petitioner's counsel interviewed Diaz after trial and yet filed no post-verdict motion based upon that interview (*see* 12/19/99 Order, at 2–3) suggests that the interview did *not* yield helpful information, and, thus, that counsel's course of action, prior to that time, was objectively reasonable. In sum, because counsel's decision not to interview Diaz prior to trial or call him at trial may have been strategic, and because Petitioner has offered no basis for overcoming the "strong presumption" in counsel's favor, it cannot be said that counsel's conduct was objectively unreasonable.

Moreover, even apart from the question of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

whether Petitioner's counsel acted unreasonably in failing to interview Diaz, Petitioner also cannot show that he suffered prejudice from his counsel's failure to conduct that interview, or the interview of any other potential witness. Petitioner has submitted nothing but his own bare assertions as to how the witnesses would have testified, which is not enough to demonstrate the likelihood that their testimony would have altered the verdict. *See Parker v. Ercole,* 582 F.Supp.2d 273, 294–96 (N.D.N.Y.2008) (rejecting ineffective assistance of counsel claim based on a failure to call a witness where "[t]he only support for petitioner's claim regarding what his testimony—and that of [the uncalled witness] would have been—is his own self-serving statement"). Indeed, even if Diaz's testimony could have been used to impeach Quinones's credibility, Petitioner cannot establish that there is a reasonable probability that such testimony would have affected the trial's outcome. *See United States v. Pagan,* 829 F.Supp. 88, 92 (S.D.N.Y.1993) (cumulative impeachment material was not reasonably likely to alter the verdict), *aff'd,* 28 F.3d 102 (Table) (2d Cir.1994). Importantly, Quinones was not the only witness to testify against Petitioner at trial, so that, even if the jury had entirely discredited his testimony, sufficient evidence would have remained to support Petitioner's conviction. *See Edwards v. Jones,* 720 F.2d 751, 755 (2d Cir.1983) (" '[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.' ") (quoting *United States v. Danzey,* 594 F.2d 905, 916 (2d Cir.1979)).

***37** Petitioner's attempt to fault his counsel for failing to interview additional alibi witnesses fails for similar reasons. Petitioner has not identified any particular alibi witnesses whom counsel failed to interview, nor has Petitioner provided any evidence of the testimony that such witnesses would have offered. In the absence of such evidence, Petitioner cannot demonstrate any likelihood that the unidentified witnesses' testimony would have altered the verdict. Thus, to the extent that Petitioner claims that his counsel's failure to interview witnesses rendered counsel's performance constitutionally ineffective, Petitioner's claim should be dismissed.

**d.** ***Counsel's Failure To Investigate the "Quinones Matter"***

As discussed above, Petitioner claims that Diaz would have testified that Quinones was a government informant, and, accordingly, Petitioner faults his trial counsel for failing to elicit this testimony from Diaz at trial. (*See* Discussion Section II(A)(3)(c), *supra.*) Likewise, Petitioner contends that his trial counsel should have directly investigated the Quinones matter prior to trial, and claims that counsel's failure to do so rendered his performance constitutionally ineffective. (*See* Pet. 440 Mtn., ¶¶ 20–21.) Petitioner claims that he told his trial counsel to investigate Quinones based upon information Petitioner had received from Diaz, but, according to Petitioner, his trial counsel refused to undertake that investigation. (*See id.*)

Petitioner's allegations about trial counsel's failure to investigate Quinones do not establish a claim for ineffective assistance of counsel. As set forth above, in support of his theory that Quinones was a government informant, Petitioner offers nothing more than his own assertions that Quinones was in the cell next to his at the Bronx House of Detention and that Diaz and others had told him that Quinones was a government informant. (*See* Section II(B)(3)(c), *supra.*) Even assuming, as Petitioner contends, that his counsel failed to conduct any investigation based on these assertions, Petitioner has failed to offer any evidence to suggest that further investigation would have revealed that Quinones was, in fact, a government informant, let alone that the result of his trial would have been different had this fact come to light. *See Bingham v. Duncan,* No. 01 Civ. 1371(LTS), 2002 U.S. Dist. LEXIS 26445, at *10, 2003 WL 21360084 (S.D.N.Y. June 12, 2003) ("[P]etitioner's conclusory allegations regarding trial counsel's failure to do investigative work and to contact potential witnesses do not establish that the result of the proceedings would have been different if not for counsel's error—or even

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 36

Slip Copy, 2013 WL 5273796 (S.D.N.Y.)
**(Cite as: 2013 WL 5273796 (S.D.N.Y.))**

that his behavior was erroneous at all.”).

For all the foregoing reasons, I recommend that the Court dismiss Petitioner's ineffective assistance of counsel claim.

**4. *Claim 11: Double Jeopardy***

Petitioner's 11th claim, seemingly based on the double jeopardy clause of the Fifth Amendment, should also be dismissed. Petitioner raised this claim in one of his motions to renew his Section 440 motion (*see* Background Section G, *supra* ), arguing that the prosecution's misconduct at his trial would preclude the government from retrying his case, should he receive relief from the judgment of conviction. Petitioner, however, does not presently face a second trial for his alleged involvement in Blanding's death, and, for the reasons discussed herein, this Court does not recommend that any new trial be ordered. Accordingly, in the present posture of this case, there is no basis for this Court to consider the constitutional propriety of a second trial. [FN22]

FN22. The Court notes that, even if Petitioner were to be awarded a new trial, double jeopardy protections would not be implicated in the manner he suggests. *See United States v. Pavloyianis,* 996 F.2d 1467, 1473 (2d Cir.1993) (stating that generally, “the Double Jeopardy safeguard does not prevent retrial of a defendant who obtains a reversal of his conviction because of an error or defect in the criminal proceedings leading to conviction”).

**C. *Newly Added Claims***

***38** Petitioner's remaining claims, though unexhausted (*see* Discussion Section 1(B), *supra* ), should nonetheless be dismissed for lack of merit, as set forth below.

**1. *Claim 12: Alleged Denial of Due Process Rights in Connection with Efforts to Obtain Purported Brady Material***

Petitioner claims that the trial court's failure to conduct an *in camera* inspection of the prosecution's files violated his right to due process. (Sandusky Aff, Ex. 19 (Affirmation in Support Motion to Amend FRCP Rule 15d, dated Nov. 5, 2007 (“Affirm.Supp.Mtn.”)), at 19.) As noted above, this claim is unexhausted (*see* Discussion Section I(B), *supra* ), but should be rejected on the merits.

As the Supreme Court explained in *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987):

> In the typical case where a defendant makes only a general request for exculpatory material under [*Brady* ], it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

*Id.* at 59. Where, however, a defendant has requested particular state files and has established a basis for a claim that those files contain material evidence, the trial court should review the files *in camera* and release to the defendant evidence deemed material. *See id.* at 58 n. 15 (noting that a defendant may not require a court to review confidential records *in camera* “without first establishing a basis for his claim that it contains material evidence”); *United States v. Leung,* 40 F.3d 577, 582–83 n. 1 (2d Cir.1994) (citing *Ritchie* for the proposition that *“in camera* review should not be required,” unless the defense first establishes a basis for a claim that the files in question contain material evidence); *see also United States v. Kiszewski,* 877 F.2d 210, 216 (2d Cir.1989) (finding that it was “error for the district court to refuse to compel production of [a cooperating witness's] personnel file for *in camera* inspection based solely on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the representations of the government").

As an initial matter, there was little, if any, evidence in the record at the time of trial that would have provided a basis for Petitioner's claim that the prosecution was withholding material evidence, and, thus, the trial court cannot be faulted for failing to conduct an *in camera* review of all of the prosecution's files. In any event, this Court has now reviewed Petitioner's supposed evidence that documents were withheld from him improperly and has conducted an *in camera* review of the documents that the prosecution has continued to withhold. As explained above, the Court has not found any exculpatory evidence, nor anything to suggest that exculpatory evidence was ever withheld. (*See* Discussion Section II(B)(1), *supra.*) Because Petitioner cannot show that any exculpatory evidence would have been disclosed, had the trial court conducted an *in camera* review, the trial court's failure to do so was harmless, and, thus, Petitioner's due process claim should be rejected. *See Ritchie,* 480 U.S. at 58 (noting that, where trial court failed to conduct an *in camera* review of certain confidential documents, the conviction would stand if subsequent review revealed that "the nondisclosure was harmless beyond a reasonable doubt"); *Kiszewski,* 877 F.2d at 216 (directing "the district court to conduct an *in camera* examination of the file to determine whether information in the file should have been disclosed and, if so, whether [the defendant] [wa]s entitled to a new trial, or whether 'nondisclosure was harmless beyond a reasonable doubt' ") (quoting *Ritchie,* 480 U.S. at 58).

**2.** ***Claim 13: Ineffective Assistance of Counsel Based Upon Failure To Explore the Circumstances Surrounding Quinones's Testimony***

***39** In his 13th claim, as raised in Petitioner's motion to amend in this habeas proceeding, Petitioner argues that was denied the effective assistance of counsel when his trial counsel failed "to fully explore the circumstances [under which] Quinones testified." (Affirm. Supp. Mtn., at 34–39.) This claim is, to some degree, duplicative of Petitioner's 10th claim, in which he faults trial counsel for failing to investigate the crime scene and interview witnesses—particularly with respect to the "Quinones ... matter" (Pet. 440 Mtn., ¶ 21)—prior to trial. To the extent that Petitioner's 13th claim is based on trial counsel's purported failure to investigate, prior to trial, the circumstances surrounding Quinones' testimony against Petitioner, such a claim was already raised before the state court in Petitioner's Section 440 motion to vacate, and, as discussed above (*see* Discussion Section II(B)(3)(d), *supra* ), it should be dismissed on the merits because the state court's rejection of such a claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

To the extent, however, that Petitioner's 13th claim challenges (1) trial counsel's failure to subpoena certain documents and request *in camera* review of documents withheld by the prosecution; and (2) the adequacy of counsel's cross-examination of Quinones at trial, Petitioner's claim is unexhausted, as it has not been raised in the state courts. (*see* Discussion Section 1(B), *supra.*) Nevertheless, it should be denied on the merits, on *de novo* review.

As explained above (*see* Discussion Section II(C)(1), *supra* ), Petitioner has failed to demonstrate the existence of material evidence that was not disclosed prior to his trial. Petitioner's counsel cannot be faulted for failing to obtain documents that Petitioner has not shown existed. Nor has Petitioner demonstrated that the result of his trial would have been any different had his counsel made further efforts to obtain additional evidence, whether by subpoena or by requesting *in camera* review of any withheld documents. *See United States v. Nersesian,* 824 F.2d 1294, 1322 (2d Cir.1987) ("Counsel certainly is not required to engage in the filing of futile or frivolous motions.").

With respect to Petitioner's counsel's cross-examination of Quinones, "[d]ecisions whether to engage in cross-examination, and if so to what

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

extent and in what manner, are ... strategic in nature." *Id.* at 1321. Here, Petitioner's counsel engaged in a vigorous cross-examination (and re-cross) of Quinones. For example, counsel highlighted Quinones's criminal record (*see* Trial Tr., at 1354–59), and elicited admissions that Quinones had falsely told an attorney that he had been harassed and threatened by a prosecutor (*see id.* at 1364–69), that Quinones had only agreed to testify for the prosecution in an unrelated case in exchange for a cooperation agreement in that case (*see id.* at 1373–79), that Quinones' pre-trial statements to the prosecution and trial testimony in that unrelated case had been inconsistent (*see id.* at 1390–95), and that he would lie under some circumstances, particularly if he or his family were threatened (*see id.* at 1384). As, even now, there is no evidence that Quinones was a cooperating witness in connection with this case, Petitioner's counsel was not ineffective, under *Strickland*, for failing to pursue this matter on cross-examination. Accordingly, Petitioner's 13th claim should be dismissed.

***CONCLUSION***

***40** For the foregoing reasons, Petitioner's Amended Petition should be dismissed in its entirety. I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Loretta A. Preska, United States Courthouse, 500 Pearl Street, Room 1320, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Preska. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983). If Petitioner does not have access to cases cited herein that are reported only on LEXIS or Westlaw, he may request copies from Respondents' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities cited therein that are unpublished or reported exclusively on computerized databases] as are cited in a decision of the Court and were not previously cited by any party.").

SO ORDERED.

S.D.N.Y.,2013.
Chebere v. Phillips
Slip Copy, 2013 WL 5273796 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


H
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Michael DELL'AERA, Petitioner,
v.
Randy JAMES, Respondent.

No. 12–CV–00344 (JFB).
Dec. 20, 2012.

Paula Schwartz Frome, Esq., Garden City, NY, for Petitioner.

Laurie Kathleen Gibbons, Assistant District Attorney, Nassau County District Attorney's Office, Mineola, NY, for Respondent.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

***1** Michael Dell'Aera ("petitioner" or "Dell'Aera") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction entered on April 14, 2010, in County Court of Nassau County, for robbery in the second degree (N.Y. Penal Law § 160.10(1)), robbery in the third degree (N.Y. Penal Law § 160.05), and petit larceny (N.Y. Penal Law § 155.25). Petitioner was sentenced to a determinate sentence of imprisonment of three and one-half years on the charge of robbery in the second degree, an indeterminate term of imprisonment with a minimum of one year and a maximum of three years on the charge of robbery in the third degree, and a sentence of imprisonment of one year on the charge of petit larceny, all to run concurrently.

Petitioner challenges his conviction on the following grounds: (1) the trial court gave an erroneous jury charge regarding intent which changed the prosecution's theory of the case, and (2) the trial court erroneously answered a jury question on the issue of the burden of proof.

For the reasons set forth below, the Court finds that petitioner has not demonstrated any basis for habeas relief, and therefore denies the petition on the merits.

I. BACKGROUND

A. Facts

The following facts were adduced from the petition and the documents attached thereto, as well as from the state court trial and appellate records.

1. The Events of June 26, 2008

On June 26, 2008, at approximately 1:00 p.m., Kwan Lee ("Lee"), the owner of Lee Jewelers, was working alone in his jewelry store when he observed petitioner on the surveillance camera. (Pet'r's Trial Transcript ("Tr.") 55, 58.) Lee saw petitioner enter by himself through the store's outer door. (*Id.* at 55.) Recognizing petitioner from a previous transaction, Lee admitted petitioner into Lee Jewelers by buzzing open the store's inner door. (*Id.*) As petitioner entered the store, a masked individual followed close behind, holding a gun to petitioner's head. (*Id.* at 55, 87–88.) Upon entering the store, the masked individual pushed petitioner onto some potted plants. (*Id.* at 89, 106, 123.) The masked individual then jumped onto the store counter, pointed his gun at Lee, and demanded money. (*Id.* at 89, 76, 88.) Lee opened the cash register, and the masked individual took money and then subsequently fled the scene. (*Id.* at 56, 76, 88.) Petitioner did not identify the masked individual to Lee at the time, nor did he indicate that he knew the individual. (*Id.* at 107.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Petitioner remained in the store while Lee called 911. (*Id.* at 56.) Because Lee did not speak English well, petitioner assisted Lee by relaying the details of the robbery to the 911 operator. (*Id.* at 64.) Petitioner also provided a written statement of his recollection of the robbery to the police when they arrived. (*Id.* at 103.) Petitioner claimed that the sole reason he went to Lee Jewelers that day was to sell a gold bracelet. (Pet'r's Mem. of Law in Supp. of Pet. for Habeas Corpus ("Pet'r's Mem.") at 18.) [FN1]

FN1. After the robbery, Lee examined the bracelet that petitioner brought to the store that day, and found that the bracelet was not in fact made of gold. Because it had no value, Lee did not purchase the bracelet from petitioner. (Tr. 62.)

***2** Detective Manuel Nash ("Detective Nash") responded to the scene of the crime. (Tr. 128–29.) He viewed the robbery on a video taken by the store's surveillance system, and noticed that petitioner had kicked open the door to help the robber enter the store. (*Id.* at 129, 139.) Detective Nash brought petitioner to the Robbery Squad headquarters and showed him the surveillance video. (*Id.*) Detective Nash confronted petitioner with the inconsistencies between his first statement given to the police and the surveillance video, to which petitioner responded by continuing to deny any knowledge of the robbery or the robber's identity. (*Id.* at 129, 135.) Upon continued examination, petitioner gave a second statement to the police, in which he admitted to both knowing the identity of the robber and having a relationship with him prior to and leading up to the incident. (*Id.* at 142.)

2. Petitioner's Police Statement

In petitioner's final statement, he admitted that the robber was his friend, Jamie Ramirez ("Ramirez"). (*Id.* at 156, 187.) He claimed, however, that his only involvement in the robbery was agreeing to sell a bracelet at Lee Jewelers on that day. (*Id.* at 159–60, 187.) [FN2] He claimed that he was completely unaware of Ramirez's intent to rob the store. (*Id.* at 159–60, 187–88.)

FN2. According to petitioner, Ramirez asked him to sell the gold bracelet because Ramirez did not have the necessary identification to sell the bracelet himself. (*Id.* at 159–60, 187.)

According to petitioner, after he and Ramirez arrived in the parking lot of Lee Jewelers, Ramirez told petitioner that he was going to Starbucks. (*Id.* at 188.) Petitioner states that as he approached the jewelry store, he noticed Ramirez walking behind him, but merely assumed that Ramirez changed his mind about going to Starbucks. (*Id.* at 188.) Petitioner claims that he kicked the door open for Ramirez, but that he was surprised and frozen in disbelief when Ramirez subsequently grabbed him from behind with a gun. (*Id.* at 159, 188–89.)

When the police arrived at the scene of the crime, petitioner received a phone call from Ramirez. (*Id.* at 189.) Petitioner picked up his cellular phone and said, "You're an a* *hole," and hung up. (*Id.*) Petitioner claims that he did not initially reveal Ramirez's identity because he did not want to be known as a "rat" or get Ramirez in trouble. (*Id.* at 156, 189–90.)

3. Ramirez's Testimony

Later that day, the police arrested Ramirez on the basis of information provided by petitioner. (*Id.* at 192.) Ramirez eventually admitted that he and petitioner had agreed to rob Lee Jewelers together. (*Id.* at 235.) Ramirez agreed to cooperate with the Nassau County District Attorney, and to give truthful testimony in exchange for a lesser plea. Accordingly, Ramirez testified at petitioner's trial.

Ramirez claimed that the plan was for petitioner to pose as an innocent customer, while Ramirez acted as a gunman demanding money. (*Id.* at 236–37.) Ramirez testified that, on June 26, 2009, petitioner

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

called him at approximately 11:30 a.m. to "hang out." (*Id.* at 233.) Shortly thereafter, petitioner arrived at Ramirez's house and they drove to the parking lot of a bowling alley to smoke marijuana and snort heroin. (*Id.* at 233–35.) After about ten minutes, Ramirez and petitioner went to Ramirez's house to watch television and eat. (*Id.* at 235.) After the high wore off, the two wanted more heroin, but did not have the money to purchase it. (*Id.* at 236.)

***3** According to Ramirez, petitioner devised a plan to rob Lee Jewelers and, after some hesitation, Ramirez agreed. (*Id.* at 235.) Ramirez proceeded to change his clothes and to retrieve his brother's BB gun. (*Id.* at 235–36.) He also used a black napkin to fashion a face-covering mask. (*Id.* at 236.)

Ramirez and petitioner then drove in petitioner's car to Lee Jewelers. (*Id.* at 238.) Ramirez tied the napkin around his face during the car ride. (*Id.* at 240.) Ramirez and petitioner walked to the jewelry store, and Ramirez crouched behind petitioner so that he would not be seen on the surveillance camera. (*Id.* at 236, 239, 243, 255.) When Lee buzzed open the store's inner door, petitioner kicked it open for Ramirez. (*Id.* at 255, 259.) Ramirez jumped up behind petitioner, put the BB gun to petitioner's head, (*id.* at 240), and put petitioner in a headlock to make the robbery look as genuine as possible, (*id.* at 257.) Upon entering, Ramirez jumped up on the store counter, took money from the cash register, and ran out of the store. (*Id.* at 240–41, 256.)

Ramirez testified that, pursuant to their plan, he fled to a Checkers restaurant near Lee Jewelers. (*Id.* at 242.) Approximately ten to fifteen minutes later, Ramirez telephoned petitioner from a pay phone. (*Id.*) Petitioner picked Ramirez up and told him that it did not look good, and that they should reconvene later at Ramirez's home. (*Id.*)

B. Procedural History

1. State Court Proceedings

a. Trial and Sentencing4

Petitioner was indicted for robbery in the second degree (N.Y. Penal Law § 160.10(1)), robbery in the third degree (N.Y. Penal Law § 160.05), and petit larceny (N.Y. Penal Law § 155.25). On April 14, 2010, a judgment was entered, following a jury trial, finding petitioner guilty of robbery in the second degree, robbery in the third degree, and petit larceny. (Tr. 505–06.) [FN3] Petitioner was sentenced to a determinate sentence of imprisonment of three and one-half years and five years' post-release supervision on the charge of robbery in the second degree, an indeterminate term of imprisonment with a minimum of one year and a maximum of three years on the charge of robbery in the third degree, and a sentence of imprisonment of one year on the charge of petit larceny, all to run concurrently. (Sentencing Transcript ("S.") at 10–11.) Defendant was also ordered to pay a $300 surcharge, a $25 crime victim assistance fee, and a $50 DNA fee. (*Id.* at 11.)

FN3. Prior to trial, the court held a *Huntley* hearing. However, because the petitioner does not challenge any aspect of the *Huntley* hearing, the Court has not summarized the hearing testimony here.

b. Direct Appeal

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department, on the following grounds: (1) the trial court's intent charge changed the prosecution's theory of the case; and (2) the trial court's charge regarding reasonable doubt included an incorrect description of the People's burden of proof, and thus deprived defendant of his right to be convicted on proof beyond a reasonable doubt. (Def.-Appellant's Appeal Br. at 26–28.)

***4** On May 17, 2011, the Appellate Division affirmed the conviction. *People v. Dell'Aera,* 84 A.D.3d 1109, 923 N.Y.S.2d 854 (N.Y.App.Div.2011).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2012 WL 6632673 (E.D.N.Y.)
**(Cite as: 2012 WL 6632673 (E.D.N.Y.))**

The court held: (1) the petitioner's challenge to the County Court's jury charge regarding intent was without merit and did not alter the People's theory as presented in the indictment or the facts as presented at trial, and (2) the petitioner's challenge to the adequacy of the County Court's response to a jury note requesting clarification of the concept of reasonable doubt was unpreserved for appellate review, and in any event, was without merit. *Id.* at 1110, 923 N.Y.S.2d 854.

Petitioner then filed an application with the New York Court of Appeals for leave to appeal the Appellate Division's decision. Petitioner's application raised the same claims as those raised before the Appellate Division. The New York Court of Appeals denied petitioner's application for leave to appeal on September 27, 2011. *People v. Dell'Aera,* 17 N.Y.3d 858, 932 N.Y.S.2d 23, 956 N.E.2d 804 (2011).

2. The Instant Petition

Petitioner filed the instant habeas corpus petition on January 24, 2012. Respondent's memorandum of law in opposition was filed on May 2, 2012. Petitioner filed a reply on May 21, 2012. The Court has fully considered the arguments and submissions of the parties.

II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). " 'Clearly established Federal law' " is comprised of " 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal rule from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

***5** AEDPA establishes a deferential standard of review: " 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.' " *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Williams,* 529 U.S. at 411). The Second Circuit added that, while " 'some increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Id.* at 93 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.' "* *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir.2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)).

III. DISCUSSION

For the reasons set forth below, the Court denies the relief sought by petitioner on the merits.

A. Jury Charge on Intent

Petitioner argues that the trial court erroneously instructed the jury on intent, and that the instruction changed the prosecution's theory of the case. (Pet'r's Mem. at 28–29.) Specifically, petitioner claims that the jury charge altered the prosecution's theory of the case—that he and Ramirez pre-planned the robbery together. (*Id.*) Petitioner further argues that, because petitioner's defense at trial was based solely on that prosecutorial theory, the jury charge regarding intent, which allegedly allowed the prosecution to proceed on an alternative theory—that petitioner was guilty for not impeding Ramirez or for not disclosing Ramirez's identity to the police—deprived him of the right to confront the evidence against him. (*Id.*) For the reasons set forth below, this contention is without merit.

On January 12, 2010, during the jury deliberations, petitioner's counsel asked the trial court for an additional charge regarding the elements of "intent" and "knowing." (Tr. 486.) Counsel asserted that the additional charge was necessary because in order to find petitioner guilty, the jury had to find that he intentionally and knowingly participated in the crime, but the crux of petitioner's defense was that he was present at the time of the robbery, but had no prior knowledge of the robbery or Ramirez's intent to rob the store. (*Id.*) The trial court subsequently gave the following charge to the jury:

> The crimes with which the [petitioner] is charged require that he has the intent to commit those crimes.
>
> Intend means conscious objective or purpose.
>
> Therefore, a person acts with intent to deprive another of property or to appropriate the property to himself or a third person when such—when such person's conscious objective or purpose is to withhold the property or cause it to be withheld permanently, to exercise control over the property or to aid a third person to exercise control over it permanently, or to dispose of the property either for the benefit of himself or a third person or under such circumstances as to render it unlikely that an owner will recover such property.
>
> ***6** Intent does not require premeditation. In other words, intent does not require advance planning. Nor is it necessary that the intent be in a person's mind for any particular period of time.
>
> The intent can be formed and need only exist at the very moment the person engages in prohibited conduct or acts to cause the prohibited result and not at any earlier time.
>
> The question naturally arises as to how to determine whether or not a defendant had the intent for the commission of a crime. To make that determination in this case you must decide if the required intent can be inferred beyond a reasonable doubt from the proven facts. In doing so you may consider the person's conduct and all of the circumstances surrounding that conduct, including but not limited to the following:
>
> What, if anything, did the person do or say? What result, if any, followed the person's conduct? And

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was that result the natural, necessary, and probable consequence of that conduct?

(*Id.* at 492–94.)

Counsel for petitioner objected to the intent charge after it was read for the first time, stating that it would permit the jury to conclude that petitioner formed his intent to participate in the robbery once Ramirez began to rob the store at gunpoint. (*Id.* at 496–98.) [FN4] The court responded that the intent charge was taken from the Criminal Jury Instructions ("CJI"), and that "CJI isn't designed to fit anybody's theory ... [but is] designed to explain to the jury what intent means in a crime requiring intent." (*Id.* at 498.)

FN4. Counsel for petitioner further objected to the intent charge on the ground that it would permit the jury to find intent to participate in the robbery from petitioner's failure to intercede and from petitioner's concealment of Ramirez's identity from the police. (Tr. 497–98.)

1. Legal Standard

Jury instructions violate due process if they "fail[ ] to give effect to [the] requirement" that the prosecution prove every element of the charged offense beyond a reasonable doubt. *See Middleton v. McNeil,* 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004) (per curiam). However, "a state prisoner making a claim of improper jury instructions faces a substantial burden." *Delvalle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002). The petitioner must establish that " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process,' not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.' " *Id.* at 1201 (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)); *see also Middleton,* 541 U.S. at 437 (explaining that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation").

2. Application

The Court finds that the trial court's instruction on intent was not erroneous and that it certainly did not constitute a due process violation. Rather, the Court notes that the trial court's instruction was proper in all respects. The instruction was given at the behest of defense counsel and followed the pattern jury instruction for intent, which is an accurate statement of the law, stating that intent does not require premeditation, advanced planning, or a prolonged period of intent. *See, e.g., Tyler v. Conway,* No. 08–CV–6560(MAT), 2010 WL 5287513, at *7 (W.D.N.Y. Dec.17, 2010) ("As the appellate court correctly pointed out, the trial court's instruction defining intent was identical to the suggested instruction contained in New York's Pattern Criminal Jury Instructions."); *see also Campbell v. Fischer,* No. CV–04–3569 NG JMA, 2005 WL 2033465, at *7 (E.D.N.Y. June 30, 2005) ("Even though there is no official significance to the New York Criminal Jury Instructions, the trial court's instructions in many respects track quite closely the pattern instructions. The trial court gave a detailed definition of burden of proof, which was followed immediately by a recitation of the elements of each of the charged crimes. There is no constitutional infirmity to the instructions ...."). In short, the trial court judge did not misstate the law in any way by instructing the jury on intent as he did at trial.[FN5]

FN5. Also, contrary to defense counsel's argument at trial, (*see* Tr. 497–98.), the trial court did not state that intent could be found simply based upon petitioner's failure to intercede or disclose Ramirez's identity to the police.

***7** To the extent petitioner suggests that, even if the instruction was correct, it constituted an improper constructive amendment to the indictment, this ar-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

gument is also without merit.[FN6] The Second Circuit has explained that,

> FN6. As a threshold matter, some courts have concluded that claims of constructive amendment to an indictment do not present a federal constitutional question that is cognizable on habeas review. *See, e.g., Player v. Artus,* No. 06 CV 2764(JG), 2007 WL 708793, at *7 (E.D.N.Y. March 6, 2007) ("[T]he Fifth Amendment's right to a grand jury indictment has not been incorporated against the states through the Fourteenth Amendment, so does not work to limit state prosecutions .... Therefore, ... [petitioner's] constructive amendment claim does not present a federal constitutional question." (citations omitted)). However, this Court assumes *arguendo,* for purposes of this habeas petition, that such a claim is cognizable, and finds that it fails on the merits for the reasons discussed *infra.*

> [t]o prevail on a constructive amendment claim, a defendant must demonstrate that "the terms of the indictment are in effect altered by the presentation of evidence and the jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio,* 683 F.3d 412, 416 (2d Cir.2012) (quoting *United States v. Mollica,* 849 F.2d 723, 729 (2d Cir.1988)). In the instant case, respondent points out that the indictment charged petitioner with second-degree robbery, and simply tracked the language of the statutory elements with no reference to a particular theory of intent.[FN7] Robbery in the second degree has no temporal restriction on the intent requirement, and neither the indictment nor the judge's charge suggested that the robbery was pre-conceived or that the aiding and abetting by petitioner occurred for any particular length of time. Thus, there is no possibility that the petitioner was convicted of "an offense other than that charged in the indictment." *Id.*

> FN7. Although the indictment itself is not contained in the record, the count at issue is quoted verbatim in the respondent's Appellate Division brief, at page 29, as well as the respondent's brief in opposition to the habeas petition, at page 17, and petitioner does not dispute that the language of the indictment for the second-degree robbery count simply tracked the statutory elements without reference to a particular theory of intent.

Similarly, the fact that the legal instruction allowed the jury to find intent based upon less premeditation than the prosecution argued during the course of the trial does not constitute an unconstitutional amendment to the indictment. Although arguing that the robbery plan was pre-conceived, the prosecution never disavowed the idea that intent could have been formed at the scene, and thus petitioner cannot complain that he was unaware of this potential prosecutorial theory of the case when he formulated a defense. Petitioner's defense was that he never formed intent to assist in the robbery, and nothing in the instruction introduced a new theory of guilt inconsistent with that defense. Accordingly, there was no constructive amendment to the indictment under either federal or New York standards. *See, e.g., United States v. James,* 998 F.2d 74, 78 (2d Cir.1993) (rejecting argument that a supplemental instruction violated due process where the instruction allowed the jury to convict defendant of aiding and abetting the bank robbery, even if the defendant did not know of the robbery until the escape phase after the robbery, the latter of which allegedly was inconsistent with government's argument to the jury that the defendant was a knowing participant from the outset of the robbery); *Player,* 2007 WL 708793, at *7 ("Notwithstanding the prosecutor's statement [that the prosecution's position was that the conspiracy was ongoing until the murder], made when the jury

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was not present, the theory of the prosecution at trial was entirely consistent in substance with the indictment.... Even if the prosecutor had offered proof of a conspiracy that did not extend beyond the death of Myer [,] ... such a change in the state's case would have been a permissible narrowing of the indictment."); *see also United States v. Hunley,* 476 Fed. App'x 897, 900 (2d Cir.2012) (holding that petitioner was not prejudiced by the fact that the trial court gave a joint possession jury instruction because "a joint possession theory of liability [did] not deviate from the indictment" and petitioner did not "identify any arguments he would have made, or defenses he would have asserted, had the government emphasized its theory of joint possession earlier in the trial").

***8** In sum, after careful review, the Court concludes that the state court's decision with respect to the intent instruction was not an unreasonable application of, nor contrary to, clearly established federal law. The Court also concludes that the state court's intent instruction was not based on an unreasonable determination of the facts in light of all of the evidence presented at trial.

B. Response to January 13, 2010 Jury Question

On January 13, 2010, the trial court announced that it received a "rambling" jury note indicating that the jurors "seem a little confused." (Tr. 496.) Petitioner and respondent agree that the note stated the following:

> We, the jury, respectfully request your clarification.
>
> 1. Is it our charge as jurors to decide guilt *based solely* upon whether or not we believe that the *prosecution* has proven guilt "beyond a reasonable doubt" or are we expected to weigh the evidence using *our judgment* to determine guilt "beyond a reasonable doubt."
>
> 2. We are still unable to agree upon a verdict. Therefore we request to examine the transcript of your response yesterday, January 12, 2010, in which you reviewed the concepts of "beyond a reasonable doubt," "intent," "acting in concert."

(Pet'r's Mem. at 24; Resp't's Mem. of Law in Opp'n to Pet. for Habeas Corpus ("Resp't's Mem.") at 5.) [FN8] In response to the note, the trial court (1) advised the jury that it would answer its question as best as possible, and (2) explained that it could not provide the jury with a transcript of the court's response from the previous day, but could instead have the court reporter read the court's previous instruction back to the jurors. (*Id.* at 500.) With respect to the first question, the court responded,

> FN8. The jury's note was not provided to this Court as part of the record. However, given a review of the record, as well as identical quotations of the note made by both parties, the Court considers the parties' quotations of the note to be accurate.

> So what I am going to do is try and clear up what I believe you're requesting in your first question. I'm going to do it the best I can.
>
> ...
>
> The duty of a juror in this case, as in any case, is to determine the facts. You are a fact-finding body. The law says you are the exclusive judges of the facts. On the other hand, and with equal emphasis, I charge you that you are bound to accept the law of the case as I instruct you. After you have determined the questions of fact, apply the law as charged by me and render a verdict based on the facts as you have decided them and under the law as charged by the court.

(*Id.* at 500–01.) The court then repeated its charge regarding intent, and portions of the previous day's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

instructions, including the instruction on reasonable doubt, were re-read to the jury. (*Id.* at 502.)

1. State Procedural Bar

a. Applicable Law

The procedural bar rule in the review of applications for writs of habeas corpus is based on the "comity and respect that must be accorded to state-court judgments." *House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). Petitioner's federal claims may be procedurally barred from habeas corpus review if they were decided at the state level on adequate and independent procedural grounds. *See Coleman v. Thompson,* 501 U.S. 722, 729–33, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). This rule is "grounded in concerns of comity and federalism"—protecting a state's right to enforce its laws and to maintain its judicial procedures as it sees fit. *Id.* at 730–31.

***9** Once it is determined that a claim is procedurally barred under state procedural rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id.* at 750 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier,* 477 U.S. 478, 496 (1986).

b. Analysis

Petitioner's claim that the trial court's charge regarding reasonable doubt included an incorrect description of the People's burden of proof, and thus deprived him of his right to be convicted on proof beyond a reasonable doubt, is procedurally barred from habeas corpus review because it was decided at the state level on adequate and independent procedural grounds.

As discussed *supra,* petitioner appealed his conviction to the Appellate Division on two grounds, one of which was improper jury response. However, in its decision affirming petitioner's conviction, the Appellate Division declined to review petitioner's jury response claim, stating that it was unpreserved for appellate review under N.Y. C.P.L. § 470.05(2). *People v. Dell'Aera,* 84 A.D.3d at 1110, 923 N.Y.S.2d 854. The Appellate Division's statement that petitioner's claim was "unpreserved" is "sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue." *Figueroa v. Grenier,* No. 02 Civ. 5444 DAB GWG, 2005 WL 249001, at *8 (S.D.N.Y. Feb.3, 2005).

New York's preservation doctrine—that in order to preserve a particular issue for appeal, a party must specifically alert the trial court to that issue at the time it arises—is firmly established and regularly followed. *See Garvey v. Duncan,* 485 F.3d 709, 714–15 (2d Cir.2007) (explaining that the preservation rule "applies with respect to motions to suppress as it does in every other context"); *Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996) (finding that failure to preserve issue for appeal was adequate and independent state law ground precluding federal habeas review, and further noting that " 'federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate ground, even where the state court has also ruled in the alternative on the merits of the federal claim' " (quoting *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990))).

Furthermore, the Appellate Division's reliance on the preservation doctrine was not exorbitant in this case. As noted above, the Supreme Court has concluded that there are a limited category of "exceptional cases" in which the state appellate court applied a firmly established and regularly followed procedural rule in an "exorbitant" manner, "render[ing] the state ground inadequate to stop consideration of a federal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

question," and thereby allowing a federal court to review that claim on the merits in a habeas appeal. *Lee v. Kemna,* 534 U.S. 362, 376–77, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002).[FN9]

FN9. The Court has considered the factors for "evaluating the state interest in a procedural rule against the circumstances of a particular case" set forth in *Cotto v. Herbert:*

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

331 F.3d 217, 240 (2d Cir.2003) (citing *Lee,* 534 U.S. at 376, 381–85). Having considered these factors in connection with this exception, the Court concludes that the Appellate Division did not apply the preservation doctrine in an exorbitant manner.

***10** Notwithstanding petitioner's failure to preserve his claim, this Court may still consider the claim on its merits if petitioner can demonstrate "cause and prejudice" for the procedural default, or that failure to consider the claim will result in a miscarriage of justice, *i.e.,* that he is actually innocent of the crimes for which he was convicted. *See Coleman,* 501 U.S. at 748–51; *Murray,* 477 U.S. at 496. Petitioner has failed to demonstrate cause or prejudice for the procedural default. Petitioner makes no argument for why he did not preserve his objection to the trial court's response requesting clarification on the concept of reasonable doubt.[FN10] To the extent petitioner is suggesting that the procedural default was a result of ineffective assistance of counsel "[w]here, as here, a petitioner cannot prevail on the merits of his claim[ ], he cannot overcome a procedural bar by claiming ineffective assistance of counsel." *McLeod v. Graham,* No. 10 Civ. 3778(BMC), 2010 WL 5125317, at *4 (E.D.N.Y. Dec.9, 2010) (citing *Aparicio v. Artuz,* 269 F.3d 78, 99 n. 10 (2d Cir.2001) and *Larrea v. Bennett,* 368 F.3d 179, 182 (2d Cir.2004)).

FN10. Petitioner argues that the claim may still be reviewed because (1) the response was a fundamental error, and under New York law, courts review fundamental constitutional error even in the absence of an objection, and (2) that where a contemporary objection is not required under New York law, the issue is preserved for review on a petition for habeas corpus. (Pet'r's Mem. at 32.) The Court finds neither argument to be meritorious. It is evident from the Appellate Division's decision that a contemporary objection was required, and that the claim was not one of fundamental error requiring review by the Appellate Division.

Nor has petitioner demonstrated that a "fundamental miscarriage of justice" would occur if these claims were not reviewed. To the extent petitioner argues that he is actually innocent of the crimes for which he was convicted, (Pet'r's Reply Mem. at 4), the Court rejects this argument and finds that, as discussed *supra*, overwhelming evidence of guilt was established by the prosecution. Accordingly, petitioner's claim is procedurally barred from review by this Court. In any event, assuming *arguendo* that the claim is reviewable based on cause for default and prejudice resulting therefrom, the claim is substantively without merit, as set forth below.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2012 WL 6632673 (E.D.N.Y.)
**(Cite as: 2012 WL 6632673 (E.D.N.Y.))**

2. Merits

In an abundance of caution, the Court considers petitioner's claim on the merits, and finds that petitioner's claim does not warrant habeas relief. The trial court's instruction regarding the role of the jury was a clear and correct statement of the jury's obligation and a proper response to the juror note. As discussed below, the instruction did not violate due process in any way.

New York Criminal Procedure Law § 310.30 provides that "[a]t any time during its deliberation, the jury may request the court for further instruction or information ...." Upon receipt of such a request, the court "must give such requested information or instruction as the court deems proper." N.Y. C.P.L. § 310.30. The court must respond meaningfully to the jury's request for further information or instruction. *People v. Gonzalez,* 293 N.Y. 259, 56 N.E.2d 574, 576 (N.Y.1944); *see also* *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946) ("When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."). The trial court is, however, "vested with some measure of discretion in framing its response and is in the best position to evaluate the jury's request in the first instance." *People v. Malloy,* 55 N.Y.2d 296, 449 N.Y.S.2d 168, 434 N.E.2d 237, 240 (N.Y.1982). The trial court may, in its discretion, choose to merely reread the original charge read to the jury in response to their question. *See* *id.* at 237 ("Where, however, after considerable deliberation, the jury requests clarification concerning the meaning of reasonable doubt and the original instruction is adequate, it is not error for the Trial Judge, as he did here, to respond to the request by rereading that instruction.").

***11** This is not to say that a mere re-reading of an original charge will in every case be the appropriate course to follow. "Indeed, if the jury subsequently expresses the need for further instructions, it may well constitute error simply to repeat the charge, for then it may be obvious that the jurors have been left without adequate guidance." *Id.* at 240. Factors to be considered by the Court in determining whether the trial court's response to the jury's inquiry was sufficient include "the form of the jury's question, the particular issue, the substance of the supplemental instruction and the presence or absence of prejudice to defendant." *People v. Cataldo,* 260 A.D.2d 662, 688 N.Y.S.2d 265 (N.Y.App.Div.1999).

Here, the jury note sought clarification of its duty with regard to the evidence, the role of the jury, and to what extent to exercise independent judgment apart from whether the prosecution met its burden to prove guilt beyond a reasonable doubt. In that context, the trial court's response to the note, which included re-reading the instruction regarding the role of the jury as the exclusive fact-finder (but reminding them of the need to accept the law as charged) was not erroneous, and in any event, certainly not constitutionally defective.[FN11] In short, the trial court's response accurately stated that the jury's role as fact finder is a "constitutional responsibility ... not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." *United States v. Gaudin,* 515 U.S. 506, 514, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

FN11. Moreover, the jury did not request further clarification or express any confusion about the trial court's answer to its question. *See* *People v. Almodovar,* 62 N.Y.2d 126, 476 N.Y.S.2d 95, 464 N.E.2d 463, 466 (N.Y.1984) ("The record does not indicate that [the trial court] had misinterpreted the [jury] request or that the jurors were dissatisfied with the instructions given. They did not ask for further instructions on justification and defense counsel did not request it until after the jury retired. Under the circumstances, the court did not err when it refused to go beyond the jury's request."); *Malloy,* 449 N.Y.S.2d 168, 434 N.E.2d at 240 ("In determining the most appropriate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

way to handle that request, the court took the view that the original charge could be made no clearer and that any attempt to alter it in light of the extensive deliberations already undertaken would only generate confusion. Although the better practice would have been to inquire of the jury what was unclear to them, they gave no indication after the original charge was repeated that their concern had not been satisfied.").

Although petitioner argues that the instruction suggested that the jury had the right to make factual findings "based upon their speculation, independent of the evidence," (Pet'r's Mem. at 31), that argument is utterly without merit in light of the language of the instruction. The instruction does not, either explicitly or implicitly, invite speculation by the jury or suggest that they can make factual findings independent of the evidence presented. In addition, as petitioner acknowledges, the instruction regarding the jury's role was given in conjunction with a re-reading of the instruction on reasonable doubt. (Pet'r's Mem. at 32.) In fact, the jury was repeatedly told that every element of the crime charged had to be proven beyond a reasonable doubt, and the concept of reasonable doubt was clearly and properly defined. (*See* Tr. 446–49, 454–55, 457, 461–66, 480–82, 483–86, 502.) Moreover, the jury was explicitly told, during the main instruction, not to speculate or consider anything beyond the evidence presented in arriving at their verdict. (*See, e.g.,* Tr. 443 ("It is essential that you base your verdict upon the evidence and the evidence alone, as you have heard it from the mouth of the witnesses and from exhibits or stipulations which were introduced into evidence. You must not under any circumstances, indulge in speculation or guesswork. Nor are to you consider anything outside the evidence. In other words, do not try to be detectives, do not try to conjecture what you would do or what should have been done, or what might have been done or what could have been done."); *Id.* at 448–49 ("In determining whether or not the People have proven the defendant's guilt beyond a reasonable doubt, you should be guided solely by a full and fair evaluation of the evidence. After carefully evaluating the evidence, each of you must decide whether or not the evidence convinces you beyond a reasonable doubt of the defendant's guilt. Whatever your verdict may be, it must not rest on baseless speculations nor may it be influenced in any way by bias, prejudice, sympathy, or by a desire to bring your deliberations to an end or to avoid an unpleasant duty.").)

***12** In sum, the trial court meaningfully responded to the jury's request for clarification regarding their fact finding role, and gave them a legally correct instruction to that effect. As such, there was no constitutional violation committed by the trial court with respect to its response to the juror note, and petitioner's claim with respect to the jury's question is without merit.[FN12]

FN12. Petitioner also argues that the "cumulative effect" of the improper intent instruction and the improper response to the jury note violated his right to due process. (Pet'r's Mem. at 27.) First, as stated *supra,* there were no errors committed by the trial court with respect to the grounds raised by petitioner. In any event, even assuming *arguendo* that there was error committed with respect to both grounds raised by petitioner, such errors did not result in a due process violation because they did not cumulatively deprive petitioner of a fundamentally fair trial. Moreover, although petitioner cites *Gaines v. Kelly,* 202 F.3d 598 (2d Cir.2000), that case is completely inapposite to the instant petition, as none of the errors in the reasonable doubt instructions given in that case are present here.

Thus, after careful review, the Court concludes that the state court's decision was not an unreasonable application of, nor contrary to, clearly established

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

federal law, nor was it based on an unreasonable determination of the facts in light of all of the evidence presented at trial.

IV. CONCLUSION

For the reasons set forth herein, the Court finds that petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of petitioner's claims are plainly without merit.[FN13] As such, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of any denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly, and close this case.

FN13. In his reply, petitioner makes clear that he is not raising a separate claim that the verdict rendered went against the weight of the evidence. (*See* Pet'r's Reply at 4 ("It is not Mr. Dell–Aera's claim, in this application for habeas corpus relief, that the verdict was against the weight of the evidence; it is his claim that the verdict was a miscarriage of justice.").) In any event, to the extent petitioner raises an implied weight of the evidence claim, a "weight of the evidence" claim is based on state law. *See* *Correa v. Duncan,* 172 F.Supp.2d 378, 381 (E.D.N.Y.2001) ( "A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."). The Court cannot consider a purely state law claim on federal habeas review. *See* *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) ( "[F]ederal habeas corpus relief does not lie for errors of state law ...."). Even if construed as a federal sufficiency of the evidence claim, such claim is unexhausted, and in any event, there is sufficient evidence to sustain the verdict in this case based upon the overwhelming evidence of petitioner's guilt, as discussed *supra.*

SO ORDERED.

E.D.N.Y.,2012.
Dell'Aera v. James
Not Reported in F.Supp.2d, 2012 WL 6632673 (E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Richard DOMINGUEZ, Petitioner,
v.
Leonard A. PORTUONDO, Superintendent of Shawangunk Correctional Facility, Respondent.

No. 02 Civ. 5885(PKC).
Sept. 8, 2004.

*MEMORANDUM AND ORDER*

CASTEL, J.

***1** On March 31, 2004, Magistrate Judge Frank Maas issued a Report and Recommendation ("R & R") recommending that respondent's motion to dismiss the petition of Richard Dominguez for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be granted. *Pro se* petitioner was advised of his right to file objections to the R & R within ten days from its issuance. Petitioner requested and received an extension to file objections until May 12, 2004. On May 10, 2004, petitioner submitted his objections to the R & R arguing that there is or should be an "actual innocence" exception to the statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1). He urges that he has made an adequate showing of "actual innocence" and, therefore, his failure to timely file his petition ought be excused.

It is a duty of this Court to make a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection[s are] made." 28 U.S.C. § 636(b)(1). In reviewing the R & R, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* I have examined *de novo* the Magistrate Judge's R & R in light of petitioner's timely filed objections and I conclude that the R & R should be adopted.

*Background*

On March 16, 1994, around 11 p.m., Diosadada Vasquez and Moises Gonzalez got into Mr. Gonzalez's white Cadillac that had been parked in front of his sister's apartment near the intersection of West 204th Street and Seaman Avenue in Upper Manhattan. As the car made a U-turn, two gunmen approached on either side of the car. Together, they fired at least 14 bullets into the vehicle. The two passengers, Gonzalez and Vasquez, sustained numerous injuries but survived the shooting. The barrage of gunfire drew attention from local residents. Two eyewitnesses, James Ferrario and Shawnee Philips, made in-court identifications of petitioner Dominguez. At trial, Vasquez, who was shot six times and has been left partially paralyzed, was unable to identify either of the assailants. She testified that Dominguez was a partner in a drug enterprise with her then-boyfriend, Gonzalez, and that the two partners had had a dispute.

On November 9, 1994, the jury returned a verdict finding Dominguez guilty on two counts each of Attempted Murder in the Second Degree, Assault in the First Degree and Criminal Possession of a Weapon in the Second Degree. (*See* Pet. ¶ 4, Trial Tr. 1204–05) On January 19, 1995, the trial judge, Justice Edward McLaughlin, sentenced Dominguez to two consecutive indeterminate prison terms of twelve and one-half to twenty-five years on the attempted murder counts and concurrent terms of seven and one-half to fifteen years on the other counts.

Following sentencing, Dominguez diligently pursued the available post-conviction remedies. He

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

filed a motion to vacate the judgment of conviction pursuant to New York Crim. Pro. L. § 440.10 asserting that there was new exculpatory evidence, specifically that Ms. Vasquez had recanted portions of her trial testimony. At trial, she said that she could not identify either of her assailants; in her recantation, she stated that she saw the passenger side shooter and it was not Dominguez. Justice McLaughlin held an evidentiary hearing at which Ms. Vasquez testified. Her testimony spanned 147 pages, as contrasted to her trial testimony of 40 pages. On June 28, 1996, Justice McLaughlin denied Dominguez's motion because he did not find Vasquez's testimony credible. (New York Law Journal, July 12, 1996 at p. 25) On October 9, 1997, the Appellate Division, First Department denied Dominguez's application for leave to appeal the denial of his motion.

***2** Before the Appellate Division ruled on the application for leave to appeal, Dominguez filed a second section 440.10 motion, alleging ineffective assistance of trial counsel. Justice McLaughlin denied this motion on January 22, 1998. The Appellate Division granted Dominguez leave to appeal from the section 440.10 motion and consolidated the appeal from the denial of his second Section 440.10 motion with his direct appeal. On January 26, 1999, the Appellate Division unanimously affirmed Dominguez's conviction, and denied his second Section 440.10 motion. *People v. Dominguez,* 257 A.D.2d 511, 685 N.Y.S.2d 14 (1st Dep't 1999).

In December 1999, Dominguez filed a writ of error *coram nobis,* in which he alleged that he was denied the effective assistance of appellate counsel. On September 7, 2000, the Appellate Division denied this application. *People v. Dominguez,* 275 A.D.2d 1044, 715 N.Y.S.2d 205 (1st Dep't 2000) (table).

Dominguez also filed a third section 440.10 motion, dated July 24, 2000, in which he again claimed ineffective assistance of trial counsel. On September 18, 2000 Justice McLaughlin denied this motion. On February 15, 2001, the Appellate Division denied Dominguez's application for leave to appeal this decision.

*Federal Habeas Corpus Petition*

Under the provisions of 28 U.S.C. § 2244(d)(1), a petition for a writ of habeas corpus may be filed within one year from the date on which a conviction became final or from the time that the facts giving rise to petitioner's claim could have been discovered. On October 9, 2001 petitioner filed the present petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the Northern District of New York. It was subsequently transferred to this District. In an order filed July 25, 2002, Chief Judge Michael Mukasey directed petitioner to show cause why his petition should not be dismissed as untimely under AEDPA. On September 25, 2002, petitioner filed an affirmation making his assertion of actual innocence. Judge Harold Baer, to whom the case was then assigned, concluded that the petition should not be summarily dismissed and directed the state answer or move. (Order of November 7, 2002) Asserting that petitioner did not comply with the one-year requirement, respondent filed the instant motion to dismiss the petition.

Dominguez's judgment of conviction became final on June 24, 1999, facially giving petitioner until June 24, 2000 to file his petition. Dominguez's petition was not filed until October 9, 2001, beyond the one-year period. But AEDPA provides for the tolling of the one-year limitation during the period that state post-conviction remedies are under pursuit. 28 U.S.C. § 2244(d)(2). The provision states:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

***3** Here, Dominguez filed two post-judgment

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

applications, and the pendency of the two overlapped. The AEDPA statute of limitations was tolled during their pendency from December 9, 1999 until February 15, 2001. Magistrate Judge Maas accurately calculated each instance where the time was tolled and correctly determined that petitioner was obligated to file his habeas petition no later than September 2, 2001. (R & R at 8) As noted, the petition was not filed until October 9, 2001, thirty-eight days after the statutory limitations period had expired.

*The Application of the Whitley Standard*

The Second Circuit has left open the question whether the Constitution requires a district court to recognize "an 'actual innocence' exception to [the] AEDPA's statute of limitations." *Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir.2003) (*quoting Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 114 (2d Cir.), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175 (2000)). In *Whitley,* the Second Circuit laid out the sequential questions that a district court should examine in its analysis of "actual innocence" claims. FN1

FN1. Magistrate Judge Maas conducted the analysis suggested in *Whitley* in his R & R. The R & R correctly lays out the questions as follows:

> (1) Did [petitioner] pursue his actual innocence claim with reasonable diligence?
>
> (2) If [petitioner] did not pursue his claim with reasonable diligence, must an actual innocence claim be pursued with reasonable diligence in order to raise the issue of whether the United States Constitution requires an "actual innocence" exception to the AEDPA standard of limitations?
>
> (3) If [petitioner] did pursue the claim with reasonable diligence or if reasonable diligence is unnecessary, does [petitioner] make a credible claim of actual innocence?
>
> (4) If [petitioner] does make a credible claim of actual innocence, does the United States Constitution require an "actual innocence" exception to the AEDPA statute of limitations on federal habeas petitions?

R & R at 9, *quoting Whitley,* 317 F.3d at 225–6.

On the first question, whether petitioner was reasonably diligent in his pursuit of his actual innocence claim, Magistrate Judge Maas concluded that Dominguez raised his claim of actual innocence in his first Section 440.10 application following his sentencing. (R & R at 9–10) The record demonstrates that petitioner acted diligently in pursuing his claim of actual innocence and I adopt the Magistrate Judge's recommendation in that regard.

The next question is whether there has been made a "credible claim of actual innocence." *Whitley,* 317 F.3d at 225–26. In order to establish a claim of actual innocence, the petitioner must show "a fair probability that, in light of all the evidence" the "trier of the facts would have entertained a reasonable doubt of [petitioner's] guilt." *Kuhlmann v. Wilson,* 477 U.S. 436, 454 n. 17, 106 S.Ct. 2616, 2627 n. 17 (1986).

I have examined the entirety of the record on the petition, including the recantation affidavit of Diosadada Vasquez, sworn to on February 26, 1996, the September 20, 2002 affirmation of Mr. Dominguez and the objections of Mr. Dominguez to the R & R. I have directed the respondent to file with the Court the entirety of the trial transcript. I have compared Ms. Vasquez trial testimony with her testimony at the hearing. I have reviewed such other portions of trial the record as appear to me to be relevant to the claim of actual innocence. There is no credible claim of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

actual innocence on the facts presented.

At trial, Ms. Vasquez testified that she knew Dominguez since June or July of 1993 and knew him as “L.P.” (Trial Tr. 463) According to Vasquez, L.P. was partner in a drug business with Gonzalez, the father of her two children. (Trial Tr. 462–64) Vasquez testified that she considered herself to be a friend of L.P. She observed L.P. and Gonzalez arguing about the drug business on at least one occasion. (Trial Tr. 465–66)

***4** At about 11 p.m. on March 16, 1994, Gonzalez's 1982 white Cadillac was parked in front of his sister's apartment at 109 Seaman Avenue, near 204th Street in Manhattan. (Trial Tr. 471–73, 482) According to Vasquez,

> We [Gonzalez and Vasquez] got in the car. He [Gonzalez] drove off. As he drove off he went to make a U-turn on 204th Street and Seaman, and after that I heard him scream, and when I turned and looked I just seen a guy, like plain black clothes and a book bag in his hand and a gun, and I felt the shots hit me. It hit him too. He screamed. He threw himself out the car, and after that is just, I just blanked out.

(Trial Tr. 473)

She testified that while the shooting was in progress she was facing toward the driver's side but did not see the face of the shooter; he was dressed in black with a book bag and a gun. (Trial Tr. 480–81) She testified that she did not see Dominguez with a gun that evening and did not see him shoot her. (Trial Tr. 492) Gonzalez did not testify at trial and was living, according to Vasquez's trial testimony, in an unknown location in Santo Domingo, Dominican Republic. (Trial Tr. 469–70)

On the basis of a post-trial affidavit of Vasquez recanting her trial testimony, Justice McLaughlin granted an evidentiary hearing. At the hearing, Vasquez said that she looked toward the passenger side and was “shocked”; “I seen the guy that was walking up with a gun towards my window.” (Hearing Tr. 15) She testified that “[h]e was dark, like black, Hispanic could he have been [sic]” with facial features inconsistent with those of Dominguez. (Hearing Tr. 15) She testified that she had known Mr. Dominguez since 1993 and had seen him on a few occasions and that the passenger side shooter was not Dominguez. (Hearing Tr. 16) With regard to the driver side shooter, she was unable to provide any meaningful description. “He was—I just seen dark color. Everything was dark. The bag in his hand and the gun.” (Hearing Tr. 17)

She says that she did not initially tell the police about Gonzalez's drug dealing or reveal that she saw the face of the driver side shooter “[b]ecause ... when you're a drug dealer's wife, girlfriend, whenever you're confronted by cops ... you don't know nothing.” (Hearing Tr. 19) “[I]f I would have said anything or I did see anything, I would have been done. He [Gonzalez] would have finished me, in other words, either [sic] try to kill me.” (*Id.*) She says that she lied at trial because Gonzalez wanted her to “invent a story” to accuse Dominguez and she was in fear of physical harm from Gonzalez. (Hearing Tr. 21) The story that she allegedly invented in order to inculpate defendant was that she did not see who shot her; the truthful version, she claimed at the hearing, was that she saw the person and it was not Dominguez.

The circumstances surrounding her recantation are strongly suggestive that the newly-told version lacked credibility, as the trial judge found. Although the trial judge did not go so far as to conclude that there was pressure emanating from Dominquez and his associates, the evidence pointed in that direction. Tellingly, Vasquez described how she was at the home of Gonzalez's sister, Dorca, after the trial. (Hearing Tr. 46) Dorca's boyfriend, Billy, was on the phone calling

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

from Rikers Island and asked that Dorca pass the phone to Vasquez. (*Id.*) "When I got to the phone Billy said, I got somebody that wants to talk to you." (Hearing Tr. 46–47) It was Dominguez on the line. "[H]e was like take care of myself. My children. Go to therapy. Take care of my arm. And I was like, okay. And that's it." (Hearing Tr. 47) He also thanked her "for being upright" adding, "I believe that you know[ ] that it wasn't me. And I told him, I know. I do." (Hearing Tr. 47)

***5** She also testified how she went to pick up a sixteen-year-old close family friend, who she described as her "cousin," at the cousin's boyfriend's home. (Hearing Tr. at 60–61) After entering the home, the boyfriend then introduced her to an individual standing in her presence, Dominguez's brother. (Hearing Tr. 60) It was through the brother that Vasquez came to meet with Dominguez's attorney. (Hearing Tr. 57–58) The attorney came to her home but was unable to produce any notes of his meeting with Vasquez. (Hearing Tr. 79–81)

While she denied any influence or pressure from Dominguez, Vasquez acknowledged that Dominguez had written her five to seven letters while in prison and he mailed them to the address where she was living; notably, Vasquez destroyed each of the letters. (Hearing Tr. 81, 82) She admitted to living in fear for a time, "you know, bent down because I would see a car coming, hide." (Hearing Tr. 83)

With respect to the affidavit in which she changed her trial testimony, she responded as follows when asked if she read it before swearing to it: "Not really. I just, you know, I read part of it, but I just went real quick." (Hearing Tr. 87)

Justice McLaughlin in a written opinion found that "Vasquez's recantation testimony is not credible" and her "motive for recanting is not believable." The trial judge reviewed her testimony, pointed out inconsistencies and her motives to lie. He noted, for example, that "[t]he destruction of all correspondence between Vasquez and defendant suggests that the letters contain evidence unfavorable to defendant...." The trial judge's denial of the motion for a new trial was well supported by the evidence.

I note that the evidence at trial included two eyewitnesses who had never met each other. One was a dog walker who observed defendant from a distance of about ten feet and saw the shooting as it happened; he took cover behind a parked car. He saw the assailants take off in a white van. The other eyewitness was an off-duty New York Police Department detective. The detective heard the shots and looked down from her window to the well-lit street and observed defendant; she later selected the defendant out of a photo array and line-up.

Whether the findings of the state court are afforded the presumption of correctness under 28 U.S.C. § 2254(e)(1) or reviewed *de novo*, this petitioner has no credible claim of actual innocence. Under *Whitely*, I need not decide whether the Constitution creates an actual innocence exception to the AEDPA statute of limitations.

*CONCLUSION*

I adopt the Report and Recommendation of Magistrate Judge Frank Maas and dismiss the petition as time-barred under 28 U.S.C. § 2244(d)(1). The Clerk of Court is directed to enter judgment in favor of the defendant.

SO ORDERED.

S.D.N.Y.,2004.
Dominguez v. Portuondo
Not Reported in F.Supp.2d, 2004 WL 2002930 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2004 WL 2002930 (S.D.N.Y.)
**(Cite as: 2004 WL 2002930 (S.D.N.Y.))**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2006 WL 1455462 (E.D.N.Y.)
**(Cite as: 2006 WL 1455462 (E.D.N.Y.))**

H
Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
E.D. New York.
Dominic DUPONT, Petitioner,
v.
William PHILLIPS, Respondent.

No. 05-CV-3426 (NGG).
May 22, 2006.

Dominic Dupont, Stormville, NY, pro se.

Kings County District Attorneys Office, New York State Attorney Generals Office, for Respondent.

*MEMORANDUM & ORDER*
GARAUFIS, United States District Judge.

***1** On July 11, 2005, Dominic Dupont ("Petitioner") filed the instant petition *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 1998 Kings County conviction. In a Memorandum & Order dated August 16, 2005 ("Aug. 16, 2005 M & O"), I directed the Petitioner to submit an affirmation explaining why his petition should not be dismissed as time-barred within 60 days of that order. At that time, I held in abeyance the August 1, 2005 Order to Show Cause issued in this matter, pending resolution of the timeliness of the petition.

On October 14, 2005, the Petitioner timely filed an affirmation with this court in accordance with my directive ("Pet.'s Aff."). I have reviewed the affirmation, and for the reasons set forth below, I find that the petition will be deemed timely for the purposes reviewing the Petitioner's habeas petition on its merits. Accordingly, I hereby lift the abeyance put in place on August 16, 2005, and direct the Respondent to respond to the petition no later than July 15, 2006. Should the Respondent choose to argue the timeliness of the petition in its responsive submissions, I will entertain such arguments and reconsider the issue if appropriate.

**I. Discussion**

**A. AEDPA Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or "Act") signed into law on April 24, 1996, provides in relevant part that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d); *see Lindh v. Murphy,* 521 U.S. 320, 327 (1997) (interpreting § 2244 to apply "to the general run of habeas cases ... when those cases had been filed after the date of the Act").

In my August 16, 2005 M & O, I advised the Petitioner that filing a post-conviction motion does not start the AEDPA one-year statute of limitations period to run anew. 28 U.S.C. § 2244(d)(2). Rather, the tolling provision under § 2244(d)(2) applies only if petitioner's post-conviction motions were pending within the one-year grace period and merely excludes the time the motions were under submission from the calculation of the one-year statute of limitations.[FN1] *Smith v. McGinnis,* 208 F.3d 13, 16 (2d Cir.2000) (per curiam).

FN1. I also apprised the Petitioner of the fact that the statute of limitations period may be equitably tolled if petitioner can demonstrate that (i) "extraordinary circumstances prevented him from filing his petition on time," and (ii) he "acted with reasonable diligence throughout the period he seeks to toll." *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000) (per curiam), cert. *denied,* 531 U.S. 840 (2000) (citing *Johnson v. Nyack Hosp.,* 86 F.3d 8, 12 (2d Cir.1996)); *see also Valverde v. Stinson,* 224 F.3d 129, 133 (2d Cir.2000) (confiscation of legal papers is sufficient to establish potential basis for equitable tolling). However, in his affirmation, the Petitioner has not put forth an argument in favor of equitable tolling, and the issue therefore will not be addressed in this M & O.

***2** Petitioner was convicted on August 14, 1998. (Petition at 1, ¶ 2.) The Appellate Division, Second Department, affirmed the conviction on May 21, 2001. *See People v. Dupont,* 283 A.D.2d 587, 724 N.Y.S.2d 901 (2d Dep't 2001). On October 21, 2001, the New York State Court of Appeals denied petitioner leave to appeal. *See People v. Dupont,* 97 N.Y.2d 640 (2001). A petitioner's judgment of conviction becomes final 90 days from the date the New York State Court of Appeals denies leave to appeal. *See Williams v. Artuz,* 237 F.3d 147, 150-51 (2d Cir.2001), *cert. denied,* 534 U.S. 924 (2001). Therefore, petitioner's conviction became final on or about January 10, 2002. Thus, under AEDPA, Petitioner had 365 days from January 10, 2002, *plus* any days during which a properly filed application for state post-conviction or other collateral review of his conviction was pending, to timely file his habeas petition. *Pratt v. Greiner,* 306 F.3d 1190, 1195 (2d Cir.2002) ("[T]o be timely, his federal habeas petition was required to be filed one year later ... unless the period was tolled."). As Petitioner properly filed several post-conviction motions which tolled the limitations period, determining the timeliness of his 2254 petition is a complicated matter.

**B. Timeliness of Petitioner's Habeas Corpus Petition**

Petitioner filed four post-conviction motions which served to toll the one-year statute of limitations under Section 2254, namely two motions pursuant to N.Y.Crim. Pro. Law 440.10 ("440"), and two writs of error coram nobis. Petitioner attests that on May 20, 2002, he filed his first 440 motion, which was denied on September 18, 2002, and on January 13, 2003, leave to appeal was denied. (Pet .'s Aff. at 2.) On June 25, 2004, petitioner filed the second 440 motion, which was denied on March 17, 2005, and on June 7, 2005, leave to appeal was denied. (*Id.* at 2-3.) On August 14, 2003, he filed his first writ of error coram nobis, which was denied on November 17, 2003, and leave to appeal was denied on February 25, 2004.(*Id.*) *See People v. Dupont,* 1 N.Y.3d 627 (2004); *People v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Dupont*, 1 A.D.2d 528 (2d Dep't 2003). On March 1, 2004, petitioner filed his second writ of error coram nobis, which was denied on May 24, 2004, and on November 8, 2004, leave to appeal was denied. (Pet.'s Aff. at 3) *See People v. Dupont,* 7 A.D.3d 809 (2d Dep't 2004).

The Petitioner has supplied the court with an informative time-line of the procedural history outlined above, indicating when the limitations period was tolled and when it ran from the period between January 10, 2002 (the date on which his conviction became final) and June 13, 2005 (the date on which he filed the instant 2254 petition). Upon review, I find that the Petitioner's illustration of the running of the limitations period is correct on its face.

On May 20, 2002, Petitioner filed his first 440 motion, which tolled the running of the limitations period on that date. *See Geraci v. Senkowski,* 211 F.3d 6, 8-9 (2d Cir.2000). Thus, the limitations period ran from January 10, 2002 through May 20, 2002-a total of 130 days, leaving Petitioner with 235 days left to file his habeas petition. On January 13, 2003, the Appellate Division, Second Department denied Petitioner's motion for leave to appeal the denial of his 440 motion. This ended the tolling period and re-triggered the running of the limitations period. *See id.* The limitations period was tolled again on August 14, 2003 when Petitioner filed his first error coram nobis petition. *See Clark v. Stinson,* 214 F.3d 315, 319 (2d Cir.2000) ("the four months that [petitioner's] petition for a writ of error coram nobis was pending in New York are not counted toward the statutory limit"). Thus, an additional 213 days ran in the 365-day grace period, bringing the total number up to 343 days. This left Petitioner with twenty-two days in which to file his Petition. The limitations period remained tolled from August 14, 2003 through February 25, 2004, when the New York Court of Appeals denied Petitioner leave to appeal. *See id.* Subsequently, the period ran for five days, from February 25, 2004 until March 1, 2004, the date on which Petitioner filed his second error coram nobis petition, leaving Petitioner seventeen days in which to timely for habeas relief. This again tolled the running of the limitations period through November 8, 2004, when the New York Court of Appeals denied Petitioner's application for leave to appeal the Second Department's denial of the error coram nobis petition. The toll, however, was not lifted on November 8, 2004 due to the fact that Petitioner filed his second 440 motion prior to that date, on June 25, 2004. Thus, the filing of this 440 motion, which was still pending as of November 8, 2004, served to continue the tolling period. *See Dominguez v. Portundo,* No. 02 Civ. 5885, 2004 WL 2002930, at *2-3 (S.D.N.Y. Sept. 8, 2004) (AEDPA statute of limitations is tolled throughout the period that *overlapping* post-conviction challenges are pending.). The tolling concluded on June 7, 2005, the date on which the Second Department denied leave to appeal the denial of the second 440 motion. Thus, the Petitioner's final seventeen days began to run again on June 7, 2005. Petitioner filed his 2254 petition six days later, on June 13, 2005. His petition, therefore, was timely because it was filed eleven days before the expiration of his 365-day grace period under AEDPA's statute of limitations.

### III. Conclusion

***3** For the reasons stated above, the court finds that Petitioner's habeas petition has been timely filed under AEDPA. I hereby lift my previously imposed abeyance of the August 1, 2005 Order to Show Cause and direct the Respondent in this matter to respond to the Petitioner's Section 2254 petition no later than July 15, 2006. As the Respondent did not submit arguments on the issue of the petition's timeliness, it may do so in its responsive submissions, notwithstanding the conclusion reached in this Memorandum & Order. I will entertain such arguments and reconsider the timeliness issue if I deem it appropriate to do so.

The Clerk of Court is directed to mail a copy of this M & O to the *pro se* petition.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1455462 (E.D.N.Y.)
**(Cite as: 2006 WL 1455462 (E.D.N.Y.))**

    SO ORDERED.

E.D.N.Y.,2006.
Dupont v. Phillips
Not Reported in F.Supp.2d, 2006 WL 1455462
(E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Devon MILLINGTON,
v.
William LEE, Respondent.

No. 11 Civ. 499(LGS)(DCF).
Filed Aug. 14, 2014.
Signed March 26, 2015.

*OPINION AND ORDER*
LORNA G. SCHOFIELD, District Judge.

***1** Petitioner Devon Millington brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for murder in the first degree (the "Petition"). This case was referred to the Honorable Debra Freeman for a report and recommendation (the "Report"). The Report was filed on August 14, 2014, and recommends that the writ be granted on Petitioner's claim of ineffective assistance of counsel because his counsel misinformed him about the maximum possible sentence after trial. In particular, the Report recommends that the prosecution be directed to re-extend its plea offer to Petitioner and, assuming Petitioner accepts the plea offer, present it to the trial court.

On August 28, 2014, Respondent filed a letter under seal explaining that the prosecution had agreed to re-extend plea offer to Petitioner as recommended in the Report. Respondent requested, with Petitioner's consent, that further action on the writ be stayed pending the outcome of re-extending the plea offer. Respondent explained that he would withdraw his objections to the Report, filed on the same day as the letter, if Petitioner successfully repleaded in state court.

By letter from Petitioner dated March 3, 2015, the parties informed the Court that Petitioner had successfully repleaded as recommended in the Report. Respondent withdrew his objections and the parties consented to the Court "affirming Judge Freeman's Report and Recommendation."

A reviewing court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The district court "may adopt those portions of the report to which no 'specific, written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Adams v. N.Y. State Dep't of Educ.,* 855 F.Supp.2d 205, 206 (S.D.N.Y.2012) (citing Fed.R.Civ.P. 72(b), *Thomas v. Arn,* 474 U.S. 140, 149 (1985)).

The factual and legal bases underlying the well-considered Report are neither clearly erroneous nor contrary to law. Accordingly, the Report is ADOPTED in its entirety. The Petition is GRANTED in part and DISMISSED in part.

As to Petitioner's ineffective assistance of counsel claim, Petitioner has met the standards for relief set forth in 28 U.S.C. § 2254(d)(1) and (2). He was denied his Sixth Amendment right to effective assistance of counsel, and is thus entitled to a writ of habeas corpus, pursuant to 28 U.S.C. § 2254(a). Therefore, a writ of habeas corpus is GRANTED as further described in the Report. The parties agree that this writ has been satisfied. Petitioner's remaining claims are DISMISSED.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

The Clerk of Court is directed to close this case.

SO ORDERED.

DEVON MILLINGTON,

Petitioner,

-against-

WILLIAM LEE, Superintendent, Green Haven Correctional Facility,

Respondent.

### REPORT AND RECOMMENDATION AND ORDER

DEBRA FREEMAN, United States Magistrate Judge.

**\*2 TO THE HONORABLE LORNA G. SCHOFIELD, U.S.D.J.:**

Petitioner Devon Millington ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254, following his conviction in state court, upon a jury verdict, of murder in the first degree. (*See* Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, dated Jan. 18, 2011 ("Petition" or "Pet.") (Dkt.1).) Petitioner is currently incarcerated at the Green Haven Correctional Facility in Stormville, New York, where he is serving a sentence of life imprisonment without parole. (*See id.* ¶ 3.)

Petitioner raises two claims: First, he claims that he received ineffective assistance of trial counsel because (a) his counsel failed to investigate potentially mitigating evidence, and (b) in the context of advising him about a plea offer, his counsel gave him erroneous advice regarding the maximum sentence he could face if convicted at trial. Second, Petitioner asserts that the state court, in post-conviction proceedings, violated

his due process rights by failing to conduct an evidentiary hearing on his ineffective-assistance-of-counsel claims. (*See id.* ¶¶ 15–17 .)

For the reasons set forth below, I recommend that Petitioner's due process claim be dismissed as not cognizable on habeas review. I further recommend, however, that a writ of habeas corpus be granted on his ineffective-assistance claim, to the extent that claim relates to the advice given to Petitioner during plea discussions. While Petitioner's challenge to his counsel's purported failure to investigate cannot survive scrutiny, this Court is persuaded that, in the context of advising Petitioner regarding a plea offer, Petitioner's counsel in fact misinformed Petitioner of the maximum sentence he could receive after trial. This Court is further persuaded that counsel's erroneous advice led Petitioner to reject a plea offer that was made by the prosecution and would likely have been accepted by the trial court, which resulted in Petitioner's being sentenced, after trial, to a substantially longer prison term (life without parole) than he would have received under the terms of the plea offer (18 years to life). Under these circumstances, a writ of habeas corpus is warranted; specifically, the prosecution should be directed to re-extend the plea offer to Petitioner and then, assuming Petitioner accepts it, to present it to the state trial court.

### BACKGROUND

**A.** *Factual Background*

The evidence presented by the prosecution at Petitioner's trial showed that, in the early morning hours of July 20, 2000, Petitioner and his co-defendants, Michael Suarez ("Suarez") and Anthony Stallings ("Stallings") robbed Bill and Bob's Sports Bar in the Bronx, where they had been drinking and getting high. (*See* Record on Appeal of State Court Proceedings ("Record" or "R.") (Dkt.10), at 1639–41 [FN1] (People's Exhibit 24 (Written Statement of Devon Millington, dated Oct. 7, 2000)).) During the course of the robbery, Petitioner shot and killed the bartender, Everard "Erik" Gerrald ("Gerrald"). (*See id.*)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

FN1. Unless otherwise noted, citations to the state court record refer to the document control numbers stamped on the bottom of each page.

***3** The police arrested Petitioner on October 7, 2000. (*See id.* at 74.) Petitioner gave written and videotaped statements to the police, confessing to the crimes. (*Id.* at 1639–41; 1642–48 (People's Exhibit 25 (Transcript of Video Statement of Devon Millington, recorded Oct. 7, 2000 [FN2])).) On October 12, 2000, a grand jury indicted Petitioner, Suarez, and Stallings for a number of crimes, including second-degree murder, and also indicted Petitioner for first-degree murder. (*See id.* at 4–9 (Indictment, dated Oct. 12, 2000).) Petitioner's father, Roy MiUington ("Roy"), retained John Nicholas Iannuzzi, Esq. ("Iannuzzi") to act as Petitioner's defense counsel. (Declaration of Bari L. Kamlet, Esq., in Opposition to Petition for a Writ of Habeas Corpus, dated June 2011 ("Kamlet Decl.") (Dkt.9), Ex. 17 (Affidavit of Roy Millington, sworn to Sept. 14, 2009 ("Roy Aff.")) ¶ 1.)

FN2. The exhibit itself indicates that the video statement was recorded on October 7, 2006 (*see* R. at 1642), which cannot be correct, as the exhibit was introduced at Petitioner's trial in 2002. According to the testimony of a police detective, the video was recorded on October 7, 2000, the same day Petitioner made his written statement. (*See id.* at 82–83.)

**B. *Procedural History***

**1. *Suppression Hearing, Trial, and Direct Appeal***

On April 9, 2001, Iannuzzi filed a motion seeking, *inter alia,* to suppress Petitioner's confessions as involuntarily made. (*See* R. at 10–11.) The Honorable Robert H. Straus, J.S.C., of the Bronx County Supreme Court, held a hearing on January 3–4, 2002, and determined that Petitioner's statements to the police, including his written and videotaped statements, would be admissible against him at trial. (*See id.* at 24–255; Court Ex. 2 (Dkt.31), at 1–48.[FN3])

FN3. Court Ex. 2 consists of pages of the state court proceedings that were missing from the Record; the exhibit was introduced by the parties at an evidentiary hearing held by this Court, as described below. (*See* Section II(B)(2)(b)(i), *infra.*) For ease of reference, citations to Court Ex. 2 are to the page numbers of the document stamped onto it when filed on the docket.

Petitioner's trial, which was also conducted before Justice Straus, began on January 15, 2002. (*See* R. at 256.) The prosecution introduced, *inter alia*, Petitioner's confessions and Suarez's testimony. (*Id.* at 599–746 (testimony of Michael Suarez); 1639–41 (written statement); 1642–48 (videotaped statement) .) During his testimony, Suarez acknowledged that he had accepted a plea bargain in which he would plead guilty to robbery in the first degree, testify against Petitioner, and receive a sentence of 14 years in prison. (*See id.* at 602–03.)

Petitioner took the stand in his own defense and disavowed his prior confessions, claiming that he did not participate in any crime, that he did not remember anything from the night in question, and that the police had drafted his written statement and coerced him into signing it. (*See id.* at 1191–98.) Iannuzzi called Dr. Ronald Hoffman as an expert in the field of forensic toxicology to give his opinion on the effect of Petitioner's drug use, during the night before and the day of his confessions, on the reliability of those confessions. (*See id.* at 1004.)

On January 28, 2002, the jury returned a verdict against Petitioner of guilty of murder in the first de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

gree (*see id.* at 1383–85), and, following a sentencing hearing on April 2, 2002, Justice Straus sentenced Petitioner to life imprisonment without parole (*see* Kamlet Decl., Ex. 11 (Transcript of Sentence, conducted Apr. 2, 2002 ("Sentence Tr.")), at 35).

***4** Iannuzzi continued to represent Petitioner on direct appeal (*see* Kamlet Decl., Ex. 1), challenging his conviction and sentence on various grounds that are not relevant here (*see id.* at 54). The Appellate Division unanimously affirmed Petitioner's conviction and sentence on February 22, 2007. *See People v. Millington,* 830 N.Y.S.2d 143 (1st Dep't 2007). On June 14, 2007, the New York Court of Appeals denied Petitioner leave to appeal from the Appellate Division's decision. *See People v. Millington,* 9 N.Y.3d 848 (2007).

**2. *State Collateral Proceedings***

Represented by new counsel, Andrea G. Hirsch, Esq. ("Hirsch"), Petitioner applied to the Appellate Division for a writ of error *coram nobis* on September 8, 2008, alleging that Iannuzzi had provided ineffective assistance of appellate counsel. (*See* Kamlet Decl. ¶ 9 & Ex. 18.) Petitioner argued that many of the claims that Iannuzzi had raised on appeal were baseless, and that, as appellate counsel, Iannuzzi had failed to raise the claim that he, himself, was ineffective in his role as trial counsel. (*See id* .) On May 7, 2009, the Appellate Division denied Petitioner's application (*see* Kamlet Decl., Ex. 3), and, on October 30, 2009, the Court of Appeals denied leave to appeal (*see* Kamlet Decl., Ex. 4).

Meanwhile, on October 15, 2009, Petitioner, again through Hirsch, also filed a motion pursuant to Section 440.10 of the New York Criminal Procedure Law, claiming ineffective assistance of trial counsel due to Iannuzzi's alleged failures (1) to investigate Petitioner's background and to have him examined by a psychiatrist prior to entering into plea negotiations and sentencing, and (2) to advise Petitioner properly with respect to accepting a plea offer. (*See* Kamlet Decl., Ex. 5 (Notice of Motion to Vacate Judgment and Set Aside Sentence, dated Oct. 15, 2009; Affirmation of Andrea G. Hirsch, Esq., dated Oct. 15, 2009; Memorandum of Law, dated Oct. 15, 2009 ("Pet. § 440.10 Mem.")).)

Among the documents Petitioner submitted to the state court, in support of his Section 440.10 motion, were his own affidavit (Letter to the Court from Assistant District Attorney ("ADA") Bari L. Kamlet, dated July 26, 2011 ("Kamlet Ltr.") (Dkt.33), Ex. 3 (Affidavit of Devon Millington, sworn to Sept. 15, 2009 ("Pet.Aff."))), an affidavit by his brother Errol Millington ("Errol") (Kamlet Decl., Ex. 16 (Affidavit of Errol Millington, sworn to Aug. 26, 2009 ("Errol Aff."))), an affidavit by his father (Roy Aff.), and a letter from a psychiatrist, Dr. Eric Goldsmith ("Goldsmith") (*see* Kamlet Decl., Ex. 9 (Letter from Eric Goldsmith, M.D. to Andrea G. Hirsch, Esq., dated Oct. 14, 2009 ("Goldsmith Ltr."))).

Much of the documentation Petitioner submitted on his Section 440 .10 motion related to purportedly mitigating evidence that Petitioner claimed his trial counsel, Iannuzzi, had failed to develop. This documentation included, *inter alia,* evidence of an incident of boyhood sexual abuse that Petitioner had experienced and a lengthy history of drug and alcohol dependency, which, according to Goldsmith, had reached the point where, for Petitioner, substance abuse was "no longer a choice." (Goldsmith Ltr., at 4.[FN4]) Goldsmith opined that, in order to cope with the trauma that followed the early incident of sexual abuse, Petitioner "began drinking heavily and using drugs to self-medicate," and that "the drugs and alcohol were so debilitating that, when [Petitioner] was in an emotionally charged situation and intoxicated[,] he was so disinhibited that he was unable to effectively apply the necessary emotional brakes." (*Id.*) Commenting on a view expressed by the sentencing judge that Petitioner appeared to lack regret for his actions, Goldsmith further opined that Petitioner's apparent "emotional detachment" was indicative of

Page 5

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

"chronic posttraumatic symptoms." (*Id.* at 5.)

FN4. The Court has assigned consecutive pages numbers to Goldsmith's letter for ease of reference.

***5** In connection with his claim regarding the plea advice that Iannuzzi allegedly gave him, Petitioner stated in his affidavit that Iannuzzi had told him that the maximum sentence he could face if convicted was 25 years to life in prison. (*See* Pet. Aff. ¶ 8.) Petitioner also stated that, at some point, Iannuzzi told him that he was attempting to negotiate a 15–year sentence for Petitioner under a plea deal, but that the prosecution was only offering 20 years to life. (*See id.*) Petitioner further maintained that, "[j]ust before trial," the prosecutor offered a plea deal of 18 years to life, but Iannuzzi "discouraged" Petitioner from accepting that deal, telling Petitioner: " '18 to life, 25 to life, what's the difference?' " (*Id.*) Petitioner informed the court that, after conducting his own legal research, he told Iannuzzi that he believed he could be sentenced to "natural life," but, according to Petitioner, Iannuzzi insisted that 25 years to life was the maximum. (*Id.*) Petitioner claims that he "followed Iannuzzi's advice" not to accept the plea deal "because [he] thought [Iannuzzi] knew best." (*Id.*) Petitioner requested an evidentiary hearing so that the trial court could make credibility determinations and findings of fact regarding his post-conviction claims. (*See* Pet. § 440.10 Mem., at 11.)

In opposition to Petitioner's Section 440.10 motion, Respondent submitted, *inter alia,* an affirmation by ADA Daniel McCarthy ("McCarthy") (Kamlet Decl., Ex. 10 (Affirmation of Daniel T. McCarthy, Esq., dated Feb. 24, 2010 ("McCarthy Aff."))) and an affirmation by Iannuzzi (*id.,* Ex. 12 (Affirmation of John Nicholas Iannuzzi, Esq., dated Feb. 24, 2010 ("Iannuzzi Aff."))). In his affidavit, McCarthy stated that "had trial counsel informed [him] of [Petitioner's] background, and provided [him] with Dr. Goldsmith's report, [he] would not have viewed that information as a basis to extend any plea offer to [Petitioner]." (McCarthy Aff. ¶ 2.) Further, despite the fact that the transcript of a pre-trial proceeding contained a representation to the court, made by one of McCarthy's colleagues, that "McCarthy says the offers have been made, to be accepted or not" (*see* Kamlet Ltr., Ex. 21 (Transcript of Calendar Call, conducted Dec. 3, 2001 ("12/3/01 Tr."), at 2), McCarthy stated in his affidavit to the trial court that he "d[id] not recall" extending a plea offer to Petitioner (McCarthy Aff. ¶ 2). Similarly, Iannuzzi stated that he "d [id] not recall" conversations with the prosecution regarding a plea offer (Iannuzzi Aff. ¶ 5), and that he had no recollection of specific conversations with Petitioner or of discouraging Petitioner from accepting a plea offer (*id.* ¶¶ 3, 6).

The state court denied Petitioner's Section 440.10 motion in its entirety on November 22, 2010, without holding the evidentiary hearing that Petitioner had requested. (*See* Kamlet Decl., Ex. 6 (Decision and Order of the Supreme Court, dated Nov. 22, 2010 ("Section 440.10 Opinion")).) The court stated, in relevant part:

> ***6** Taking all the evidence before this Court into consideration, the Court finds no basis to conclude that trial counsel's representation of [Petitioner] was ineffective. Applying the standard enunciated in *People v. Baldi,* 54 N.Y.2d 137 (1981), this Court concludes: 1) despite the overwhelming evidence of guilt, [Iannuzzi] presented a well grounded defense; and 2) that [Iannuzzi] exhibited a "reasonable competence" in his representation of [Petitioner]. As stated in *Baldi,* "[a]n attorney who presents a well grounded but unsuccessful defense will not be held to have provided ineffective assistance of counsel, and thus a defendant will not be entitled to a vacatur of his conviction on such basis."

(Section 440.10 Opinion, at 4.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

On January 6, 2011, Petitioner requested leave to appeal to the Appellate Division from the denial of his Section 440.10 motion. (*See* Kamlet Decl., Ex. 7.) On April 14, 2011, the Appellate Division summarily denied leave to appeal. (*See* Kamlet Decl., Ex. 8.)

**C. *Federal Habeas Petition***

Petitioner filed the instant habeas petition *pro se* on January 18, 2011, [FN5] asserting the same claims that he raised in his Section 440.10 motion. (*See* Pet. ¶¶ 15–17.)

FN5. Although the Court's docket reflects a filing date of January 21, 2011 for the Petition (Dkt.1), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court. *See Houston v. Lack,* 487 U.S. 266, 270 (1988). Thus, in the absence of evidence to the contrary, the Court will deem the Petition to have been filed on January 18, 2011, the date Petitioner signed it. *See, e.g., Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

On June 20, 2011, Respondent filed an opposition to the Petition. (*See* Kamlet Decl. & attached Memorandum of Law, dated June 2011 (Dkt.9).) Shortly thereafter, on July 4, 2011, Hirsch filed a notice of appearance on Petitioner's behalf. (*See* Dkt. 12.) On October 6, 2011, Petitioner, through Hirsch as counsel, filed his reply papers. (*See* Petitioner's Reply to the State's Opposition Papers ("Pet.Reply") (Dkt.15).)

**D. *This Court's Preliminary Findings and Evidentiary Hearing***

By Order dated November 13, 2013 (the "November Order") (Dkt.21), this Court found that an evidentiary hearing before the Court would be both permissible under the law and warranted, with respect to Petitioner's particular claim that, during plea negotiations, his counsel had given him materially erroneous information regarding his potential maximum sentence, and, based on that erroneous information, counsel had discouraged Petitioner from accepting a plea. (*See* Section II(B)(2)(a), *infra*.) This Court held such an evidentiary hearing on January 22, 2014, to develop the record with respect to that aspect of Petitioner's ineffective-assistance claim. As explained below, certain further documentary evidence was introduced, and the Court heard testimony from Petitioner, Roy, Errol, and Iannuzzi. (*See generally* Transcript of Proceedings, conducted Jan. 22, 2014 ("Habeas Hr'g Tr .") (Dkt.22).)

***DISCUSSION***

**I. *APPLICABLE LEGAL STANDARDS***

**A. *Statute of Limitations***

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires habeas petitions to be filed within one year of the latest of four dates, the relevant one in this case being "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Here, Petitioner's habeas petition was timely filed.

***7** Petitioner's judgment of conviction was entered on January 28, 2002. (*See* R. at 1383–85.) On February 22, 2007, the Appellate Division affirmed, *see People v. Millington,* 830 N.Y.S.2d 143 (1st Dep't 2007), and on June 14, 2007, the Court of Appeals of New York denied Petitioner leave to appeal, *see People v. Millington,* 9 N.Y.3d 848 (2007). Petitioner's conviction became final 90 days later, on September 12, 2007, when the time for seeking certiorari expired. *See Saunders v. Senkowski,* 587 F.3d 543, 547 (2d Cir.2009) ("[T]he limitations period for state prisoners therefore begins to run only after the denial of certiorari or the expiration of time for seeking certiorari." (internal quotation marks and citation omitted)); 28 U.S.C. § 2101(c) (providing 90 days to seek

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

certiorari with the United States Supreme Court).

On September 8, 2008—362 days after his conviction became final-Petitioner filed his motion for a writ of error *coram nobis,* tolling the statute of limitations. *See* 28 U.S.C. § 2244(d)(2). On May 7, 2009, the Appellate Division denied that motion (*see* Kamlet Decl., Ex. 3), and the Court of Appeals denied leave to appeal on October 30, 2009 (*see id.,* Ex. 4).

In the meantime, Petitioner additionally filed, on October 15, 2009, a Section 440.10 motion in Bronx County Supreme Court. (*See* Kamlet Decl., Ex. 5.) The Section 440.10 motion also tolled the statute of limitations. *See, e.g., King v. Greiner,* No. 02cv5810 (DLC), 2003 WL 57307, at *1 (S.D.N.Y. Jan. 7, 2003). The Bronx County Supreme Court denied Petitioner's Section 440.10 motion on November 22, 2010,[FN6] but the notice of entry was not mailed to Petitioner until December 9, 2010. (*See* Kamlet Deck, Ex. 7.)

FN6. The Petition incorrectly states that Bronx County Supreme Court denied the Section 440.10 motion on November 22, 2009. (*See* Pet. ¶ 10.) The decision itself indicates the date as November 22, 2010. (*See* Section 440.10 Opinion, at 4.)

On January 6, 2011, Petitioner filed a motion, which was deemed timely, for leave to appeal the denial of his Section 440.10 motion (*see* Kamlet Decl., Exs. 7, 8; 22 N.Y.C.R.R. § 600.8(d)(1) (appeals to the Appellate Division due "30 days after service of the order upon the applicant")), continuing to toll the statute of limitations. *See Evans v. Chavis,* 546 U.S. 189, 191 (2006); *Bethea v. Girdich,* 293 F.3d 577, 578 (2d Cir.2002); *Wilkins v.. Kirkpatrick,* No. 06cv2151 (SCR)(LMS), 2009 WL 3644082, at *7 (S.D.N.Y. Nov. 4, 2009).

On January 18, 2011, prior to the decision on his Section 440.10 appeal, Petitioner filed the instant Petition. As the one-year statute of limitations thus ran for only 362 days, the Petition was timely filed.

**B. *Exhaustion***

As a general matter, a federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted the remedies available in the state courts. 28 U.S.C. § 2254(b)(1) (A); *see also Baldwin v. Reese,* 541 U.S. 27 (2004); *Picardv. Connor,* 404 U.S. 270, 275 (1971). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the ' "opportunity to pass upon and correct' alleged violations of ... prisoners' federal rights." *Picard,* 404 U.S. at 275 (quoting *Wilwording v. Swenson,* 404 U.S. 249, 250 (1971)). A petitioner may accomplish this in several ways, including by citing relevant provisions of the federal Constitution in his appellate brief, *see Davis v. Strack,* 270 F.3d 111, 122–23 (2d Cir.2001), or by relying on "pertinent federal cases employing constitutional analysis," *Rustici v. Phillips,* 308 F. App'x 467, 469 (2d Cir.2009) (internal quotation marks and citation omitted).

***8** Aside from setting out the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the pertinent state." *Larocco v. Senkowski,* 65 F. App'x 740, 742 (2d Cir.2003); *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (citation omitted). In New York, for a claim that can be raised on direct appeal, a petitioner must first appeal his conviction to the Appellate Division and then seek "further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane,* 394 F.3d 68, 74 (2d Cir.2005). A request for leave to appeal to the Court of Appeals may be made by a letter submission that encloses the briefs and other documents that were before the lower courts. *See id.* A court will deem the exhaustion requirement satisfied where the "fair im-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

port" of the total application suggests a request for review of the constitutional claims raised in those submissions. *Id.* at 75–77.

To exhaust a claim raised before the state trial court in a collateral post-conviction motion, as in a motion made pursuant to Section 440.10 of the New York Criminal Procedure Law, the petitioner must seek leave to appeal the denial of the motion. *See Ture v. Racette,* No. 9:12–cv–01864–JKS, 2014 WL 2895439, at *4 (N.D.N.Y. June 26, 2014) (claim unexhausted where petitioner did not seek to appeal denial of Section 440.10 motion); *see also Klein v. Harris,* 667 F.2d 274, 283–84 (2d Cir.1981); *Ramos v. Walker,* 88 F.Supp.2d 233, 234 n. 3 (S.D.N.Y.2000) (noting that "[a]n order denying a Section 440.10 is appealable to the intermediate appellate court by leave of a judge thereof granted under Section 460.15[,] ... [although] [t]here is no provision in New York law for an appeal to the Court of Appeals from an order denying leave to appeal from an order denying a Section 440.10 motion" (internal citations omitted)).

In this case, Petitioner raised his ineffective-assistance-of-counsel claim in a postconviction Section 440.10 motion brought before the trial court. (*See* Kamlet Decl., Ex. 7 (Memorandum of Law), at 6–7.) He raised the claim in federal terms, by relying on federal cases employing constitutional analysis. (*See id.*) In then seeking leave to appeal to the Appellate Division, Petitioner reiterated this claim and also expressly argued that, by denying him a hearing on his motion, the trial court had "violated his constitutional right to due process and his derivative right to a full and fair hearing." (*See id.* (Affirmation of Andrea G. Hirsch, Esq., dated Jan. 6, 2011), at 8.) Thus framed, Petitioner's constitutional claims were "fairly presented" to the state courts. *See Baldwin,* 541 U.S. at 29.

As noted above, however, Petitioner did not wait for the Appellate Division to rule on his application for leave to appeal, before he filed his habeas petition in this Court. Rather, relying on dicta in *Pace v. DiGuglielmo,* 544 U.S. 408 (2005), Petitioner suggested in his Petition that, in light of the fact that the statute of limitations had nearly expired (with only three days left to run), he was entitled to file a federal petition "protectively." (Pet., at 1; *see also Pace,* 544 U.S. at 416 (noting that a prisoner trying in good faith to exhaust state remedies may avoid the "predicament" of having his federal habeas petition time-barred "by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted").) More specifically, Petitioner filed prior to the full exhaustion of his claims in order to ensure that they would not become time-barred if a decision by the Appellate Division were to end the statutory tolling of the AEDPA limitations period before he could file in this Court. (*See* Pet., at 1.) Given that Petitioner was not mailed notice of the trial court's decision on his Section 440.10 motion for more than two weeks after that decision was issued, it was reasonable for Petitioner to fear a similar lapse in time before he received the decision of the Appellate Division. Indeed, if there were any delay in mailing—or even if notice were mailed promptly but took three days to reach him—then Petitioner would likely miss his deadline to file a federal habeas petition. (*See id.* (Petitioner stating: "If ... I were to wait to file this petition until after I received a decision from the New York Appellate Division ... and I then filed this petition, the petition would be untimely.").)

***9** Under the particular circumstances presented, it was within this Court's discretion to stay these proceedings and hold them in abeyance pending full exhaustion of Petitioner's claims. In particular, a stay was warranted because (1) Petitioner had made substantial efforts to exhaust his claims prior to commencing this proceeding, (2) he had good cause for filing the Petition when he did, given realistic concerns about the running of the statute of limitations, and (3) at least one of his claims appeared to be a strong one. *See Rhines v. Weber,* 544 U.S. 269,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

276–79 (2005) (describing guidelines for courts' exercise of discretion in staying habeas proceedings). Certainly, this is not a case in which a petitioner sought to "drag[ ] out indefinitely [his] federal habeas review." *Id.* In fact, approximately three months after Petitioner filed his "protective" Petition, his application for leave to appeal to the Appellate Division was denied (*see* Kamlet Decl., Ex. 8), eliminating any concern that review of Petitioner's claims by this Court would deprive the state courts of the first opportunity to consider them.

Thus, to the extent necessary for the sake of the record, this Court finds that it was appropriate for Petitioner to have filed a "protective" petition to avoid the risk of forfeiting his claims, and grants his application for a stay, *nunc pro tunc* to the date the Petition was filed. *See Pace,* 544 U.S. at 416; *see also Pan etti v. Quarterman,* 551 U.S. 930, 945–46 (2007) (noting that, in interpreting AEDPA's requirements, the purposes of the statute and the practical effects of precedent should be considered, and that "[t]his is particularly so when petitioners 'run the risk' under the proposed interpretation of 'forever losing their opportunity for any federal review of their unexhausted claims' ") (quoting *Rhines* )); *Haynes v. Ercole,* No. 08–CV–3643 (JFB), 2009 WL 580435, at * 1 (E.D.N.Y. Mar. 6, 2009) (finding good cause for staying habeas petition where petitioner had filed a ' "protective habeas' to ensure its timeliness"); *Brown v. Ebert,* No. 05cv5579 (DLC)(KNF), 2006 WL 1273830, at *2–3 (S.D.N.Y. May 9, 2006) (finding that petitioner had shown good cause for failing to exhaust his claims, in part because he followed the procedure set forth in *Pace* by filing a "protective" petition).

**C. *Standard of Review***

Under AEDPA, federal courts owe substantial deference to the decisions of state courts, where the state courts have adjudicated constitutional claims on the merits. *See* 28 U.S.C. § 2254(d) (2006); *see also Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (" 'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.").

AEDPA establishes a standard of review that is, by design, "difficult to meet." *Harrington v. Richter,* 131 S.Ct. 770, 786 (2011). A federal court may only issue a writ of habeas corpus if the state court adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Further, a state court's factual findings are presumed to be correct and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

***10** The requirement that federal law be "clearly established" limits petitioners to citing the "holdings, as opposed to the dicta of [the] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin,* 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor,* 529 U.S. 362, 412 (2000) ("*Terry Williams* ")). A state court decision is not "contrary to" clearly established federal law unless it either (1) applies a rule that is "antithetical" to Supreme Court precedent, or (2) "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Terry Williams,* 529 U.S. at 405–06; *Rosario v. Ercole,* 601 F.3d 118, 123 (2d Cir.2010). For a decision to be an "unreasonable application" of clearly established law, a state court must correctly identify the governing legal principle, but then apply that principle unreasonably to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003). An "unreasonable application" of clearly established law within the meaning of AEDPA is not merely an incorrect application of clearly es-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tablished law. Rather, it is an application "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter,* 131 S.Ct. at 786–87.

Similarly, a state court's factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen,* 558 U.S. 290 (2010). A state court's factual determinations may only be rebutted by clear and convincing evidence, *see* 28 U.S.C. § 2254(e)(1), and a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding," *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d) (2)). These standards, however, while "demanding," are "not insatiable," *Miller–El v. Dretke,* 545 U.S. 231, 240 (2005), and "[d]eference does not by definition preclude relief," *id.* (quoting *Cockrell,* 537 U.S. at 340). A factual determination may be unreasonable if it "cannot reasonably be reconciled" with the record before the state court. *Jones v. Murphy,* 694 F.3d 225, 235 (2d Cir.2012).

**II. *PETITIONER'S CLAIMS***

**A. *Due Process Violation***

This Court cannot review Petitioner's claim that, by failing to hold an evidentiary hearing during post-conviction proceedings to resolve his ineffective-assistance claims, the trial court violated his due process rights. (*See* Pet. ¶ 17.) In this circuit, such a claim is not cognizable in a federal habeas proceeding. *Word v. Lord,* 648 F.3d 129, 131 n. 5, 132 (2d Cir.2011) (holding, *per curiam,* that "alleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief," while acknowledging that two other circuits had rejected such a *per se* rule); *see also Diaz v. Greiner,* 110 F.Supp.2d 225, 235 (S.D.N.Y.2000) (noting that "federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings" (internal quotation marks and citation omitted)). Accordingly, I recommend that this claim be dismissed.

**B. *Ineffective Assistance of Trial Counsel***

***11** For purposes of AEDPA, the standard enunciated in *Strickland v. Washington,* 466 U.S. 668 (1984), has generally been accepted as "clearly established federal law" for determining whether, under the guarantees of the Sixth Amendment, a criminal defendant has received constitutionally effective assistance of counsel. *See, e .g., Terry Williams,* 529 U.S. at 391. To prevail on an ineffective-assistance claim under *Strickland,* a defendant must show that: (1) counsel's performance "fell below an objective standard of reasonableness" in light of prevailing professional norms; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694. The New York state constitutional standard, explicated in *People v. Baldi,* 54 N.Y.2d 137 (1981), differs in some ways from the federal constitutional standard under *Strickland,* but not in material respects, for purposes of analysis under AEDPA, *see Rosario,* 601 F.3d at 126 (holding that "the New York state standard for ineffective assistance of counsel is not contrary to [federal law]"); *Lindstadt v. Keane,* 239 F.3d 191, 198 (2d Cir.2001) (*Baldi* "is not 'diametrically different, opposite in character or nature, or mutually opposed' to" federal standards (quoting *Terry Williams,* 529 U.S. at 405)).

Here, the last-reasoned decision of the state courts (*i.e.,* the decision of the trial court, on Petitioner's Section 440.10 motion) rejected Petitioner's ineffective-assistance claims on the merits by finding that, under *Baldi,* the state court had "no basis to conclude

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that trial counsel's representation of [Petitioner] was ineffective." (Section 440.10 Opinion.) While the state court did not address the specifics of Petitioner's claims about the deficiencies in Iannuzzi's performance, and even though *Baldi* was a state-law case, the court's express reliance on *Baldi* is sufficient to deem Petitioner's federal constitutional claims to have been "adjudicated on the merits," 28 U.S.C. § 2254(d), such that this Court's review of Petitioner's ineffective assistance of counsel claim is governed by AEDPA, *see Rosario,* 601 F.3d at 126; *Lindstadt,* 239 F.3d at 198 (2d Cir.2001); *Watkins v. Perez,* No. 05cv477 (GEL), 2007 WL 1344163, at *8 (S.D .N.Y. May 7, 2007) (noting that a New York court " 'adjudicates' a federal ineffective-assistance claim 'on the merits if it applies or simply cites *Baldi' "* ).

**1.** ***Counsel's Alleged Failure to Investigate Petitioner's Background***

Petitioner contends that his trial counsel failed to conduct an adequate investigation into potentially mitigating circumstances in Petitioner's background, and that, if counsel had investigated thoroughly, then he would have been able to negotiate a more favorable plea bargain or to obtain a more lenient sentence after trial. (*See* Pet. ¶¶ 15, 17.) Petitioner cannot prevail on this claim because, as a threshold matter, he cannot show that it is "clearly established" by the holdings of the Supreme Court that a criminal defense attorney has a constitutional duty to investigate mitigating evidence, except with respect to capital sentencing. Further, even if such a duty were found to exist, and even if Iannuzzi were found to have failed to fulfill that duty, Petitioner cannot show that he suffered prejudice as a result, as required under *Strickland.* Thus, this Court cannot conclude that the state court's rejection of this aspect of Petitioner's ineffective-assistance claim was contrary to, or constituted an unreasonable application of, clearly established federal law.

**a.** ***Failure to Show a Violation of "Clearly Established Federal Law"***

***12** While *Strickland* itself constitutes "clearly established federal law," *see Terry Williams,* 529 U.S. at 391, and although the very conduct at issue in *Strickland* was counsel's failure to investigate matters relevant to sentencing, *see* 466 U.S. at 690, *Strickland* was a capital case. The Supreme Court expressly reserved opinion as to whether the standards of conduct that it was articulating should apply in a non-capital context. *See id.* at 686 (noting that the Court "need not consider the role of counsel in an ordinary sentencing, which may involve informal proceedings and standardless discretion in the sentencer, and hence may require a different approach to the definition of constitutionally effective assistance"). Subsequent to *Strickland,* whenever the Supreme Court has specifically clarified the extent of counsel's duty to investigate, it has done so in the context of capital sentencing proceedings. *See, e.g., Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Terry Williams,* 529 U .S. at 362. This has caused the Second Circuit to observe that it is "by no means clear" that defense counsel has a constitutional duty to investigate mitigating evidence, *except* in the context of capital sentencing. *U.S. v. Herrera,* 186 F. App'x 109, 112 (2d Cir.2006) (summary order). Other courts have reached similar conclusions. *See, e.g., Davis v. Grigas,* 443 F.3d 1155, 1158 (9th Cir.2006) (noting that "there is no clearly established federal law as determined by the Supreme Court in this context [of counsel's performance in non-capital sentencing]" (internal citation omitted)); *Flores v. Ercole,* No. 09–CV–602 (DLI), 2010 WL 3951048, at *8 (E.D.N.Y. Oct. 7, 2010) (questioning "whether the issue of counsel's meaningful representation at sentencing is cognizable on habeas review").

The Supreme Court has directed that "garden-variety applications" *of Strickland to* new and varied factual circumstances do not produce new constitutional rules, *Chaidez v. U.S.,* 133 S.Ct. 1103, 1107 (2013), but it has also cautioned that "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

precedent or license federal courts to treat the failure to do so as error," *White v. Woodall,* 134 S.Ct. 1697, 1706 (2014) (emphasis in original; internal citation omitted). Given the precedent cited above, it is difficult for this Court to conclude that examining the adequacy of defense counsel's investigation of potentially mitigating evidence, in the context of a non-capital case, would merely be a "garden-variety application" *of Strickland.* It is thus difficult to see how Petitioner could meet his burden, under AEDPA, of demonstrating that the state court's denial of his ineffective-assistance claim was contrary to, or represented an unreasonable application of, "clearly established federal law." 28 U.S.C. § 2254(d).

**b.** ***Failure to Show the Prejudice That Strickland Would Require***

***13** Even if the *Strickland* standard were applicable to Petitioner's claim regarding his trial counsel's alleged failure to investigate, Petitioner would be unable to meet that standard. In particular, regardless of whether his counsel's investigation was deficient, Petitioner cannot show that any such deficiency resulted in actual prejudice. *See Strickland,* 466 U.S. at 697 (holding that both prongs of the test for ineffective assistance must be satisfied, and that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"); *Parker v. Ercole,* 666 F.3d 830, 834 (2d Cir.2012) (noting that the court "need only consider the second prong" of *Strickland* to resolve the petitioner's ineffective-assistance-of-counsel claim).

Petitioner claims that if his counsel, Iannuzzi, had investigated adequately, then Iannuzzi would have discovered that, as a young child, Petitioner had once been subjected to sexual abuse by his older half-brother; that it was difficult for Petitioner to speak about that incident; that he had attempted suicide on three occasions during his youth; that he had experienced difficulty in school; that he had heavily abused drugs and alcohol from an early age; and that he had fought often and engaged in reckless behavior. (*See* Pet. Aff. ¶¶ 2–5.) According to Petitioner, had Iannuzzi uncovered this information, he would have been obligated to have Petitioner examined by a psychiatrist, who (like Goldsmith) would then have been able to show that Petitioner's drug abuse—supposedly his method of self-medicating to cope with his past molestation—was beyond his control, and that his reckless and aggressive behavior, including his participation in the robbery and shooting for which he was convicted, was directly linked to the same childhood abuse. (*See* Pet. Reply, at 63–65.)

As an initial matter, Petitioner has not demonstrated that a diligent investigation by Iannuzzi would necessarily have led to the retention of a psychiatrist and the presentation of that psychiatrist's findings either to the prosecution, in connection with plea discussions, or to the court, in connection with sentencing. Rather, based on some of the potentially damaging information that an investigation would apparently have revealed-such as the extent of Petitioner's substance abuse and past pattern of reckless behavior (*see* Goldsmith Ltr., at 2–5)—counsel might have made a strategic decision not to obtain a psychiatrist's report, or not to present one, if obtained. As the Supreme Court stated in *Strickland,* "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 689–90.

More critically, the record does not support Petitioner's hypothesis that additional information about his background and a psychiatric report like the one prepared by Goldsmith would have made a difference to either the prosecutor or the sentencing judge, resulting in a more favorable outcome to him. Petitioner has offered nothing but speculation to rebut the prosecutor's unequivocal statement, placed before the state court in opposition to Petitioner's Section 440.10 motion, that, had trial counsel informed him of Petition-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

er's background and provided him with the same psychiatrist's report that Petitioner ultimately obtained, he "would not have viewed that information as a basis to extend any plea offer to [Petitioner]." (McCarthy Aff. ¶ 2.)

***14** Similarly, Petitioner cannot avoid the comments made by the court at sentencing, which suggest that such information would likely have made little, if any, difference to the outcome. The sentencing judge, who was already aware from the pre-sentence report that Petitioner had a history of substance abuse (*see* Sentence Tr., at 12–13), stated that, in his view, Petitioner's drug use was not a mitigating factor, but rather an aggravating factor, because "it's a choice to throw away restraints and to do whatever you please with other people" (*id.* at 31–32). The judge further indicated that he had formed, at trial, an impression of Petitioner as someone who "sought to hide behind drug use as some sort of explanation for taking the life of an innocent person." (*Id.* at 32.) Perhaps most importantly, the court stated:

> [W]hat stands out in my mind as possibly the most significant factor is the fact that [Petitioner] shot Mr. Gerrald in the head three times. Not once to initially drop him to the ground, and that would have been enough and perhaps he would have lived, perhaps not, but then to in effect complete an execution of Mr. Gerrald by firing two more shots into his head, which guaranteed his death for no reason except just overall mean spiritedness, anger, whatever you want to call it, personal choice, gratification, it was done....
>
> He has committed the act of a person filled with whether it's anger, hatred, greed, it makes no matter, because he did what he did. He won't own up to it. He tried to evade responsibility and he was unsuccessful in that....
>
> [U]nder all the circumstances I don't feel that any other sentence is justified but the most severe sentence for the most severe crime, murder of an innocent person during the course of a robbery. And what sells it for me are the three bullets in the head. That's what separates [Petitioner's] act from that of someone else who may be a murderer, but who I might find in him some sparks of sadness over the occasion or regret or mistake or whatever. I don't find any of that here.
>
> (*Id.* at 33–35.)

Petitioner contends that a psychiatrist could have explained the nature of Petitioner's drug and alcohol dependency, and thereby refuted the judge's suggestion that Petitioner had made a conscious "choice" to act without restraint. Without the benefit of hindsight knowledge of the court's comments at sentencing, however, there can be no assurance that a psychiatrist would even have thought to address that particular point. Moreover, even Goldsmith, whom Petitioner eventually retained in connection with his Section 440.10 motion, and who was able to review and attempt to address all of the sentencing judge's remarks, never opined that Petitioner's denials of his involvement in the killing were connected to his childhood abuse or any other mitigating aspect of his background. (*See* Goldsmith Ltr., at 5.) Yet it was this failure to accept responsibility, combined with the deliberate nature of Petitioner's firing two more bullets into Gerrard's head, after he was already on the ground, that the judge found "separate[d]" Petitioner's crime from other murders. (Sentence Tr., at 35.) FN7

FN7. While Petitioner now faults Iannuzzi for his own false trial testimony, claiming that Iannuzzi advised him to lie under oath, and for his lies to the probation officer during his pre-sentence interview, claiming that Iannuzzi failed to prepare him (*see* Kamlet Decl., Ex. 5 (Memorandum of Law, at 16 n. 5)), even these contentions could be viewed as further attempts by Petitioner to blame

Page 14

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

others and avoid taking responsibility for his conduct.

***15** Finally, as noted above, some of the evidence that, according to Petitioner, would have been viewed by the court as lessening his culpability, could equally well have been viewed as aggravating. For example, among the information reported by Goldsmith was that Petitioner described himself as a person who got into fights with strangers, was easily provoked, and had had lots of confrontations, including a knife fight in which he had been stabbed in the neck. (*See* Goldsmith Ltr., at 2.) While the court may have accepted that Petitioner's history of recklessness and violence stemmed from his childhood abuse, it may also have considered such an admitted history to counterbalance his lack of documented prior criminal activity.

For all these reasons, while it is possible that Petitioner would have received a more lenient plea offer or sentence if additional mitigating evidence had been discovered, there could certainly be “fairminded disagreement” about whether, under *Strickland,* a more favorable result was reasonably probable. *See Richter,* 131 S.Ct. at 786–87. Accordingly, even if *Strickland* should be found to apply in the context presented, this Court cannot conclude that the state court's rejection of Petitioner's challenge to the adequacy of his trial counsel's investigation was “contrary to,” or an “unreasonable application of,” *Strickland. See* 28 U.S.C. § 2254(d). Thus, Petitioner cannot satisfy his burden under AEDPA, and this portion of Petitioner's ineffective-assistance claim should be dismissed.

**2. *Counsel's Alleged Failure, During Plea Discussions, To Advise Petitioner Correctly of the Maximum Sentence He Could Face at Trial***

As noted above, this Court held an evidentiary hearing on the question of whether Iannuzzi advised Petitioner ineffectively during plea negotiations. Based on the evidence adduced at that hearing, this Court concludes that Petitioner has a meritorious habeas claim that warrants relief.

**a. *This Court's Preliminary Determination of an AEDPA Violation, and Subsequent Holding of an Evidentiary Hearing***

The first question that was presented to this Court, with respect to Petitioner's claim that his counsel misadvised him of his potential sentence, was whether the state court's denial of this claim violated Section 2254(d) of AEDPA. That question needed to be answered based on the record that was before the state court, without any further development of the facts by this Court. *See Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011). Based on the troubling affidavits and pre-trial transcripts that Petitioner placed before the trial court on his Section 440.10 motion and the lack of any meaningful rebuttal by the State, this Court made a preliminary finding that the trial court had, indeed, either unreasonably applied *Strickland to* Petitioner's claim, in violation of Section 2254(d)(1), or, by rejecting Petitioner's claim without a hearing, made an unreasonable determination of the facts in light of the evidence in the record, in violation of Section 2254(d)(2). (*See* November Order.)

***16** Attached to this Report and Recommendation is a copy of the Court's fairly lengthy November Order, which is fully incorporated herein by reference. Although this Court will not repeat all of its reasoning herein, a brief summary is warranted. In short, this Court found that, in rejecting Petitioner's claims on the merits, the trial court could only have decided one of two things: either that Petitioner's version of the facts, as presented by affidavit to that court, was true; or that some or all of it was false. (*See id.* at 11.) If the trial court accepted Petitioner's recitation of facts as *true* (in other words, if the court accepted that Iannuzzi misinformed Petitioner of the maximum sentence that he could receive, if convicted, and that Petitioner rejected a plea offer as a result of this misinformation), then the trial court's rejection of Petitioner's ineffective-assistance claim constituted an unreasonable application of *Strickland* to those facts, in violation of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

28 U.S.C. § 2254(d)(1). (*See* November Order, at 12–13; *see also Lafler v. Cooper,* 132 S.Ct. 1376 (2012) (finding a violation of *Strickland* where the petitioner had rejected a plea offer based on his attorney's deficient advice).) If, on the other hand, the trial court, without a hearing, found that some or all of Petitioner's alleged facts were *false,* then the trial court's finding could not "reasonably be reconciled" with the limited record that was then before it, resulting in violation of 28 U.S.C. § 2254(d)(2). (*See* November Order, at 13–19; *see also Jones,* 694 F.3d at 235 & n. 1.) Accordingly, for the reasons stated in the Court's November Order, this Court made a preliminary determination that Petitioner had demonstrated a violation of Section 2254(d).

That determination, however, did not resolve the underlying issue of Petitioner's entitlement to habeas relief, as the record before the trial court was too limited to enable this Court to ascertain whether Petitioner had, in fact, received ineffective assistance of counsel and was thus being held "in custody in violation of the Constitution ... of the United States." 28 U.S.C. § 2254(a). As the lack of factual development was not due to any fault of Petitioner's, but rather to the failure of the state court to hold a hearing, it was permissible for this Court to hold the necessary evidentiary hearing to make credibility determinations and to resolve any conflicts in the evidence, *see Williams v. Taylor,* 529 U.S. 420, 429 (2000) ("*Michael Williams"* ); *cf.* 28 U.S .C. § 2254(e)(2), and this Court held such a hearing on January 22, 2014.

**b.** ***Findings of Fact, Based on the Evidence Before This Court***

At the evidentiary hearing before this Court, Petitioner generally testified credibly, in a manner that was materially consistent with the affidavit he had submitted in connection with his Section 440.10 motion. Iannuzzi also testified credibly, but his testimony tended more to corroborate Petitioner's account of the facts than to refute it, and new documentary evidence submitted by Respondent also tended to support Petitioner's version of events. After considering all of the presented evidence, as well as the demeanor of the witnesses, this Court makes the following findings of fact:

**i.** ***Plea Offer***

***17** *First, this Court finds that the prosecution initially extended to Petitioner, through Iannuzzi, an offer of a sentence of 20 years to life, and t hen, shortly before trial, an offer of 18 years to life, in exchange for Petitioner's plea of guilty to murder in the second degree.*

This Court's finding that an 18–to–life plea offer was eventually extended to Petitioner, before trial, is supported by Petitioner's testimony, which was not only unrefuted by any witness with knowledge, but which was largely corroborated by both the minutes of pre-trial proceedings and the trial judge's own notes.

When Petitioner first attested to having received a plea offer of 18 years to life (*see* Pet. Aff. ¶ 8), both the prosecutor and Petitioner's own trial counsel denied any recollection of this or, indeed, of *any* plea discussions. The lead prosecutor, McCarthy, stated by affidavit that he did not recall "extending any plea offer" to Petitioner (McCarthy Aff. ¶ 2), and Petitioner's trial counsel, Iannuzzi, stated by affidavit that he neither recalled having any conversations with the prosecution about a plea offer, nor conveying to Petitioner an offer of either 20 years to life or 18 years to life (Iannuzzi Aff. ¶ 5). As noted above, however, Petitioner submitted to the trial court a transcript of a pre-trial calendar call reflecting that, according to one of McCarthy's colleagues, "offers" in the case "ha[d] been made." (12/3/01 Tr ., at 2.) More importantly, additional evidence obtained by habeas counsel, prior to the hearing in this Court, confirmed that the prosecution had in fact extended an offer to Petitioner-eliminating any doubt as to whether the "offers" referred to in the pre-trial transcript might have been made only to Petitioner's co-defendants.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

Specifically, at the hearing before this Court, the parties stipulated that, if called to testify, the trial judge would state that he took notes regarding Petitioner's case, that he retained those notes, and that, according to those notes, a plea offer of "Murder 2 with 20 to life" had been extended to Petitioner, with the possibility of "18 or 19 to life." (Habeas Hr'g Tr., at 2–3; Court Ex. 1 (Dkt.30).) In addition, the parties introduced previously missing pages of the state court transcript, which included colloquy on the record among Iannuzzi, McCarthy, and the court, confirming that, as of about two weeks before Petitioner's trial, the prosecution had made Petitioner a plea offer, but that the offer was not acceptable to Petitioner.[FN8] (*See* Habeas Hr'g Tr., at 4–5; Court Ex. 2, at 38–39.) According to this transcript, Iannuzzi stated to the Court that he was "sure" that, "over the weekend," McCarthy would "reconsider" the prosecution's position. (*See* Habeas Hr'g Tr., at 7–8; Court Ex. 2, at 39.) Taking this evidence together, it is fully consistent with the testimony given by Petitioner, in which he asserted that the prosecution had first offered him a deal of 20 years to life and then, "[r]ight before trial," reduced the offer to 18 years to life. (Habeas Hr'g Tr., at 14; *see* Pet. Aff. ¶ 8.) Further, the fact that Petitioner memorialized his account by affidavit, before learning of the judge's notes, speaks to the trustworthiness of his account.

FN8. In his post-hearing brief, Petitioner indicates that the date when this colloquy took place was January 3, 2002 (Petitioner's Post–Hearing Letter Brief, dated Feb. 14, 2014 ("Pet.Ltr.Br.") (Dkt.25), at 6), but Respondent's counsel represented that it took place on the last day of the pre-trial hearing (*see* Habeas Hr'g Tr., at 5), which was January 4, 2002 (*see* R. at 213). The one-day discrepancy would not alter this Court's analysis of Petitioner's claim, as in either case, the exchange took place after Suarez pleaded guilty on January 2, 2002 (*see* Pet. Ltr. Br., at 6; State Court File Jacket ("File Jacket") (Dkt.25–1) (showing the date of disposition on Suarez's guilty plea as "1–2–02"); Respondent's Post–Hearing Letter Brief, dated Feb. 13, 2014 ("Resp.Ltr.Br.") (Dkt.26), at 3) and prior to the commencement of Petitioner's trial (*see* R. at 256).

***18** While now forced to concede that "an offer was extended to [P]etitioner at some point" (Resp. Ltr. Br., at 2), Respondent nonetheless argues that the details of the offer are insufficiently established and that, for various reasons, Petitioner should not be considered credible. Among other things, Respondent points out that the trial judge's notes also reflect that Petitioner, for his part, was seeking a plea with a sentence of 15 years to life, which conflicts with Petitioner's testimony that, to his understanding, Iannuzzi was trying to negotiate a determinate sentence for him of a "flat" 15 years. (Resp. Ltr. Br., at 3; *see also* Habeas Hr'g Tr., at 26–27.) The similarity of the accounts strikes this Court as more remarkable than their differences. Prior to the hearing, Petitioner was the only person to state affirmatively that Iannuzzi had sought to negotiate any plea deal on his behalf, let alone to specify a desired 15–year term. (*See* Pet. Aff. ¶ 8.) Whether Iannuzzi was trying to negotiate a determinate 15–year sentence, as Petitioner seems to have believed, or an indeterminate sentence of 15 years to life, as the judge's notes suggest, does not affect this Court's assessment of Petitioner's credibility on the key question of what offer was actually extended to him. Although Respondent is correct that no documentary evidence precisely confirms that the prosecution eventually offered Petitioner a plea deal of 18 years to life (which was only reflected as a possible future offer in the trial judge's notes) (*see* Resp. Ltr. Br., at 3), the Court nevertheless finds Petitioner's testimony on this point to be both genuine and generally consistent with the trial court's notes and the comments made by the parties on the record, and accepts it as fully credible.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

As to the other terms of the plea offer, Petitioner testified that, had he accepted the plea offer, he would have pleaded guilty to murder in the second degree, and that, as he understood it, there were no other material terms of the bargain. (*See* Habeas Hr'g Tr., at 17.) Again, the trial judge's notes support Petitioner's testimony, as they included a notation that the initial offer was for a plea to "Murder 2," and the notes did not reference any other terms. (*See* Court Ex. 1.) Based on the structure of the New York Penal Law, it would have made sense for a deal of 18 years to life to have been based on a plea to second-degree murder, given that such a sentence would not have satisfied the minimum sentencing requirement for first-degree murder. *See* N.Y. Pen. L. § 70.00(3)(a)(i) (eff. until July 22, 2004) (dictating minimum prison term for first-degree murder to be "not less than twenty years" and minimum term for other class A–I felonies, such as second-degree murder, to be "not ... less than fifteen years") .[FN9] Finally, the fact that second-degree murder would have been among the most serious offenses to which Petitioner could have pleaded guilty, and thus not necessarily in his self-interest, buttresses Petitioner's credibility on this point, especially where Petitioner knew that his co-defendant Suarez had pleaded guilty to the lesser crime of robbery.

FN9. For both first- and second-degree murder, the statutory maximum term of the sentence would have been life imprisonment, but life without parole could only have been imposed for murder in the first degree. *See* N.Y. Pen. L. §§ 70.00(2)(a), (5); 125.25; 125.27.

**ii. *Erroneous Advice by Counsel***

***19** *Second, this Court finds that Petitioner's counsel informed him, erroneously, that the maximum sentence he could face, if convicted, would be 25 years to life in prison (as opposed to life without parole).*

As in the affidavit he submitted to the trial court on his Section 440.10 motion, Petitioner testified before this Court that, based on his own research, he had told Iannuzzi that he thought he could receive a sentence of "natural life" on a charge of first-degree murder, but Iannuzzi had informed him that he was wrong, and that the maximum sentence he could receive after trial was instead 25 years to life. (*See* Habeas Hr'g Tr., at 12–13, 21.) This testimony by Petitioner became entirely believable after Iannuzzi took the stand and testified to his own recollection of events.

Iannuzzi's testimony on the stand was somewhat confused and disjointed, but, considered in its entirety, it painted a picture of the circumstances in which he came to offer incorrect advice to Petitioner. As background, this Court takes judicial notice of the fact that, in 1995, the New York state legislature made certain amendments to the state penal, criminal procedure, and related laws, including, *inter alia,* expanding the definition of first-degree murder to include an intentional killing committed during any of certain enumerated felonies, allowing for a sentence of life imprisonment without parole upon conviction for first-degree murder, and restoring the death penalty as a sentencing option. *See* 1995 Sess. Law News of N.Y. Ch. 1 (S.2850, A.4843) (McKinney's). Iannuzzi testified that, at the time that these statutes were amended, he attended a training program relating to the amendments, but the program covered, as he described it, "[m]ostly death." (Habeas Hr'g Tr., at 60; *see also id.* ("It was concentrated on death and the handling of actual death cases.").) According to Iannuzzi, the aspect of the amendment that allowed for a sentence of life imprisonment without parole was "not really" dealt with at the training he attended. (*Id.*) Rather, he testified that "[t]he course was dealing mainly with death. They didn't deal very much with cases where death wasn't involved." (*Id.*)

Iannuzzi recalled that Petitioner's case, which commenced in 2000, "was being handled as murder 1

until such time as the district attorney determined that it was not to be a death penalty" case (*id.* at 65), and that "once [he] got a determination from the District Attorney's office that murder 1 was not in the picture" (*id.),* he "thereafter ... more or less handled [the case] as if it were a murder 2" (*id.).* Indeed, from the totality of Iannuzzi's testimony, it appears that, in the wake of the restoration of the death penalty, he largely equated first-degree murder with capital murder. In this context, Iannuzzi testified that, while he could not recall any specific conversations that he had with Petitioner, he was "sure" that he "would have told [Petitioner]" that the maximum sentence he faced was 25 years to life in prison (*id.* at 64)-*i.e.,* the maximum sentence that was then available for second-degree murder, *see* N.Y. Pen. L. § 70.00(3)(i) (eff. until July 22, 2004), *not* first-degree murder, for which Petitioner was still being prosecuted.

***20** While Respondent argues that Iannuzzi was an experienced criminal defense lawyer who would not have been likely to make such a mistake (*see* Resp. Ltr. Br., at 8), and attempts to cast his testimony as that of a zealous advocate "falling on his sword" for Petitioner (*id.* at 8–9), Iannuzzi testified that he had not tried a first-degree murder case since well before the 1995 amendments (*see* Habeas Hr'g Tr., at 59 (testifying that he had tried such a case in 1964 and 1965)). It appears that, between the date of the statutory amendments in 1995 and Petitioner's case in 2000, Iannuzzi had not represented any client who had been charged with first-degree murder and who had therefore faced a potential sentence of life without parole. It is thus entirely credible that such a sentence would not have been part of Iannuzzi's usual frame of reference for homicide cases. In fact, Iannuzzi confirmed that he "wasn't focusing on" the possibility that Petitioner would receive a sentence of life without parole until the jury reached its verdict. (*Id.* at 68.) Iannuzzi testified credibly that it was only at or after that point that the sentence "became something [he] focused on more," when "suddenly [he] had to deal with life without parole." (*Id.*) Given this testimony, it seems that Petitioner's potential sentence of life imprisonment without parole caught Iannuzzi by surprise.

In the hearing conducted by this Court, Respondent's counsel asked Iannuzzi directly whether he would have told Petitioner that the maximum sentence he could face upon conviction was 25 years to life imprisonment, when Petitioner's maximum sentencing exposure was actually life without parole. In response, Iannuzzi testified: "It would be hard for me to tell him that he would be facing 25 to life if he was facing life without parole unless it was something that I didn't discuss with him until later in the case, after the verdict came in and then we had to deal with the possibility at that point." (*Id.* at 69.) Taking Iannuzzi's hearing testimony as a whole, this Court finds that, once the prosecution decided not to pursue the death penalty, Iannuzzi began to think of the case as a second-degree murder case, informed Petitioner accordingly that his maximum sentence was 25 years to life, and failed to realize—let alone to communicate to Petitioner—that Petitioner was actually facing a sentence of life without parole until after he was convicted.

**iii.** ***Likelihood That Petitioner Would Have Accepted the Plea Offer and That It Would Have Been Presented to the Court***

*Third, this Court finds that there is a reasonable probability that, if not for counsel's erroneous advice, Petitioner would have accepted the plea offer of 18 years to life, that the prosecution would not have withdrawn the offer, and that it would have been presented to the trial court.*

As in his earlier affidavit, Petitioner testified before this Court that Iannuzzi had discouraged him from taking the plea offer that was extended because it was not substantially different from the maximum sentence that Iannuzzi believed Petitioner would face if convicted. (*See* Habeas Hr'g Tr., at 15 ("Right before trial when we started saying that we were about to select our jury, I was telling him, what about the offer,

Page 19

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

you know. And he had told me, 18 years to life, 25 years to life, what's the difference.").) The Court credits this testimony, especially in light of Iannuzzi's evident confidence, at the time of trial, in the strength of Petitioner's defense. (*See id.* at 71 (Iannuzzi testifying that, as Petitioner was intoxicated at the time of the crime, "[h]e couldn't possibly have had intent [to commit the crime]").) If Iannuzzi thought that Petitioner had a strong defense that could be presented to a jury, and that the plea deal did not provide Petitioner with a significant benefit over the sentence that he would face if convicted at trial, then Iannuzzi might well have thought that accepting the plea would not have been in Petitioner's best interest.[FN10] Even so, though, Petitioner testified that he *did* seriously consider accepting the 18–years–to–life offer, because he was "a little nervous." (*Id.* at 13.) He also testified that he had no doubt that he would have accepted the offer, had he known that he could be sentenced to life imprisonment without parole. (*Id.* at 15.)

FN10. It seems likely that Iannuzzi thought that, if convicted and sentenced (whether based on a plea or a jury verdict), Petitioner would not readily be granted parole, such that any indeterminate sentence could effectively result in life imprisonment and, for that reason, would not be a favorable deal. (*See* Habeas Hr'g Tr., at 47 (Errol recounting that Iannuzzi had "expressed that he wanted to go to trial because any sentencing with life at the end of it would be considered life in prison ...").)

***21** Respondent argues that, as a sentence of 18 years to life would have been significantly more favorable than 25 years to life (as Petitioner acknowledged in the hearing before this Court (*see id.* at 26)), Petitioner should have been interested in the plea offer even if he had believed that 25 years to life was the maximum sentence he faced at trial (Resp. Ltr. Br., at 5); from this, Respondent suggests that the fact that Petitioner rejected the offer implies that he did not want a plea deal at all, but rather an acquittal (*id.).* The Court notes the inherent difficulty of discerning between what someone would do differently now, with perfect hindsight, and what someone would have done at the time, with competent legal advice, but no certainty as to the eventual outcome of the trial. Nonetheless, this Court is persuaded that Petitioner was, in fact, interested in a plea; that he followed his attorney's advice that the plea offer was not favorable, given Petitioner's available defenses and his supposed maximum potential exposure at trial; and that, had Petitioner understood his actual sentencing exposure (an issue on which he had pressed Iannuzzi before trial), he would have made a different risk calculation.

Further, there is nothing in the record to suggest that, had Petitioner accepted the plea offer, the prosecution would have withdrawn it before trial. The record is clear that an offer to Petitioner remained on the table on January 4, 2002 (*see* Court Ex. 2), less than two weeks before his trial was to commence (*see* R. at 256). Even Suarez's agreement, two days earlier, to plead guilty and cooperate as a prosecution witness against Petitioner had not caused the prosecution to withdraw the offer to Petitioner. (*See* File Jacket.) Given that, as of January 4, 2002, the prosecutor was still keeping the trial court apprised of the status of plea negotiations with Iannuzzi, the record gives every indication that any plea offer accepted by Petitioner would have been presented by the prosecution to the court.

**iv. *Likelihood That the Trial Court Would Have Accepted the Offer's Terms and Imposed a Sentence Less Severe Than the Sentence Petitioner Ultimately Received***

*Fourth, this Court finds that there is a reasonable probability that the state court would have accepted the terms of the plea offer, had it been presented to the court, and that Petitioner would have t hen received a less severe sentence than the one he received after trial.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Absolutely nothing in the record suggests that the trial court would not have accepted a guilty plea by Petitioner to second-degree murder, with an agreed sentence of 18 years to life. The trial judge specifically stated, at a pre-trial calendar call: "The case can always be disposed of if that's what the attorneys and their clients and the People wish to do." (12/3/01 Tr., at 6.) Moreover, before the prosecution extended its final plea offer to Petitioner, the trial judge made note of the prosecution's extant offer of 20 years to life, as well as the possibility that the prosecution would, in the future, offer a deal of 18 or 19 years to life, without giving any indication that such a potential future offer would be unacceptable. (*See* Court Ex. 1.)

***22** Neither party contends that the judge disapproved, at any time, of any offer of which the court was made aware. In fact, Suarez—the only one of Petitioner's co-defendants to accept a plea offer—pleaded guilty to a lesser charge of robbery in the first degree and received a shorter sentence of 14 years in prison. (*See* File Jacket.) The notations in the court file suggest that those terms, which were less severe than the terms offered to Petitioner, both as to the crime and as to the sentence, were accepted by the trial court. (*See id.*) It thus appears reasonably probable that the trial court would have similarly accepted the terms of Petitioner's plea bargain and sentenced him, accordingly, to a prison term of 18 years to life, a sentence that is obviously less severe than the sentence of life without parole that Petitioner received after his conviction at trial.

**c. *Conclusions of Law as to Whether Habeas Writ Should Issue***

This Court has already reasoned that, by rejecting Petitioner's ineffective-assistance-of-counsel claim without a hearing, the state court either (1) unreasonably applied *Strickland to* Petitioner's claim, or (2) made an unreasonable determination of the facts in light of the record before it. (*See generally* November Order; 28 U.S.C. § 2254(d)(1), (2).) Under these circumstances, "no deference is due" to the state court's decision, under AEDPA. *Pan etti,* 551 U.S. at 948. Rather, the Court must determine, *de novo,* whether Petitioner is in fact being held "in custody in violation of the Constitution or laws or treaties of the Unites States." 28 U.S.C. § 2254(a).

While there is no constitutional right to a plea bargain, *Weatherford v. Bursey,* 429 U.S. 545, 561 (1977), there is a constitutional right to the effective assistance of counsel at the plea-bargaining stage, *see Missouri v. Frye,* 132 S.Ct. 1399 (2012); *Padilla v. Kentucky,* 559 U.S. 356 (2010); *Hill v. Lockhart,* 474 U.S. 52 (1985), and the *Strickland test* generally applies to ineffective assistance claims arising out of that stage, *see Cooper,* 132 S.Ct. at 1384.

Under the first prong of the *Strickland test,* an attorney has "a professional obligation to adequately inform [his] client about the considerations that are relevant to [his] client's decision to accept or deny a plea bargain," *Davis v. Greiner,* 428 F.3d 81, 88 (2d Cir.2005), which means that "counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed," *Purdy v. United States,* 208 F.3d 41, 44 (2d Cir.2000) (internal citation omitted). "[G]rossly underestimating [the defendant's] sentencing exposure" constitutes a breach of an attorney's duty "to advise his client fully on whether a particular plea to a charge appears desirable." *U.S. v. Gordon,* 156 F.3d 376, 380 (2d Cir.1998) (internal citations omitted). Thus, in *Gordon,* where the attorney erroneously advised his client that he faced a maximum of 120 months incarceration if convicted, when in fact he faced a sentencing range from 210 to 262 months, the attorney's conduct was found to fall "below an objective standard of reasonableness." *Id.*

***23** To establish the "prejudice" necessary to satisfy the second prong of *Strickland,* a petitioner must also demonstrate that "the outcome of the plea

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

process would have been different with competent advice." *Cooper,* 132 S.Ct. at 1384. Specifically, a petitioner who chose not to accept a plea offer must show that, "but for the ineffective advice of counsel[,] there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the [petitioner] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 1385.

Here, as set out above, this Court has found that Iannuzzi misrepresented Petitioner's maximum sentencing exposure as 25 years to life in prison, when, in fact, Petitioner faced a maximum potential sentence of life imprisonment without parole. This is sufficient to satisfy *Strickland's* requirement that counsel's performance in advising Petitioner during plea negotiations "fell below an objective standard of reasonableness" in light of prevailing professional norms. *Strickland,* 466 U.S. at 688; *see Gordon,* 156 F.3d at 380.

Moreover, this Court has found that, had Petitioner been given correct information by his counsel, he would have accepted an offer by the prosecution to plead guilty to second-degree murder and serve a sentence of 18 years to life in prison, the prosecution would not have withdrawn the offer, and the trial court would likely have accepted the parties' plea deal and sentenced Petitioner in accordance with its terms. Under these circumstances, Petitioner has also met his burden, under *Strickland,* to demonstrate prejudice from Iannuzzi's deficient advice. A conviction for murder in the second degree, by way of a plea, would have been inherently less severe than a conviction for murder in the first degree. *See, e.g., People v. Granger,* 187 N.Y. 67, 73 (1907) (referring to murder in the first degree as a "greater offense" than murder in the second degree). More significantly, a prison sentence of 18 years to life would have been, on its face, much less severe than the sentence that Petitioner received after trial-life imprisonment without the possibility of parole. *See Solem v. Helm,* 463 U.S. 277, 297 (1983) (referring to life imprisonment without possibility of parole as "far more severe" than a life sentence with the possibility of parole); *Graham v. Florida,* 560 U.S. 48, 69–70 (2010) (referring to life imprisonment without parole as "the second most severe penalty permitted by law," after the death penalty).

This Court concludes that Petitioner was deprived of the effective assistance of counsel during plea negotiations, in violation of the Sixth Amendment, *see Cooper,* 132 S.Ct. at 1384, and that federal habeas relief should therefore be granted. As noted by the Supreme Court in *Cooper,* the proper remedy in these circumstances is to direct the prosecution to re-extend its final plea offer to Petitioner (*i.e.,* its offer to agree to a prison sentence of 18 years to life, in exchange for Petitioner's plea of guilty to murder in the second degree), and, assuming Petitioner accepts it, to present the plea deal to the state trial court. *See Cooper,* 132 S.Ct. at 1391; *see also* Resp. Ltr. Br., at 10 n. 2. Accordingly, I recommend that a writ of habeas corpus be granted, to that extent.

***CONCLUSION***

***24** For the foregoing reasons, Petitioner's application to stay these proceedings and hold them in abeyance pending the exhaustion of his claims (*see* Dkt. 1) is hereby granted, *nunc pro tunc* to the date of the Petition.

As to the resolution of Petitioner's habeas claims, I respectfully recommend that, with respect to Petitioner's claim that he received ineffective assistance of counsel in connection with a plea offer, the Court

(1) find that Petitioner has met the standards for relief set forth in 28 U.S.C. § 2254(d)(1) and/or (2);

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) find that Petitioner has demonstrated that he was denied his Sixth Amendment right to the effective assistance of counsel, and that he is thus entitled to a writ of habeas corpus, pursuant to 28 U.S.C. § 2254(a); and

(3) grant Petitioner habeas relief accordingly, to the extent of directing the prosecution to re-extend the 18–years–to–life plea offer and to present any resulting plea deal to the state trial court.

I further recommend that the remaining claims pleaded in the Petition be dismissed. Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6 (adding three days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield, United States Courthouse, 40 Foley Square, Room 201, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Schofield. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL–CIO Pension Fundv. Herrmann, 9* F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**ORDER**

Petitioner Devon Millington (“Petitioner”), who, as a result of his conviction by a jury for the crime of murder in the first degree, is currently serving a term of life in prison at the Green Haven Correctional Facility in Stormville, New York, challenges his conviction and sentence in a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The case has been referred to the undersigned for a report and recommendation, but, for the reasons discussed below, this Court has determined that it must hold an evidentiary hearing prior to issuing proposed findings of fact and any recommendation as to the proper disposition of Petitioner's claims. In particular, this Court finds that an evidentiary hearing is needed to resolve factual disputes underlying Petitioner's claim that, in the context of discouraging Petitioner from accepting a plea bargain offered by the State, Petitioner's trial counsel rendered ineffective assistance by misinforming Petitioner that the maximum prison sentence he could face, if convicted, was an indeterminate sentence of 25 years to life, when Petitioner actually faced a maximum sentence of life imprisonment without parole.

***BACKGROUND***

**A. *Petitioner's Indictment***

***25** Based on the evidence presented at trial, Petitioner killed Everad “Eric” Gerrald (“Gerrald”) during the course of a robbery that Petitioner committed with Michael Suarez (“Suarez”) and Anthony Stallings (“Stallings”). (*See generally* Record on Appeal (“R.”) (Dkt.10), at 256 [FN11] (Transcript of Trial, conducted Jan. 15, 2002 through Jan. 28, 2002).) The details of the crime itself are not relevant to this Order.

FN11. The page numbers to the Record on Appeal, as referenced herein, are to the document control numbers stamped at the bottom of each page of the Record.

The police arrested Petitioner during the early morning hours of October 7, 2000. (R., at 918:23–926:19.) The next day, Petitioner gave a

statement after being informed of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966). (*See id.,* at 929:1–930:18.) In the statement, Petitioner admitted that, although it had been Suarez's idea to rob Gerrald, Petitioner had committed the murder (*see* R., at 1639–41 (People's Exhibit 24 (Written Statement of Devon Millington), dated Oct. 7, 2000)). Petitioner subsequently also gave a videotaped confession. (*See* R., at 1050:16–1052:21, 1642–48 (People's Exhibit 25 (Transcript of Video Statement of Devon Millington)).) As part of the videotaped statement, Petitioner acknowledged that the written statement he had given earlier was his, and that he had signed an explanation of his rights. (*See id.* at 1648.)

On October 12, 2000, a grand jury indicted Petitioner for first-degree murder and Petitioner, Stallings, and Suarez for second-degree murder and several other crimes. (*See* R., at 4–9 (Indictment, dated Oct. 12, 2000).)

**B. *Alleged Plea Offers and Erroneous Advice of Counsel***

Petitioner's father, Roy Millington ("Roy"), retained John Nicholas Iannuzzi, Esq. ("Iannuzzi") as Petitioner's defense counsel. (Declaration in Opposition to Petition for a Writ of Habeas Corpus, dated June 2011 ("Kamlet Decl.") (Dkt.9), Ex. 17 (Affidavit of Roy Millington, sworn to Sept. 14, 2009 ("Roy Aff.")), ¶ 1.)

According to Petitioner, Iannuzzi told him, in the course of his representation, that the maximum sentence Petitioner would face if convicted was 25 years to life in prison. (*See* Letter from Bari L. Kamlet, dated July 26, 2011 ("Kamlet Ltr."), Ex. 3 (Petitioner's Affidavit, sworn to Sept. 15, 2009 ("Pet.Aff.")), ¶ 8.) Petitioner also asserts that, at some point, Iannuzzi told him that he was attempting to negotiate a 15–year sentence for Petitioner under a plea deal, but that the prosecutor was only offering 20 years to life. (*Id.*) Petitioner further maintains that, "[j]ust before trial," the prosecutor offered a plea deal of 18 years to life, but Iannuzzi "discouraged" Petitioner from accepting that deal, and also discouraged Petitioner's parents from advising him to plead guilty, telling Petitioner: " '18 to life, 25 to life, what's the difference?' " (*Id.*)

After conducting his own legal research, Petitioner allegedly told Iannuzzi that he believed the statute allowed for "natural life," but, according to Petitioner, Iannuzzi insisted that 25 years to life was the maximum. (*Id.*) Petitioner claims that he "followed Iannuzzi's advice" not to accept the plea deal "because [he] thought [Iannuzzi] knew best." (*Id.*)

**C. *Petitioner's Trial., Conviction, and Direct Appeal***

***26** Petitioner was eventually tried, separately from his co-defendants, in January, 2002. (*See* R., at 256.) On January 28, 2002, the jury found Petitioner guilty of murder in the first degree (*see* R., at 1632:1–13), and, on April 2, 2002, the trial court sentenced him to life imprisonment without parole (*see* R., at 1685 (Sentencing Transcript)).

Petitioner, still represented by Iannuzzi, appealed to the Appellate Division in October 2006, raising several claims not relevant here. (*See* Kamlet Decl., Ex. 1.) The Appellate Division denied the appeal on February 22, 2007, *see People v. Millington,* 830 N.Y.S.2d 143 (1st Dep't 2007), and, on June 14, 2007, the Court of Appeals denied Petitioner leave to appeal from the Appellate Division's decision, *see People v. Millington,* 9 N .Y.3d 848 (2007).

**D. *Collateral Post–Conviction Proceedings***

Petitioner retained Andrea Hirsch, Esq. ("Hirsch") for the purpose of pursuing additional post-conviction relief. (*See* Kamlet Ltr., Ex. 5 (Letter from Hirsch to Iannuzzi, dated Apr. 4, 2008).) Through Hirsch, Petitioner filed a *coram nobis* petition in the Appellate Division, as well as certain motions for collateral relief in the trial court. Of particular relevance here is the October 15, 2009 motion filed by Petitioner in the trial court under Section 440.10 of the

Page 24

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

New York Criminal Procedure Law, challenging the effectiveness of his trial counsel. (*See* Kamlet Decl., Ex. 5 (Notice of Motion to Vacate Judgment and Set Aside Sentence, dated Oct. 15, 2009; Affirmation of Andrea G. Hirsch, Esq., dated Oct. 15, 2009; Memorandum of Law, dated Oct. 15, 2009) ("Pet. § 440.10 Mem.").) On that motion, Petitioner argued, *inter alia,* that Iannuzzi's representation was constitutionally defective because, in the context of advising Petitioner regarding a plea offer, Iannuzzi misrepresented to Petitioner the maximum sentence he could face if convicted of first-degree murder. (*See* Pet. § 440.10 Mem., at 19–20.) [FN12]

FN12. Petitioner's state *coram nobis* petition raised a related argument-that Iannuzzi had provided ineffective assistance on appeal by raising baseless claims, while neglecting to raise the "strong argument" that he, himself, had deprived Petitioner of effective assistance of counsel in proceedings before the trial court. (*See* Kamlet Decl. ¶ 9 & Ex. 18 (Corrected Motion for a Writ of Error *Coram Nobis;* Affirmation of Andrea G. Hirsch, Esq., dated Oct. 28, 2008; and Memorandum of Law, dated Oct. 28, 2008 ("Coram Nobis Mem."), at 7–13).) On May 7, 2009, the Appellate Division summarily denied Petitioner's motion for a writ of error *coram nobis* (*see* Kamlet Decl., Ex. 3), and the Court of Appeals denied leave to appeal on October 30, 2009, *People v. Millington,* 13 N.Y.3d 837 (2009).

In connection with this Section 440.10 motion, both Petitioner and Respondent submitted affidavits and letters to support their positions. (*See* Kamlet Ltr., Ex. 3–5, 9, 21–23.) Petitioner also submitted several transcripts of pretrial proceedings. (*See* Kamlet Ltr., Ex. 21.) Although Petitioner requested an evidentiary hearing so that the trial court could make credibility determinations and findings of fact (*see* Pet. § 440.10 Mem., at 11), the court denied Petitioner's Section 440.10 motion in its entirety without holding a hearing (Kamlet Decl., Ex. 6 ("11/22/10 Opinion"), at 4).

After reviewing the procedural history of the case, the court concluded its decision with the following brief analysis of Petitioner's ineffective-assistance-of-counsel claim:

> Taking all the evidence before this Court into consideration, the Court finds no basis to conclude that trial counsel's representation of the defendant was ineffective. Applying the standard enunciated in *People v. Baldi* (54 N.Y.2d 137 [1981] ), this Court concludes: 1) despite the overwhelming evidence of guilt, Mr. Ianuzzi [sic] presented a well grounded defense; and 2) that Mr. Ianuzzi [sic] exhibited 'reasonable competence' in his representation of the defendant. As stated in *Baldi,* '[a]n attorney who presents a well grounded but unsuccessful defense will not be held to have provided ineffective assistance of counsel, and thus a defendant will not be entitled to a vacatur of his conviction on such basis.'

***27** (*Id.*) [FN13] Nowhere in its decision did the trial court specifically address how it resolved Petitioner's and the State's contradictory allegations regarding plea discussions and Iannuzzi's conduct in that context.

FN13. A New York court "adjudicates a federal ineffective-assistance claim on the merits if it applies or simply cites *Baldi,*" *Watkins v. Perez,* 2007 WL 1344168, at *8 (S.D .N.Y. May 7, 2007) (internal quotation marks and citations omitted), which tracks *Strickland [v. Washington,* 466 U.S. 668 (1984) ] at the first prong but departs at the second prong with a standard of prejudice "somewhat more favorable to defendants," *Rosario v. Ercole,* 601 F.3d 118, 124 (2d Cir.2010) (quoting *People v. Turner,* 5 N.Y.3d 476 (N.Y.2005) (collecting cases)); *see also* discussion of the federal *Strickland*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

standard, *infra.*

On January 6, 2011, Petitioner sought leave to appeal to the Appellate Division. (*See* Kamlet Decl., Ex. 7.) The Appellate Division summarily denied that application on April 14, 2011. (*See* Kamlet Decl., Ex. 8.)

E. ***Federal Habeas Petition***

Proceeding *pro se*, Petitioner initiated the instant habeas proceeding on January 18, 2011.[FN14] (*See* Petition, dated Jan. 18, 2011 ("Pet.") (Dkt.1).) In his papers, Petitioner noted that Hirsch had prepared his habeas Petition and requested that the Court appoint her to represent him. (*See* Pet. ¶ 13.)

FN14. Although the Court's docket reflects a filing date of January 21, 2011 for the Petition (Dkt.1), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court. *See Houston v. Lack,* 487 U.S. 266, 270 (1988). Thus, in the absence of evidence to the contrary, the Court will deem the Petition to have been filed on January 18, 2011, the date Petitioner signed it. *See, e.g., Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

Although Petitioner raised a number of claims in his Petition, only one is relevant to this Order—Petitioner's claim (as previously raised in his Section 440.10 motion) that Iannuzzi's representation of Petitioner in connection with plea discussions was constitutionally ineffective because of Iannuzzi's purported failure "to tell [Petitioner] what sentences he faced; to advise [Petitioner] about the strengths and weaknesses of the prosecution's case; [and] to encourage him to accept the plea offer." (Pet.¶¶ 15, 17.)

On June 20, 2011, Respondent filed an opposition to the Petition (*see* Memorandum of Law, dated June 2011 (Dkt.9) (attached to Kamlet Decl.)), arguing, *inter alia,* that no plea was ever offered to Petitioner (*id.,* at 18–21).

After that, on July 4, 2011, Hirsch filed a Notice of Appearance in this Court, stating that she had "been retained to represent [Petitioner] in all further proceedings in this case." (Dkt.12.) Hirsch filed a reply on Petitioner's behalf on October 6, 2011. (*See* Petitioner's Reply to the State's Opposition Papers (Dkt.15).)

***DISCUSSION***

**I.** ***APPLICABLE LEGAL STANDARDS***

**A.** ***Standard of Review***

A petitioner who is in custody pursuant to a state court judgment may seek a federal writ of habeas corpus on the ground that his custody is in violation of federal law, *see* 28 U.S.C. § 2254(a), when he has exhausted all available state court remedies or is excused from doing so, *see* 28 U.S.C. § 2254(b)(1). If the petitioner's claim has been adjudicated on the merits by the state court, then the federal court must accord substantial deference to the state court's decision under the standard of review dictated by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d). The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidence presented in the State court proceeding.

***28** *Id.* This standard of review is, by design, "difficult to meet ." *Harrington v. Richter,* 131 S.Ct. 770,786 (2011).

An "unreasonable application" of clearly established federal law under § 2254(d)(1) occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003). The state court's decision "must have been more than incorrect or erroneous"; it must have been "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. 510, 520–21 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 409 (2000) (*Terry Williams)).* Review under Section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011). Evidence later introduced in federal court is irrelevant to this review. *Id.*

Further, under AEDPA, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), showing that the state court's factual determinations were "objectively unreasonable," *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003). A federal court may find a factual determination of the state court to have been unreasonable under this standard if the decision "cannot reasonably be reconciled" with the record that was before the state court. *Jones v. Murphy,* 694 F.3d 225, 235 (2d Cir.2012).

Section 2254(e)(2) controls whether a petitioner may receive an evidentiary hearing in federal district court on claims that were not developed in the state courts. *See Williams v. Taylor,* 529 U.S. 420, 429 (2000) (*Michael Williams).* Section 2254(e)(2) provides that, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim," with strictly limited exceptions. 28 U.S.C. § 2254(e)(2). A petitioner has *not* "failed to develop" the facts of his claim, and thus *may* receive a hearing without demonstrating that his case falls into the exceptions, "[i]f there has been no lack of diligence at the relevant stages in the state proceedings." *See Michael Williams,* 529 U.S.C. at 437.

Reading *Michael Williams* and *Pinholster* together, a habeas petitioner may receive an evidentiary hearing to determine the merits of his petition in federal court if- and only ifhe has been diligent in state court (or meets the exceptions) and can satisfy § 2254(d)(1) solely on the basis of the record that was before the state court. *See* 28 U.S.C. § 2254(e)(2); *Pinholster,* 131 S.Ct. at 1400 & n. 5 (reconciling its holding with *Michael Williams* ). As explained in detail below, that is precisely the posture of Petitioner's case.

**B. *Ineffective Assistance of Counsel***

***29** For purposes of review under AEDPA, *Strickland v. Washington,* 466 U.S. 668 (1984) sets out the relevant "clearly established federal law" for ineffective-assistance-of-counsel claims. *See Aparicio v. Artuz,* 269 F.3d 78, 95 & n. 8 (2d Cir.2001) (noting that it is "beyond cavil" that *Strickland* is clearly established federal law). To prevail on a claim of ineffective assistance of counsel under *Strickland,* a petitioner must show that: (1) counsel's performance "fell below an objective standard of reasonableness" in light of prevailing professional norms, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694. A court may reject an ineffective-assistance-of-counsel claim for failure to satisfy either prong of the *Strickland* standard, without reaching the other. *See Strickland,* 466 U.S. at 697.

The Supreme Court has long held that a criminal defendant's Sixth Amendment right to counsel applies

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

in the plea-bargaining phase as well as at trial, *see McMann v. Richardson,* 397 U.S. 759, 771 (1970), and that *Strickland* provides the relevant standard, *see Hill v. Lockhart,* 474 U.S. 52 (1985); *Padilla v. Kentucky,* 559 U.S. 356 (2010); *Missouri v. Frye,* 132 S.Ct. 1399 (2012).

In the context of plea negotiations, counsel must "communicate to the defendant the terms of any plea bargain." *Cullen v. U.S.,* 194 F.3d 401, 404 (2d Cir.1999) (applying the first prong of the *Strickland* test). Further, "grossly underestimating [the defendant's] sentencing exposure" constitutes a breach of an attorney's duty "to advise his client fully on whether a particular plea to a charge appears desirable." *U.S. v. Gordon,* 156 F.3d 376, 380 (2d Cir.1998) (quoting *Boria v. Keane,* 99 F.3d 492, 496 (2d Cir.1996) (applying *Strickland* )).

Prejudice in this context means that "the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper,* 132 S.Ct. 1376, 1384 (2012); *see also Hill,* 474 U.S. 52. Specifically, where a petitioner claims that deficient advice caused him to reject a favorable plea offer, the petitioner must show that,

> but for the ineffective advice of counsel[,] there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the [petitioner] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Cooper,* 132 S.Ct. at 1385.

As "the standards created by *Strickland* and § 2254(d) are both highly deferential, ... when the two apply in tandem, review is doubly so." *Richter,* 131 S.Ct. at 788 (internal quotation marks and citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland'* s deferential standard." *Id.*

## II. *THE STATE COURT'S DETERMINATION OF PETITIONER'S CLAIM*

***30** Review in this case is complicated by the trial court's failure to make any explicit findings of fact regarding Iannuzzi's conduct in the plea context. (*See* 11/22/10 Opinion.) To the extent the court implicitly made findings on that subject, there are only two possible sets of findings that could have supported the court's legal conclusion that Iannuzzi "exhibited 'reasonable competence' in his representation of [Petitioner]." *Id.* First, the court could have accepted the truth of Petitioner's assertions regarding the existence of a plea offer and Iannuzzi's erroneous representation regarding the maximum sentence Petitioner could face, but nonetheless found Iannuzzi's conduct to have been constitutionally adequate. Second, the court could have rejected some or all of Petitioner's assertions as untrue.

If this Court were to assume that the state court *accepted* Petitioner's recitation of facts, then this Court would need to determine, under 28 U.S.C. § 2254(d)(l)-and based solely on the record that was before the state court, *see Pinholster,* 131 S.Ct. at 1398–whether the state court's resulting denial of Petitioner's claim constituted an unreasonable application of *Strickland.* On the other hand, if this Court were to assume that the state court *rejected* Petitioner's factual assertions, then this Court would need to determine, under 28 U.S.C. § 2254(d) (2), whether the state court's denial of Petitioner's claim was based on an unreasonable determination of the facts in light of the evidence before it. If, under each of these AEDPA provisions, this Court were to determine that the state court acted unreasonably under the applicable stand-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ards, then this Court would need to proceed to consider whether Petitioner is actually being held in custody unlawfully. *See* 28 U.S.C. § 2254(a).

**A.** ***State Court's Application of Strickland***

In *Lafler v. Cooper,* 132 S.Ct. 1376 (2012), the Supreme Court addressed factual circumstances materially similar to those presented here. The petitioner in *Cooper* had rejected a plea offer on his attorney's deficient advice that he could not be convicted at trial; he was then convicted and received a harsher sentence than what had been offered under the plea deal. *Id.,* at 1383. The Supreme Court held that "[b]y failing to apply *Strickland* ..., the state court's adjudication was contrary to clearly established federal law." [FN15] *Cooper,* 132 S.Ct., at 1390.

FN15. Although *Cooper* was decided after the date of the state court decision at issue here, *Cooper* is still instructive, as it addressed a state court decision issued in 2005 (well before the decision being challenged by Petitioner here), and held that the state court's failure to apply *Strickland* to advice regarding the rejection of a plea offer was contrary to clearly established federal law, even at that time. *See Cooper,* 132 S.Ct. at 1383.

Here, Petitioner claims that the prosecution offered him a plea bargain that he would have accepted, had he known the maximum sentence that could be imposed at trial, but that, because his trial attorney advised him erroneously about his potential sentencing exposure, he elected to stand trial and received a harsher sentence. (*See* Pet. Aff. ¶ 8.)

If the trial court decided or assumed that these assertions by Petitioner were true, then the court could not reasonably have concluded that Iannuzzi's conduct during plea negotiations met "an objective standard of reasonableness" in light of prevailing professional norms. *Strickland,* 466 U.S. at 688. By "grossly underestimating" Petitioner's sentencing exposure, and indeed erroneously advising him that he could not be sentenced to life imprisonment without parole, counsel's representation fell below an objective standard of reasonableness. *See Gordon,* 156 F.3d at 380; *see also Davis v. Greiner,* 428 F.3d 81, 89 (2d Cir.2005) (noting that potential sentencing exposure is a "key consideration" in making an informed decision whether to plead guilty).

***31** Moreover, if the state court decided or assumed that Petitioner's allegations were true, it could not reasonably have concluded that Petitioner suffered no prejudice as a result of his counsel's conduct. To be prejudiced by poor advice at the plea stage, a petitioner must show that he would have accepted a plea offer, that the prosecution would not have withdrawn the offer, that the court would have accepted the agreement, and that "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Cooper,* 132 S.Ct. at 1385. Petitioner asserted that he would have accepted the plea deal of 18 years to life that he claims was offered (a prison term that would have been substantially lower than the term of life imprisonment without parole he eventually received (*see* Pet. Aff. ¶ 8)), and nothing in the record suggests that the offer, if made by the State and accepted by Petitioner, would not have been presented to or accepted by the trial court.

As noted above, the state court concluded that it had "no basis" to find that Petitioner's trial counsel was ineffective, because Iannuzzi "exhibited 'reasonable competence' in his representation." (*See* 11/22/10 Opinion, at 4.) Yet, for the reasons discussed above, if the court assumed or decided that the facts were as Petitioner alleged, then this decision necessarily involved an unreasonable application *of Strickland.*

**B.** ***State Court's Determination of the Facts in Light of the Evidence Presented***

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 29

Slip Copy, 2015 WL 1402133 (S.D.N.Y.)
**(Cite as: 2015 WL 1402133 (S.D.N.Y.))**

Of course, the trial court need not have accepted as true the facts asserted by Petitioner in his Section 440.10 motion. Alternatively, in concluding that Iannuzzi "exhibited 'reasonable competence,' " the court may have implicitly determined that Petitioner was not credible in his assertions (1) that a plea deal was offered; (2) that Iannuzzi improperly advised Petitioner about his maximum sentencing exposure; and (3) that there was a reasonable probability that the plea offer would have been presented to and accepted by the trial court, and that the sentence would have been less severe than the one Petitioner actually received. The state court, however, could not have reasonably made such factual determinations on the record before it, without a hearing.

**1. *Whether a Plea Offer Was Made***

Petitioner submitted an affidavit to the trial court, in which he attested that a plea offer had been extended to him. Specifically, Petitioner stated:

> Iannuzzi talked about a plea bargain. He said that he was trying to get me 15 years flat. At that time, the DA's office was offering me 20 years to life. Just before trial, they dropped it to 18 years to life.

(Pet.Aff.¶ 8.) While the trial court may have believed that Petitioner lacked credibility in this regard, or may have rejected as hearsay Petitioner's statements as to what Iannuzzi had told him,[FN16] the record before the trial court also contained the minutes of several pretrial calendar calls (*see* Kamlet Ltr., Ex. 21), which provided independent, reliable evidence that plea negotiations had taken place and that, prior to trial, some type of plea offer had in fact been made to Petitioner.

FN16. The court also may have rejected, on either credibility or hearsay grounds, the statements on this point made by Petitioner's brother, Errol Millington ("Errol"), and father, Roy, both of whom submitted affidavits in support of Petitioner's Section 440.10 motion. In his affidavit, Errol stated that he was present at a meeting with his father and Iannuzzi, at which Iannuzzi reported that Petitioner could get "18 years to life if he accepted a plea bargain." (Kamlet Decl., Ex. 16 (Affidavit of Errol Millington, sworn to Aug. 26, 2009 ("Errol Aff.")), ¶ 4.) Petitioner's father, for his part, merely reported hearing from Petitioner that "he could get 18 years to life." (Roy Aff. ¶ 3.)

***32** First, the record reflected that, on July 10, 2001, at a calendar call for the case against Petitioner and Stallings, Assistant District Attorney ("ADA") Christine Scaccia stated: "I've also extended what the People's recommendations are as far as sentencing on any possible disposition, and we've had some further discussion about what interest the defendants might have." (*See* Kamlet Ltr., Ex. 21 (attached Transcript of Calendar Call, conducted July 10, 2001), at 4:7–10.) ADA Scaccia further represented that "with respect to these two attorneys [Iannuzzi for Petitioner and Oliver Smith for Stallings]," she could discuss "any details that may need to be gone into" before the hearing date "for disposition purposes." (*Id.* at 5:13–16.) These statements strongly suggested that plea negotiations were then occurring with both Petitioner and Stallings.

Second, the record showed that, at a November 19, 2001 calendar call, attorney Kevin Faga, who apparently worked for Iannuzzi's law firm,[FN17] appeared on behalf of Petitioner. (*See* Kamlet Ltr., Ex. 21 (attached Transcript of Calendar Call, conducted Nov. 19, 2001), at 2:4–5.) Faga told the judge that Petitioner was withdrawing a pending motion "based on the fact that we are negotiating towards a disposition." (*Id.* at 2:25–3:2.) The prosecutor did not disagree.

FN17. (*See* R., at 20 (Letter from Kevin B. Faga); Kamlet Ltr., Ex. 13 (including correspondence to "Kevin Faga, Esq." at "Ian-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

nuzzi & Iannuzzi").)

Finally, on December 3, 2001, ADA Jeffrey Rosenbaum informed the Court on the record, on behalf of the State, that "[ADA] McCarthy says the offers have been made, to be accepted or not," and that "if this case is going to trial, he will be ready to try this case on January 2nd." (*See* Kamlet Ltr., Ex. 21 (attached Transcript of Calendar Call, conducted Dec. 3, 2001 ("12/3/01 Tr.")), at 2:22–24.) The plain implication of this representation by the prosecutor (which suggested that there might be no reason to try the case at all) was that the State had made plea offers to each of the co-defendants, including Petitioner.

Although, in opposition to Petitioner's Section 440.10 motion, ADA Bari Kamlet informed the trial court that the prosecution case file "contain[ed] no indication that any plea offer was ever extended to [Petitioner]" (Kamlet Decl., Ex. 14, ¶ 10), the State offered no evidence directly refuting its own December 3, 2001 statement on the record that "the offers have been made." In fact, ADA McCarthy submitted an affirmation stating only that he did not "recall extending any plea offer" to Petitioner. (Kamlet DecL, Ex. 10 (Affirmation of Daniel T. McCarthy ("McCarthy Aff.")), ¶ 2.) Similarly, in his own affirmation, Iannuzzi stated only that he could "not recall conversations with the People about a plea offer" or conveying any plea offer to Petitioner. (Kamlet Decl., Ex. 12 (Affirmation of John Nicholas Iannuzzi, dated Feb. 24, 2010 ("Iannuzzi Aff.")), ¶ 5.)

In sum, on his Section 440.10 motion, Petitioner asserted by affidavit that he had been offered a plea deal of 18 years to life imprisonment, and he also submitted transcripts of state court proceedings tending to confirm that a pretrial plea deal had, in fact, been offered to him. Although, in opposition to Petitioner's motion, the State represented that its file did not reflect a plea offer, this, coupled only with counsel's asserted lack of recollection, would not have been sufficient to enable the trial court to conclude, without a hearing, that no plea offer had been made. As any such conclusion "cannot reasonably be reconciled" with the record the court had before it, *see Jones,* 694 F.3d at 235 & n. 1 (2d Cir.2012), it would have constituted an "unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2).

**2. *Whether Iannuzzi Gave Petitioner Erroneous Information About His Maximum Potential Sentence***

***33** In the affidavit he submitted to the trial court, Petitioner also stated that Iannuzzi failed to inform him properly of the "comparative sentence exposure between standing trial and accepting a plea offer" crucial to the decision to accept a plea deal, *Gordon,* 156 F.3d at 380. Petitioner stated that Iannuzzi explicitly told him that his maximum sentence would be 25 years to life and that Iannuzzi specifically denied that Petitioner could face a life sentence if convicted. (*See* Pet. Aff. ¶ 8.) By separate affidavit, Petitioner's brother, Errol, corroborated Petitioner's account, stating that he, too, had heard Iannuzzi tell Petitioner that "the maximum sentence [Petitioner] faced if he went to trial was 25 years to life." (Errol Aff. ¶ 4.)

In his own affidavit, Iannuzzi stated that he "was fully aware at the time [he] represented [Petitioner]" that Petitioner could face life in prison without parole, if convicted at trial. (Iannuzzi Aff. ¶ 2.) In his affidavit, Iannuzzi also indicated that he did "not have a recollection of specific conversations that [he] had with [Petitioner]" (*id.* ¶ 3), but he went on to assert: "My general practice is to advise my clients as to what the law provides with regard to sentencing" (*id.* ¶ 4). Iannuzzi made no statement, though, as to what his general practice *was* at the time he represented Petitioner. As to whether he had discouraged Petitioner from accepting a plea offer, Iannuzzi stated only that he had "no current recollection" of ever doing so. (*Id.* ¶ 6.)

Based on this record, it also would have been

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

unreasonable for the state court to conclude, without a hearing, that Iannuzzi's statements as to his general practice—and his statements about his lack of recollection—conclusively disproved Petitioner's and his brother's specific recollections as to what occurred in this case. *See Garcia v. Portuondo,* 104 F. App'x 776, 779–80 (2d Cir.2004) (finding that state court's refusal to hold a hearing resulted in a decision that was an "unreasonable determination of the facts in light of the evidence, where prosecutor and trial counsel had submitted affirmations denying petitioner's allegations that counsel had "grossly underestimat[ed]" his sentencing exposure); *see also Montes de Oca,* 2007 WL 4591991 at *6–7, *14–15 (S.D.N.Y. Dec. 27, 2007) (noting that a record containing conflicting affidavits was inadequate to resolve factual disputes); *see also Carrion v. Smith,* 365 F. App'x 278, 283 (2d Cir.2010) (after evidentiary hearing, crediting petitioner's specific testimony over counsel's repeated testimony of general practice).

**3.** ***Whether Petitioner Was Prejudiced***

Nothing in the record tended to suggest that a plea offer, if made, would not have been presented to the trial court. Petitioner asserted that, if properly advised about his maximum sentencing exposure at trial, he would have accepted a plea offer of 18 years to life in prison. (*See* Pet. Aff. ¶ 8.) As the prosecutor denied recollection of extending any offer, his affirmation is silent on the question of whether any such offer would have been withdrawn without being presented to the court. (*See* McCarthy Aff. ¶ 2.) Yet, the fact that the prosecution apparently entered into a plea deal with one of Petitioner's co-defendants, Suarez (*see* R., at 602:16–603:19) suggests a reasonable probability that, had a plea offer been accepted by Petitioner, it would not have been withdrawn.

***34** Similarly, nothing in the record tends to suggest that, if a plea offer had been presented to the court, it would have been rejected. To the contrary, the calendar call transcripts seem to indicate that the trial judge had no objection to the case being resolved by a plea bargain. (*See, e.g.,* 12/3/01 Tr., at 2:22–25 (trial judge responding, "All right," when informed by the prosecutor that offers had been made); 12/3/01 Tr., at 3:24–25 (trial judge advising that "[i]f you think you are working some disposition out, you better work it out before January 2nd").) The judge's remarks suggest a reasonable probability that a plea deal would have been accepted by the court.

Finally, there is no dispute that the conviction or sentence under a plea deal of 18 years to life imprisonment would have been less severe than the term of life imprisonment without parole to which Petitioner was in fact sentenced.

**C.** ***Necessity of an Evidentiary Hearing***

As the state court's decision either involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence, *see* 28 U.S.C. § 2254(d), this Court must proceed to consider the ultimate question of whether Petitioner is in custody in violation of law, *see* 28 U.S.C. § 2254(a), without deference to the state court's decision, *see Pan etti v. Quarterman,* 551 U.S. 930, 948 (2007).

Factual disputes remain regarding whether a plea deal was actually offered to Petitioner and, if so, the terms of that plea offer; the quality of advice given by counsel about any plea offer; and the credibility of the various affiants, which cannot adequately be resolved without a hearing. *See Garcia,* 104 F. App'x at 779–80; *Montes de Oca,* 2007 WL 4591991 at *6–7, *14–15. These factual disputes remain not due to a lack of diligence on Petitioner's part, but due to the state court's refusal to hold the hearing Petitioner requested. Given that Petitioner exercised diligence, and thus did not "fail [ ] to develop" the factual basis of his claim, AEDPA does not bar this Court from holding an evidentiary hearing in this case. *See Michael Williams,* 529 U.S .C. at 437. Neither is *Pinholster* a barrier, as that case limited the ability of a district court to hold a hearing only with respect to

review under § 2254(d)(1), *see* *Pinholster,* 131 S.Ct. at 1398–an inquiry this Court has undertaken, above, without reference to any evidence other than what was before the state court.

Accordingly, as a hearing is both permissible for, and necessary to, the resolution of Petitioner's ineffective-assistance-of-counsel claim, this Court will hold an evidentiary hearing to evaluate the credibility of Petitioner and any other witnesses with relevant knowledge and to consider any evidence presented. Subsequent to the hearing, this Court will issue a Report and Recommendation to Judge Schofield as to the appropriate disposition of the Petition, in its entirety.

***CONCLUSION***

***35** For the foregoing reasons, counsel are directed to initiate jointly a telephone conference with this Court on November 21, 2013, at 2:00 p.m., at which time this Court will schedule a hearing on Petitioner's ineffective-assistance-of-counsel claim. As Petitioner has now retained counsel for all proceedings herein (Dkt.12), there is no need for this Court to appoint counsel for purposes of the hearing, and Petitioner's initial application for appointment of counsel (as contained in his Petition (Dkt.1)) is denied as moot.

SO ORDERED.

Dated: Nov. 13, 2013.

S.D.N.Y.,2015.
Millington v. Lee
Slip Copy, 2015 WL 1402133 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Rodney Steven SKINNER, Petitioner,
v.
George B. DUNCAN, Robert M. Morgenthau & Eliot L. Spitzer, Respondents.

No. 01 Civ.6656 DAB AJP.
June 17, 2003.

*REPORT AND RECOMMENDATION*
PECK, Magistrate J.

***1** Pro se petitioner Rodney Skinner seeks a writ of habeas corpus from his June 23, 1997 conviction in Supreme Court, New York County, of first degree assault, three counts of second degree criminal possession of a weapon, and fourth degree tampering with a witness, and sentence to twenty-five years to life imprisonment, reduced on appeal to seventeen years to life imprisonment. (Dkt. No. 1:Pet.¶¶ 1–4, 9.) *See People v. Skinner,* 269 A.D.2d 202, 202–03, 704 N.Y.S.2d 18, 19–20 (1st Dep't 2000). Skinner's habeas petition alleges that: (1) he was arrested without probable cause and his coat and identifications were fruits of that unlawful arrest (Pet.¶¶ 12(A)-(B)); (2) the prosecution failed to disclose a cooperation agreement with Skinner's co-defendant and withheld various police reports (Pet.¶ 12(C)); (3) the joinder of the indictments against him subjected him to Double Jeopardy (Pet.¶ 12(D); (4) trial counsel Lynne Stewart was conflicted because she was facing indictment by the same District Attorney's Office that was prosecuting Skinner and she provided ineffective assistance in various ways (Pet.¶ 12(E)); and (5) the use of a witness's grand jury testimony violated Skinner's Confrontation Clause rights (Dkt. No. 19: Traverse at 49–53).

For the reasons set forth below, Skinner's habeas petition should be DENIED.

*FACTS*

On January 31, 1996, Rodney Skinner, Anthony Wager and Anibal Rosa were arrested in connection with a confrontation with a rival drug gang, including Jehu Morales and Juan Rivera, on East 11th Street in Manhattan. (Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 3–4; Pet. Ex. B: State 1st Dep't Br. at 2.) Skinner, Wager, Rosa, and an unidentified individual displayed weapons and demanded to see the dealers' bosses, who they believed were responsible for the murder of their friend Will Rodriguez earlier that day. (Skinner 1st Dep't Br. at 34; State 1st Dep't Br. at 1–2.) According to Morales, as the four men began to walk away, Wager, Rosa, and the other individual punched Morales and shot him in the legs. (Skinner 1st Dep't Br. at 4; *see* State 1st Dep't Br. at 2.) Skinner, Wager, and Rosa were arrested shortly after. (Skinner 1st Dep't Br. at 4; State 1st Dep't Br. at 2–3.)

Skinner, Rosa, and Wager were charged with first degree assault and three counts each of second and third degree criminal possession of a weapon. (Skinner 1st Dep't Br. at 4; State 1st Dep't Br. at 3.) Before trial, Wager pleaded guilty to third degree criminal possession of a weapon and was sentenced to one and one-third to four years imprisonment. (Skinner 1st Dep't Br. at 4; State 1st Dep't Br. at 3 n. 1.) Rosa pleaded guilty to second degree criminal possession of a weapon and was sentenced to one and one-half to four and one-half years imprisonment. (Skinner 1st Dep't Br. at 4–5; State 1st Dep't Br. at 3 n. 1.)

*Skinner's Arrest for Witness Tampering and Consolidation of the Indictments*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

***2** On September 24, 1996, Skinner (who was out on bail for the shooting) was arrested for making threats to prosecution witnesses, including Juan Rivera, Dominic Rosado, and Jehu Morales. (Dkt. No. 1: Pet. Ex. B: State 1st Dep't Br. at 3–4; *see* Pet. Ex. A: Skinner 1st Dep't Br. at 4.) Indictment number 8190/96, which superceded 8151/96 (Dkt. No. 1: Pet. Ex. C: Miscellaneous Certificate No. 19451), charged Skinner with three counts of third degree intimidating a witness and one count of fourth degree tampering with a witness. (Skinner 1st Dep't Br. at 4; State 1st Dep't Br. at 4; *see also* Dkt. No. 19: Traverse Ex. F: 10/11/96 Arraignment Transcript ["Arr."] at 1–2; Traverse Ex. C: Indictment No. 8190/96.)

The State's motion to consolidate the two indictments was initially denied on November 14, 1996, before Skinner's co-defendants pleaded guilty. (Dkt. No. 8: 11/14/96 Justice Altman Decision.) After Rosa and Wager pleaded guilty, the State renewed its motion to consolidate the indictments, which was granted in a written decision dated January 23, 1997. (Dkt. No. 8: 1/23/97 Justice Altman Decision.)

*Pre-trial Suppression Hearing*

Skinner moved to suppress his black jacket and the line-up identifications of him on the ground that his arrest was not supported by probable cause, and a *Dunaway* /*Mapp* /*Wade* hearing was held on January 24 through January 27, 1997. (Suppression Hearing Transcript ["H."] at 1–3, 278, 288.) [FN1]

FN1. The second portion of the hearing addressed the propriety of the photo arrays and line-up procedures under *Wade.* The State called six witnesses, including three detectives and two investigators for the District Attorney's Office. (*See generally* H. 100, 125–257). At the conclusion of the hearing, the Court found that neither the photo arrays nor the line-up procedures were unduly suggestive. (H.298–99.)

On January 31, 1996 at 1:00 a.m., Officer Maiorano and Sergeant Kelly were in a police car at Avenue B and East 12th Street when an individual ran up to the car and stated that "his friend was just shot." (Maiorano: H. 4–5, 11–12.) The officers drove to the scene with the individual and found a man who apparently had been shot, lying on ground, his legs bleeding. (Maiorano: H. 5–6, 13.) "[T]wo or three males" at the scene told the officers that "there were approximately five to ten male Hispanics involved in this" incident. (Maiorano: H. 6–7, 14.) One male, "wearing a green puffy jacket," was six-foot-two and either Black or Hispanic, in his early twenties. (Maiorano: H. 7.) The witnesses stated that two other males were with him, both wearing black jackets, one leather and the other "puffy." (Maiorano: H. 7.) The witnesses also said that the perpetrators "had guns." (Maiorano: H. 9.) Sergeant Kelly broadcast a description of the perpetrators provided by the man who stopped the police car (Kelly: H. 122; *see also* Maiorano: H. 7, 10, 16–18), as follows: "between five and ten male Blacks and Hispanics, one was around six foot .... [and] had a green jacket on and ... another male that had a black jacket and ... a black leather hat. They fled on foot east on 11th Street ... between Avenue B and C." (Kelly: H. 118; *see also* Adams: H. 41–42, 70; Hernandez: H. 82–83.) [FN2]

FN2. At Skinner's counsel's request, a recording of this radio transmission was admitted into evidence at the hearing and played during Sergeant Kelly's hearing testimony. (H. 19; Kelly: H. 120.)

Lieutenant Hernandez was at a different homicide scene about "four blocks south and two avenues east" of the shooting when he heard a radio transmission that someone had been shot in the legs and the possible perpetrators, "approximately 10 male Hispanics/Blacks," were fleeing eastbound from 11th Street and Avenue C. (Hernandez: H. 22–24.) According to Lt. Hernandez, the radio transmission stated that a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

six-foot-two, Black or Hispanic male was wearing a "green puffy jacket" and the others had "dark clothing, dark jackets." (Hernandez: H. 24.) Lt. Hernandez and his driver Officer Adams observed a group of three or four males "jogging through the walkway between the FDR Drive and Avenue D, going south approaching 6th Street." (Hernandez: H. 25–26, 80–81; Adams: H. 42–43.) Upon following the group to investigate further, Lt. Hernandez "noticed the tall male with a green [goose down] jacket in the company of two other males," who were wearing "black coats." (Hernandez: H. 26–28.) When the officers approached the male in the green jacket, he ran away and two officers pursued him. (Hernandez: H. 29.) Officer Adams observed the fleeing male place something about six inches long in a garbage can (Adams: H. 44, 47, 71, 76), from which Officer Gorman later recovered a loaded .9 millimeter pistol. (Gorman: H. 9596; *see also* Hernandez: H. 32–33, 90). Officer Adams testified that the individual in the green puffy jacket was co-defendant Anthony Wager. (Adams: H. 48.)

***3** Officer Adams held at gunpoint the two men in black coats, who Lt. Hernandez and Officer Adams both testified were Skinner and co-defendant Anibal Rosa. (Hernandez: H. 30, 86; Adams: H. 44–45.) As Officer Adams approached, Rosa stated that he had a gun in his left coat pocket; Officer Adams recovered a .38 revolver from him. (Adams: H. 45–46, 72–73; Hernandez: H. 30–31, 33, 88.) Lt. Hernandez handcuffed Skinner, who "gave [him] a little resistance," while Officer Adams handcuffed Rosa. (Hernandez: H. 31, 89; Gorman: H. 95.)

The defense did not call any witnesses at the hearing. (H.257, 279.) Defense counsel Lynne Stewart argued that there was not a sufficient description of Skinner for the officers to have had probable cause to arrest him, and thus his jacket and subsequent identification should be suppressed. (H.258–61.)

The Court denied Skinner's motions to suppress on February 5, 1996, ruling from the bench that the police had probable cause to arrest Skinner. (H.288–97.) The court found that while Skinner argued that a description of a " 'male black or male Hispanic in a black jacket" ' does not provide probable cause to arrest, Skinner had "ignore[d] the amplifying details which accompanied that description." (H.295–96.) Specifically, the court found that

> Defendant [Skinner] was, in fact, apprehended along with two other male Hispanics, one of whom was wearing a black jacket as indicated in the description, and the other male who matched the most detailed description, that is, a male black or Hispanic, approximately 6'2 wearing a green puffy jacket.
>
> These descriptions were given to the police officers a very short time after the crime had occurred, they were immediately relayed to the apprehending officers who were a very short distance away and the apprehending officers spotted the suspects immediately after they had listened to the descriptions.
>
> Furthermore, the fact that the man in the puffy green jacket threw an object onto a garbage can immediately upon seeing the police officers and immediately before fleeing, (an object which was subsequently discovered to be a gun), and the fact that the individual in the black jacket who was with the defendant immediately told the officers quote, "I have [a] gun," close quote, and that gun was recovered from that defendant, this gave the officers probable cause to arrest [Skinner].

(H.295–97.) [FN3]

FN3. When Skinner's counsel Stewart pointed out that there were only two men described in Sergeant Kelly's radio description, "one in the green jacket and one male wearing a black leather coat and a black leather hat ... [and] no mention of any other

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

male in a black jacket" (H.300–01), the judge agreed that "in fairness to this record ... it may well be that the radio broadcasts were limited to the two descriptions." (H.301–302). Nevertheless, the judge found that "as a matter of law, [he] would not find that that variation in the testimony would change the conclusion of law that this Court would reach with regard to the totality of the other circumstances." (H.302.)

*Skinner's Trial*

*The Prosecution Case*

______________ The State's witnesses included various police officers, detectives, and investigators, the shooting victim, Jehu Morales, and several eyewitnesses, including Juan Rivera and Dominick Rosado. (*See* Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 14–25; Pet. Ex. B: State 1st Dep't Br. at 6–19.) Juan Rivera testified at trial that Skinner put a .9 millimeter gun to his head. (Rivera: Tr. 120, 159.) Rivera told the grand jury that Wager shot Jehu Morales, but at trial he said that Wager had a gun but did not shoot Morales. (Rivera: Tr. 223–25.) "According to Jehu Morales, [Skinner] approached with Anthony Wager and Anibal Rosa, pulled out a 9 millimeter gun and was walking around pointing it at various people." (Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 18, citing Morales: Tr. 831–32.) Wager asked who was selling "Dead Presidents" brand heroin, Morales said he was, and Wager told Morales to tell his bosses that they were going to get it for killing his friend. (Morales: Tr. 829, 830, 833.) After a scuffle, Morales was shot in the leg. (Morales: Tr. 833–35.) Morales testified that the person who shot him was "[l]ight skin[ned] with ... a goose [down] coat with purple and black," with no facial hair, no sunglasses, and no hat. (Morales: Tr. 922–23, 943.) Morales stated that right before he was shot, Skinner "was walking around with the gun pointing it at all of us." (Morales: Tr. 944.)

***4** Rosado's grand jury testimony was read into evidence (Rosado: Tr. 754–59), following a *Sirois* [FN4] hearing outside the jury's presence, at which Rosado stated that he would rather be jailed for contempt than testify at Skinner's trial because he believed that testifying would threaten his and his family's safety. (Rosado: Tr. 353; *see generally* Rosado: Tr. 340–53; *see also* Connelly: Tr. 755–59 (Rosado told D.A.'s investigator Connelly that he would not testify for fear he would be killed by Skinner or his associates).) The court determined that "since the unavailability of this witness to testify at trial was procured by the misconduct of the defendant," the court would permit the State to read into evidence Rosado's grand jury testimony. (Tr. 364–65.)

FN4. *See* Point V below.

Rosado's grand jury testimony identified Skinner's picture as the person who put a gun to Juan Rivera's neck while one of Skinner's companions shot Jehu Morales. (Rosado: Tr. 766–62, 775.) Rosado's second grand jury testimony, also read to the jury, stated that after his first grant jury testimony, he saw Skinner in the street. (Rosado: Tr. 776.) Rosado testified that Skinner told him that there were some people testifying against Skinner and when he finds out who they are, he is "going to blast them," going to "waste anybody that's going to testify against him when he finds out," holding his fingers to simulate shooting a gun. (Rosado: Tr. 777–79.)

Detective Fiorica, a police ballistics expert (Fiorica: Tr. 468–71), testified that the shell casing and the bullet that hit Morales were not fired from the .9 millimeter gun that was found in the garbage can and believed to be Wager's, and could not have been fired from the .38 revolver found on Rosa. (Fiorica: Tr. 476–77.) Detective Fiorica concluded that the shell casing and the bullet that hit Morales came from two different weapons, neither of which was recovered.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Fiorica: Tr. 476–77, 481–82.) In other words, there were at least four firearms at the scene of the shooting. (Fiorica: Tr. 483.)

*The Defense Case*

Skinner's defense was alibi. (Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 26.) Skinner testified that he was innocent of the crimes charges and had not tried to intimidate any witness. (Skinner: Tr. 1274–75, 1349, 1353–54.) Skinner testified that he was at his mother's birthday party at the time of the shooting, starting at about 11:30 p.m., and that he called Anna Rivera before leaving "[a] little before 1" a.m. from his mother's phone (Skinner: Tr. 1304–06, 1370.) Skinner testified that after 1 a.m., he left the party and met Anna Rivera outside her building, located behind his mother's building. (Skinner: Tr. 1307.) As they were walking to the parking lot, "two young men came running towards [him.] Well, actually they were walking." (Skinner: Tr. 1308.) Then, "in a matter of seconds a bunch of cops just came out of nowhere, [said] freeze, [and had] their guns out." (Skinner Tr. 1308.) Lt. Hernandez searched, handcuffed, and took Skinner to the precinct. (Skinner Tr. 1308–10, 1315–16.)

***5** When the State confronted Skinner on cross-examination with the fact that no call was made from Skinner's mother's phone to Anna Rivera's phone after 7:46 p.m. that evening, Skinner stated that he used a cellular phone. (Skinner: Tr. 1375–76.) When the State pointed out that credit records showed his cellular phone had been turned off in 1994, Skinner said he used a "cloned" phone that "a guy in the neighborhood" turned on for him. (Skinner: Tr. 1377–79, 1394–96.)

Skinner's mother, Kay Skinner, his aunt, Evelyn Taylor, and a family friend, Eddie Rosario, testified that Skinner was at his mother's birthday party between 11:00 p.m. and 1:00 a.m. on the night of the shooting. (K. Skinner: Tr. 985–98; [FN5] Taylor: Tr. 1105–10; Rosario: Tr. 1130–32.) Luis Guzman, Ralph Hittman and Robert Caballero testified to Skinner's reputation for peacefulness and honestly, but conceded that they did not have knowledge of Skinner's complete criminal record. (Guzman: Tr. 1044–59; Hittman: Tr. 1337–43; Caballero: Tr. 1502–12.) The parties stipulated that had Betty White been called, she would have testified that "she was aware of Rodney Skinner's reputation for nonviolence and peacefulness" within the school community on the lower east side of Manhattan. (Tr. 1611–14.)

FN5. The prosecution's cross-examination of Kay Skinner established that she had provided alibi testimony for Skinner in three previous cases in which he was convicted. (K. Skinner: Tr. 1001–11; *see also* Skinner: Tr. 1355–65.)

_____________ To rebut Skinner's character evidence, the State called Anibal Rosa's sister Brenda Rosa, and mother Manerva Rosa, who both testified that Skinner had a reputation for violence. (B. Rosa: Tr. 1557–62, 1568; M. Rosa: Tr. 1574–81.) Brenda Rosa denied that her testimony would help her brother, Skinner's co-defendant, because "[t]he plea that he copped" already included agreement that he would be sentenced to one and one-half to four and one-half years. (B. Rosa: Tr. 1564.)

*Verdict and Sentencing*

On February 21, 1997, the jury found Skinner guilty of first degree assault, three counts of second degree criminal possession of a weapon, and fourth degree tampering with a witness. (Tr. 1830–37.) Skinner was found not guilty of the third degree weapon possession and witness intimidation charges. (Tr. 1831–37.) *See also People v. Skinner,* 269 A.D.2d 202, 202, 704 N.Y.S.2d 18, 19 (1st Dep't 2000).

On June 23, 1997, Skinner was adjudicated a persistent felony offender (Sentencing Transcript ["S."] at 7, 11, 13–14) and sentenced to four concur-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

rent terms of twenty-five years to life, and a concurrent one year term. (S. 46–48; *see* Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 5.) *See also People v. Skinner,* 269 A.D.2d 202, 202–03, 704 N.Y.S.2d 18, 19–20 (1st Dep't 2000).

*Skinner's March 1997 Motions to Set Aside the Verdict*

On March 21, 1997, represented by counsel, Skinner moved under C.P.L. § 330 to have the verdicts set aside on the grounds that the jury reached inconsistent or repugnant verdicts and that a juror did not sufficiently support or announce the verdicts. (*See* Dkt. No. 15: State Br. at 7; Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 32–33.) The Court denied the motions on the record at Skinner's June 23, 1997 sentencing. (S.2–3.)

***6** Also on March 21, 1997, Skinner submitted a pro se motion to set aside the verdict, arguing that the indictments were improperly joined because Indictment 8190/96 had previously been dismissed. (Dkt. No. 16: Asst. Atty. General Laurie M. Israel Affidavit Ex. A: Skinner Pro Se 3/21/97 Motion to Set Aside Verdict at 2a–3a.) At sentencing, after the court ruled on the issues in the counseled C.P .L. § 330 motion, Skinner's counsel informed the court that Skinner wanted “to further amend his motion to set aside with regard to whether or not ... the second indictment in the case [8190/96] ... had been properly superceded.” (S.9.) The court foreclosed counsel from discussing that issue because all § 330 motions had already been decided. (S.9.)

*Skinner's July 1997 C.P.L. § 440 Motion*

On July 12, 1997, Skinner brought a pro se C.P.L. § 440 motion in the trial court. (Dkt. No. 1: Pet. Ex. C: Skinner 7/12/97 C.P.L. § 440 Motion & Addendum.) The motion essentially repeated Skinner's pro se March 1997 C.P.L. § 330 motion asserting that Indictment 8190/96 had been dismissed. (*Id.*) Skinner argued that: “Indictment # 8190/96 was improperly joined to Trial Proceedings in contravention to § 160.50 of the C.P.L., in that said Indictment was previously sealed and dismissed in favor of the Defendant ...” (*Id.,* Skinner 7/12/97 C.P.L. § 440 Aff. ¶ 5.) Skinner “assert[ed] an abuse of Judicial Authority, whereas said Indictments were improperly joinable, in contravention to New York State Criminal Procedure Law: Sections § 200.20 and § 200.40, and Defendant['s] Due Process Entitlements under New York State and United States Constitutions regarding Double–Jeopardy.” (*Id.*, Skinner 7/12/97 C.P.L. § 440 Notice of Motion ¶ 1.)

In an addendum to this motion, Skinner alleged, *inter alia,* that: (1) Skinner's trial counsel Lynne Stewart's opening statement compelled Skinner to testify; (2) several detectives gave contradictory testimony; (3) Stewart refused to call Detective Pagan; (4) Skinner's alibi did not require his testimony nor his mother's; (5) Stewart failed to filed an omnibus motion under Indictment # 8190/96; (6) exhibits to Skinner's § 330.30 and § 440.30 motions “clearly state indictment # 8190/96 was dismissed and sealed [on] October 11, 1996 and October 15, 1996.” (Pet. Ex. D: Skinner 7/12/97 C.P.L. § 440 Motion Addendum at 1–B, 2–B.)

In an order entered on September 22, 1997, the trial court denied the motion without opinion. (Dkt. No. 16: Israel Aff. Ex. C: 9/22/97 Order.) By order dated February 25, 1998, the First Department granted Skinner leave to appeal the denial of his C.P.L. § 440 motion, and consolidated that appeal with his direct appeal. (Israel Aff. Ex. G: 2/25/98 1st Dep't Order.) *See People v. Skinner*, 1998 N.Y.App. Div. LEXIS 2802 (1st Dep't Mar. 3, 1998).

*Skinner's March 1999 C.P.L. § 440 Motion*

Skinner brought a second C.P.L. § 440 motion on March 30, 1999, raising five claims, including ineffective assistance of trial counsel. (Dkt. No. 16: Israel Aff. Ex. M: Skinner 3/30/99 C.P.L. Motion entitled “Supplemental Appeal Brief”; *see also id.* Ex. N: Skinner Addendum.) Skinner claimed, *inter alia,* that counsel Stewart failed to file an omnibus motion,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to alert Skinner that she faced a criminal contempt charge in another case, failed to appear at his arraignment, failed to cross-examine Detective Wigdor, and failed to call Skinner's girlfriend Anna Rivera as a witness at trial. (*Id.*) The State "cannot locate a copy of the court's decision on this motion, [and presumes] it must have been denied." (Dkt. No. 15: State Br. at 14 n. 13.)

*Skinner's Direct Appeal*

***7** _____________ On appeal to the First Department in August 1999, Skinner's appointed appellate counsel [FN6] argued that: (1) the trial court erred in denying Skinner's for-cause challenge to a prospective juror (Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 43–47); (2) there was insufficient evidence of first-degree assault (*id.* at 48–52); (3) the introduction at trial of Rosado's grand jury testimony violated Skinner's Due Process and Confrontation Clause rights (*id.* at 52–57); (4) two counts of the criminal possession of a weapon indictment were "duplicitous" in violation of Skinner's Due Process rights because they failed to specify the weapon Skinner allegedly possessed (*id.* at 57–59); (5) the trial judge erred in charging the jury and responding to one of its requests (*id.* at 59–63); (6) Skinner's twenty-five year to life sentence was excessive under the circumstances (*id.* at 64–68); and (7) the trial court violated Skinner's Due Process rights by summarily denying his July 1997 C.P.L. § 440 motion (*id.* at 68–70). (*See also* Israel Aff. Ex. O: Skinner 1st Dep't Reply Br.)

> FN6. On direct appeal, Skinner was represented by Abigail Everett from the Center for Appellate Litigation. (Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br.)

On February 10, 2000, the First Department affirmed Skinner's conviction, but reduced his sentence to "four concurrent terms of 17 years to life concurrent with a term of 1 year." *People v. Skinner,* 269 A.D.2d 202, 202–03, 704 N.Y.S.2d 18, 19–20 (1st Dep't 2000). The First Department's decision reads as follows:

> Defendant failed to preserve his claim that his assault conviction was supported by insufficient evidence of intent to cause serious physical injury, and we decline to review it in the interest of justice. Were we to review this claim, we would find that the evidence amply demonstrated that he shared a community of purpose with his codefendants in shooting the victim. Ambiguous testimony cited by defendant does not establish abandonment of the intent to inflict serious physical injury, and defendant's flight with his codefendants provided further evidence of community of purpose.
>
> The court properly exercised its discretion in denying defendant's challenge for cause, since the record establishes that the prospective juror in question never suggested any inability to be fair and impartial.
>
> The court properly exercised its discretion in admitting the Grand Jury testimony of an eyewitness, since the People proved by clear and convincing evidence, following a hearing, that the witness's unavailability at trial was caused by threats made by defendant. The court properly exercised its discretion in declining defendant's request that it attempt to compel the witness to testify, since the witness had already testified that he was aware of his legal obligation to testify but that his fear was so intense that he would rather go to jail.
>
> Since there was no repugnancy in the jury's verdict, the court properly refused to resubmit the case to the jury.
>
> We find the sentence excessive to the extent indicated [*i.e.*, reduced from 25 years to life, to seventeen years to life].
>
> ***8** Defendant's motion to vacate judgment was

properly denied (*see*, CPL 440.30[4][d] ).

Defendant's remaining contentions are unpreserved and we decline to review them in the interest of justice. Were we to review these claims, we would reject them.

*People v. Skinner,* 269 A.D.2d at 202–03, 704 N.Y.S.2d at 19–20 (citations omitted).

On June 19, 2000, the New York Court of Appeals denied leave to appeal. *People v. Skinner,* 95 N.Y.2d 838, 713 N.Y.S.2d 145 (2000).

*Skinner's Coram Nobis Petition to the First Department*

______________ Skinner filed a coram nobis petition in the First Department in March 2000, alleging various shortcomings of his appellate counsel, including inadequately arguing the points she raised and failing to raise other arguments, such as trial counsel's ineffectiveness, lack of probable cause for his arrest, and *Brady* and *Rosario* violations. (Dkt. No. 19: Traverse Ex. Z–1: Skinner 3/16/00 Coram Nobis Motion; *see also* Dkt. No. 16: Israel Aff. Ex. T: Skinner 9/13/00 Reply Coram Nobis Letter.)

On June 15, 2000, the First Department denied Skinner's coram nobis petition without opinion. *People v. Skinner,* 273 A.D.2d 950, 714 N.Y.S.2d 626 (1st Dep't 2000). The New York Court of Appeals denied leave to appeal on October 26, 2000. *People v. Skinner,* 95 N.Y.2d 908, 716 N.Y.S.2d 629 (2000).

*Skinner's State Habeas Corpus Petition*

On July 25, 2000, Skinner filed a pro se petition for a writ of habeas corpus in the Third Department, alleging that his conviction was illegally obtained because indictment number 8190/96 had been dismissed before it was consolidated for trial with indictment number 4378/96. (Dkt. No. 1: Pet. Ex. H: Skinner 7/25/00 3d Dep't Habeas Petition.) The Third Department sua sponte denied the petition on November 9, 2000. (*See* Pet. Ex. O: 11/9/00 3d Dep't Order.) The New York Court of Appeals denied leave to appeal on January 16, 2001. *People ex rel. Skinner v. Duncan,* 96 N.Y.2d 703, 722 N.Y.S.2d 795 (2001), and denied Skinner's reargument motion on March 22, 2001, *People ex rel. Skinner v. Duncan,* 96 N.Y.2d 793, 725 N.Y.S.2d 642 (2001).

*Skinner's 2001–2002 C.P.L. § 440 Motions*

In a C.P.L. § 440 motion dated July 12, 2001, Skinner alleged, *inter alia,* that the prosecution violated *Brady v. Maryland* by failing to disclose that his co-defendant Rosa had a cooperation agreement with the District Attorney's office, and that Rosa had named Jehu Morales' shooter as someone other than Skinner. (Dkt. No. 17: Skinner 7/12/01 C.P.L. § 440 Br.).[FN7] Skinner enclosed in this motion a transcript of Rosa's testimony in *People v. Rodriguez, et al.,* indictment number 3790/97. (Dkt. No. 17: Skinner 7/12/01 C.P.L. § 440 Motion Ex. Q.) Skinner also argued that trial counsel Stewart was ineffective for various reasons, and that Stewart's "failure to advise defendant and defendant's family of her legal problems, and indictment was a *Conflict of Interest."* (Skinner 7/12/01 C.P.L. § 440 Br. at 40.)

FN7. The State makes no mention of this § 440 motion in its opposition to Skinner's federal habeas petition and in fact argues that Skinner failed to exhaust his *Brady* claim because he only raised it in his coram nobis petition.

***9** In April 2001, Skinner filed a pro se motion to disqualify the trial judge (Justice Wetzel) from further proceedings in his case and for other relief. (Dkt. No. 17: Skinner 4/15/01 "Judicial Disqualification Motion.") On September 11, 2001, Skinner filed an "Addendum" to his "Judicial Disqualification Motion." (Dkt. No. 17: Skinner 9/11/01 Addendum to Judicial Disqualification Motion.)

Page 9

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

On January 3, 2002, Skinner's new retained counsel, Paul Dalnoky, filed a C.P.L. § 440 motion for Skinner, arguing that "reversal is required due to a per se conflict [by trial defense counsel Stewart] and the court's failure to conduct an inquiry." (*See* Dkt. No. 17: Skinner 2/26/02 Addendum to C.P.L. § 440 Motion, Ex. D at 6.) Specifically, "[w]hile it is understandable that defendant and his family were not aware of the criminal charges pending against Ms. Stewart, this Court and ADA Gagan are both presumed to have had knowledge of the fact that Ms. Stewart had been indicted and had been fighting the charges for several years. It was incumbent upon the Court to put the defendant on notice and obtain a waiver. Failure to do so requires automatic reversal." (*Id.* at 7–8.) After a January 7, 2002 appearance before Justice Wetzel in which he required Dalnoky to certify what in the current C.P.L. § 440 motion was "new" and what was "redundant" of prior motions (*see* Dkt. No. 19: Traverse Ex. Z: 1/7/02 Hearing Transcript at 2–3), Dalnoky withdrew from representing Skinner.

On February 26, 2002 Skinner filed another pro se "addendum" to his C.P.L. § 440 motion, alleging that his "due process rights were violated as a result of prosecutorial misconduct, and ineffective assistance of counsel." (Dkt. No. 17: Skinner 2/26/02 Addendum to C .P.L. § 440 Motion.) Skinner again accused the prosecution of *Brady* violations. (*Id.* at 5.)

The trial court's decision on May 16, 2002 addressed Skinner's myriad pending motions:

> Virtually from the moment of his conviction in 1997 until the present, [Skinner] has deluged this court, as well as the federal court, law enforcement agencies, and local and state government agencies with an onslaught of motions, requests for information, and letters accusing various individuals of being part of a grand conspiracy to frame him. This motion, which seeks judicial disqualification, vacatur of judgment, as well as the sun, the moon, and the stars, is the latest offering.
>
> Initially, this motion was brought on the defendant's behalf by an attorney, Mr. Paul B. Dalnoky. At oral argument on this motion on January 7, 2002, I directed Mr. Dalnoky to swear that he had read *every previous motion filed by this defendant,* then to identify to the court precisely what, if any, new issues were contained in the instant motion. Mr. Dalnoky requested an adjournment to review the numerous boxes of previous motion papers, and to respond to my inquiry.
>
> Several weeks later, Mr. Dalnoky submitted a motion to be relieved from the case, accompanied by several letters which the defendant sent to Mr. Dalnoky after January 7, 2002. In sum and substance, those letters criticize Mr. Dalnoky's professional appearance and conduct, and indicate that defendant no longer wished Mr. Dalnoky to represent him. Some might even interpret the defendant's letters as a thinly-veiled threat to Mr. Dalnoky's personal safety. I granted Mr. Dalnoky's motion to withdraw. [fn. omitted.]
>
> ***10** On April 30, 2002, I sent a letter to the defendant advising him that Mr. Dalnoky had requested to be relieved, and that I had granted that request. I further advised the defendant to tell me, once and for all, whether all of his complaints were gathered together in the instant motion, so that the curtain could finally fall on five years of post-judgment motions. In response, another packet of materials dated May 6, 2002, arrived, which added nothing new or substantive to the previously-filed motion.
>
> After an exhaustive (and exhausting) review of this motion, I conclude that the sole new issue raised is the claim that defendant's trial counsel, Lynne Stewart, was ineffective because she allegedly

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to file the proper pre-trial motions. While such a claim could have been raised on his direct appeal, *see* CPL § 440.10(2)(c), this Court will nonetheless address it. In support of this claim, the defendant attaches a transcript of colloquy between Judge Herbert Altman and Ms. Stewart, in which Judge Altman comments upon Ms. Stewart's lack of punctuality in filing her motions. While this may be interesting for its "Day in the Life of the Court" quality, the inference which the defendant would like to draw from this transcript is vitiated by what actually happened in the case.

A review of the relevant court files shows that the defendant was initially indicted for assault under indictment number 4378/96. Indictment number 8190/96 followed, charging the defendant with Intimidation of a Witness and Tampering With a Witness. The court records show that the defendant, through his attorney, filed an omnibus pre-trial motion in connection with 4378/96 requesting discovery and pre-trial hearings, including *Huntley/Dunaway* and *Wade* hearings. The People moved for consolidation of the two indictments. The defendant's attorney made the appropriate motion opposing the consolidation. Ultimately, Judge Altman granted the People's consolidation motion and denied the defendant's motions for pre-trial hearings as to Indictment No. 4378/96. The issue of pre-trial hearings [was] irrelevant to indictment number 8190/96 because the People did not serve notice as to any statements, identifications, or recovered property. Only felony grand jury notice was served as to 8190/96 pursuant to CPL § 190.50(5)(a). Parenthetically, it should be noted that the defendant, through his attorney, did challenge that indictment, claiming a violation of his right, upon written notice, to testify before the Grand Jury. Judge Altman found that claim meritless on November 14, 1996. [fn. omitted .]

In view of the documented fact that appropriate pre-trial motions were filed on the defendant's behalf, his latest claim of ineffective assistance of counsel is groundless, and affords no basis for relief. In addition, the defendant has not met his burden of showing what motions that should have been made were not made, and that had they been made, would have made a difference.

***11** His remaining contentions are simply a rehash of previously filed, decided, and in many cases already-appealed motions. Accordingly, the defendant's instant motion is in all respects denied pursuant to CPL §§ 440.10(2)(a),(c), and 3(b)(c).

(Dkt. No. 8: 5/16/02 Justice Wetzel Decision.)

By order entered on August 29, 2002, the First Department denied Skinner's application for leave to appeal Justice Wetzel's May 16, 2002 order. (Dkt. No. 16: Israel Aff. Ex. Z: 8/29/02 1st Dep't Order .)

*Skinner's Federal Habeas Petition*

_____________ Skinner's timely-filed pro se habeas corpus petition argues that: (1) the police lacked probable cause to arrest him and his coat and identifications were fruits of that unlawful arrest (Dkt. No. 1: Pet. ¶¶ 12(A)-(B)); (2) in violation of *Brady v. Maryland*, the prosecution failed to disclose a cooperation agreement with Skinner's co-defendant and withheld various police reports (Pet.¶ 12(C)); (3) the indictments against him were improperly joined in violation of his rights against Double Jeopardy after indictment number 8190/06 was dismissed (Pet.¶ 12(D)); (4) trial counsel was conflicted by facing indictment by the same office as Skinner and provided ineffective assistance by failing to call several witnesses at trial, failing to appear on the day of his arraignment on the witness tampering charges, and failing to file an omnibus motion for these charges (Pet.¶ 12(E)); and (5) the use of Dominick Rosado's grand jury testimony at trial violated Skinner's Confrontation Clause rights (Dkt. No.19: Traverse at 49–53).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*ANALYSIS*

I. *THE AEDPA REVIEW STANDARD* [FN8]

FN8. For additional decisions authored by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, *see Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *16–18 (S .D.N.Y. June 3, 2003) (Peck, M.J.); *Wilson v. Senkowski,* 02 Civ. 0231, 2003 WL 21031975 at *5–7 (S.D.N.Y. May 7, 2003) (Peck, M.J.); *Naranjo v. Filion,* 02 Civ. 5449, 2003 WL 1900867 at *5–7 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *8–10 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *6–8 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Figueroa v. Greiner,* 02 Civ. 2126, 2002 WL 31356512 at *5–6 (S.D.N.Y. Oct. 18, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *6–8 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Velazquez v. Murray,* 02 Civ. 2564, 2002 WL 1788022 at *12–14 (S.D.N.Y. Aug. 2, 2002) (Peck, M.J.); *Soto v. Greiner,* 02 Civ. 2129, 2002 WL 1678641 at *6–7 (S.D.N.Y. July 24, 2002) (Peck, M.J.); *Green v. Herbert,* 01 Civ. 11881, 2002 WL 1587133 at *9–11 (S.D.N.Y. July 18, 2002) (Peck, M.J.); *Bueno v. Walsh,* 01 Civ. 8738, 2002 WL 1498004 at *10–11 (S.D.N.Y. July 12, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *8–9 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *12–13 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Jamison v. Grier,* 01 Civ. 6678, 2002 WL 100642 at 8–9 (S.D.N.Y. Jan. 25, 2002) (Peck, M.J.); *Thomas v. Breslin,* 01 Civ. 6657, 2002 WL 22015 at *4–5 (S.D.N.Y. Jan. 9, 2002) (Peck, M.J.); *Thomas v. Duncan,* 01 Civ. 6792, 2001 WL 1636974 at *7 (S.D.N.Y. Dec. 21, 2001) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *6 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Rodriguez v. Lord,* 00 Civ. 0402, 2001 WL 1223864 at *16 (S.D.N.Y. Oct. 15, 2001) (Peck, M.J.); *James v. People of the State of New York,* 99 Civ. 8796, 2001 WL 706044 at *11 (S.D.N.Y. June 8, 2001) (Peck, M.J.), *report & rec. adopted,* 2002 WL 31426266 (S.D.N.Y. Oct. 25, 2002) (Berman, D.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at *5 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), *aff'd,* 303 F.3d 411, 417 (2d Cir.2002), *cert. denied,* 123 S.Ct. 1353 (2003); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01–2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003).

Before the Court can determine whether Skinner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." *Williams v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

*Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also, e.g., Eze v. Senkowski,* 321 F.3d 110, 120 (2d Cir.2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.' ') (quoting *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1611 (2002)).

***12** The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." *Williams v. Taylor,* 529 U.S. at 404–05, 120 S.Ct. at 1519.[FN9] Both, however, "restrict[ ] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523.[FN10] "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller,* 289 F.3d at 42. "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 296 F.3d at 135; *accord, e.g., DelValle v. Armstrong,* 306 F.3d at 1200.

FN9. *Accord, e.g., Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000); *Lurie v. Wittner,* 228 F.3d 113, 125 (2d Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1404 (2001); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000), *cert. denied,* 531 U.S. 1116, 121 S.Ct. 865 (2001).

FN10. *Accord, e.g., DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002); *Yung v. Walker,* 296 F.3d 129, 135 (2d Cir.2002); *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,* 123 S.Ct. 251 (2002); *Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

As to the "contrary to" clause:

A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.... A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

*Williams v. Taylor,* 529 U.S. at 405–06, 120 S.Ct. at 1519–20.[FN11]

FN11. *Accord, e.g., DelValle v. Armstrong,* 306 F.3d at 1200; *Yung v. Walker,* 296 F.3d at 135; *Kennaugh v. Miller,* 289 F.3d at 42; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

*Wittner,* 228 F.3d at 127–28.

In *Williams,* the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413, 120 S.Ct. at 1523. However, "[t]he term 'unreasonable' is ... difficult to define." *Id.* at 410, 120 S.Ct. at 1522. The Supreme Court made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.*[FN12] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 539 U.S. at 409, 120 S.Ct. at 1521.[FN13] The Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." ' *Jones v. Stinson,* 229 F.3d at 119 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).[FN14] Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Kennaugh v. Miller,* 289 F.3d at 45; *accord Yung v. Walker,* 296 F.3d at 135. Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." *Yung v. Walker,* 296 F.3d at 134.

FN12. *See also, e.g., Eze v. Senkowski,* 321 F.3d at 124–25; *DelValle v. Armstrong,* 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

FN13. *Accord, e.g., Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002); *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v. Wittner,* 228 F.3d at 128–29.

FN14. *Accord, e.g., Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d at 245; *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184.

***13** Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

*Sellan v. Kuhlman,* 261 F.3d at 312; *accord, e.g., Cotto v. Herbert,* No. 01–2694, 2003 WL 1989700 at *6 (2d Cir. May 1, 2003); *Eze v. Senkowski,* 321 F.3d at 121; *Ryan v. Miller,* 303 F.3d at 245; *Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir.), *cert. denied,* 123 S.Ct. 694 (2002); *Jenkins v. Artuz,* 294 F.3d 284, 291 (2d Cir.2002) ("In *Sellan,* we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference."); *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002); *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001).[FN15] "By its terms, § 2254(d) requires such deference only with respect to a state-court 'adjudication on the merits,'

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

not to a disposition 'on a procedural, or other, ground.' Where it is 'impossible to discern the Appellate Division's conclusion on [the relevant] issue,' a federal court should not give AEDPA deference to the state appellate court's ruling." *Miranda v.. Bennett,* 322 F.3d 171, 177–78 (2d Cir.2003) (citations omitted).[FN16] Of course, "if there is no [state court] adjudication on the merits, then the pre-AEDPA, *de novo* standard of review applies." *Cotto v. Herbert,* 2003 WL 1989700 at *7.

FN15. The Second Circuit "recognize[d] that a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests." *Sellan v. Kuhlman,* 261 F.3d at 312. Where the state court does not explain its reasoning, the Second Circuit articulated the analytic steps to be followed by a federal habeas court:

> We adopt the Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated "on the merits" by a state court. As the Fifth Circuit has explained, "[W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999).

*Sellan v. Kuhlman,* 261 F.3d at 314; *accord, e.g., Cotto v. Herbert,* 2003 WL 1989700 at *6; *Eze v. Senkowski,* 321 F.3d at 121–22; *Norde v. Keane,* 294 F.3d at 410; *Aparicio v. Artuz,* 269 F.3d at 93.

FN16. The Second Circuit in *Miranda v. Bennett* continued: "Generally, when the Appellate Division opinion states that a group of contentions is either without merit 'or' procedurally barred, the decision does not disclose which claim in the group has been rejected on which ground. If the record makes it clear, however, that a given claim had been properly preserved for appellate review, we will conclude that it fell into the 'without merit' part of the disjunct even if it was not expressly discussed by the Appellate Division." *Id.* at 178.

## II. *SKINNER'S FOURTH AMENDMENT CLAIM THAT HE WAS ARRESTED WITHOUT PROBABLE CAUSE SHOULD BE DENIED BECAUSE IT CANNOT PROVIDE A BASIS FOR HABEAS RELIEF UNDER STONE V. POWELL* [FN17]

FN17. For additional decisions authored by this Judge discussing the *Stone v. Powell* standard on habeas review in language substantially similar to the legal analysis in this entire section of this Report & Recommendation, *see Tibbs v. Greiner,* 01 Civ. 4319, 2003 WL 1878075 *11–13 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Roberts v. Batista,* 01 Civ. 5264, 2003 WL 1900866 at *5–7 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Lesane v. Dixon,* 01 Civ. 9867, 2002 WL 977528 at *4 (S.D.N.Y. May 13, 2002) (Peck, M.J.); *Herring v. Miller,* 01 Civ. 2920, 2002 WL 461573 at *2–3 (S.D.N.Y. Mar. 27, 2002) (Peck, M.J); *Gumbs v. Kelly,* 97 Civ. 8755, 2000 WL 1172350 at *9 (S.D.N.Y. Aug. 18, 2000) (Peck, M.J.); *Solomon v. Artuz,* 00 Civ. 0860, 2000 WL 863056 at *4 (S.D.N.Y. June 28, 2000) (Peck, M.J); *Roberson v. McGinnis,* 99 Civ. 9751, 2000 WL

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

378029 at *5 (S.D.N.Y. Apr. 11, 2000) (Batts, D.J. & Peck, M.J.); *Cruz v. Greiner,* 98 Civ. 7939, 1999 WL 1043961 at *24 (S.D.N.Y. Nov. 17, 1999) (Peck, M.J.); *Jones v. Strack,* 99 Civ. 1270, 1999 WL 983871 at *9 (S.D.N.Y. Oct. 29, 1999) (Peck, M.J.); *Torres v. Irvin,* 33 F.Supp.2d 257, 274–75 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); *Robinson v. Warden of James A. Thomas Ctr.,* 984 F.Supp. 801, 804–05 (S.D.N.Y.1997) (Sprizzo, D.J. & Peck, M.J.).

Skinner's habeas petition asserts that he was arrested without probable cause and the subsequent identification procedures and the seizure of his coat were therefore fruits of his unlawful arrest. (Dkt. No. 1: Pet. ¶¶ 12(A)-(B).) At Skinner's pretrial *Mapp* /*Dunaway* /*Wade* hearing, Skinner challenged his arrest as unsupported by probable cause and moved for the suppression of subsequent line-up identifications and his black jacket. (*See generally* H. 1–299; *see also* pages 3–6 above.) After a four-day hearing, the court held that the officers had probable cause to arrest Skinner and denied his motions to suppress. (H. 288–97; *see* page 6 above.)

Skinner's Fourth Amendment claim must be assessed by reference to the Supreme Court's decision in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037 (1976), which precludes habeas review of Fourth Amendment claims that have been litigated in state court:

> ***14** [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force.

*Stone v. Powell,* 428 U.S. 465, 494–95, 96 S.Ct. 3037, 3052–53 (1976) (fns.omitted).[FN18]

> FN18. *Accord, e.g., Withrow v. Williams,* 507 U.S. 680, 682–86, 113 S.Ct. 1745, 1748–50 (1993); *McClesky v. Zant,* 499 U .S. 467, 479, 111 S.Ct. 1454, 1462 (1991); *Fowler v. Kelly,* No. 95–2527, 104 F.3d 350 (table), 1996 WL 521454 at *3 (2d Cir. Sept. 16, 1996); *Capellan v. Riley,* 975 F.2d 67, 69–71 (2d Cir.1992); *Grey v. Hoke,* 933 F.2d 117, 121 (2d Cir.1991); *Plunkett v. Johnson,* 828 F.2d 954, 956 (2d Cir.1987).

The Second Circuit, sitting *en banc,* has concluded that *Stone v. Powell* permits federal habeas review of exclusionary rule contentions only in limited circumstances:

> If the state provides no corrective procedures at all to redress Fourth Amendment violations, federal habeas corpus remains available. It may further be that even where the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process, the federal intrusion may still be warranted.

*Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir.1977) (citations omitted), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775 (1978).[FN19]

> FN19. *Accord, e.g., Graham v. Costello,* 299 F.3d 129, 133–34 (2d Cir.2002); *Branch v. McClellan,* No. 96–2954, 234 F.3d 1261 (table), 2000 WL 1720934 at *3 (2d Cir. Nov. 17, 2000); *Capellan v. Riley,* 975 F.2d at 70; *Aziz v. Warden of Clinton Correctional Facility,* 92 Civ. 104, 1992 WL 249888 at *3 (S.D.N.Y. Sept. 23, 1992), *aff'd,* 993 F.2d 1533 (2d Cir.), *cert. denied,* 510 U.S. 888,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

114 S.Ct. 241 (1993); *Allah v. LeFevre,* 623 F.Supp. 987, 990–92 (S.D.N.Y.1985); *see also, e.g., Smith v. Senkowski,* No. 97 CV 1280, 1999 WL 138903 at *6 (E.D.N.Y. Mar. 10, 1999) (Petitioner claimed he was arrested without probable cause and that his pretrial statements therefore should have been suppressed. "A federal court is not permitted to judge the merits of the state court's decision. The Court need only find that the State's procedure for resolving Fourth Amendment claims is 'facially adequate' and that no unconscionable breakdown' of the process occurred in the petitioner's case. An unconscionable breakdown occurs when the state court fails to conduct a reasoned inquiry into the petitioner's claim.") (citing *Capellan v. Riley,* 975 F.2d at 71).

Here, Skinner litigated his Fourth Amendment claim at his pretrial suppression hearing. (*See* pages 3–6 above.) During a four-day *Dunaway* /*Mapp* /*Wade* hearing, four police officers, a sergeant, and a lieutenant testified as to the probable cause that led to Skinner's arrest (H.3–125), and an additional three detectives and two District Attorney's Office investigators provided testimony about the identification procedures. (H.129–257.) Skinner's trial counsel cross-examined each of these witnessses. (*See generally* H. 3–257.) Thus, state corrective process was not only available but was employed for Skinner's Fourth Amendment claims, which therefore cannot support a petition for a writ of habeas corpus. *See, e.g., Gandarilla v. Artuz,* 322 F.3d 182, 185 (2d Cir.2003) ("[T]he merits of a Fourth Amendment challenge are not reviewable in a federal habeas proceeding if a defendant has had a fair opportunity to litigate that question in State court ..."); *Graham v. Costello,* 299 F.3d at 134 ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the [state] court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief."); *Blagrove v. Mantello,* No. 95–2821, 104 F.3d 350 (table), 1996 WL 537921 at *2 (2d Cir. Sept. 24, 1996) (where defendant's "Fourth Amendment issues were raised before the trial court in the suppression hearing and before the Appellate Division in [his] pro se brief" defendant's "Fourth Amendment argument is barred [from federal habeas review] because the issue was fully and fairly litigated in the state courts."); *Capellan v. Riley,* 975 F.2d at 70 & n. 1 (noting that "the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims....' "); *McPhail v. Warden, Attica Corr. Facility,* 707 F.2d 67, 69 (2d Cir.1983) (New York's procedure for litigating a Fourth Amendment claim in a criminal trial complied with requirement that state provide an opportunity to litigate such claims). [FN20]

FN20. *See also, e.g., Montero v. Sabourin,* 02 Civ. 8666, 2003 WL 21012072 at *5 (S.D.N.Y. May 5, 2003) ("[H]abeas review of Fourth Amendment claims that were, or could have been, previously litigated in state court are barred by *Stone v. Powell* .... It has long been acknowledged that New York provides adequate procedures under C.P.L. § 710 et seq., for litigating Fourth Amendment claims."); *Ferron v. Goord,* No. 99–CV–6421, 2003 WL 1786993 at *2 (W.D.N.Y. Mar. 27, 2003) ("The Second Circuit has noted that *Stone* requires only that the 'the state have provided the *opportunity* to the state prisoner for full and fair litigation of the Fourth Amendment claim.") (quoting *Gates v. Henderson,* 568 F.2d at 839); *Baker v. Bennett,* 01 Civ. 1368, 2002 WL 31802302 at *6 (S.D.N.Y. Dec. 6, 2002) ("The state court need only grant a petitioner 'an *opportunity* for full and fair litigation of a fourth amendment claim." ') (quoting *Capellan v. Riley,* 975 F.2d at 70); *Fayton v. Goord,* 01 Civ. 2912, 2001 WL 694573 at *1 (S.D.N.Y. June 18, 2001) ("Since this petition is based

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

on a fully and fairly litigated Fourth Amendment claim ... such relief cannot be granted."); *Gumbs v. Kelly,* 2000 WL 1172350 at *10 (New York's procedure for litigating Fourth Amendment claims provides full and fair opportunity to litigate claim); *Hunter v. Greiner,* 99 Civ. 4191, 2000 WL 245864 at *6 (S.D.N.Y. Mar. 3, 2000).

***15** Skinner's claim that he was arrested without probable cause and that his coat and the line-up identifications therefore should be suppressed is a Fourth Amendment claim that is not cognizable on habeas review. *E.g., Jackson v. Scully,* 781 F.2d 291, 297 (2d Cir.1986) (Even where state conceded that petitioner's arrest lacked probable cause, petitioner's claim that his post-arrest questioning was fruit of the illegal arrest was barred because New York "clearly provided" petitioner with "an opportunity fully and fairly to litigate" the Fourth Amendment claim.); *Chavis v. Henderson,* 638 F.2d 534, 538 (2d Cir.1980) (Petitioner's claim "that his arrest was without probable cause and that therefore the identification evidence should have been excluded, was properly rejected by the district court. [Petitioner] made no showing ... that he had been precluded from a full and fair opportunity to litigate this issue in the state courts. Under *Stone v. Powell* ..., he may not urge the same grounds for federal habeas corpus relief ."), *cert. denied,* 454 U.S. 842, 102 S.Ct. 152 (1981); *Roberson v. McGinnis,* 2000 WL 378029 at *5 (Under *Stone v. Powell*, the Court was precluded from reviewing petitioner's claim that his conviction was based on his confession and the identification testimony obtained as a result of his unlawful arrest. Petitioner had the opportunity to fully and fairly litigate this Fourth Amendment claim during his pretrial suppressing hearing and First Department appeal.); *see, e.g., Pina v. Kuhlmann,* 239 F.Supp.2d 285, 289 (E.D.N.Y.2003) (Habeas review unavailable for petitioner's claim that since the police lacked probable cause to arrest him, his post-arrest statements should have been suppressed. "It is well settled that such claims are not cognizable for habeas corpus review where the State has provided a full and fair opportunity to litigate this issue."); *Manning v. Strack,* No. CV 99–3874, 2002 WL 31780175 at *4 (E.D.N.Y. Oct. 11, 2002) (Raggi, D.J.) (*"Stone v. Powell* prohibits habeas review of [petitioner's] Fourth Amendment claim" that "he was arrested without probable cause" and that his "identifications and ... statements should have been suppressed as the fruits of this unlawful arrest." Petitioner "was afforded a full evidentiary hearing on his arrest challenge, as well as one appeal of right and one opportunity to move for leave to appeal."); *Senor v. Greiner,* No. 00–CV–5673, 2002 WL 31102612 at *10–11 (E.D.N.Y. Sept. 18, 2002) (Habeas claim barred where petitioner argued that he was arrested without probable cause and lineup identifications therefore should have been suppressed. Petitioner "cannot claim that the state lacked sufficient procedures for redress of his Fourth Amendment claims because the courts in this circuit have expressly approved New York's procedure for litigating such claims ..." nor has petitioner "alleged that an unconscionable breakdown in the process occurred."); *Bilbrew v. Garvin,* No. 97–CV–1422, 2001 WL 91620 at *4–5 (E.D.N.Y. Jan. 10, 2001) (Where petitioner "was not denied the opportunity to litigate his Fourth Amendment claims in the state courts, [the habeas court] will not consider" petitioner's claims "that his statements to the police and the station house identifications of him should have been suppressed as 'fruits' of an unlawful arrest .... made without probable cause."); *Ortiz v. Artuz,* 113 F.Supp.2d 327, 335–36 (E.D.N.Y. Sept. 8, 2000) ("Petitioner argue[d] that he was arrested without probable cause in violation of the Fourth Amendment and that his pretrial statement and the identification procedure should have been suppressed as the fruit of the illegal arrest." Because "[t]he hearing court conducted a reasoned inquiry into petitioner's claim and determined that there was probable cause for his arrest, and the Appellate Division affirmed on the merits .... petitioner's Fourth Amendment claim is unreviewable by this Court."), *aff'd,* No. 00–2713, 36 Fed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

Appx. 1, 2002 WL 126131 (2d Cir. Jan. 28, 2002), *cert. denied,* 536 U.S. 909, 122 S.Ct. 2367 (2002).[FN21]

FN21. *See also, e.g., Dawson v. Donnelly,* 111 F.Supp.2d 239, 247 (W.D.N.Y.2000) (Where petitioner's habeas claim that "he was under arrest when he confessed and that there was no probable cause for his arrest" was also raised in a pretrial suppression motion and in his direct state appeal, the state courts gave petitioner "a full and fair opportunity to litigate the claim. Therefore, this Court is precluded from addressing it in the context of a Federal habeas proceeding, and the claim must be dismissed."); *Senor v. Senkowski,* No. 97–CV–4929, 1999 WL 689477 at *8 (E.D.N.Y. Aug. 31, 1999) (Habeas court cannot consider petitioner's claim that his "arrest violated the Fourth Amendment, and that the lineup identifications were fruit of that unlawful arrest."); *Joyner v. Leonardo,* 99 Civ. 1275, 1999 WL 608774 at *3–4 (S.D.N.Y. Aug. 12, 1999) (Petitioner's claim that the police lacked probable cause to arrest him and that his subsequent identifications should be suppressed was "rejected under the doctrine established by the Supreme Court in *Stone v. Powell* ..."); *France v. Artuz,* No. 98–CV–3850, 1999 WL 1251817 at *6 (E.D.N.Y. Dec. 17, 1999) (Where petitioner's habeas claim that his statements should be suppressed because he was arrested without probable cause was addressed during a pretrial suppression hearing, his claim was denied "[b]ecause petitioner was given a full and fair opportunity in the state courts to litigate this Fourth Amendment issue ..."); *Quinones v. Keane,* 97 Civ. 3173, 1998 WL 851583 at *4–5 (S.D.N.Y. Dec. 7, 1998) (Habeas court barred from considering petitioner's claim that his statements should be suppressed because he "was detained without probable cause when he gave the statements."); *Maldonado v. Giambrum,* 98 Civ. 0058, 1998 WL 841488 at *2 (S.D.N .Y. Dec. 3, 1998) (Petitioner "claim[ed] that the police did not have probable cause to place him under arrest and, for that reason, the evidence acquired after the arrest should not have been admitted at his trial." Because petitioner was "afforded an adequate opportunity to address this fourth amendment claim in the state court proceedings .... [the habeas court] need not consider [petitioner's] claim."); *Sansalone v. Kuhlmann,* 96 Civ. 9231, 1998 WL 804693 at *1 (S.D.N.Y. Nov. 16, 1998) (Parker, D.J.) (Petitioner's "claim, alleging that a lack of probable cause for his arrest warranted suppression of ... identification testimony ... [is] precluded from review here because the issues were fully and fairly litigated both in pre-trial hearings and on direct review."); *Moreno v. Kelly,* 95 Civ. 1546, 1997 WL 109526 at *8 (S.D.N.Y. Mar. 11, 1997) (Where petitioner alleged that his arrest was not based on probable cause and "that all post-arrest identifications should therefore be suppressed as the fruits of an unconstitutional arrest," petitioner's claim was "not a basis for federal habeas relief." Because the trial court held a combined identification, suppression, and probable cause hearing, which was reviewed on direct appeal, petitioner "received a 'full and fair' opportunity to litigate his Fourth Amendment claim in the state courts and this [habeas] court has no authority to revisit the issue ." Petitioner's "contention that the trial court's pre-trial determination was incorrect does not entitle him to federal habeas review."); *Burton v. Senkowski,* No. CV–94–3836, 1995 WL 669908 at *4 (E.D.N.Y. Nov. 5, 1995) ("[*Stone v.] Powell* and its progeny" barred review of petitioner's claims that his arrest lacked probable cause and that his line-up identification should

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

have been suppressed as fruit of this unlawful arrest.).

***16** Accordingly, because Skinner was given a full and fair opportunity to litigate his Fourth Amendment claim in state court, Skinner's claim that he was arrested without probable cause is not cognizable on habeas review and should be denied.

III. *SKINNER'S CLAIM THAT THE PROSECUTION VIOLATED* BRADY *V. MARYLAND SHOULD BE DENIED*

Skinner's habeas petition asserts that the prosecution: (1) "withheld information that co-defendant Anibal Rosa was under cooperation with the DA's office and used this to enlist the Rosa famil[y's] perjured testimony"; (2) "withheld information of the name of the shooter under indictment # 4378/96 provided to them by Anibal Rosa"; and (3) "never turned over any of the DD'5 reports or police memo[ ]s for the arresting detectives under indictments # 4378/96 and # 8190/96." FN22 (Dkt. No. 1: Pet. ¶ 12(C).) Skinner claims that he "discovered an array of fabricated information against him that was conflicting at this trial when Anibal Rosa[ ] testified at another trial one year later, and proved that he was the *confidential informant* and sole source of information against petitioner although the prosecutor denied this on the record before the trial court." (Dkt. No. 19: Traverse at 49.)

FN22. "DD–5s" are "complaint follow-up reports." *See Bynum v. Duncan,* 02 Civ. 2124, 2003 WL 296563 at *9 (S.D.N.Y. Feb. 12, 2003).

A. *Skinner's Brady Claim is Exhausted*

Contrary to the State's argument, Skinner did exhaust his claim that the prosecution failed to disclose its cooperation agreement with Rosa and the fact that Rosa named Morales' shooter. While the State asserts that Skinner "first addressed the 'secret cooperation' of Anibal Rosa in his application for a writ of coram nobis" (Dkt. No. 15: State Br. at 25–28), Skinner properly raised the claim in his July 12, 2001 C.P.L. § 440 motion. (Dkt. No. 17: Skinner 7/12/01 C.P.L. § 440 Motion.)

In his July 2001 C.P.L. § 440 motion, under the heading "*Rosario* and *Brady* Violation," Skinner alleged, in part, that

> Anibal "Puti" Rosa, in his testimony under indictment # 3790/97 testified that he told ADA Gagan, who the shooter was under indictment # 4378/96 before [Skinner's] trial and none of the documents pertaining to this information were turned over to the defense.... Had the People revealed this information it would not have cleared [Skinner] but it would have revealed the People's theory of this shooting was fabricated by ADA Gagan....

(Dkt. No. 17: Skinner 7/12/01 C.P.L. § 440 Motion at 36.) Skinner's February 2002 "addendum" further asserted that

> Defendant's alleged co-defendant Anibal Rosa, who was under secret cooperation with the District Attorney's Office in New York, and Queens Counties, had prior to [Skinner's] trial informed the DA's office and trial prosecutor who the shooter was under indictment # 4378/96. However, at trial and prior to trial the People claimed not to have known the identity of this person.... The fact that the jury never knew anything about the shooter's identification is clearly a *Brady Violation.* The People were concern[ed] that ... this revelation of important undisclosed facts ... [would] cause the jury to acquit [Skinner].

***17** (Dkt. No. 17: Skinner 2/26/02 C.P.L. § 440 Motion Addendum at 5.)

The Court assumes that Skinner's July 2001

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

C.P.L. § 440 motion and February 2002 addendum were denied prior to or as part of the only ruling subsequent to July 2001 that appears in the record, namely Justice Wetzel's May 16, 2002 Order. (Dkt. No. 8: 5/16/02 Justice Wetzel Decision.) In that order, Justice Wetzel denied all of Skinner's other claims (except his counsel conflict claim) as "a rehash of previously filed, decided, and in many cases already appealed motions." (*Id.*) The First Department denied leave to appeal on August 29, 2002. (Dkt. No. 16: Israel Aff. Ex. Z: 8/29/02 1st Dep't Order.) Since the State has not argued that Justice Wetzel denied Skinner's *Brady* claim on an adequate and independent state ground (because the State asserted that the claim was never raised in a C.P.L. § 440 motion), the Court will address the *Brady* claim on the merits.

B. *The Brady v. Maryland Standard* [FN23]

FN23. For additional decisions authored by this Judge discussing the *Brady v. Maryland* standard in language substantially similar to that in this entire section of this Report & Recommendation, *see Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *11–12 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), *aff'd,* 303 F.3d 411 (2d Cir.2002), *cert. denied,* 123 S.Ct. 1353 (2003); *Franza v. Stinson,* 58 F.Supp.2d 124, 153 (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.).

Under *Brady v. Maryland* and its progeny, state as well as federal prosecutors must turn over exculpatory and impeachment evidence, whether or not requested by the defense, where the evidence is material either to guilt or to punishment. *See, e.g., Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948 (1999); *United States v. Bagley,* 473 U.S. 667, 676, 682, 105 S.Ct. 3375, 3380, 3383–84 (1985); *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399 (1976); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97 (1963).[FN24] The *Brady* rule also encompasses evidence known only to the police: "In order to comply with *Brady,* therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler v. Greene,* 527 U.S. at 281, 119 S.Ct. at 1948 (quoting *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567 (1995)).

FN24. *See also, e.g., United States v. Diaz,* 176 F.3d 52, 108 (2d Cir.), *cert. denied,* 120 S.Ct. 181 (1999); *Tankleff v. Senkowski,* 135 F.3d 235, 250 (2d Cir.1998); *Orena v. United States,* 956 F.Supp. 1071, 1090–92 (E.D.N.Y.1997) (Weinstein, D.J.).

The *Brady* rule does not require a prosecutor to "deliver his entire file to defense counsel," but only to disclose those items which are material to the defendant's guilt or punishment. *United States v. Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380; *accord, e.g., Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. at 1567 ("We have never held that the Constitution demands on open file policy."); *United States v. Agurs,* 427 U.S. at 108–09, 96 S.Ct. at 2400. [FN25]

FN25. *See also, e.g., Tate v. Wood,* 963 F.2d 20, 25 (2d Cir.1992); *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214 (1987); *Hoover v. Leonardo,* No. 91–CV–1211, 1996 WL 1088204 at *2 (E.D.N.Y. June 11, 1996).

"There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene,* 527 U.S. at 281–82, 119 S.Ct. at 1948.[FN26]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN26. *See also, e.g., Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568 (1972); *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995), *cert. denied,* 516 U.S. 1165, 116 S.Ct. 1056 (1996); *Orena v. United States,* 956 F.Supp. at 1090.

C. *Additional Facts Underlying Skinner's Brady Claim*

The prosecutor in Skinner's case denied twice on the record that the District Attorney's Office had entered into a cooperation agreement with Anibal Rosa about Skinner's case. (Tr. 695–701, 1469–70.) The following exchange took place on February 11, 1997, after the testimony of Edith Velasquez, Anibal Rosa's aunt, outside the presence of the jury:

***18** Ms. Stewart: Judge, I just ask to place on the record – try to recreate the substance of the sidebar conference that we had off the record during the questioning of this last witness, Ms. Velasquez.

I had asked for the sidebar in order to inquire whether or not her nephew, Anibal Rosa, was cooperating with [Assistant District Attorney] Gagan's office. And I said that I had information, I believe, from Mr. Gagan himself that [Rosa] was cooperating, and I wanted to know whether this aunt was maybe perhaps somehow involved in that cooperation or knew of it. I guess I will let Mr. Gagan answer for himself.

The Court: ... Mr. Gagan indicated that he had not been in a cooperation agreement.

Mr. Gagan: There is no cooperation agreement.

The Court: There is no cooperation agreement?

Mr. Gagan: No, not at this time.

Ms. Stewart: And I indicated that that does not necessarily mean that someone is not coming in and proffering and in discussion, even though they may not have been signed up by the office yet and given any kind of consideration therefor.

The Court: But [Mr. Gagan] made a representation to the Court that ... he had no intention to call Mr. Rosa as a witness, which goes beyond, in my opinion, cooperating.

Ms. Stewart: Well, no, he could be cooperating in something else, Judge, and not called as a witness here because he's being protected.... There's a possibility that [the District Attorney's Office] may want him to talk about something else for another case but not this case.

The Court: All right, has there been any agreement or any attempt to reach an agreement of cooperation with Mr. Rosa?

Mr. Gagan: As for this case, no.

The Court: How about as to any other cases?

Mr. Gagan: Well, yeah, your Honor, we talk to people all the time, and in fact, Mr. Skinner came there and talked to us on a “Queen For A Day” agreement when he had [previous trial counsel] so, obviously, Mr. Skinner is not cooperating with us, so whether someone comes in and talks to us is a different matter than if they are cooperating, and Mr. Rosa is not cooperating in this case, and there is no cooperation in this case. He's not testifying in this case, and I will produce him for Ms. Stewart to call him as a witness if she would like.

Ms. Stewart: Judge, can I just say that I think Mr. Gagan's very definitive in this case.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Each thing that he said delineates where this may be going, and I would state for the record that Mr. Rosa was involved in a highly-publicized incident, a shooting in Queens where people, I believe, were murdered, and he is accused of being a participant in those murders, and it is my understanding that he was very anxious to cut some kind of a deal somewhere.

Now I recognize that whatever he may be doing in Queens has no relationship but it seems to me if he is involved with Mr. Gagan's office, whether it is in this case or another case, it has been known that a relative would come in to testify rather than expose the person of the first party because he has too much baggage to come in with [them]. They don't want another witness that hurts them more than he helps them.

***19** (Tr. 695–98; *see also* Tr. 699–701.)

On February 19, 1997, based on the substance of A.D.A. Gagan's cross-examination of Skinner, the issue of Rosa's possible cooperation was again raised by defense attorney Stewart and again denied by A.D.A. Gagan:

Ms. Stewart: Well, Judge, I asked this question at the side bar when Ms. Velasquez was on the stand, whether Anibal Rosa was cooperating, was actively seeking to cooperate and had an agreement, and I would ask once again, based on this extensive series of questions, ... it seems to me those questions had to come from Anibal Rosa; there is no other way.

The Court: It didn't seem that way to me....

Put the question to the assistant [district attorney], whether Anibal Rosa is cooperating in this case.

Mr. Gagan: No.

(Tr. 1469–70.)

Skinner claims that Anibal Rosa's subsequent testimony at another trial "proved that he was the *confidential informant* and sole source of information against [Skinner] although the prosecutor denied this on the record before the trial court" and therefore Assistant District Attorney Gagan withheld this information from Skinner and his counsel during his trial. (Dkt. No. 19: Traverse at 49.)

On June 24, 1998, Anibal Rosa testified in Supreme Court, New York County, in the case of *People v. David Rodriquez, et al.*, indictment number 3790/97. (Dkt. No. 17: Skinner C.P.L. § 440 Motion Ex. Q: Transcript of People v. Rodriguez, et al., Indictment # 3790/97 ["Rodriquez Tr."].) Rosa testified that in October 1996 he was arrested, indicted, pleaded guilty and was released on bail in connection with the shooting of Jehu Morales. (Rodriguez Tr. 1522–24, 1552–53, 1557–59.) He was arrested in connection with a hit-and-run in Queens in November 1996, prior to his sentencing in the Morales case. (Rodriguez Tr. 1557–60.) According to Rosa, in December 1996, he had a court appearance in Manhattan that was adjourned when his attorney failed to appear. (Rodriguez Tr. 1564.) About a week later, Rosa was brought back to the Manhattan Courthouse and met with Assistant District Attorneys Hickey and Gagan for a "couple of hours." (Rodriguez Tr. 1565–67.) Rosa testified that he decided to cooperate with the District Attorney's Office as a result of that conversation, although he could not sign a cooperation agreement because his lawyer failed to appear on at least two occasions. (Rodriguez Tr. 1563, 1567–68.)

As to the night of Morales' shooting, Rosa testified that Skinner had a gun but did not shoot Morales. (Rodriguez Tr. 1518, 1542–43.) Rosa, Skinner, Wager, and "Erkel" were all present at Morales' shooting,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and Erkel shot Morales. (Rodriguez Tr. 1515–18, 1543.) Rosa, Wager, and Skinner left together and were arrested, while Erkel "took a different ... route." (Rodriguez Tr. 1519, 1543–44.) Rosa stated that when asked by the Manhattan District Attorney's office who Erkel was, Rosa told them he met Erkel through Skinner. (Rodriguez Tr. 1544–45.)

***20** At Rosa's sentencing on September 27, 1989 for his role in the Morales shooting, Assistant District Attorney Hickey informed the judge that some time after Rosa's arrest in Queens, Rosa cooperated in an investigation that she was conducting on the Lower East Side. (Dkt. No. 17: Skinner 7/12/01 C.P.L. § 440 Motion Ex. A: Rosa Ind. No. 4378/96 Sentencing Transcript ["Rosa S."] 3–5.) A.D.A. Hickey stated that after his Queens indictment, Rosa

> basically cooperated in an investigation that I was conducting on the Lower East Side. He testified in the grand jury [in] which he was active in the indictment of almost 40 people. He also testified at the trial of four of those defendants which led to their conviction. The extent of the promise that the People made are as follows: We discussed this case with the Queens District Attorney, specifically the assistant who was assigned to that case. No promises were made in terms of a lesser plea. My supervisor, Walter Arsenault, did speak to the Judge in Queens who presided over that case and informed that Judge of the extent of Anibal Rosa's cooperation.... I told Mr. Rosa I would tell your Honor that the extent of cooperation was considerable and I believe as fully as he could provide or was able to provide at the time.... We promised him in exchange for this we would inform you of these facts and recommend in light of the cooperation he [be] sentenced to one and a half to four and a half on this indictment and if you thought it appropriate to run concurrent with the sentence he's currently serving [on the Queens charges.]

(Rosa S. 3–5.)

This information is consistent with Assistant District Attorney Gagan's statement during Skinner's trial that Rosa was not cooperating "in this case." (*See* pages 36–38 above.) Presumably, at the time of Skinner's trial, the District Attorney's Office was trying to secure Rosa's cooperation for the case involving the forty-person indictment, which was eventually secured, according to A.D.A. Hickey (Rosa S. 3–5.)

D. *Application of the Brady Standard to Skinner's Claim*

1. *Rosa's Information that Skinner Was Present But Was Not the Shooter Would Not Have Exculpated Skinner*

These transcripts are not the "smoking gun" Skinner portrays them to be. Even in light of Rosa's testimony at the Rodriguez trial and A.D.A. Hickey's discussion of Rosa's cooperation at Rosa's September 1999 sentencing, Skinner's *Brady* claim fails on the merits.

First, assuming that Rosa told the District Attorney's Office a version of the Morales shooting consistent with his testimony at the *Rodriguez* trial (*see* pages 38–39 above), that information is not *Brady* material because it would not in any way have exculpated Skinner. Rosa's description of the events surrounding the Morales shooting *inculpates* Skinner by describing Skinner's presence with a gun and connecting Skinner to "Erkel," who Rosa testified shot Morales. (Tr. 1516–17, 1522, 1545.) Skinner highlights the fact that Rosa informed the prosecutor that someone other than Skinner shot Morales (Dkt. No. 17: Skinner 7/12/01 C.P.L. § 440 Motion at 36), but fails to recognize that Rosa's version entirely refutes Skinner's alibi defense.

***21** Skinner further asserts that "[h]ad the People revealed [Rosa's identification of the shooter] it would

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

not have cleared [Skinner] but it would have revealed the People's theory of this shooting was fabricated by ADA Gagan ...” (Skinner 7/12/01 C.P.L. § 440 Motion at 36.) In fact, the State prosecuted Skinner under an “acting in concert” theory. (Charge: Tr. 1741–44) (“It's the theory of the People's case that the defendant acted in concert with Anibal Rosa and Anthony Wager and others in the commission of counts 1 through 7 of the indictment. Accordingly, the legal principle of acting in concert, which is sometimes referred to as aiding and abetting, applies to those counts.”) The prosecutor himself stated that “the fact is [that Skinner is] not charged as the shooter in this case.” (State Summation: Tr. 1701.) Because Rosa's version of the events, including the naming of the shooter, would not have exculpated Skinner nor contradicted the prosecution's theory of the case, it fails to qualify as *Brady* material. *See, e.g., United States v. Gonzalez,* 110 F.3d 936, 944 (2d Cir.1997) (where “defendants' theory was that only [police officer] fired a weapon ... [alleged *Brady* ] evidence suggesting *no* shots were fired plainly would have undermined, rather than supported, that theory.” Further, “the charge against defendants was not that they fired their weapons, but that they possessed them.”); *United States v. Pimentel,* No. 99 CR 1104, 2002 WL 1208679 at *4 (E.D.N.Y. May 30, 2002) (*Brady* claim rejected where, *inter alia*, suppressed information implicated defendant in the crime and did not undermine the government's theory of the case); *cf. Mendez v. Artuz,* 303 F.3d 411, 414 (2d Cir.2002) (“Suppressed information is exculpatory and thus ‘favorable’ to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses.”).

Second, information provided by Rosa, such as the identity of the shooter, cannot be properly analyzed as *Brady* material because Rosa's identity or existence was not “suppressed” by the government. Skinner and his counsel were surely aware that Rosa, who was arrested and charged along with Skinner and Wager, might have relevant information about the crime with which Skinner, Rosa, and Wager were charged. At least as to the identity of the shooter, Skinner's *Brady* claim fails on this ground because the State in no way deprived Skinner's counsel of interviewing or calling Rosa at trial. In fact, A.D.A. Gagan stated on the record that he “would produce [Rosa] for Ms. Stewart to call him as a witness if she would like.” (Tr. 697.) To the extent the State had any *Brady* obligation as to Rosa's version of events (as opposed to the existence of a cooperation agreement), the State met its obligation by offering to make Rosa available to testify. *See, e.g., United States v. Torres,* 129 F.3d 710, 717 (2d Cir.1997) (“It is well settled that evidence ‘is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known of the essential facts permitting him to take advantage of [that] evidence.” ’) (quoting *United States v. Gonzalez,* 110 F.3d 936, 944 (2d Cir.1997)); *United States v. Campos,* No. 95–1377, 100 F .3d 945 (table), 1996 WL 83166 at *1 (2d Cir. Feb. 26, 1996) (“Even if [witness's] failure to identify [defendant] in a photospread constituted *Brady* material, the defense's opportunity to interview [the witness]—and its failure to call [the witness] ... at trial eliminates any possibility of prejudice.”), *cert. denied*, 518 U.S. 1027, 116 S.Ct. 2569 (1996); *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995) (“[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.”) (internal quotes omitted), *cert. denied,* 516 U.S. 1165, 116 S.Ct. 1056 (1996); *Busiello v. McGinnis,* 235 F.Supp.2d 179, 190 (E.D.N.Y.2002) (“The Second Circuit has explained that *Brady* is inapplicable ‘if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.” ’); *United States v. Fasciana,* 01 Cr. 00058, 2002 WL 31495995 at *1 (S.D.N.Y. Nov. 6, 2002) (“In most circumstances, the ‘Government may fulfill its *Brady* obligation by directing the defendant's attention to witnesses who may have exculpatory evidence. Once

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 25

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

the defendant is made aware of the existence of such witnesses, he may attempt to interview them to 'ascertain the substance of their prospective testimony,' or subpoena them if the Government does not intend to call them as witnesses at trial." ').

2. *Rosa's Alleged Cooperation Agreement Was Not Material Impeachment Evidence Since Rosa Did Not Testify at Skinner's Trial*

***22** Assuming *arguendo* that at the time of Skinner's trial Rosa had a cooperation agreement with the District Attorney's Office (specifically relating to Skinner's case) and the prosecutor improperly withheld this fact from Skinner and his counsel, Skinner's *Brady* claim still fails because a cooperation agreement with Rosa was not material to Skinner's trial.

The Supreme Court has emphasized four aspects of materiality. First, "[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1565–66 (1995) (citing, *inter alia, United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3380, 3383 (1985)).[FN27] Thus, non-disclosed "evidence is material 'if there is a *reasonable probability* that, had the evidence been disclosed to the defense, *the result of the proceeding would have been different.*" ' *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948 (1999) (quoting *United States v. Bagley,* 473 U .S. at 682, 105 S.Ct. at 3383) (emphasis added). [FN28] The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial." ' *Kyles v. Whitley,* 514 U.S. at 434, 115 S.Ct. at 1566 (quoting *United States v. Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).[FN29]

FN27. *Accord, e.g., Tankleff v. Senkowski,* 135 F.3d 235, 250 (2d Cir.1998); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *12 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), *aff'd,* 303 F.3d 411 (2d Cir.2002), *cert. denied,* 123 S.Ct. 1353 (2003); *Hoover v. Leonardo,* No. 91–CV–1211, 1996 WL 1088204 at *3 (E.D.N.Y. June 11, 1996).

FN28. *Accord, e.g., Kyles v. Whitley,* 514 U.S. at 433–34, 115 S.Ct. at 1565; *United States v. Maisonet,* No. 00–1488, 45 Fed. Appx. 74, 76, 2002 WL 31060361 at *1 (2d Cir. Sept. 17, 2002); *Mendez v. Artuz,* 2000 WL 722613 at *12.

FN29. *See also, e.g., Strickler v. Greene,* 527 U.S. at 289–90, 119 S.Ct. at 1953; *United States v. Diaz,* 176 F.3d 52, 108 (2d Cir.), *cert. denied,* 528 U.S. 875, 120 S.Ct. 181 (1999); *Tankleff v. Senkowski,* 135 F.3d at 250; *United States v. Amiel,* 95 F.3d 135, 144–45 (2d Cir.1996); *United States v. Payne,* 63 F.3d 1200, 1209 (2d Cir.1994), *cert. denied,* 516 U.S. 1165, 116 S.Ct. 1056 (1996); *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.), *cert. denied,* 488 U.S. 890, 109 S.Ct. 224 (1988); *Mendez v. Artuz,* 2000 WL 722613 at *12; *Orena v. United States,* 956 F.Supp. 1071, 1092 (E.D.N.Y.1997) (Weinstein, D.J.); *Hoover v. Leonardo,* 1996 WL 1088204 at *3.

Second, the sufficiency of the evidence is not the touchstone of materiality:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

> The second aspect of ... materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles v. Whitley,* 514 U.S. at 434–35, 115 S.Ct. at 1566.[FN30] "This means that the omission must be evaluated in the context of the entire record." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402 (1976); *accord, e.g., Mendez v. Artuz,* 2000 WL 722613 at *12.[FN31]

FN30. *Accord, e.g., Strickler v. Greene,* 527 U.S. at 290, 119 S.Ct. at 1952; *Mendez v. Artuz,* 2000 WL 722613 at *12; *Orena v. United States,* 956 F.Supp. at 1092; *Hoover v. Leonardo,* 1996 WL 1088204 at *3.

FN31. " 'If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness. But if there were fifty eyewitnesses, forty-nine of whom identified the defendant, and the prosecutor neglected to reveal that the other, who was without his badly needed glasses ... had said that the criminal looked something like the defendant but he could not be sure as he had only had a brief glance, the result might well be different." ' *United States v. Agurs,* 427 U.S. at 113 n. 21, 96 S.Ct. at 2402 n. 21; *accord, e.g., Mendez v. Artuz,* 2000 WL 722613 at *12.

***23** Third, once constitutional error has been established there is no need for harmless error review, since " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different' ... necessarily entails the conclusion that the suppression must have had " 'substantial and injurious effect or influence in determining the jury's verdict." " ' *Kyles v. Whitley,* 514 U.S. at 435, 115 S.Ct. at 1566.[FN32]

FN32. *Accord, e.g., Mendez v. Artuz,* 2000 WL 722613 at *13; *Orena v. United States,* 956 F.Supp. at 1092; *Hoover v. Leonardo,* 1996 WL 1088204 at *3.

Fourth, in determining materiality, the "suppressed evidence [is] considered collectively, not item by item." *Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. at 1567.[FN33]

FN33. *Accord, e.g., United States v. Persico,* 164 F.3d 796, 805 (2d Cir.), *cert. denied,* 120 S.Ct. 171 (1999); *Mendez v. Artuz,* 2000 WL 722613 at *13; *Orena v. United States,* 956 F.Supp. at 1092; *Hoover v. Leonardo,* 1996 WL 1088204 at *3.

"Suppressed impeachment evidence is 'material if the witness whose testimony is attached supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." ' *United States v. Diaz,* 176 F.3d at 108 (quoting *United States v. Wong,* 78 F.3d 73, 79 (2d Cir.1996)). [FN34]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

FN34. *Accord United States v. Avellino,* 136 F.3d 249, 256–57 (2d Cir.1998); *United States v. White,* Nos. 95–1567, 96–1091, 95–1696, 96–1083, 113 F.3d 1230 (table), 1997 WL 279972 at *12 (2d Cir.1997) ("Because [witness's] testimony was not the only evidence linking [defendant] to the crime, impeachment material against him was not material."), *cert. denied,* 523 U.S. 1085, 118 S.Ct. 1539 (1998); *Busiello v. McGinnis,* 235 F.Supp.2d 179, 191 (E.D.N.Y.2002) (Impeachment evidence is material under *Brady* if the witness to be impeached " 'supplied the only evidence linking the defendant to the crime,' or 'if the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." '); *Shabazz v. Artuz,* No. 97 CV 1704, 2002 WL 873319 at *3 (E.D.N.Y. Apr. 29, 2002) ("Impeachment evidence, such as the existence of cooperation agreements or promises, may be material where the witness in question supplies the only evidence linking the defendant to the crime."); *Lyon v. Senkowski,* 109 F.Supp.2d 125, 139 (W.D.N.Y. Aug. 7, 2000) ("Since [witness's] testimony did not directly link [petitioner] to the crime or provide an essential element of the offense, evidence impeaching him would not have been material under *Brady."* ).

Here, since Anibal Rosa did not testify at Skinner's trial and Skinner's counsel thus had no opportunity to impeach him, the existence of a cooperation agreement between Rosa and the District Attorney's office was not material. *See, e.g., United States v. Shandorf,* No. 01–1047, 20 Fed. Appx. 50, 53, 2001 WL 1178797 at *2 (2d Cir. Oct. 3, 2001) (information regarding government agent not material under *Brady* where agent "was not a witness at trial" and defendant "could not have permissibly called [him] as a hostile witness for the sole purpose of impeaching him."); *Mesterino v. United States,* 96 Civ. 2114, 90 Cr. 276, 1997 WL 528047 at *4 n. 6 (S.D.N.Y. Aug. 27, 1997) (Rejecting defendant's claim that the government improperly withheld the existence of a cooperation agreement with informant because informant's "statements were *not* offered as evidence, and therefore no testimony existed for the defense to impeach. Since the Government neither called [the informant] to testify nor presented his hearsay testimony for its truth, any cooperation agreement between the Government and [the informant] was irrelevant to the issues at trial.").[FN35]

FN35. *See also, e.g., Walker v. True,* No. 02–22, 2003 WL 21008657 at *10 (4th Cir. May 6, 2003) (statements to detective could not be characterized as impeachment evidence because declarant did not testify); *United States v. Williams,* 954 F.2d 668, 672 (11th Cir.1992) ("The law is clearly established that one may not introduce evidence to impeach a witness who does not testify ."); *cf. United States v. Sanchez,* 118 F.3d 192, 196–97 (4th Cir.1997) (District court did not abuse its discretion in limiting defendant's cross-examination of government agents regarding informant's cooperation agreement where informant "did not testify against [defendant]; the government did not call [the informant] as a witness and, ... [defendant] also did not call him to testify. Therefore, [the informant's] general dishonesty and credibility, to which details of his cooperation might be relevant, were not at issue in this case."); *Marino v. Miller,* No. 97–CV–2001, 2002 WL 2003211 at *6–7 (E.D.N.Y. Aug. 22, 2002) (Where witness did not testify about the identification procedure at trial, information prosecution allegedly withheld about the procedure would not have been impeachment material because "there was no opportunity for [petitioner] to impeach [the witness] with the alleged in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

consistency .").

Nor would any cooperation agreement have been material impeachment evidence to attack the credibility of Rosa's mother, aunt, and sister who testified at Skinner's trial. Anibal Rosa's aunt, Edith Miriam Velasquez, testified that she heard shots, looked out the window, saw Will Rodriquez fall to the ground and called the police; Anibal Rosa came to the scene shortly thereafter and "went crazy because [Rodriguez] was his friend" and started to cry. (Velasquez: Tr. 647–48.) Velasquez drove Rosa to the hospital, where they learned that Rodriguez was dead. (Velasquez: Tr. 650.) Velasquez testified that when they went outside, she saw Skinner and others. (Velasquez: Tr. 650–51.) Velasquez also testified that some time after Morales' shooting she overheard Skinner tell her nephew Rosa that Skinner tossed his gun onto a second floor roof. (Velasquez: Tr. 668.) Skinner's counsel asked Velasquez "do you believe that your testimony here today will help your nephew in some way?," and Velasquez responded that she was "just saying the truth, that's what's important." (Velasquez: Tr. 687.)

***24** Following Velasquez's testimony, outside the jury's presence, Skinner's counsel raised the issue of whether Anibal Rosa had a cooperation agreement (Tr. 695–701; *see* pages 36–37 above), and the judge noted that he had allowed defense counsel to question Velasquez about her knowledge of any cooperation agreement:

The Court: But let the record also reflect that at the sidebar I suggested, and you took my suggestion, that you ma[k]e an inquiry of this witness [Velasquez] as to whether her testimony may be influenced by a desire to benefit her nephew. That was put to the witness, and the only crucial thing with regard to that witness would be that question, if she was unaware of a cooperation agreement it would have been no benefit to you during cross-examination of her....

Ms. Stewart: I asked her if her testimony would benefit him. Her answer was along the lines [of], "I'm only here to tell the truth."

...

That doesn't necessarily mean her testimony isn't intended to benefit him....

The Court: That's true.

...

Well, for whatever reason, Ms. Stewart, you elected not to follow-up on that question.

...

[A.D.A.] Gagan: I want the record to reflect that I never discussed Anibal Rosa's case with this witness, Ms. Velasquez. I wouldn't do that, and I don't do that, and he's not under a cooperation agreement. He's not being called.

(Tr. 698–701.)

Anibal Rosa's sister, Brenda Rosa, and his mother, Manerva Rosa, provided rebuttal evidence to Skinner's character witnesses.[FN36] When Skinner's counsel asked Brenda Rosa if she thought that her "testimony here today in anyway may help [her brother Anibal] at this time?" Brenda Rosa responded, "[n]o ... [n]ot at all. He's already doing his time; it has nothing to do with today." (B. Rosa: Tr. 1563.) Brenda Rosa stated that although her brother had not yet been sentenced, it was her "belief" that he would be sentenced to "one and a half to four and a half" years based on "[t]he plea that [Anibal Rosa]" copped, "an agreement that was done way before ." (B. Rosa: Tr. 1563–64.) Upon the court's questioning, Brenda Rosa

confirmed that Anibal Rosa had a plea agreement in the case involving Skinner and was aware that her brother "could get more time because of what happened to him" after the agreement was made. (Rosa: Tr. 1564–65.) On re-direct, Assistant District Attorney Gagan clarified that the agreement Brenda Rosa referred to, under which Anibal Rosa would be sentenced to one and a half to four and a half years, was not with the District Attorney's Office but rather with Judge Altman. (Rosa: Tr. 1570–72.) Brenda Rosa testified that her brother Anibal was not currently talking to the District Attorney's Office, but she was unsure if he had in the past. (Rosa: Tr. 1572.)

FN36. No mention of a cooperation agreement was made during the testimony of Manerva Rosa, Rosa's mother. (M. Rosa: Tr. 1574–81.)

None of these witnesses supplied the *only* evidence linking Skinner to the crime, nor would the likely impact on the witnesses' credibility have undermined a critical element of the prosecution's case. *See, e.g., United States v. Diaz,* 176 F.3d at 108. Brenda and Manerva Rosa's testimony was limited to Skinner's reputation for violence, in rebuttal to defense witness's testimony about his reputation for peacefulness. Neither witness' testimony referred to an element of any of the crimes with which Skinner was charged. Even if these witnesses had been completely discredited by Anibal Rosa's cooperation agreement or otherwise, the impact on their credibility would not have undermined a critical element of the State's case, given the corrobative testimony of eyewitnesses Juan Rivera, Dominick Rosado, and the victim himself, Jehu Morales.

***25** In conclusion, the Court sees no reasonable probability that the result of Skinner's trial would have been different had the State disclosed Anibal Rosa's (alleged) cooperation agreement with the District Attorney's Office.

3. *Skinner's Claim that Police Reports Were Withheld is a* Rosario *Claim Not Cognizable on Habeas Review, But Even If Considered a* Brady *Claim, it is Too Speculative*

Skinner's petition alleges that "the prosecutor never turned over any of the DD'5 reports or police memo's for the arresting detectives under indictments # 4378/96 and # 8190/96." (Dkt. No. 1: Pet. ¶ 12(C).) Aside from a conclusory assertion that the missing reports "surely would have contradicted these witnesses under cross-examination" (Dkt. No. 19: Traverse at 9), Skinner does not allege that the reports would have been material impeachment or exculpatory evidence under *Brady.* As a result, he is essentially raising violation of New York's *Rosario* rule,[FN37] which is not cognizable on habeas review.

FN37. *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, *cert. denied,* 368 U.S. 866, 82 S.Ct. 117 (1961). The *Rosario* rule has been codified at C.P.L. § 240.45(1)(a), which provides:

> [T]he prosecutor shall ... make available to the defendant: (a) Any written or recorded statement, including any testimony before a grand jury and an examination videotaped pursuant to section 190.32 of this chapter, made by a person whom the prosecutor intends to call as a witness at trial, and which relates to the subject matter of the witness's testimony[.]

While the *Brady* rule that due process requires prosecutors to provide materially exculpatory evidence to the defense (*see* pages 34–35 above) and New York's *Rosario* rule, requiring disclosure of witness statements in criminal cases, overlap considerably, they are not identical. *See, e.g., Landy v. Costello,* No. 97–2433, 141 F.3d 1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998) (*Rosario* obliga-

Page 30

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

tions arise solely under state law); *Pena v. Fischer,* 00 Civ. 5984, 2003 WL 1990331 at *10 (S.D.N.Y. Apr. 30, 2003) (" '[F]ederal courts have consistently held that Rosario claims are not subject to federal habeas corpus review because they arise exclusively under state law."); *Bynum v.. Duncan,* 02 Civ. 2124, 2003 WL 296563 at *9 n. 5 (S.D.N.Y. Feb. 12, 2003) (*Rosario* claims are not cognizable on habeas review); *Gumbs v. Kelly,* 97 Civ. 8755, 2000 WL 1172350 at *6 (S.D.N.Y. Aug. 18, 2000) (Peck, M.J.) ( & cases cited therein); *Sutherland v. Walker,* 97 Civ. 4432, 1999 WL 1140870 at *9 (S.D.N.Y. Dec. 10, 1999) (a prosecutor's failure to turn over "*Rosario* material," unlike failure to provide *Brady* material, is not reviewable by a federal habeas court); *Green v. Artuz,* 990 F.Supp. 267, 274 (S.D.N.Y.1998) ("[F]ailure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of a state law"); *Bernard v. Stinson,* 97 Civ. 1873, 1998 WL 40201 at *4 (S.D.N.Y. Jan. 30, 1998); *Copes v. Schriver,* 97 Civ. 2284, 1997 WL 659096 at *4 (S.D.N.Y. Oct. 22, 1997) (*Rosario* violation does not establish a constitutional violation); *Morrison v. McClellan,* 903 F.Supp. 428, 429 (E.D.N.Y.1995) ("Any error under *Rosario* at trial would be a violation of state law, and, thus, not subject to review under a petition for a writ of habeas corpus.").

Even if the Court were to construe Skinner's *Rosario* claim as a *Brady* claim, it would fail because he provides no evidence to support his allegations.[FN38] *See, e.g., United States v. Love,* No. 02–2953, 2003 WL 1796009 at *2 (7th Cir. Mar. 27, 2003) ("[A]ny *Brady* claim would be speculative and therefore frivolous [where] there is no evidence in the record that the prosecution suppressed [police] reports or that they even existed."); *Chandras v. McGinnis,* No. 01 Civ. 2519, 2002 WL 31946711 at *5 (E.D.N.Y. Nov. 13, 2002) ("In the absence of credible evidence contradicting the ADAs' denials" that a cooperation agreement existed, petitioner's *Brady* claims denied as meritless.); *Ferguson v. Walker,* 00 Civ. 1356, 2002 WL 31246533 at *13 (S.D.N.Y. Oct. 7, 2002) (Swain, D.J. & Peck, M.J.) (Petitioner's "claim of withheld *Brady* material is without evidence and speculative and must be rejected.") (citing cases); *Cruz v. Artuz,* No. 97–CV–2508, 2002 WL 1359386 at *14 (E.D.N.Y. June 24, 2002) (*Brady* claim dismissed as "speculative, conclusory, and unsupported" where there was "nothing in the record, nor does [petitioner] proffer anything, to suggest that the [allegedly suppressed] statements exist."); *Palmer v. Senkowski,* 99 Civ. 9634, 2002 WL 54608 at *7 (S.D.N.Y. Jan. 15, 2002) (where the record contained no evidence of an undisclosed agreement with prosecution witness, "failure to disclose the alleged agreement cannot serve as a ground for habeas relief."); *United States ex rel. Whitehead v. Page,* No. 96 C 5013, 2000 WL 343209 at *17 (N.D.Ill. Mar. 30, 2000) (Petitioner "fails to present this court with any proof that the prosecution withheld evidence; rather, he merely speculates that there was other evidence. Mere speculation is not enough to show a *Brady* violation."), *aff'd,* 263 F.3d 708 (7th Cir.2001), *cert. denied,* 534 U.S. 1116, 122 S.Ct. 927 (2002); *Franza v. Stinson,* 58 F.Supp.2d 124, 154 (S.D.N.Y. July 1, 1999) (Peck, M.J.) (Petitioner's "claim of withheld *Brady* material is speculative, conclusory and unsupported, and thus must be rejected.").[FN39]

FN38. Skinner's appellate counsel aptly explained the weakness in Skinner's *Rosario* claim to him:

> As for the *Rosario*-withheld DD5's claim, you have not raised this issue in a way that I can pursue it on appeal. A viable claim must make some showing that a specific document was withheld and that the failure to turn over the document prejudiced you. I have read through your 440 and 330 papers several times. I do not see any clear allegation that any specific DD5's were withheld from you....

> If you continue to believe there is a *Ro-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

> *sario* violation in your case, you must try a FOIL request and if you come up with some withheld document, then do another 440 and argue how the withheld document prejudiced you.
>
> However, it is entirely possible that once the first indictment was pending that the police and or trial assistant stopped writing down what Morales and the others were saying to them during interviews and that is why there is no additional DD–5 for the second indictment. As long as that is possible, the court will not assume from the lack of documents that some document out there is being withheld from you.
>
> For this reason, I am not planning to add anything to the brief regarding withheld DD5's.

(Dkt. No. 17: Skinner C.P.L. § 460.15 Motion to 1st Dep't, Ex. A: 8/2/99 Letter from Appellate Counsel to Skinner.)

Skinner points to a response to one of his many FOIL requests, which shows that DD5s for Rosado and Rivera could not be located and that the DD5 for Jehu Morales was "denied in that release of such would endanger the life and safety of any person." (Dkt. No. 19: Traverse Ex. X: 9/12/02 Police Dep't Legal Bureau FOIL Response.) The absence of a report, however, is not evidence that any report was improperly withheld from Skinner.

FN39. *See also, e.g., United States v. Walker,* No. 94–CR–328, 1998 WL 760260 at *3–4 (N.D.N.Y. Oct. 30, 1998) (denying defendant's motion for a new trial based upon withholding of *Brady* evidence, because "[d]efendant's claim of prosecutorial misconduct based on allegations that the government withheld material evidence ... is speculative"); *Harris v. United States,* 9 F.Supp.2d 246, 275 (S.D.N.Y.1998) (denying petitioner's § 2255 habeas petition based upon withheld evidence because "the government does not bear the burden of establishing that documents were *not* withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [petitioner]. Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [petitioner] to relief.") (citations omitted); *United States v. Upton,* 856 F.Supp. 727, 746 (E.D.N.Y.1994) ("As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under *Brady v. Maryland* ... is not enough to establish that the government has, in fact, failed to honor its discovery obligations.... The government is under no obligation to turn over that which it does not have."); *Shuman v. Wolff,* 543 F.Supp. 104, 110 (D.Nev.1982) ("Petitioner ... baldly asserts, without any additional support or argument, that his conviction was obtained due to the prosecution's failure to provide him favorable evidence (*i.e., Brady* material) after a timely request for discovery was made. Where a habeas petitioner does not identify or otherwise at least generally specify what evidence was allegedly wrongfully withheld, no relief is available on those grounds."); *United States ex rel. Jiggetts v. Follette,* 308 F.Supp. 468, 471 (S.D.N.Y 1970) (dismissing § 2255 habeas petitioner's *Brady* violation claim because "[p]etitioner is engaging in mere unsupported speculation. There is a total lack of any support for his contention that the prosecution suppressed evidence favorable to petitioner and material to the question of his

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

guilt."), *aff'd*, 446 F.2d 114 (2d Cir.1971).

***26** Accordingly, Skinner's *Brady* habeas claims are without merit and should be denied.

IV. *SKINNER'S DOUBLE JEOPARDY HABEAS CLAIM SHOULD BE DENIED BECAUSE HE HAS FAILED TO REBUT THE STATE COURT'S FINDING THAT THE INDICTMENTS WERE PROPERLY JOINED*

Skinner's habeas petition alleges that he was subjected to Double Jeopardy in violation of the Fifth Amendment because "[t]he People presented the matter under indictment # 8109/96 to a grand jury with perjured false testimony and when defense counsel on September 30, 1996 revealed before the court that all the complaining witnesses were in fact incarcerated at the time of the alleged threats the People dismissed the matter 11 days later but never released this petitioner and thereafter consolidated the two indictments for trial ." (Dkt. No. 1: Pet.¶ 12(D).)

Skinner first raised this Double Jeopardy claim in his July 1997 C.P.L. § 440 motion, alleging that indictment number 8190/96 was dismissed before trial and therefore improperly joined with indictment number 4378/96. (Pet. Ex. C: Skinner 7/12/97 C.P.L. § 440 Aff. ¶¶ 5, 8.) With this C.P.L. § 440 motion, Skinner included, *inter alia,* (1) an incorrect (and later corrected) version of his rap sheet, dated January 24, 1997, listing indictment 8190/96 as having been "dismissed" (Pet. Ex. C: 1/24/97 Rap Sheet at 8) and "sealed upon termination of criminal action in favor of the accused CPL 160.50" on October 15, 1996 (1/24/97 Rap Sheet at 9); (2) a certificate from the Clerk of the New York Supreme Court, dated April 14, 1997, regarding indictment number 8190/96 and stating that "on February 21, 1997, [Skinner] was tried and found guilty to the crime of tampering with a witness in the fourth degree ... and found not guilty to the crimes of intimidating a witness in the third degree ..." (Pet. Ex. C: Miscellaneous Certificate No. 13867); (3) an April 18, 1997 letter to Skinner from the New York County Supreme Court stating that the "Division of Criminal Justice Services has been notified to correct the information recorded on [Skinner's] rap sheet for indictment numbers 8151–96 and 8190–96" (Pet. Ex. C: 4/18/97 Sup.Ct. N.Y. Co. Letter); and (4) an amended rap sheet, dated May 14, 1997, listing Skinner as "convicted upon a plea of guilty" of fourth-degree tampering with a witness and "acquitted" of third degree intimidation of a witness for indictment number 8190/96 on February 21, 1997 (Pet. Ex. C: 5/14/97 Rap Sheet).

The trial court summarily denied Skinner's C.P.L. § 440 motion in an order entered on September 22, 1997. (Dkt. No. 16: Israel Aff. Ex. C: 9/22/97 Order.) Skinner's C.P.L. § 440 motion appeal was consolidated with his direct appeal. (*See* pages 12–13 above.) The First Department upheld the trial court's denial of Skinner's C.P.L. § 440 motion, holding that Skinner's "motion to vacate judgment was properly denied (*see,* CPL 440.30[4][d] )." *People v. Skinner,* 269 A.D.2d 202, 203, 704 N.Y.S.2d 18, 20 (1st Dep't 2000) (quoted at pages 14–15 above).

***27** C.P.L. § 440.30(4)(d) provides that "[u]pon considering the merits of the motion, the court may deny it without conducting a hearing if ... [a]n allegation of fact essential to support the motion (i) is contradicted by a court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true." C.P.L. § 440.30(40(d).

There is a split of authority within the Second Circuit as to whether denial of a motion pursuant to C.P.L. § 440.30(4)(d) is an "independent and adequate" state procedural bar. Some district court decisions in the Second Circuit have treated the denial of a § 440 motion pursuant to § 440.30(4)(d) as a procedural bar to habeas review. *E.g., Marsh v. Ricks,* 02 Civ. 3449, 2003 WL 145564 at *6–7 & n. 7 (S.D.N.Y.

Jan. 17, 2003) ("[B]ecause the denial of a motion to vacate a conviction pursuant to [C.P.L.] § 440.30(4) constitutes reliance on an independent and adequate state law ground, our review of petitioner's claim is barred by this procedural default absent a showing of a valid excuse.") (citing *Roberts v. Scully,* 875 F.Supp. 182, 193 n. 7 (S.D.N.Y.), *aff'd,* 71 F.3d 406 (2d Cir.1995)); *Ahmed v. Portuondo,* No. 99 CV 5093, 2002 WL 1765584 at *1–2 (E.D.N.Y. July 26, 2002) (Where "trial court, on the CPL § 440 motion, ... relied on the adequate and independent state ground that petitioner failed to support [his] claim with any evidence or sworn affidavits beyond his own," citing C.P.L. § 440.30(4)(d), petitioner's habeas claim "is subject to a procedural bar."); *Barton v. Walker,* 99 Civ. 12016, 2001 WL 262692 at *3 (S.D.N.Y. Mar. 15, 2001) (preliminary finding that petitioner's claim procedurally barred where state court denied claim as " 'unsupported beyond the conclusory allegations offered by the defendant' ... pursuant to CPL § 440.30(4)(d)."); *Dunavin v. Leonardo,* No. 95–CV–296, 1997 WL 151771 at *12 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J.) (state court's denial of claim with citation to C.P.L. § 440.30(4)(d) "constitutes the invocation of a procedural bar to a petitioner's [habeas] claims.").[FN40]

FN40. *See also, e.g., Pachay v. Strack,* No. 94–CV–3169, 1995 WL 479708 at *4 (E.D.N.Y. Aug. 4, 1995) (Where Appellate Division denied petitioner's § 440 claims "because they were 'unsupported by any other affidavit or evidence' .... [and] explicitly invoked § 440.30(4)(d) as a bar to petitioner's claims ..., these claims are procedurally barred."); *cf. Shaw v. Artuz,* 99 Civ. 9754, 2001 WL 1301735 at *3–4 (S.D.N.Y. Oct. 19, 2001) (Petitioner procedurally defaulted his claim by failing to comply with C.P.L. § 440.30(4)(b), "which requires appellants to support their allegations with sworn statements. By failing to conform with this state procedural rule, [petitioner] defaulted this claim. Indeed, the state court clearly and expressly barred his claim under New York law for that reason."); *White v. Keane,* 00 Civ. 6202, 2001 WL 699053 at *2 (S.D.N.Y. June 21, 2001) ("a violation of [C.P.L. § 440.30(4)(b) ] would create a procedural bar"); *Roberts v. Scully,* 875 F.Supp. at 192–93 n. 9 (denial under § 440.30(4)(b) due to inadequacy of petitioner's papers would be an independent and adequate state law ground).

Other decisions, however, disagree and find that denial pursuant to C.P.L. § 440.30(4)(d) is a decision on the merits. *E.g., Lou v. Mantello,* No. 98–CV–5542, 2001 WL 1152817 at *9 n. 9 (E.D.N.Y. Sept. 25, 2001) (claims rejected pursuant to §§ 440.30(4)(b) and 440.30(4)(d) were not procedurally barred; state's argument that the § 440 court's denial was based on an adequate and independent state ground was "based on an erroneous interpretation of [these sections], which in fact provide that a trial court may deny a motion to vacate a judgment of conviction only 'upon considering the merits.' ") (collecting cases); *Ortiz v. Keohane,* No. 94–CV–0124, 1995 WL 669904 at *4 n. 5 (E.D.N.Y. Nov. 5, 1995) (same); *Muhammad v. Kirk,* 90 Civ. 1667, 1993 WL 37502 at *4 & n. 5 (S.D.N.Y. Feb. 8, 1993); *see also Smart v. Scully,* 787 F.2d 816, 820 (2d Cir.1986) (state court's denial of pro se defendant's § 440 motion for failure to comply with § 440.30 by omitting sworn allegations was not " 'an adequate and independent state ground' warranting a federal habeas court's refusal to consider the underlying federal issues").

***28** The Court agrees with the reasoning of Judge Gleeson's decision in *Lou v. Matello,* 2001 WL 1152817 at *9 n. 9, that because C.P.L. § 440.30 refers to the procedures for deciding C.P.L. § 440 motions, and C.P.L. § 440.30(4) specifically states that *"[u]pon considering the merits of the motion,* the court may deny it without conducting a hearing" if certain conditions exist, that is a merits based decision, not a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

procedural bar. Indeed, the fact that C.P.L. § 440.30(3) *requires* a court to *grant* a C.P.L. § 440 motion without a hearing if certain requirements are met strongly suggests that C.P.L. § 440.30(4)'s provisions are not procedural. The Court therefore turns to the merits of Skinner's claim.[FN41]

FN41. *Cf.*, *Jones v. Spitzer,* 01 Civ. 9754, 2003 WL 1563780 at *46 (S.D.N.Y. Mar. 26, 2003) ("Some case law suggests that a violation of CPL § 440.30(4)(b) 'create[s] a procedural bar,' and thus precludes habeas relief ... However, because there is [other] authority holding that the denial of a claim based on CPL § 440.30(4)(b) fails to constitute an adequate and independent state ground," court reviewed claim on the merits.); *Palmer v. Senkowski,* 99 Civ. 9634, 2002 WL 54608 at *8 n. 2 (S.D.N.Y. Jan 15, 2002) (Noting disagreement among district courts on whether § 440.30(4)(d) is a procedural bar, habeas court found it "unnecessary to determine if [denial under § 440.30(4)(b) ] is an independent and adequate state procedural ground" because petitioner's claim lacked merit.).

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This prohibition applies to state prosecutions through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 2062 (1969).[FN42]

FN42. *Accord, e.g., Monge v. California,* 524 U.S. 721, 118 S.Ct. 2246, 2250 (1998); *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076 (1969), *overruled on other grounds, Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201 (1989); *Gumbs v. Kelly,* 97 Civ. 8755, 2000 WL 1172350 at *14 (S.D.N.Y. Aug. 18, 2000) (Peck, M.J.); *Morris v. Reynolds,* 99 Civ. 5439, 1999 WL 1565179 at *9 (S.D.N.Y. Dec. 16, 1999) (Peck, M.J .), *rev'd,* 107 F.Supp.2d 421 (S.D.N.Y.2000) (Marrero, D.J.), *rev'd,* 264 F.3d 38, 51 (2d Cir.2001), *cert. denied,* 536 U.S. 915, 122 S.Ct. 2381 (2002).

The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. at 717, 89 S.Ct. at 2076 (fn. & citations omitted).[FN43]

FN43. *Accord, e.g., Monge v. California,* 118 S.Ct. at 2250; *Ohio v. Johnson,* 467 U.S. 493, 498, 104 S.Ct. 2536, 2540 (1984); *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225 (1977); *Boyd v. Meachum,* 77 F.3d 60, 63 (2d Cir.), *cert. denied,* 519 U.S. 838, 117 S.Ct. 114 (1996); *United States v. LoRusso,* 695 F.2d 45, 53 (2d Cir.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525 (1983); *Gumbs v. Kelly,* 2000 WL 1172350 at *14; *Morris v. Reynolds,* 1999 WL 1565179 at *9.

The provision "serves principally as a restraint on courts and prosecutors." *Brown v. Ohio,* 432 U.S. at 165, 97 S.Ct. 2225. "[T]he bar to retrial following acquittal or conviction ensures that the State does not make repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence." *Ohio v. Johnson,* 467 U.S. at 498–99, 104 S.Ct. at 2540. Importantly, the Double Jeopardy Clause "represents a constitutional policy of finality for the defendant's benefit in ... criminal proceedings." *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554 (1971).[FN44]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN44. *Accord, e.g., Brown v. Ohio,* 432 U.S. at 165, 97 S.Ct. at 2225; *see generally, e.g., Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223 (1957) ("[T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."); *Gumbs v. Kelly,* 2000 WL 1172350 at *14; *Morris v. Reynolds,* 1999 WL 1565179 at *9.

Pursuant to the AEDPA, " 'a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." ' *Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001) (quoting 28 U.S.C. § 2254(e)(1)).[FN45] As the Second Circuit recently stated, a federal habeas court should

FN45. *Accord, e.g., Tibbs v. Greiner,* 01 Civ. 4319, 2003 WL 1878075 *8 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *10 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.).

> review the state court's findings only to determine whether they were unreasonable in light of the evidence presented, 28 U.S.C. § 2254(d)(2), or whether the presumption that they are correct was rebutted by "clear and convincing" evidence, 28 U.S.C. § 2254(e)(1).... In accordance with 28 U.S.C. § 2254, as modified by AEDPA, our review of the state court determinations of facts is limited to an inquiry into whether the conclusion of the state trial court was unreasonable based on the evidence presented and whether petitioner has presented evidence in the District Court that clearly and convincingly rebuts the presumption that the state court's factual findings are correct.

***29** *Channer v. Brooks,* 320 F.3d 188, 195–96 (2d Cir.2003); *accord, e.g., Miller–El v. Cockrell,* 123 S.Ct. 1029, 1041 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."); *Cotto v. Herbert,* No. 01–2694, 2003 WL 1989700 at *10 (2d Cir. May 1, 2003) ("Under 28 U.S.C. § 2254(e)(1), the fact-findings of the trial court are subject to a 'presumption of correctness'.... On habeas review, the petitioner has the burden of 'rebutting the presumption of correctness by clear and convincing evidence." ') (citing 28 U.S.C. § 2254(e)(1)); *Drake v. Portuondo,* 321 F.3d 338, 345 (2d Cir.2003) ("Under AEDPA, a state court's factual findings enjoy a presumption of correctness and may not be disturbed except upon a showing of 'clear and convincing evidence." '); *Davis v. Kelly,* 316 F.3d 125, 127 (2d Cir.2003) ("Under the AEDPA, we must accept [the state court's] finding of fact unless it is controverted by 'clear and convincing evidence." ').[FN46]

FN46. *See also, e.g., LanFranco v. Murray,* 313 F.3d 112, 117 (2d Cir.2002) ("In reviewing habeas petitions, we must presume the state court's findings of fact are correct, unless the petitioner meets 'the burden of rebutting th[is] presumption of correctness by clear and convincing evidence.") (brackets in original); *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002) ("We presume that the state court's factual findings are correct unless they are rebutted by clear and convincing evidence."); *Yung v. Walker,* 296

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.3d 129, 134 (2d Cir.2002) ("We must presume the state court's factual findings to be correct and may overturn those findings only if petitioner offers clear and convincing evidence of their incorrectness."); *Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir.2002) ("[T]he AEDPA instructs that state court findings of fact 'shall be presumed correct,' rebuttable only upon a showing of 'clear and convincing evidence.' '); *Tibbs v. Greiner,* 2003 WL 1878075 at *8; *Bynum v. Duncan,* 02 Civ. 2124, 2003 WL 296563 at *6 (S.D.N.Y. Feb. 12, 2003) ("Under AEDPA, this Court must presume the state court's factual findings to be correct and may overturn those findings only if the petitioner offers clear and convincing evidence of their incorrectness."); *Fabian v. Herbert,* 00 Civ. 5515, 2003 WL 173910 at *5 (S.D.N.Y. Jan. 23, 2003) ("In reviewing state court factual determinations, the Court 'must apply a presumption of correctness ... unless rebutted by clear and convincing evidence.' ') (quoting *Rodriguez v. Bennett,* 98 Civ. 580, 1998 WL 765180 at *3 (S.D.N.Y. Nov. 2, 1998)); *Marsh v. Ricks,* 02 Civ. 3449, 2003 WL 145564 at *2 (S.D.N.Y. Jan. 17, 2003) ("State court fact findings underlying habeas claims enjoy a strong presumption of correctness that can only be rebutted by 'clear and convincing evidence.' '); *Brown v. Costello,* 00 Civ. 4734, 2003 WL 118499 at *8 (S.D.N.Y. Jan. 13, 2003) ("State court factual determinations must be presumed correct unless the petitioner is able to rebut them with clear and convincing evidence."); *Grate v. Stinson,* 224 F.Supp.2d 496, 501 (E.D.N.Y.2002) (Post–AEDPA, "a federal court conducting a collateral review must still presume state court findings of fact to be correct, 28 U.S.C. § 2254(e), although it is probably harder now [than pre-AEDPA] for a habeas petitioner to overcome this presumption, as the petitioner must now present clear and convincing evidence that the finding of fact was erroneous, *id."* ).

The First Department held that Skinner's motion was properly denied without a hearing under C.P.L. § 440.30(4)(d). *People v. Skinner,* 269 A.D.2d 202, 203, 704 N.Y.S.2d 18, 20 (1st Dep't 2000). That means that "[a]n allegation of fact essential to support the motion (i) is contradicted by a court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence ..." C.P.L. § 440.30(4)(d).

The factual allegation essential to Skinner's double jeopardy claim is whether indictment number 8190/96 was dismissed before it was consolidated with 4378/96. The First Department's reliance on C.P.L. § 440.30(4)(d) indicates that Skinner's allegation that indictment 8190/96 was dismissed was contradicted by a court record, such as Miscellaneous Certificate 13867 or Skinner's May 14, 1997 Amended Rap Sheet (Dkt. No. 1: Pet. Ex C: Miscellaneous Certificate No. 13867; Pet. Ex. C: 5/14/97 Rap Sheet), or was made solely by Skinner and unsupported by any other evidence. As the State noted, "[i]ndictment # 8190/96 was the indictment that superseded indictment # 8151/96. While it is true that indictment # 8151/96 was dismissed, it was dismissed only after it was superseded by indictment # 8190/96." (Dkt. No. 1: Pet. Ex. F, ex. e: 4/11/97 A.D.A. Gagan Response to Skinner Motion to Set Aside Verdict at 11.) Moreover, as the State later noted, "[t]he trial court was at the trial and obviously knew, notwithstanding the DCJS error, that it had not dismissed the indictment and that defendant had been convicted under it." (Dkt. No. 17: Skinner Judicial Disqualification Motion Ex. B: 4/25/00 State Letter to N.Y. Ct.App. at 2.)

***30** Whether indictment 8190/96 was dismissed before consolidation with 4378/96 is a matter of historical fact subject to the presumption of correctness

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

under 28 U.S.C. § 2254(e)(1). Skinner has not presented clear and convincing evidence to rebut the C.P.L. § 440 court's and First Department's factual conclusion, which this Court must otherwise presume to be correct. [FN47] 28 U.S.C. § 2254(e); *see, e.g., Tibbs v. Greiner,* 2003 WL 1878075 at *10; *Avincola v. Stinson,* 60 F.Supp.2d 133, 164 (S.D.N.Y.1999) (Scheindlin, D.J. & Peck, M.J.); *Rivas v. Keane,* 97 Civ. 2560, 1998 WL 804741 at *3 (S.D.N.Y. Nov. 17, 1998) (Parker, D.J.); *Rodriguez v. Bennett,* 1998 WL 765180 at *3. Furthermore, this Court cannot say that the state courts' factual determination that indictment number 8190/96 was not dismissed prior to consolidation was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Accordingly, Skinner's habeas claim that he was subjected to double jeopardy (Pet.¶ 12(D)) should be denied.

FN47. Indeed, in Skinner's brief to the First Department appealing the denial of his § 440 motion, Skinner's counsel conceded that the Division of Criminal Justice Services ("DCJS") had amended Skinner's criminal history record to reflect that indictment 8190/96 had not been dismissed. (Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 70.) Skinner tries to shift his burden to the State, arguing that "[i]f the record contradicts petitioner's allegations that indictment # 8190/96 wasn't [sic] dismissed [ ] and sealed why didn't Respondent attach an official document to refute these allegations once and for all, instead of her self serving baseless remarks." (Dkt. No. 19: Traverse at 10.)

V. *SKINNER'S CONFRONTATION CLAUSE CLAIM SHOULD BE DENIED BECAUSE HE HAS FAILED TO REBUT THE STATE COURT'S FINDING THAT SKINNER'S MISCONDUCT CAUSED THE WITNESS'S UNAVAILABILITY*

Skinner argues that his Confrontation Clause rights were violated when the state trial court allowed Rosado's grand jury testimony to be read into the record at trial, depriving Skinner of the opportunity to cross-examine Rosado. (Dkt. No. 19: Traverse at 50–51 .) [FN48] The trial court held a *Sirois* hearing [FN49] (Tr. 344–73) outside the jury's presence at which Rosado testified that he would rather go to jail for contempt than testify at Skinner's trial because he believed that testifying would threaten his and his family's safety. (Rosado: Tr. 353.) An investigator from the District Attorney's Office testified that Rosado "was adamant that he would refuse" to testify in court because "he was in fear of his life, [and] that something would happen to him should he testify ." (Connelly: Tr. 355.) Rosado told the officer that Skinner had threatened him in the past and that even though Skinner was in jail, Skinner's family and friends "would get to [Rosado] and [Rosado] would end up being killed." (Connelly: Tr. 356.)

FN48. Although Skinner did not raise this claim in his petition but only in his Traverse, the Court will liberally construe his pro se petition to include this claim. *See, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *5 n. 4 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *5 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at *7 (S.D.N.Y. July 19, 2000) (Peck, M.J .).

FN49. The hearing is named for the defendant in *People v. Sirois,* the criminal case considered in *In re Holtzman v. Hellenbrand,* 92 A.D.2d 405, 415, 460 N.Y.S.2d 591, 597 (2d Dep't 1983), which held that

> (1) whenever the People allege specific facts which demonstrate a "distinct possibility" ( *United States v. Mastrangelo,* 662 F.2d 946, 952 [ (2d Cir.1982) ] ), that a criminal defendant's misconduct has in-

> duced a witness' unlawful refusal to testify at trial or has caused the witness' disappearance or demise, the People shall be given the opportunity to prove that misconduct at an evidentiary hearing;
>
> (2) at said hearing the burden shall be upon the People to prove defendant's misconduct by clear and convincing evidence; ... and
>
> (3) upon an affirmative finding by the court on the issue of defendant's misconduct, the defendant will be deemed to have waived any objection to the admissibility of the witness' prior Grand Jury testimony and said testimony may be admitted as direct evidence at the defendant's trial.
>
> *See also People v. Geraci,* 85 N.Y.2d 359, 363 n. 1, 625 N .Y.S.2d 469, 471 n. 1 (1995).

At the conclusion of the hearing, the trial court made the factual finding that Rosado's "refusal to testify is based upon actual threats of bodily harm to the witness, and at least in the perception of the witness, to members of his family, which threats were directly initiated and caused by this defendant." (Tr. 364.) The trial court found that Rosado "acknowledged that his refusal [to testify] could result in his incarceration" and indicated that he would nevertheless refuse to testify. (Tr. 364.) Rosado "indicated that he had testified in the Grand Jury only because he did not realize" that was the reason he was brought downtown and "implicitly, he was regretting having testified before the Grand Jury." (Tr. 364–65.) The trial court concluded as a matter of law that the State made the required showing of "clear and convincing evidence" under *People v. Geraci,* 85 N.Y.2d at 367, 625 N.Y.S.2d at 473–74, that Rosado's unavailability was procured by Skinner's threats to Rosado, and that "since the unavailability of this witness to testify at trial was procured by the misconduct of the defendant," the court would permit the State to read into evidence Rosado's grand jury testimony. (Tr. 365.)

***31** On appeal to the First Department, Skinner argued that the trial court erred in admitting Rosado's grand jury testimony because: (1) the prosecution failed to prove by clear and convincing evidence that Skinner was responsible for Rosado's refusal to testify, and even if it did, (2) the court should have first taken reasonable steps to compel Rosado to testify before admitting his grand jury testimony. (Dkt. No. 1: Pet. Ex. A: Skinner 1st Dep't Br. at 52–57.)

The First Department held:

> The court properly exercised its discretion in admitting the Grand Jury testimony of an eyewitness, since the People proved by clear and convincing evidence, following a hearing, that the witness's unavailability at trial was caused by threats made by defendant. The court properly exercised its discretion in declining defendant's request that it attempt to compel the witness to testify, since the witness had already testified and he was aware of his legal obligation to testify but that his fear was so intense that he would rather go to jail.

*People v. Skinner,* 269 A.D.2d 202, 202–03, 704 N.Y.S.2d 18, 19–20 (1st Dep't 2000).

The Confrontation Clause of the Sixth Amendment affords the accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment's Confrontation Clause is applicable in state criminal trials via the Fourteenth Amendment. *E.g., Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076 (1965); *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 1068 (1965).[FN50] The primary purpose of the Confrontation Clause is to prevent out-of-court statements from being used

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

against a criminal defendant in lieu of in-court testimony subject to the scrutiny of cross-examination. *E.g., Douglas v. Alabama,* 380 U.S. at 418–19, 85 S.Ct. at 1076–77.[FN51]

FN50. *See also, e.g., Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *11 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *James v. People of the State of New York,* 99 Civ. 8796, 2001 WL 706044 at *9 (S.D.N.Y. Jun. 8, 2001) (Peck, M.J.); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *29 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), *aff'd,* 303 F.3d 411 (2d Cir.2002), *cert. denied,* 123 S.Ct. 1353 (2003); *Avincola v. Stinson,* 60 F.Supp.2d 133, 153 (S.D.N.Y.1999) (Scheindlin, D.J. & Peck, M.J.).

FN51. *See also, e.g., Cotto v. Herbert,* No. 01–2694, 2003 WL 1989700 at *5 (2d Cir. May 1, 2003); *Ryan v. Miller,* 303 F.3d 231, 247 (2d Cir.2002); *Mitchell v. Hoke,* 930 F.2d 1, 2 (2d Cir.1991); *Aramas v. Donnelly,* 2002 WL 31307929 at *11; *James v. People,* 2001 WL 706044 at *9; *Mendez v. Artuz,* 2000 WL 722613 at *29; *Avincola v. Stinson,* 60 F.Supp.2d at 153.

"Although the confrontation right is of constitutional dimension, it is not absolute ... [and] it may be waived by the defendant's misconduct." *United States v. Dhinsa,* 243 F.3d 635, 651 (2d Cir.) (collecting cases recognizing circumstances in which a defendant waives his confrontation right), *cert. denied,* 534 U.S. 897, 122 S.Ct. 219 (2001).[FN52] The Second Circuit applies "the waiver-by-misconduct rule in cases where the defendant has wrongfully procured a witness's silence through threats, actual violence, or murder." *Cotto v. Herbert,* 2003 WL 1989700 at *8; *accord, e.g., id.* at *10 ("witness intimidation is the paradigmatic example of the type of 'misconduct' that can lead to the forfeiture of confrontation rights"); *United States v. Dhinsa,* 243 F.3d at 651–52; *United States v. Miller,* 116 F.3d at 668; *United States v. Thai,* 29 F.3d at 814; *Silverman v. Edwards,* No. 99–CV–7792, 2002 WL 257820 at *10 (E.D.N.Y. Jan. 28, 2002); *Geraci v. Senkowski,* 23 F.Supp.2d 246, 261 (E.D.N.Y.1998) ("[I]t is well established that, where a defendant procures the silence of an adverse witness, 'whether by chicanery, actual violence or murder,' the Constitution does not prevent a trial court from holding that a defendant 'cannot then assert his confrontation clause rights in order to prevent prior grand jury testimony of that witness from being admitted against him." ') (quoting *United States v. Mastrangelo,* 693 F.2d, 269, 272 (2d Cir.1982)), *aff'd,* 211 F.3d 6 (2d Cir.), *cert. denied,* 531 U.S. 1018, 121 S.Ct. 581 (2000).

FN52. *Accord, e.g., United States v. Miller,* 116 F.3d 641, 668 (2d Cir.1997) ("The right to confront hostile witnesses may be constructively waived by a defendant's conduct."), *cert. denied,* 524 U.S. 905, 118 S.Ct. 2063 (1998); *United States v. Thai,* 29 F.3d 785, 814–15 (2d Cir.), *cert. denied,* 513 U.S. 977, 115 S.Ct. 456 (1994); *LaTorres v. Walker,* 216 F.Supp.2d 157, 165–66 (S.D.N.Y.2000).

***32** Because the Second Circuit, under *United States v. Mastrangelo,* 693 F.2d 269, 272–73 (2d Cir.1982), "requires that a court find by 'a preponderance of evidence' that a defendant was responsible for a witness's unavailability before Sixth Amendment rights can be waived," a New York court's finding of admissibility after a *Sirois* hearing applying the state's "higher standard of 'clear and convincing' evidence [set forth in *People v. Geraci,* 85 N.Y.2d 359, 362, 625 N.Y.S.2d 469, 470 (1995) ] ... if correct, would also satisfy the constitutional standard." *LaTorres v. Walker,* 216 F.Supp.2d at 166; *see also Cotto v. Herbert,* 2003 WL 1989700 at *11 (Second Circuit's own "requirement on the standard of proof applicable

at a federal *Mastrangelo* hearing – that the government prove by a preponderance of the evidence that the defendant procured the witness's unavailability – is actually less stringent than the New York standard, which requires a showing of intimidation by clear and convincing evidence.”).

Skinner's confrontation clause claim relies on his argument that, in retrospect, he posed no danger to Rosado: Rosado “testified before the grand jury on or about September 25, 1996, [and] petitioner was arrested and incarcerated from that time to present date [and] the People never alleged any further threats from petitioner ...” (Dkt. No. 19: Traverse at 50–51.) Skinner essentially disputes the trial court's factual finding that Rosado's “refusal to testify is based upon actual threats of bodily harm to the witness, and at least in the perception of the witness, to members of his family, which threats were directly initiated and caused by this defendant.” (Tr. 364.) That factual finding, which was affirmed by the First Department, *People v. Skinner,* 269 A.D .2d 202, 202–03, 704 N.Y.S.2d 18, 19–20 (1st Dep't 2000), is a factual determination entitled to a presumption of correctness under 28 U.S.C. 2254(e)(1). (*See* cases cited at pages 60–61 above.)

Skinner has presented no evidence, much less clear and convincing evidence, that the state courts erred in this finding. In the absence of such evidence, this Court is not permitted to re-evaluate the credibility of witnesses not before it (such as Rosado), and has no basis here to disturb the state court's credibility determinations. *See, e.g., Cotto v. Herbert,* 2003 WL 1989700 at *10 (“Under 28 U.S.C. § 2254(e)(1), the fact-findings of the trial court are subject to a ‘presumption of correctness,’ a presumption that is particularly important when reviewing the trial court's assessment of witness credibility.”); *Tirado v. Walsh,* 168 F.Supp.2d 162, 170 (S.D.N.Y.2001); *LaTorres v. Walker,* 216 F.Supp.2d 157, 167 (S.D.N.Y.2000) (“It is well settled that on habeas corpus review deference is to be given to factual findings made by state courts.... This is particularly the case when a witness's credibility is in question. ‘[AEDPA] gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them .” ’).

***33** Furthermore, this Court cannot say that the state court's factual determination that Skinner's threats caused Rosado's refusal to testify (Tr. 364) was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2); *see, e.g., Cotto v. Herbert,* 2003 WL 1989700 at *10 (“Given the extremely narrow scope of our review [under 2254(e)(1) ], we cannot reverse the [state] trial court's finding that [petitioner] was behind the intimidation of [the unavailable witness] as an ‘unreasonable determination of the facts in light of the evidence presented.’ 28 U .S.C. 2254(d)(2).”); *United States v. Potamitis,* 739 F.2d 784, 788–89 (2d Cir.) (where hearing testimony provided “ample support” for the finding that defendant's threats caused witness's unavailability and “finding was based largely on [hearing judge's] evaluation of the credibility of this testimony,” there was no basis for appellate court to hold that the hearing court's ruling was clearly erroneous. “Since the record fully supports the finding that [defendant] was responsible for the witnesses' unavailability, his confrontation clause objections to the admission of grand jury testimony carry no weight.”), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297 (1984); *Geraci v. Senkowski,* 23 F.Supp.2d at 259 (“The [state] trial court properly found that [the witness] changed his testimony [from the time of the Grand Jury to the *Sirois* hearing] as a result of threats that originated with or were condoned by the petitioner. The petitioner has not overcome the presumption of correctness enjoyed by that finding. Nor has he shown that the state adjudication of the claim ‘resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.’ 28 U .S.C. § 2254(d)(2).”).

Accordingly, Skinner's Confrontation Clause

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

habeas claim should be denied.

VI. *SKINNER'S INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS SHOULD BE DENIED*

Skinner's habeas petition alleges that his trial counsel, Lynne Stewart, provided ineffective assistance in three respects: (1) Stewart failed to appear at Skinner's arraignment for witness tampering and intimidation, indictment number 8190/96, which he asserts was "the day of the dismissal" of that indictment; (2) Stewart failed to file an omnibus motion for indictment number 8190/96; and (3) Stewart failed to call as trial witnesses "alibi witness Anna Rivera at trial and the arresting detective" and "refused to question the arresting officer" on indictment number 8190/96. (Dkt. No. 1: Pet. ¶ 12(E).) These issues will be discussed in Points VI.A & B below. Skinner also alleges that counsel Stewart had a conflict of interest because "Stewart was under indictment by the same office" as Skinner. (*Id.*) The conflict claim is discussed in Point VII below.

A. *The Strickland v. Washington Standard On Ineffective Assistance of Counsel* FN53

FN53. For additional decisions authored by this Judge discussing the *Strickland v. Washington* standard for ineffective assistance of counsel in language substantially similar to this section of this Report & Recommendation, *see Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *18–19 (S.D.N.Y. June 3, 2003) (Peck, M.J .); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *14–16 (S .D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *26–28 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J .) *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *13–14 (S .D.N.Y. Nov. 6, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *9–11 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J .); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *16–19 (S .D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *9–11 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *15–17 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *9 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Ennis v. Walker,* 00 Civ. 2875, 2001 WL 409530 at *15–16 (S.D.N.Y. Apr. 6, 2001) (Peck, M.J.); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01–2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002); *Dukes v. McGinnis,* 99 Civ. 9731, 2000 WL 382059 at *8 (S.D.N.Y. Apr. 17, 2000) (Peck, M.J.); *Cruz v. Greiner,* 98 Civ. 7939, 1999 WL 1043961 at *16 (S.D.N.Y. Nov. 17, 1999) (Peck, M.J.); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 370 (S.D.N.Y.1999) (Patterson, D.J. & Peck, M.J.); *Santos v. Greiner,* 99 Civ. 1545, 1999 WL 756473 at *7 (S.D.N.Y. Sept. 24, 1999) (Peck, M.J.); *Franza v. Stinson,* 58 F.Supp.2d 124, 133–34) (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); *Torres v. Irvin,* 33 F.Supp.2d 257, 277 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); *Boyd v. Hawk,* 965 F.Supp. 443, 449 (S.D.N.Y.1997) (Batts, D.J. & Peck, M.J.).

***34** In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 42

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

687, 104 S.Ct. at 2064. This performance is to be judged by an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064; *accord, e.g., Bell v. Cone,* 535 U.S. 685, 695, 122 S.Ct. 1843, 1850 (2002).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted).[FN54]

FN54. *Accord, e.g., Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001).

Second, the defendant must show prejudice from counsel's performance. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068–69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.[FN55]

FN55. *See also, e.g., Bell v. Cone,* 535 U.S. at 695, 122 S.Ct. at 1850; *Aparicio v. Artuz,* 269 F.3d at 95; *Sellan v. Kuhlman,* 261 F.3d at 315; *DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.), *cert. denied,* 519 U.S. 824, 117 S.Ct. 83 (1996).

> "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." *Strickler v. Greene,* 527 U.S. 263, 289–91, 119 S.Ct. 1936, 1952–53 (1999); *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1565–66 (1995); *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998 (1986) ( "a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland"* ); *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." *Strickler v. Greene,* 527 U.S. at 291, 119 S.Ct. at 1953; *cf. id.* at 297–301, 119 S.Ct. at 1955–58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

The Supreme Court has counseled that these principles "do not establish mechanical rules." *Strickland v. Washington,* 466 U.S. at 696, 104 S.Ct.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.*

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury." ' *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland v. Washington,* 466 U.S. at 695–96, 104 S.Ct. at 2069); *accord, e.g., Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991).

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. at 2069.[FN56]

FN56. *Accord, e.g., Smith v. Robbins,* 528 U.S. 259, 286 n. 14, 120 S.Ct. 746, 764 n. 14 (2000).

***35** In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. at 2066.[FN57]

FN57. *See also, e.g., Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 1575 (1982) ("We have long recognized ... that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) ("In reviewing *Strickland* claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on ... counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81 (1994).

As the Second Circuit noted: "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d at 199.

For purposes of this Court's AEDPA analysis, "the *Strickland* standard ... is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States." ' *Aparicio v. Artuz,* 269 F.3d at 95 & n. 8 (quoting 28 U.S.C. § 2254(d)(1)).[FN58] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established." ' *Aparicio v. Artuz,* 269 F.3d at 95 n. 8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

independent judgment, the state-court decision applied *Strickland* incorrectly.... Rather, he must show that the [First Department] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone,* 535 U.S. at 699, 122 S.Ct. at 1852.

FN58. *See also, e.g., Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Sellan v. Kuhlman,* 261 F.3d at 315.

B. *Application of the* Strickland *Standard to Skinner's Ineffective Assistance Claim*

1. *Stewart's Failure to Appear at Skinner's Arraignment for Indictment Number 8190/96*

Skinner argues that a transcript from Skinner's October 11, 1996 arraignment confirms that neither Stewart nor any other defense attorney was present. (Dkt. No. 19: Traverse Ex. F: 10/11/96 Arraignment Minutes.) [FN59] That is correct, but Skinner does not claim, and the Court cannot find, that Stewart's failure to appear prejudiced Skinner in any way. Specifically, Skinner appears to be claiming that Stewart's failure to appear at the 8190/96 arraignment lends support to his allegation that that indictment was dismissed before consolidation with indictment 4378/96. (*See* pages 54–55 above.) In his Traverse, Skinner claims that on September 30, 1996, after his original counsel, Marvin Pettus, "advised the court that petitioner could not have threaten[ed] the three ... alleged witnesses under indictment # 8190/96 because at the time of these alleged threats these complainants were incarcerated and petitioner[ ] was out on bail under indictment # 4378/96," Assistant District Attorney Gagan "panic[ked]" and dismissed the indictment. (Dkt. No. 19: Traverse at 39–40; *see* Dkt. No. 19: Traverse Ex. D: 9/30/96 Transcript.) Furthermore, Skinner claims that the dismissal "should explain why Ms. Stewart [ ] did not appear on October 11, 1996." (Traverse at 40.) It is unclear, then, why Skinner refers to October 11, 1996 in his petition as "the day of the dismissal." (Dkt. No. 1: Pet. ¶ 12(E).) [FN60]

FN59. Court Clerk: Calender # 10, Rodney Skinner. Calendar # 11, supercedes calendar # 10.

The Court: Calendar # 10 is dismissed as being superceded by # 11.

Court Clerk: Rodney Skinner, you are charged with intimidating a witness in the third degree. How do you plead; guilty or not guilty?

[Skinner]: Not guilty.

The Court: Wheel the case. Notify his counsel. Mr. Pet[t]us is his attorney.

Court Clerk: No, I have a notice of appearance from Lynn[e] Stewart.

The Court: Wheel the case.

[ADA] Hoexter: The case should go to Part 41, for October 17.

The Court: October 17, Part 41. Notify Ms. St[ew]art that's for motions.

[ADA] Hoexter: Remand continued?

The Court: Yes.

(Dkt. No. 19: Traverse Ex. F: 10/11/96 Arraignment Minutes.)

FN60. The State argues that Stewart alerted Skinner on October 8, 1996 that she was unavailable on October 11, 1996 and Skinner retained her despite this fact. (Dkt. No. 15:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 45

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

State Br. at 38–39.) In this letter, Stewart wrote:

> If it is possible, we would like to be retained before October 11, when you appear in part 50. This is because we wish to immediately file a motion for your testimony to be heard by the grand jury.
>
> I was sorry not to be able to meet with your mother but her travel schedule and mine conflicted. I will be back in the office on Tuesday, October 15th, but if arrangements can be made please have your mother call and speak to Geoffrey Stewart [a lawyer associated with Lynne Stewart's office].
>
> (Dkt. No. 19: Traverse Ex. E: 10/8/96 Stewart Letter to Skinner.) The Court agrees with Skinner that the letter does not clearly convey the fact that Stewart would not appear on October 11. (Traverse at 3.) Indeed, the Court questions why Stewart would ask to be retained in order to file a prompt motion, file a notice of appearance, and yet not appear at the arraignment or ensure that another lawyer was present.

***36** While Skinner may be arguing that Stewart's failure to be present on October 11, 1996 during the "dismissal," which in fact was merely a superceding indictment (*see* page 62 above), led Skinner to be subjected to double jeopardy, the Court has already addressed and rejected Skinner's double jeopardy claim on the merits. Thus, Skinner has failed to show prejudice and this aspect of his ineffective assistance claim should be denied.[FN61]

> FN61. Moreover, because the October 11, 1996 arraignment was a pre-trial proceeding, Skinner's deprivation of counsel is subject to harmless error analysis. "Unlike violations of the right to counsel at trial, pre-trial violations of the right to counsel are subject to harmless error analysis." *Gayle v. Lacy,* No. 95CV683, 1997 WL 610654 at *9 (N.D.N.Y. Oct. 1, 1997) (Pooler, D.J.) ("[P]etitioner offers no proof of harm result from the absence of counsel at the initial arraignment" and Court found petitioner was not harmed.) (citing for harmless error rule *United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 942 (1986), & *Coleman v. Alabama,* 399 U.S. 1, 11, 90 S.Ct. 1999, 2004 (1970)); *see also, e.g., Jones v. Spitzer,* 01 Civ. 9754, 2003 WL 1563780 at *13 (S.D.N.Y. Mar. 26, 2003) ("Circuit courts have ... routinely applied a harmless error analysis on habeas review of a claim regarding the denial of counsel during preliminary hearings of state criminal proceedings."); *Brown v. Hoke,* No. 87 CV 2066, 1987 WL 25887 at *4 (E.D.N.Y. Nov. 18, 1987) (same; although petitioner did not validly waive right to counsel before the grand jury, the error was harmless because the "grand jury merely charged petitioner" and "[t]he petit jury found petitioner guilty without hearing his grand jury testimony."). In the absence of any evidence that Skinner was prejudiced by Stewart's failure to appear at the arraignment, any violation of Skinner's right to counsel at the arraignment was harmless.

2. *Stewart's Failure to File an Omnibus Motion for Indictment Number 8190/96*

The trial court denied Skinner's claim that Stewart was ineffective for failing to file an omnibus motion in connection with indictment 8190/96, stating:

> I conclude that the sole new issue raised is the claim that defendant's trial counsel, Lynne Stewart, was ineffective because she allegedly failed to file the proper pre-trial motions. While such a claim

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

could have been raised on his direct appeal, *see* CPL § 440.10(2)(c), this Court will nonetheless address it. In support of this claim, the defendant attaches a transcript of colloquy between Judge Herbert Altman and Ms. Stewart, in which Judge Altman comments upon Ms. Stewart's lack of punctuality in filing her motions. While this may be interesting for its "Day in the Life of the Court" quality, the inference which the defendant would like to draw from this transcript is vitiated by what actually happened in the case ...

The issue of pre-trial hearings [was] irrelevant to indictment number 8190/96 because the People did not serve notice as to any statements, identifications, or recovered property. Only felony grand jury notice was served as to 8190/96 pursuant to CPL § 190.50(5)(a). Parenthetically, it should be noted that the defendant, through his attorney, did challenge that indictment, claiming a violation of his right, upon written notice, to testify before the Grand Jury. Judge Altman found that claim meritless on November 14, 1996. [footnote omitted]

*In view of the documented fact that appropriate pre-trial motions were filed on the defendant's behalf, his latest claim of ineffective assistance of counsel is groundless, and affords no basis for relief.* In addition, the defendant has not met his burden of showing what motions that should have been made were not made, and that had they been made, would have made a difference.

(Dkt. No. 8: 5/16/02 Justice Wetzel Order at 3–4, emphasis added.)

The § 440 court's finding, as a "documented fact," that "appropriate pre-trial motions were filed on the defendant's behalf" (in connection with the consolidated indictments, even if not specific to indictment 8190/96) is a factual determination entitled to a presumption of correctness under 28 U.S.C. 2254(e)(1), and Skinner has failed to present contrary evidence. (*See* cases cited pages 60–61 above.) Moreover, as the § 440 court noted, Skinner does not allege, much less show, what specific motions should have been made or, if made, how it would have benefitted Skinner. Thus, even assuming that proper motions were not filed, Skinner has not shown prejudice. Accordingly, this part of his ineffective assistance claim should be denied.

3. *Stewart's Failure to Call Certain Witnesses*

***37** Skinner's petition asserts that "[c]ounsel refused to question the arresting officer about this arrest at trial ... [and] refused to call alibi witness Anna Rivera at trial and the arresting detective." (Dkt. No. 1: Pet. ¶ 12(E).) Skinner's Traverse further alleges that Stewart "did not just fail [ ] to call one witness[ ] but six witnesses": (1) Anna Rivera, (2) Dolph LeMoult, "author of petitioner's autobiography," (3) Alice Martell, "petitioner's book agent," (4) Betty White, a special education supervisor at a junior high school, (5) Jesse Cruz, "the un-refuted source of the 911 tape descriptions," and (6) Detective Joseph Pagan, "the detective who advised the other police officers to arrest petitioner." (Dkt. No. 19: Traverse at 27–28.)

Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357 (1987); *see also, e.g., United States v. DeJesus,* No. 01–1479, 57 Fed. Appx. 474, 478, 2003 WL 193736 at *3 (2d Cir. Jan. 28, 2003) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' *United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999). Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed.") (counsel's decision not to call a character witness was

grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses."); *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."); *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998), 526 U.S. 1164, 119 S.Ct. 2059 (1999); *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.), *cert. denied,* 522 U.S. 846, 118 S.Ct. 130 (1997); *Nieves v. Kelly,* 96 Civ. 4382, 990 F.Supp. 255, 263–64 (S.D.N.Y.1997) (Cote, D.J. & Peck, M.J.); *Rodriguez v. Mitchell,* 92 Civ.2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

More importantly, "[g]enerally, the decision whether to pursue a particular defense is a tactical choice which does not rise to the level of a constitutional violation.... [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed ...,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial." *Jones v. Hollins,* 884 F.Supp. 758, 765–66 (W.D.N.Y.1995) (citations omitted), *aff'd,* 89 F.3d 826, 1995 WL 722215 (2d Cir.1995); *see, e.g., United States v. Vegas,* 27 F.3d 773, 777–78 (2d Cir.) ("As is often the case when convicted defendants complain after-the-fact of their lawyers' trial performance, we find that the choices made by the attorney were matters of trial strategy; because counsel's strategy was a reasonable one, these claims do not show incompetence"; not ineffective to pursue entrapment defense rather than innocence defense), *cert. denied,* 115 S.Ct. 284 (1994); *Lawson v. Caspari,* 963 F.2d 1094, 1096 (8th Cir.1992) (counsel not ineffective for failing to call alibi witnesses he did not believe were credible, especially where counsel "presented a theory of the case by pointing out the 'weaknesses in the state's case and rais[ing] serious questions about the credibility of the state's sole eyewitness." '); *Harris v. Hollins,* 95 Civ. 4376, 1997 WL 633440 at *6 (S.D.N.Y. Oct. 14, 1997) (counsel not ineffective for not securing alibi witnesses where counsel presented a vigorous defense).[FN62]

FN62. *See also, e.g., LaFrance v. Mitchell,* 93 Civ. 0804, 1996 WL 741601 at *2 (S.D.N.Y. Dec. 27, 1996) ("It is quite evident that the decision to omit this [alibi] defense was a sound one and that the basis for an effective alibi defense simply did not exist."); *Johnson v. Mann,* 92 Civ.1909, 1993 WL 127954 at *1 (S.D.N.Y. April 20, 1993) (counsel not ineffective for strategic decision to attack identification of petitioner rather than to rely on an "inherently suspect" alibi defense); *Munoz v. Keane,* 777 F.Supp. 282, 288–89 (S.D.N.Y.1991) ("Given the overwhelming evidence that [petitioner] participated in the drug transaction at issue, it was reasonable for defense counsel to conclude, as a strategic matter, that presenting testimony of the alleged alibi witnesses would be damaging to [petitioner's] case."), *aff'd sub nom. Linares v. Senkowski,* 964 F.2d 1295 (2d Cir.), *cert. denied,* 506 U.S. 986, 113 S.Ct. 494 (1992); *Minor v. Henderson,* 754 F.Supp. 1010, 1017–18 (S.D.N.Y.1991) (counsel not ineffective for tactical choice not to present alibi defense where evidence petitioner believed supported such defense did not exist); *Buitrago v. Scully,* 705 F.Supp. 952, 954 (S.D.N.Y.1989) (counsel not ineffective for failing to present alibi witness where petitioner fails to show witness would provide alibi).

***38** Moreover, a petitioner may not merely allege that certain witnesses might have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such testimony would have changed the result. *See, e.g., Lawrence v. Ar-*

*montrout,* 900 F.2d 127, 130 (8th Cir.1990) ("To affirmatively prove prejudice [from counsel's failure to investigate], a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial."); *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *33 & n. 59 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *24 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Greenidge v. United States,* No. 01 CV 4143, 2002 WL 720677 at *2 (E.D.N.Y. Mar. 27, 2002) (§ 2255 case; petitioner's ineffective assistance of counsel claim has no merit where petitioner "nowhere specifies how the testimony of those witnesses [counsel purportedly failed to call] would have been helpful to his defense.").[FN63]

FN63. *See also, e.g., Lou v. Mantello,* No. 98–CV–5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative." ') (citations omitted); *Muhammad v. Bennett,* 96 Civ. 8430, 1998 WL 214884 at *1 (S.D.N.Y. Apr. 29, 1998) ("petitioner's speculative claim about the testimony of an uncalled witness" is insufficient to show ineffective assistance of trial counsel); *Burke v. United States,* 91 Civ. 468, 1992 WL 183752 at *2 (S.D.N.Y. July 22, 1992) (petitioner's "contention that he was denied effective assistance of counsel" where "his attorney failed to subpoena several witnesses who would have aided his defense is wholly insufficient given [petitioner]'s failure to set forth who the specific witnesses are or their relevant testimony."); *Croney v. Scully,* CV–86–4335, 1988 WL 69766 at *2 (E.D.N.Y. June 13, 1988) ("Petitioner's contention that assignment of an investigator would have been helpful to his defense is conclusory and speculative. Petitioner must show not only that the testimony would have been favorable, but also that the witness would have testified at trial."), *aff'd,* 880 F.2d 1318 (2d Cir.1989).

Skinner's ineffective assistance claim for failure to call LeMoult [FN64] and Martell should be denied because Skinner fails to indicate what they would have testified to and if they were willing to testify. Moreover, to the extent LeMoult and Martell would have testified to Skinner's reputation, their testimony would have been cumulative of the other defense reputation witnesses (*see* page 10 above). The failure to call cumulative or repetitive witnesses is neither ineffective nor prejudicial. *See, e.g., United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998) ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second guess." Where the witness defendant asserts counsel should have called "would have testified in a manner corroborative of another witness [,] counsel might well have regarded the testimony as unnecessarily cumulative."), *cert. denied,* 526 U.S. 1164, 119 S.Ct. 2059 (1999); *Cotto v. Lord,* 99 Civ. 4874, 2001 WL 21246 at *16 n. 6 (S.D.N.Y. Jan. 9, 2001) (rejecting claim that counsel was ineffective for failing to call additional family members where petitioner "made no showing as to which other family members should have been called, what their testimony would have been and why that testimony would not have been cumulative of what the petitioner and [other witness] could provide."), *aff'd,* No. 01–2056, 21 Fed. Appx. 89, 2001 WL 1412350 (2d Cir. Nov. 8, 2001); *White v. Keane,* 51 F.Supp.2d 495, 505 (S.D.N.Y.1999) (Court rejected petitioner's claim that counsel was ineffective for failing to call witnesses where their testimony was "speculative, repetitive, vague, or related solely to the issue of credibility of one of the People's many witnesses.") (record citations omitted); *Treppedi v.. Scully,* 85 Civ. 7308, 1986 WL 11449 at *3 (S.D.N.Y. Oct. 9, 1986) ("Since the effect

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the presentation of additional alibi witnesses would have been cumulative at best, the failure of counsel to call additional alibi witnesses cannot be considered an error that deprived the defendant of a fair trial."), *aff'd,* 847 F.2d 837 (2d Cir.1988); *see also, e.g., United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir.1990) ("The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record.").

FN64. In Skinner's July 1997 C.P.L. § 440 motion, he stated that "[d]efense character witness Dolph L[e]Moult was never called in by Ms. Stewart because Ms. Stewart claimed the court would not allow his testimony unless it dealt with defendant's character on the Lower East Side. In fact, Mr. LeMoult could testify more in depth than any of the other character witnesses because of his months of collaboration with this defendant on a book proposal based on [Skinner's] life experiences entitled, 'Broken Eyes Don't Cry." ' (Dkt. No. 1: Pet. Ex. C: Skinner 7/12/97 C.P.L. § 440 Motion at 43.)

***39** Second, while Skinner claims that Cruz "would have testified that petitioner was not there when his friend Jehu Morales[ ] was shot, and he would have been able to testify that Benny Rosado, Anthony Baez, and Pedro Montalvo, were actually participants to the shooting of his friend Jehu" (Traverse at 27), Skinner fails to offer any support for his speculation that Cruz would have testified as such.

Third, Skinner describes Detective Pagan as "the detective who instructed Lt. Hernandez and Police Officer Adams to arrest [Skinner]" for the charges in indictment number 4378/96. (Pet. Ex. C: Skinner 7/12/97 C.P.L. § 440 Motion at 6.) Again, because Skinner fails to provide any comprehensible explanation about what testimony Detective Pagan would have provided (*e.g.,* Traverse at 28), his claim should be denied.

Fourth, Skinner's claim regarding White should be denied, as a stipulation regarding her testimony was admitted. Because "Ms. White's health was such that it was impossible or [im]practical to conduct the examination and take her testimony this morning," the parties stipulated that had Betty White been called, she would have testified that "[s]he was aware of Rodney Skinner's reputation for nonviolence and peacefulness" within his school community on the lower east side of Manhattan. (Tr. 1611–14.) Moreover, even if her videotaped testimony would have been more convincing than a stipulation, her reputation evidence was cumulative of other witnesses. (*See* cases cited at pages 82–83 above.)

Fifth, as to Anna Rivera, Stewart provided an explanation on the record for not calling Anna Rivera, when the prosecution requested a missing witness charge:

> I will very frankly say I did not call her. I spoke to her, but she was extremely reluctant. She did not want people to know that she was involved in this at all or involved with Rodney [Skinner], and when I asked a question on redirect [of Skinner] yesterday about whether she had a fiancee and whether she had a fiancee at this very time she was going to New Jersey with him ... it would place before the jury some ostensible reason why this person would not be here.

(Tr. 1608.) FN65 Another factor weighing against calling Anna Rivera could have been the serious damage to Skinner's credibility on cross-examination about his direct testimony that he called Anna Rivera from his mother's house. (Skinner: Tr. 1376–79.) When confronted with phone records that indicated no call was made to Rivera from Skinner's mother's

Page 50

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

phone at that time, Skinner stated that he used his cellular phone. (Skinner: Tr. 1375–76.) When confronted with records that showed his cellular phone service had been terminated before that night, Skinner claimed he used a "cloned" phone. (Skinner: Tr. 1377–79, 1394–96.) In a letter to Skinner, Stewart's associate told Skinner that "Lynne [Stewart] has said she thought [A.D.A.] Gagan did an effective job cross-examining you." (Dkt. No. 17: Judicial Disqualification Motion Ex. D: 3/20/97 Geoffrey Stewart Letter to Skinner.)

FN65. Stewart also could have reasonably decided to not call Rivera given her romantic relationship with Skinner. *See, e.g.,* *Aponte v. Scully,* 740 F.Supp. 153, 158 (E.D.N.Y.1990) (McLaughlin, D.J.) (counsel not ineffective for failing to call alibi witness who "had a romantic involvement with petitioner, which undercuts her credibility").

***40** Given Stewart's explanation on the record about why she did not call Anna Rivera as a witness, and the additional strategy that reasonably could have further motivated Stewart's decision not to call her, this Court cannot find Stewart's performance to be deficient. *See, e.g.,* *Ryan v. Rivera,* No. 00–2153, 21 Fed. Appx. 33, 34, 2001 WL 1203391 at *1 (2d Cir. Oct. 9, 2001) ("[W]hen a party challenges matters of trial strategy, such as the decision not to call a witness, even greater deference is generally warranted: " '[A]n appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." ') (quoting *United States v. Luciano,* 158 F.3d at 660); *James v. United States*, 00 Civ. 8818, 97 CR 185, 2002 WL 1023146 at *16 (S.D.N.Y. May 20, 2002) (Counsel's decision not to call witness was "supported by the fact that [witness] was [petitioner's] brother and would be subject to impeachment due to bias," was a matter of strategy and not ineffective assistance.).

As this Court has previously held, " '[t]he decision of whether to call or bypass a particular witness is a question of trial strategy which courts will practically never second-guess.... In the instant case, the testimony of any of these witnesses may have as likely exposed inconsistencies and weaknesses in defendant's case as have lent support to Petitioner's defense. Additionally, a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice." ' *Cromwell v.. Keane,* 2002 WL 929536 at *24 (quoting *Ozuru v. United States,* No. 95 CV 2241, 1997 WL 124212 at *4 (E.D.N.Y. Mar. 11, 1997), *aff'd,* 152 F.3d 920 (2d Cir.1998), *cert. denied,* 525 U.S. 1083, 119 S.Ct. 828 (1999)).

Skinner's habeas claim that Stewart was ineffective for not calling certain witnesses should be denied.

## VII. *SKINNER'S CLAIM THAT DEFENSE ATTORNEY STEWART HAD A CONFLICT OF INTEREST LACKS MERIT*

Skinner's petition asserts that he received ineffective assistance of counsel because attorney "Stewart was under indictment by the same office" as Skinner. (Dkt. No. 1: Pet. ¶ 12(E).) According to Skinner, Stewart only "advised petitioner that she was about to be indicted after petitioner's conviction [. S]he thereafter asked the Court to be relieved[. H]er motion was granted. However, petitioner had retained new counsel after [Stewart] informed him of this crypt [sic] action against her. Ms. Stewart, without petitioner's knowledge had developed an open door relationship with the Homicide Investigations Unit, and its investigators, and prosecutors due to the fact [that] one of her clients was under cooperation...." (Dkt. No. 19: Traverse at 32.)

### A. *Applicable Conflict of Interest Legal Principles* FN66

FN66. For an additional decision authored by this Judge discussing the applicable legal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

principles for analyzing attorney conflict of interest ineffectiveness habeas claims in language substantially similar to this section of this Report & Recommendation, *see Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *26–28 (S .D.N.Y. June 3, 2003) (Peck, M.J.).

" 'A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." ' *United States v. Schwarz,* 283 F.3d 76, 90 (2d Cir.2002) (quoting *United States v. Blau,* 159 F.3d 68, 74 (2d Cir.1998)).[FN67] "The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1181 (1978); *see also, e.g., Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1241 (2002). As the Supreme Court has repeatedly noted:

FN67. *Accord, e.g., Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *United States v. Perez,* 325 F.3d 115, 125 (2d Cir.2003); *United States v. Blount,* 291 F.3d 201, 210 (2d Cir.2002), *cert. denied,* 123 S.Ct. 938 (2003).

***41** "Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing.... [A] conflict may ... prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another."
*Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1697 (1988) (quoting *Holloway v. Arkansas,* 435 U.S. at 489–90, 98 S.Ct. at 1181). The right to conflict-free counsel applies equally to appointed and, as here, retained counsel. *E.g., Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716 (1980).

" '[A] defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." ' *United States v. Blau,* 159 F.3d at 74.[FN68]

FN68. *Accord, e.g., United States v. Perez,* 325 F.3d at 125; *United States v. Blount,* 291 F.3d at 210–11; *Lopez v. Scully,* 58 F.3d 38, 41 (2d Cir.1995).

The standard governing an ineffective assistance of counsel claim based on an asserted conflict of interest was articulated by the Supreme Court in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708 (1980), and differs from the more general ineffective assistance standard enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984). *See, e.g., United States v. White,* 174 F.3d 290, 294–95 (2d Cir.1999). Indeed, both prongs of the standard – defective performance and prejudice – are substantially different under *Cuyler v. Sullivan.*

As to the defective performance prong, where, as here, a petitioner "raised no objection at trial" regarding the alleged conflict, *Cuyler v. Sullivan,* 446 U.S. at 348–49, 100 S.Ct. at 1718, his Sixth Amendment claim cannot prevail unless he demonstrates "that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance," *Burger v. Kemp,* 483 U.S. 776, 783, 107 S.Ct. 3114, 3120 (1987) (citations & internal quotations omitted); *accord, e.g.,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Mickens v. Taylor,* 122 S.Ct. at 1242 ("absent objection, a defendant must demonstrate that 'a conflict of interest actually affected the adequacy of his representation" ') (quoting *Cuyler v. Sullivan,* 446 U.S. at 348–49, 100 S.Ct. at 1718). The Supreme Court recently clarified that "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor,* 122 S.Ct. at 1244 n. 5; *accord id.* at 1243 ("we think 'an actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties.").

***42** "The burden of proof rest[s] on [petitioner] to show a conflict of interest by a preponderance of the evidence." *Triana v. United States,* 205 F.3d 36, 40 (2d Cir.) (§ 2255 proceeding), *cert. denied,* 531 U.S. 956, 121 S.Ct. 378 (2000); *accord, e.g., Mickens v. Taylor,* 240 F.3d 348, 361 (4th Cir.2001) (*en banc* ) (petitioner must prove by preponderance of the evidence that actual conflict adversely affected attorney's performance), *aff'd,* 535 U.S. 162, 122 S.Ct. 1237 (2002); *see also, e.g ., Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. at 1718 ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). "[T]he burden of proof cannot be met by speculative assertions of bias or prejudice." *Triana v. United States,* 205 F.3d at 41.

As for the prejudice prong, because, among other things, "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests," *Strickland v. Washington,* 466 U.S. at 692, 104 S.Ct. at 2067, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief," *Cuyler v. Sullivan,* 446 U.S. at 349–50, 100 S.Ct. at 1719; *accord, e.g., Mickens v. Taylor,* 122 S.Ct. at 1244 ("prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown"); *Burger v. Kemp,* 483 U.S. at 783, 107 S.Ct. at 3120.[FN69]

FN69. *See also e.g., Cuyler v. Sullivan,* 446 U.S. at 349–50, 100 S.Ct. at 1719 ("Once the Court concluded that [an attorney] had an actual conflict of interest, it refused 'to indulge in nice calculations as to the amount of prejudice' attributable to the conflict. The conflict itself demonstrated a denial of the 'right to have the effective assistance of counsel." ') (quoting *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 467 (1942)); *United States v. Schwarz,* 283 F.3d at 91 ("While a defendant is generally required to demonstrate prejudice to prevail on a [*Strickland* ] claim of ineffective assistance of counsel, this is not so when counsel is burdened by an actual conflict of interest. Prejudice is presumed under such circumstances. Thus, a defendant claiming he was denied his right to conflict free counsel based on an actual conflict need not establish a reasonable probability that, but for the conflict or a deficiency in counsel's performance caused by the conflict, the outcome of the trial would have been different. Rather, he need only establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance.") (citations omitted); *Lopez v. Scully,* 58 F.3d at 43 ("Harmless error analysis is inappropriate in this context. Once a petitioner has shown that an actual conflict of interest adversely affected defense counsel's performance, prejudice to the petitioner is presumed and no further showing is necessary for reversal.... Because prejudice is presumed, the violation of [petitioner's] Sixth Amendment rights cannot be harmless.").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 53

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

To date, the Supreme Court only has applied this presumption of prejudice to cases involving attorneys who concurrently represented clients with conflicting interests—so-called “multiple concurrent representation.” *Mickens v. Taylor,* 122 S.Ct. at 1245–46 (“In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question.”).[FN70]

FN70. The Supreme Court further explained: “Both *Sullivan* itself, and *Holloway,* stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. Not all attorney conflicts present comparable difficulties.” *Mickens v. Taylor,* 122 S.Ct. at 1245 (citations omitted).

B. *Stewart Was Not Subject to an Actual Conflict of Interest that Adversely Affected Her Performance*

Prior to *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237 (2002), courts consistently split the *Sullivan* deficiency prong into two elements: (1) actual conflict, and (2) adverse effect on performance. Under this prior precedent, a defendant was required (1) first to prove an actual conflict, and (2) then to prove that the conflict adversely affected the attorney's performance, *i.e.,* that “a ‘lapse in representation” ’ resulted from the conflict. *See, e.g., United States v. Schwarz,* 283 F.3d 76, 91–92 (2d Cir.2002). Although *Mickens* effectively conflated the two elements, *Mickens v. Taylor,* 122 S.Ct. at 1244 n. 5 (“An ‘actual conflict,’ for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.”), this Court will analyze the two elements separately for conceptual clarity. *E.g., Williams v. United States,* No. 02–2198, 2002 WL 21182101 at *2 (2d Cir. May 20, 2003) (“To prevail on an ‘actual conflict’ claim, a defendant must first show that an actual conflict existed, then demonstrate that this conflict adversely affected counsel's performance.”).

***43** To aid in analyzing the conflict issue, it is important to understand the relatively unique circumstances of defense counsel Stewart's criminal problems. Stewart was charged with criminal contempt for refusing to disclose to a grand jury her fee arrangements and retainer agreements with a client being investigated as a member of a major narcotics operation. *See People v. Stewart,* 158 Misc.2d 776, 777–78, 601 N.Y.S.2d 983, 984 (Sup.Ct.N.Y.Co.1993). The state courts denied Stewart's motion to quash, and when she was re-called to the grand jury in 1991, she still refused to testify. *Id.* In May 1993, however, Justice Andrias dismissed the contempt charges against Stewart on policy grounds. *Id.* at 786–87, 601 N.Y.S.2d at 989. Thus, at the time of Skinner's trial in early 1997, the charges against Stewart had been dismissed, although the State had appealed the dismissal.[FN71] On April 8, 1997—more than two months after Skinner's trial ended—the First Department reversed Justice Andrias and reinstated the criminal contempt charges against Stewart. *People v. Stewart,* 230 A.D.2d 116, 656 N.Y.S.2d 210 (1st Dep't 1997). The New York Court of Appeals initially granted leave to appeal, *People v. Stewart,* 90 N.Y.2d 867, 661 N.Y.S.2d 194 (1997), but in February 1998 dismissed the appeal because of a “threshold jurisdictional impediment” (because the First Department's decision was based on facts not law). *People v. Stewart,* 91 N.Y.2d 900, 902, 668 N.Y.S.2d 1000, 1000 (1998). Thereafter, in March 1999, Stewart pleaded guilty to a misdemeanor and was given an unconditional discharge.[FN72]

FN71. The First Department heard oral arguments in Stewart's case in May 1995. *See* Matthew Goldstein, *Appeal on Forced Disclosure of Fee Terms is Still Pending,* N.Y.L.J., Mar. 20, 1997.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN72. *See* Daniel Wise, *Stewart Quits Contempt Fight to Save Career,* N.Y.L.J., Mar. 29, 1999.

1. *Skinner Has Not Shown That The State's Appeal of Stewart's Dismissed Indictment Created an Actual Conflict of Interest*

The Second Circuit has held when a defendant and his lawyer are simultaneously prosecuted by the same office, "[t]he interests of lawyer and client may ... diverge[ ] with respect to their dealing with that office," which may "present a plausible claim that his lawyer had an actual conflict of interest." *Armienti v. United States,* 234 F.3d 820, 824–25 (2d Cir.2000).[FN73] Prosecution or investigation by the same office, standing alone, however, is not grounds for finding an actual conflict. *See, e.g., United States v. Armienti,* 313 F.3d 807, 814 (2d Cir.2002) (Second Circuit rejected defendant's argument that counsel's prosecution by the same U.S. Attorney's office created an actual conflict, rejecting defendant's attempt to liken his case to *United States v.. Levy,* 25 F.3d 146, 150, 156 (2d Cir.1994), in which the Second Circuit "found that the fact that Levy's attorney was being prosecuted on unrelated criminal charges by the same office prosecuting Levy was one of the factors that contributed to an actual conflict between Levy and his counsel....None of [the] additional factors relied upon in *Levy* are present in this case," since Levy's counsel represented both co-defendants, had privileged information from co-defendant relevant to Levy's defense, counsel could have been called as a trial witness, and the attorney may have been involved in co-defendant's flight.).

FN73. In *Beatty v. United States,* 142 F.Supp.2d 454, 459 (S.D.N.Y.2001), the court stated that "[t]o rise to the level of an actual conflict ... the agency or office prosecuting the attorney must be the same as the agency or office prosecuting the defendant," citing, *inter alia, Armienti. Armienti* makes clear, however, that while the same prosecuting agency is necessary to find a conflict, it alone is not sufficient to demonstrate an actual conflict.

***44** Although Stewart's contempt charge was brought by the same District Attorney's Office that was prosecuting Skinner, Stewart did not have an actual conflict of interest during her representation of Skinner. First, Stewart was not under indictment during her representation of Skinner; Stewart's indictment was dismissed on May 18, 1993, almost three years before Skinner was arrested on January 31, 1996. (*See* pages 2 and 91 above.) Second, the charges against Stewart—criminal contempt for refusing to disclose fee and retainer information about a client—were entirely unrelated to the assault, weapons and witness tampering charges that Skinner was facing. *Compare, e.g., Moss v. United States,* 323 F.3d 445, 472 (6th Cir.2003) ("It is well-established that a conflict of interest may arise where defense counsel is subject to a criminal investigation.... In order to establish a conflict of interest, however, the alleging party must demonstrate a nexus between the crimes of the client and the attorney."), *with United States v. Fulton,* 5 F.3d 605, 609–12 (2d Cir.1993) (actual conflict existed where defendant alleged that counsel was engaged in the heroin trafficking with which he was charged). Third, the dismissed charges against Stewart are not the sort of charges for which Stewart would want or need to curry favor with the District Attorney's Office. If Stewart were interested in currying favor with the District Attorney's Office, she could have provided the fee information sought rather than refusing to testify before the grand jury. Stewart's willingness to face criminal contempt charges in order to protect her views as to the sanctity of the attorney-client relationship belies any theory that she would sacrifice Skinner's interests for her own. The nature of the charges against Stewart and her reputation for aggressive advocacy for criminal defendants [FN74] refute any allegation that she was operating under a fear of retaliation from the District Attorney's Office or wanted to curry favor with the office.[FN75] *See, e.g.,*

Page 55

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

*United States v. Peterson,* 233 F.Supp.2d 475, 489 (E.D.N.Y.2002) (where counsel was sentenced almost a month before the government's investigation of defendant began, counsel "had no reason to curry favor with the government during the pendency of the defendant's case for fear that the government may prosecute him more vigorously."); *see also, e.g., Thompkins v. Cohen,* 965 F.2d 330, 332 (7th Cir.1992) (Investigation of criminal defendant's lawyer "may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer ... [T]he defense lawyer may fear [such retaliation], at least to the extent of tempering the zeal of his defense of his client somewhat. Yet presumably the fear would have to be shown before a conflict of interest could be thought to exist."). FN76

FN74. When dismissing the indictment in 1993, the Supreme Court noted Stewart's reputation as a vigorous advocate. *People v. Stewart,* 601 N.Y.S.2d 983, 988–89 (N.Y.Sup.Ct.1993) ("There is nothing in the extensive papers before this Court to reflect anything but an advocate totally dedicated to the rule of law and to advancing the principle of justice for all.... The point is not whether the People or Ms. Stewart is correct but whether Ms. Stewart took a principled position that a vigorous advocate has every right to advance.... [T]he public's welfare is safeguarded as much by fair dealing and vigorous advocacy as it is by aggressive enforcement of a particular law, even one as important as contempt.") The criminal defense bar also lauded Stewart's willingness to resist the grand jury subpoena. *See* Daniel Wise, *Stewart Quits Contempt Fight to Save Career,* N.Y.L.J., Mar. 29, 1999 (A past president of the National Association of Criminal Defense Lawyers "agreed that Ms. Stewart, in taking a principled stand in defense of the sanctity of the attorney-client privilege, had made an 'important contribution' in 'sensitizing' federal and state prosecutors to the dangers posed by subpoenas aimed at lawyers." The then-president of the New York Criminal Bar Association "said that the group would vigorously defend Ms. Stewart [because] '[t]o the extent she broke the law, she did so with the very best of intentions." The then-president elect of the New York Association of Criminal Defense Lawyers reported " 'a strong likelihood that [the] group will play a highly active role in Ms. Stewart's defense because she had been motivated by a very real concern for the attorney-client relationship." ').

> Of course, Stewart's most recent legal problems have raised serious issues as to whether she has taken vigorous client advocacy too far. *See* Mark Hamblett, *Attorney Charged With Aiding Terrorists: Defense Lawyer Accused of Helping Imprisoned Client Contact Islamic Group,* N.Y.L.J., Apr. 10, 2002; Benjamin Weiser & Robert F. Worth, *Indictment Says Lawyer Helped a Terror Group,* N .Y. Times, Apr. 10, 2002.

FN75. According to the New York Law Journal article reporting Stewart's guilty plea:

> Once [the presiding judge] ruled ... that she could not defend the contempt charges by arguing she was protecting the attorney-client relationship, Ms. Stewart explained, the case against her was "pretty much open-and-shut." Alluding to the likelihood that she would have automatically lost her license, she said, "too many people depend upon me, for me to put my head down and let them cut it off."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 56

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

Stewart also stated that "in resisting the subpoena she had 'energized a lot of people.' and that as a result 'prosecutors have not been issuing subpoenas to lawyers on a regular basis." ' Daniel Wise, *Stewart Quits Contempt Fight to Save Career*, N.Y.L.J. Mar. 29, 1999.

FN76. *Compare, e.g., United States v. Levy,* 25 F.3d at 150, 156 (counsel's prosecution on unrelated criminal charges by the same office prosecuting defendant was one of several conflict grounds because while awaiting sentence, counsel "may have believed he had an interest in tempering his defense of [defendant] in order to curry favor with the prosecution, perhaps fearing that a spirited defense of [defendant] would prompt the Government to pursue the case against [counsel] with greater vigor."); *United States v. DeFalco,* 644 F.2d 132, 136–37 & n. 5 (3d Cir.1979) (conflict found where facts presented "not a case of mere indictment of a lawyer; [but rather] indictment plus plea bargaining plus entry of a plea of guilty" where lawyer was prosecuted by, and plea bargained with, same United States Attorney's Office that prosecuted his clients and lawyer entered into bargaining while client's appeal was pending).

The Court finds that on the unique facts of this case—a vigorous defense attorney charged with contempt for trying to protect client confidences, and the charges she was facing were dismissed (albeit still on appeal) during Skinner's trial—Skinner has failed to demonstrate that the pending appeal of Stewart's dismissed indictment created an actual conflict of interest. [FN77]

FN77. The Court has found only one other case where a former client of Stewart's claimed that her contempt charge caused a conflict of interest: *Beatty v. United States,* 142 F.Supp.2d 454, 456 (S.D .N.Y. Apr. 17, 2001). Beatty was represented at trial by Stewart and convicted on January 17, 1997. Requesting the appointment of new counsel to represent him at sentencing, Beatty argued that Stewart's case, pending on appeal before the First Department, "created a conflict that in turn caused Stewart to make unsound strategic decisions during [Beatty's] trial." 142 F.Supp.2d at 457. First, the court found no per se conflict because the court "first learned of the alleged conflict at a post-trial hearing and then fully considered the issue [and because] there is nothing before the Court suggesting that Stewart was not authorized to practice law or that she was implicated in the crime for which Beatty was being charged." 142 F.Supp.2d at 458–59. Second, rejecting Beatty's argument that "Stewart had an interest in cooperating with the prosecution because of the contempt charges against her," the court found that no actual conflict was established because Beatty and Stewart were not being prosecuted by the same offices or agencies. 142 F.Supp.2d at 459. The court further found that Stewart was not ineffective under *Strickland*, as she was "diligent and well prepared" and her "performance most certainly did not fall below an objectively unreasonable level." 142 F.Supp.2d at 459.

2. *Even Assuming* Arguendo *That Stewart Had An Actual Conflict, The Pending Appeal of Stewart's Dismissed Indictment Did Not Adversely Affect Her Representation of Skinner*

a. *The Adverse Effect Standard* [FN78]

FN78. For an additional decision authored by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 57

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

this Judge discussing the adverse effect standard in conflict cases in language substantially similar to that in this entire section of this Report & Recommendation, *see* *Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *33–35 (S.D.N.Y. June 3, 2003) (Peck, M.J.).

***45** Assuming *arguendo* that Stewart had a conflict, Skinner also would have to show by a preponderance of the evidence that " 'a conflict of interest actually affected the adequacy of his representation." ' *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1242–43 (2002) (petitioner must establish that the conflict "affected the counsel's performance, as opposed to a mere theoretical division of loyalties"); *see also* *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719 (1980) ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."). The Supreme Court has explained, in general terms, that the conflict must have an "adverse" and "significant[ ]" effect, *Mickens v. Taylor,* 122 S.Ct. at 1244 n. 5, 1245, but has not described the precise contours of the "lapse in representation," *Cuyler v. Sullivan,* 446 U.S. at 349, 100 S.Ct. at 1719; *see, e.g., Burger v. Kemp,* 483 U.S. 776, 785, 107 S.Ct. 3114, 3121 (1987) (rejecting claim of actual conflict of interest because, *inter alia,* any conflict "did not harm [the allegedly conflicted] lawyer's advocacy").

To fill this gap, the Second Circuit adopted a test followed by both the First and Third Circuits:

> [I]n order to prove adverse effect on the basis of what an attorney failed to do,
>
> "[a defendant first] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

*Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993) (quoting *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988) (quoting *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985)), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215 (1989)), *cert. denied,* 511 U.S. 1022, 114 S.Ct. 1407 (1994); *accord, e.g., United States v. Schwarz,* 283 F.3d 76, 92 (2d Cir.2002); *Amiel v. United States,* 209 F.3d 195, 199 (2d Cir.2000); *Triana v. United States,* 205 F.3d 36, 40–41 (2d Cir.2000). Based on this two-element test, the Second Circuit has held that once a petitioner demonstrates an actual conflict, he:

> is not required to show that the lapse in representation affected the outcome of the trial or that, but for the conflict, counsel's conduct of the trial would have been different. [ *United States v.] Malpiedi,* 62 F.3d [465,] 469 [ (2d Cir.1995) ]. The forgone strategy or tactic is not even subject to a requirement of reasonableness. *Id.* As we have previously recognized,
>
> [t]he test is a strict one because a defendant has a right to an attorney who can make strategic and tactical choices free from any conflict of interest. An attorney who is prevented from pursuing a strategy or tactic because of the canons of ethics is hardly an objective judge of whether that strategy or tactic is sound trial practice.

***46** *United States v. Schwarz,* 283 F.3d at 92.[FN79]

FN79. *Accord, e.g., Hess v. Mazurkiewicz,* 135 F.3d 905, 910 (3d Cir.1998) (Petitioner "must identify a plausible defense strategy that could have been pursued, and show that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

> this alternative strategy inherently conflicted with, or was rejected due to, [counsel's] other loyalties or interests.... Significantly, [petitioner] need not show that the lapse in representation was so egregious as to violate objective standards for attorney performance. See [ *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988) ] (noting that accused may establish a lapse in representation merely by showing counsel rejected a defense that 'possessed sufficient substance to be a viable alternative')."").

Other circuits have held, to the contrary, that in order to prove an adverse effect, petitioner must show that the foregone strategy was "objectively reasonable." *See Mickens v. Taylor,* 240 F .3d 348, 361 (4th Cir.2001) (*en banc* ), *aff'd,* 535 U.S. 162, 122 S.Ct. 1237 (2002); *Freund v. Butterworth,* 165 F.3d 839, 860 (11th Cir.) (*en banc* ), *cert. denied,* 528 U.S. 817, 120 S.Ct. 57 (1999). As the *en banc* Eleventh Circuit held:

> First, [petitioner] must point to "some plausible alternative defense strategy or tactic [that] might have been pursued." Second, *he must demonstrate that the alternative strategy or tactic was reasonable under the facts.* Because prejudice is presumed, the petitioner "need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used," rather he only need prove that the alternative "possessed sufficient substance to be a viable alternative." Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other words, "he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

*Freund v. Butterworth,* 165 F.3d at 860 (quoting *Freund v. Butterworth,* 117 F.3d 1543, 1579–80 (11th Cir.1997)) (emphasis added & citations omitted). FN80

FN80. The Fourth Circuit, *en banc,* offered a similar formulation:

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, *the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts* of the case known to the attorney at the time of the attorney's tactical decision.... [T]he petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." ... Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

> *Mickens v. Taylor,* 240 F.3d at 361 (emphasis added). A panel of the Eight Circuit followed a similar path, albeit not as well-defined. *See Caban v. United States,* 281 F.3d 778, 786 (8th Cir.2002) ("if a reasonable attorney would have adopted the same trial strategy absent a conflict, [petitioner] cannot show [his attorney's] performance was adversely affected by that conflict" under *Cuyler v. Sullivan* standard).

> Certain circuit court decisions seem to apply the *Strickland* standard of deferring to counsel's "trial strategy" rather than applying *Sullivan's* "adverse effect" standard. *See United States v. Mays,* 77 F.3d 906, 909 (6th Cir.1996) ("[D]efendant must show not only a conflict but also that the conflict caused the attorney to make bad choices for his client. In fact, the incidents referred to in defendant's brief of arguably unwise questions by defense counsel of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

prosecution witnesses appear to have been part of a losing strategy but they were not the result of choices made where there were clearly better alternatives. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) ('Judicial scrutiny of counsel's performance must be highly deferential')."); *United States v. Kindle,* 925 F.2d 272, 275–76 (8th Cir.1991) ("[T]he defendant must ... 'demonstrate an actual conflict of interest which adversely affected his attorney's performance' to obtain relief.... The limited record is simply inadequate for us to conclude that there was an actual conflict of interest and clear prejudice to appellant. The alleged omissions by defense counsel are not enough in the context of the record to constitute clear evidence of a conflict of interest and prejudice. Such decisions could have been defense strategy, and we give great deference to counsel's determinations within that realm."). Deference to "trial strategy" in the context of a conflict of interest review seems plainly contrary to Supreme Court precedent, as it would eviscerate the less deferential standard announced by the Supreme Court in *Cuyler v. Sullivan* and its progeny. The standard announced in *Sullivan* was meant to be different from *Strickland.* Deferring to trial strategy would render the first prong of *Sullivan* no different from *Strickland* (although *Sullivan'* s presumption of prejudice would still remain in the second prong).

Thus, there is no Supreme Court precedent, but a split in Circuit authority, regarding the appropriate conflict of interest standard. Under AEDPA, however, the question is whether the state court's decision unreasonably applied *Supreme Court* precedent; "[a] petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 296 F.3d 129, 135 (2d Cir.2002). Given that the Supreme Court has not spoken on whether or not the plausible alternative strategy need be "reasonable," and the circuits are divided, this Court cannot say that the Second Circuit's holding that a petitioner need not prove that a foregone strategy was "reasonable" represents "clearly established" Supreme Court precedent under AEDPA.[FN81]

FN81. *See James v. Herbert,* No. 02–2389, 57 Fed. Appx. 894, 896, 2003 WL 328803 at *2 (2d Cir. Feb. 13, 2003) (where Supreme Court had not spoken on a particular counsel conflict issue, and at least one other circuit court disagreed with the Second Circuit's position on the issue, the Second Circuit could not say that the state court's contrary decision " 'unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to [a] situation[ ] which that principle should have, in reason, governed" '); *Hines v. Miller,* 318 F.3d 157, 164 (2d Cir.) ("Given the many divergent approaches and outcomes in federal courts that have applied clearly established Supreme Court precedent to the facts at issue and the absence of any Supreme Court decision concerning this type of [ineffective assistance] claim, we find no basis for concluding—as the dissent does—that the Appellate Division's decision here constituted an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States."), *cert. denied,* No. 02–9637, 2003 WL 1609428 (May 15, 2003); *DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002).

In any event, under either the Second or Eleventh Circuit standard, Skinner has not shown some plausible defense strategy or tactic that Stewart might have,

Page 60

Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)
**(Cite as: 2003 WL 21386032 (S.D.N.Y.))**

but did not, pursue.

b. *Skinner Has Not Shown, and the Court Cannot Find, Any Adverse Effect on Stewart's Representation Related to the Alleged Conflict*

Skinner has not alleged any deficiency in Stewart's performance caused by the possibility that her dismissed indictment would be reinstated on appeal. Even assuming *arguendo* the pending appeal created an actual conflict, none of Skinner's challenges to her representation specifically, failure to call certain witnesses, to file certain motions, and to appear at his indictment [FN82]—would have been caused by a desire to curry favor with the prosecutor or by a fear that vigorously representing Skinner would harm Stewart's own case. Indeed, the Court has already found Skinner's assertions of Stewart's alleged ineffectiveness to be meritless. (*See* Point VI above.) *See United States v. Blount,* 291 F.3d 201, 211–12 (2d Cir.2002) (no conflict found where a member of defendant's attorney's law firm had represented the government's witness in an unrelated matter, but, *inter alia,* defendant failed to show that the prior representation "had any effect" on defense counsel's performance), *cert. denied,* 123 S.Ct. 938 (2003); *United States v. Salerno,* 868 F.2d 524, 541 (2d Cir.) (claim that counsel's involvement in two Department of Justice investigations created conflict of interest denied where defendant "has not even attempted a showing of actual conflict of interest or in any way indicated what possible effect there may have been upon his lawyer's trial performance, or how these investigations were in any way related to the present case."), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192 (1989); *Moseley v. Scully,* 908 F.Supp. 1120, 1142 (E.D.N.Y.1995) ("Even assuming, *arguendo,* that these [foregone] motions were plausible and likely to succeed, there is simply no evidence that they were 'inherently in conflict with or not undertaken due to [attorney's purported] other loyalties or interests." '), *aff'd,* 104 F.3d 356 (2d Cir.1996); *see also, e.g., United States v. Bruce,* 89 F.3d 886, 896 (D.C.Cir.1996) (rejecting conflict of interest challenge where "the defendant has neither demonstrated, nor even suggested, a nexus between the alleged conflict and these examples of claimed ineffectiveness. If an attorney fails to make a legitimate argument *because* of the attorney's conflicting interest (for example, counsel fails to raise a misidentification defense because to do so might implicate himself or another client), then the *Cuyler* standard has been met. But if the attorney's alleged shortcoming is utterly unrelated to the conflict, the defendant cannot make use of the *Cuyler* presumption of prejudice and must instead proceed under *Strickland."* ); *Buenoano v. Singletary,* 74 F.3d 1078, 1087 (11th Cir.) (where petitioner offered "no evidence of an adverse effect" of publication rights contract on counsels' performance, "performance was not adversely affected by any conflict even if an actual conflict existed."), *cert. denied,* 519 U.S. 1012, 117 S.Ct. 520 (1996).

FN82. Skinner's other allegation, that Stewart allegedly "developed an open door relationship with the Homicide Investigations Unit" and prosecutors (Dkt. No. 19: Traverse at 32), is attributed by Skinner not to Stewart's criminal charges but to the fact that one of Stewart's other clients was a cooperator (*id.*). If representing a cooperator created a conflict, few if any criminal defense attorneys could be considered conflict free. Moreover, Skinner has not articulated how Stewart's alleged relationship to the Homicide Investigation Unit as a result of representing a cooperator adversely affected Stewart's representation of Skinner.

C. *It is Not Reasonably Probable that any Conflict Prejudiced Skinner's Case*

***47** It is well-settled Supreme Court precedent that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 1719 (1980); *accord, e.g., Mickens v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1245 (2002) ( "prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown"). In its most recent decision on the issue of conflicts, however, the Supreme Court emphasized that it had never applied this presumption of prejudice outside the context of "multiple concurrent representation." *Mickens v. Taylor,* 122 S.Ct. at 1245.[FN83]

FN83. Indeed, the Supreme Court cautioned that its decision should not be "misconstrued" as extending the *Sullivan* rule to conflicts involving successive representation:

> In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question.

*Id.* at 1245–46. The Supreme Court seemed to distinguish successive representation cases on the ground that the *Sullivan* presumption of prejudice only applied where " 'a defendant shows that his counsel *actively represented* conflicting interests." ' *Id.* at 1245 (quoting *Cuyler v. Sullivan,* 446 U .S. at 350, 100 S.Ct. at 1719) (emphasis added in *Mickens* ). The Sixth Circuit recently stated that "[i]n the wake of *Mickens,* no court has applied the *Sullivan* presumption to a case of successive representation." *Moss v. United States,* 323 F.3d 445, 460 (6th Cir.2003) (collecting cases).

In light of *Mickens*, there is no "clearly established federal law, as determined by the Supreme Court of the United States" mandating reversal of a conviction on a mere showing of a conflict of interest involving an attorney's conflict because of his or her own legal problems. Accordingly, on habeas review, conflict claims involving counsel under indictment or investigation must satisfy the *Strickland* standard for proving prejudice, *i.e.*, petitioner must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," ' *Mickens v. Taylor,* 122 S.Ct. at 1240 (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068 (1984)). *See Montoya v. Lytle,* No. 01–2318, 53 Fed. Appx. 496, 498, 2002 WL 31579759 at *2 (10th Cir. Nov. 20, 2002) (on habeas review, applying *Strickland* prejudice standard to conflict claim involving successive representation), *cert. denied*, No. 02–9835, 2003 WL 1825142 (May 19, 2003).[FN84]

FN84. *See also United States v. Young,* 315 F.3d 911, 914–15 n. 5 (8th Cir.) (*Sullivan* applies to cases of "multiple or serial" representation, while *Strickland* applies to all other conflicts), *cert. denied*, No. 02–9949, 2003 WL 1923315 (May 19, 2003); *Beets v. Scott*, 65 F.3d 1258, 1265–72 (5th Cir.) (*Cuyler v. Sullivan* standard should only apply to conflict of interest claims involving multiple representation: "Although the federal circuit courts have unblinkingly applied Cuyler's 'actual conflict' and 'adverse effect' standards to all kinds of alleged attorney ethical conflicts, a careful reading of the Supreme Court cases belies this expansiveness. Neither *Cuyler* nor its progeny strayed beyond the ethical problem of conflict representation." Court applies *Strickland* analysis to attorney self-interest conflict from media rights agreement.), *cert. denied,* 517 U.S. 1157, 116 S.Ct. 1547 (1995).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Sixth Circuit dealt with a similar factual situation in *Smith v. Hofbauer,* 312 F.3d 809, 817 (6th Cir.2003). Smith claimed that " 'he was denied the effective assistance of counsel in violation of his Sixth Amendment rights because his attorney was charged with a felony pending in the same county." ' *Smith v. Hofbauer,* 312 F.3d at 816. Applying the *Cuyler v. Sullivan* standard, the state court found no actual conflict of interest that adversely affected Smith's counsel's performance. *Id.* The district court denied Smith's habeas petition, also under *Cuyler v.. Sullivan,* because Smith failed to demonstrate he was adversely effected by counsel's alleged conflict. 312 F.3d at 817. The Sixth Circuit affirmed the district court's decision, but its affirmance was specifically "based on the fact that Petitioner seeks relief on a basis not supported by clearly established federal law inasmuch as the Supreme Court has never applied *Sullivan's* lessened standard of proof to any conflict other than joint representation." *Smith v. Hofbauer,* 312 F.3d at 818 ("Because the question of whether ... *Sullivan's* lessened standard of proof for a claim of ineffective assistance of counsel based upon an attorney's conflict of interest for anything other than joint representation remains an 'open question' in the jurisprudence of the Supreme Court, *Mickens [v. Taylor* ], 122 S.Ct. at 1246, and in fact was an open question at the time Petitioner's case was heard, Petitioner's claim fails because it is not based upon clearly established Supreme Court precedent as mandated by AEDPA.").

***48** Thus, the only clearly applicable Supreme Court precedent is the *Strickland v. Washington* standard, discussed in Point VI.A above. Applying *Strickland* to Skinner's claim, and assuming *arguendo* that Stewart had an actual conflict, there is no reasonable probability that any conflict of interest prejudiced the outcome of Skinner's case.[FN85] First, as discussed above, none of Skinner's specific complaints about Stewart's representation have any merit. Second, Stewart's representation of Skinner was vigorous and able. The Court has read the entire suppression hearing and has skimmed the trial transcripts, which reveal that Stewart was well-prepared and vigorously advocated for Skinner: she moved for suppression of Skinner's identifications and coat, presented an adequate alibi defense, ably cross-examined witnesses, called into question the credibility of the State's witnesses, and presented a compelling summation. *E.g., Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *33 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) (denying claim that counsel failed to prepare adequately, in light of court's review of counsel's adequate trial performance); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *20 (S.D.N.Y. May 8, 2002) (Peck, M.J.) (same); *see, e.g., Washington v. United States,* No. 00–CV–761, 2002 WL 32074710 at *8 (W.D.Va. Apr. 1, 2002) (even assuming conflict existed, strategies that counsel allegedly failed to pursue, such as "failure to move to dismiss the indictment, interview witnesses, submit a justification defense, recall [particular witness] or seel a [particular] jury instruction" were not linked to the actual conflict and "would only be due to general deficient performance, rather than an attempt to curry favor or a failure to cooperate [with prosecutor]".), *aff'd,* No. 02–6744, 46 Fed. Appx. 705, 2002 WL 31116146 (4th Cir. Sept. 25, 2002), *cert. denied,* 123 S.Ct. 1605 (2003); *United States v. Novaton,* 271 F.3d 968, 1009, 1012 (11th Cir.2001) (Even assuming actual conflict based on counsel's investigation by same United States Attorney's Office in connection with a different case, defendant "made absolutely no showing of any adverse effect resulting from his attorney's alleged conflict" and record was "replete with examples of vigorous and relentless attacks" on the government's case by counsel. Counsel's "aggressive approach could hardly be seen as an effective way for an attorney to curry favor with the government.") (internal quotations omitted), *cert. denied,* 535 U.S. 1120, 122 S.Ct. 2345 (2002); *United States v. Seguame,* No. 94–50157, 50 F.3d 18 (table), 1995 WL 115559 at *5 (9th Cir. Mar. 16, 1995) (defendant's claim that the threat of contempt charges created conflict of interest failed where "there is no indication of any adverse effect on [counsel's] performance" and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

record reflected that counsel “made numerous objections, conducted significant cross-examination, and presented a viable defense case-in-chief.”), *cert. denied,* 515 U.S. 1149, 115 S.Ct. 2594 (1995).[FN86]

FN85. While professional standards may have obligated Stewart to alert Skinner that the charges against her could be reinstated on appeal, any such breach is irrelevant to Skinner's Sixth Amendment claim. The Supreme Court has repeatedly held that “ ‘breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.” ’ *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1246 (2002) (quoting *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 993 (1986)); *accord, e.g., United States v. Taylor,* 139 F.3d 924, 930 (D.C.Cir.1998) (“An ethical lapse is not the same as a conflict of interest....”); *United States v. Gallegos,* 39 F.3d 276, 278 (10th Cir.1994) (“our inquiry is not whether a state disciplinary rule for lawyers has been violated ..., but whether, everything considered, Appellant's counsel ‘actively’ represented conflicting interests”).

FN86. *See also, e.g., Jeremiah v. Artuz,* 181 F.Supp.2d 194, 203 (E.D.N.Y.2002) (examining “counsel's overall performance” and finding no ineffective assistance where “[t]rial counsel ably presented petitioner's justification defense throughout the trial and attempted in cross-examination to develop grounds for questioning the testimony of prosecution witnesses that was harmful to petitioner's defense. Counsel also helped elicit petitioner's trial testimony in an intelligible fashion. His summation was an organized and coherent presentation of the defense position which focused on the justification defense. Notwithstanding the apparent strength of the prosecution's case, counsel forcefully urged the jury to find a reasonable doubt based on an evaluation of the evidence and gaps in the evidence.... [E]ven assuming that counsel committed an oversight or error in judgment ... petitioner was not deprived of his right to the effective assistance of counsel....”); *Walker v. McGinnis,* 99 Civ. 3490, 2000 WL 298916 at *7 (S.D.N.Y. Mar. 21, 2000) (“[A] thorough review of the trial transcript reveals that [petitioner]'s counsel was, in fact, competent, tenacious, and thorough throughout the ing.”); *Harris v. Hollins,* 95 Civ. 4376, 1997 WL 633440 at *6 (S.D.N.Y. Oct. 14, 1997) (“Petitioner offers a laundry list of alleged errors made by defense counsel during trial, which he claims denied him his constitutional right to effective assistance of counsel.... Taken in its totality, petitioner's claim must fail because he has not demonstrated that counsel's conduct fell below that of a reasonable attorney, or that the jury would have found him not guilty but for counsel's ineffective performance. The record indicates that defense counsel aggressively pursued pretrial motions ... cross-examined witnesses, made objections and motions, and gave a comprehensive summation that tied together defense strategies in an effort to discredit the State's case.”); *White v. Keane,* 90 Civ. 1214, 1991 WL 102505 at *6 (S.D.N.Y. June 6, 1991), *aff'd,* 969 F.2d 1381 (2d Cir.1992); *Sanchez v. Kuhlman,* 83 Civ. 4758, 1984 WL 795 at *4 (S.D.N.Y. Aug. 23, 1984) (“Careful review of the entire transcript demonstrates that petitioner's trial counsel was both zealous and competent.”).

***49** For all these reasons, Skinner's conflict of interest ineffective assistance of counsel claim should be denied.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*CONCLUSION*

For the reasons set forth above, Skinner's habeas claims should be denied. A certificate of appealability should not be issued on any of Skinner's claims. Although there is a lack of clarity as to the legal standard applicable to conflict of interest ineffective assistance of counsel claims, Skinner cannot prevail on his conflict claim no matter the standard, so a certificate of appealability should not issue even on that claim.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2003.
Skinner v. Duncan
Not Reported in F.Supp.2d, 2003 WL 21386032 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Patrick E. WEST, Petitioner,
v.
Donald UHLER, Superintendent, Upstate Correctional Facility,[FN1] Respondent.

FN1. Donald Uhler, Superintendent, Upstate Correctional Facility, is substituted for David A. Rock, former Superintendent, Upstate Correctional Facility. FED. R. CIV. P. 25(d).

No. 9:12–cv–01611–JKS.
Signed Aug. 8, 2014.

Patrick E. West, Malone, NY, pro se.

Paul B. Lyons, New York State Attorney General, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior District Judge.

***1** Patrick E. West, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. West is in the custody of the New York State Department of Corrections and Community Supervision and is incarcerated at Upstate Correctional Facility. Respondent has answered, and West has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On the evening of December 31, 2008, West attended a family party and then went to a bar afterwards, and consumed several alcoholic drinks and possibly prescription drugs over the course of the evening. As West was walking home, James Adams bumped into him. West punched Adams in the head and then stomped on Adams's head after Adams fell to the ground. West was arrested on January 1, 2009, and initially charged with second-degree assault and seventh-degree criminal possession of a controlled substance. West claimed he acted in selfdefense. Adams died the following day of acute brain injuries due to blunt force trauma to the head, and West was subsequently indicted by a grand jury for first-and second-degree manslaughter. A jury convicted West of first-degree manslaughter. The court sentenced West to 21 years' imprisonment followed by 5 years of post-release supervision, and ordered him to pay restitution in the amount of $36,293.13.

West directly appealed through counsel, arguing that: 1) the trial court erroneously allowed the prosecution to designate one of its own witnesses, Robin Stevens, "hostile," thereby improperly allowing the prosecution to cross-examine and impeach Stevens in violation of West's right to confrontation; 2) the trial court erroneously allowed the prosecution to use Stevens's out-of-court statements to impeach Stevens and substitute for his testimony in violation of West's right to confrontation; 3) the trial court failed to give sufficient limiting or curative instructions regarding Stevens's testimony; 4) objections to the above-mentioned errors were properly preserved for appeal; and 5) the above-mentioned errors could not be deemed harmless because the evidence against West was not overwhelming.

The Appellate Division unanimously affirmed West's judgment of conviction in a reasoned opinion. *People v. West,* 85 A.D.3d 1393, 925 N.Y.S.2d 272, 273 (N.Y.App.Div.2011). The appellate court held that, "[g]iven Stevens' repeated refusals at trial to answer any questions concerning the written statement he provided to police regarding certain admissions

allegedly made by [West] while in jail, County Court properly exercised its discretion in declaring Stevens to be a hostile witness and permitting the use of leading questions by the People." *Id.* at 272. The court further found that West had failed to preserve for review his claims that the prosecution was improperly permitted to impeach Stevens with his prior out-of-court statements in violation of New York Criminal Procedure Law ("CPL") § 60.35 and his right to confrontation and that the trial court failed to adequately instruct the jury regarding the limited purpose for which such statements could be considered. *Id* . at 272–73. In the alternative, the court concluded that the trial court provided prompt and appropriate limiting instructions and that the use of Stevens's prior statements for impeachment purposes, although improper, was harmless in light of the overwhelming evidence of West's guilt. *Id.* at 273.

***2** West filed a counseled application for leave to appeal to the Court of Appeals. West argued that the Appellate Division erred in concluding that the trial court properly exercised its discretion in declaring Stevens a hostile witness and in finding that the People's improper impeachment of Stevens was unpreserved and harmless. The Court of Appeals denied leave to appeal without comment. *People v. West,* 957 N.E.2d 1164, 1164 (N.Y.2011).

West then filed a *pro se* motion to vacate the judgment pursuant to CPL § 440.10. West argued that trial counsel was ineffective for failing to "state factual allegations inside of his omnibus motion to secure the suppression" of his inculpatory statements to the police and for otherwise moving to suppress those statements. The trial court denied relief without a hearing, noting that West had not raised an ineffective assistance of counsel claim on direct appeal despite the fact that his appellate counsel was different from his trial counsel. The court alternatively held that, viewing the record as a whole, trial counsel provided West meaningful and effective assistance of counsel. West sought leave to appeal from the trial court's denial of his motion, arguing that the trial court erred in denying his motion without a hearing. The Appellate Division denied relief without comment. West then filed for leave to appeal to the Court of Appeals. The Court of Appeals dismissed the application for leave to appeal, concluding that the order sought to appeal from was not appealable.

West then filed a *pro se* petition for writ of error coram nobis, arguing that his appellate counsel was ineffective for failing to argue on direct appeal that the prosecutor committed misconduct where he "became an unsworn witness for the prosecution and placed his own veracity as an issue before the jury and also vouched for ... his witness," and for failing to argue that his sentence was harsh and excessive. The Appellate Division unanimously denied West relief without comment. West then applied for leave to appeal, which the Court of Appeals denied.

West timely filed his *pro se* Petition with this Court on October 25, 2012.

## II. GROUNDS RAISED

In his Petition to this Court, West argues that: 1) the trial court violated CPL §§ 440.30(5) & (7) in denying his motion to vacate the judgment by failing to hold an evidentiary hearing "to develop the facts missing on the record in finding[s] of facts, conclusions of law and reasons for its determination"; 2) trial counsel was ineffective for failing to secure the suppression of his inculpatory statements to the police; and 3) appellate counsel was ineffective for failing to argue on direct appeal that a) the prosecutor committed misconduct in summation, b) his sentence was harsh and excessive, and c) the trial court erred in concluding that Stevens was a hostile witness.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cision of the state court was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” § 2254(d)(1), or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,” § 2254(d)(2). A state-court decision is “contrary” to federal law “if the state court applies a rule that contradicts the governing law set forth” in controlling Supreme Court authority or “if the state court confronts a set of facts that are materially indistinguishable from a decision” of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor,* 529 U.S. 362, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

***3** The Supreme Court has explained that “clearly established Federal law” in § 2254(d)(1) “refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision,” *Williams,* 529 U.S. at 412, and not circuit precedent, *see Renico v. Lett,* 559 U.S. 766, 777–78, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010). The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds and not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer,* 537 U.S. 3, 10, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, “it cannot be said that the state court ‘unreasonabl[y] appli[ed] clearly established Federal law.’ “ *Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (citation omitted). In applying these standards in habeas review, this Court reviews this “last reasoned decision” by the state court. *Ylst v. Nunnemaker,* 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir.2000). Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e) (1); *see also Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

IV. DISCUSSION

A. Exhaustion

This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (citing cases). To be deemed exhausted, a claim must have been presented to the highest state court that may consider the issue presented. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In New York, to invoke one complete round of the State's established appellate process, a criminal defendant must first appeal his or her conviction to the Appellate Division and then seek further review by applying to the Court of Appeals for leave to appeal. *Galdamez v. Keane,* 394 F.3d 68, 74 (2d Cir.2005). Respondent is correct in asserting that West failed to exhaust, such as through a petition for writ of error coram nobis, his claim that appellate counsel was ineffective for failing to raise on direct appeal the argument that the trial court erred in permitting Stevens to be treated as a hostile witness.

Exhaustion of state remedies also requires a petitioner to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly present the legal basis of the claim. An issue is exhausted when the substance of the federal claim is clearly raised and decided in the state court proceedings, irrespective of the label used. *Jackson v. Edwards,* 404 F.3d 612, 619 (2d Cir.2005). Respondent correctly contends that West failed to exhaust his claim that the trial court violated CPL §§ 440.30(5) & (7) by denying his motion to vacate his sentence without holding an evidentiary hearing because he raised it on state-law grounds only.

***4** [W]hen a ‘petitioner failed to exhaust state

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez,* 510 F.3d 382, 390 (2d Cir.2008) (citation omitted); *see also See Grey v. Hoke,* 933 F.2d 117, 121 (2d Cir.1991). A habeas petitioner may only avoid dismissal of his procedurally defaulted claims if he can demonstrate "cause for the default and prejudice from the asserted error," *House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), or a "fundamental miscarriage of justice," *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), *superceded by statute on other grounds, United States v. Gonzalez–Largo,* No. 2:07–cr–0014, 2012 WL 3245522, at *2 (D.Nev. Aug.7, 2012). West does not claim that cause exists for his procedural default. Because West already appealed the denial of his CPL § 440 motion, he may not now return to state court to raise any federal aspect of his claim that the trial court denied his motion without a hearing, and this claim may accordingly be deemed exhausted but procedurally defaulted from habeas review. *See Ramirez v. Attorney Gen.,* 280 F.3d 87, 94 (2d Cir.2001).

West's unexhausted ineffective assistance of appellate counsel claim is not barred, however, because there is no time limit or number bar in filing writ of error coram nobis applications. *See Smith v. Duncan,* 411 F.3d 340, 347 n. 6 (2d Cir.2005); *Turner v. Sabourin,* 217 F.R.D. 136, 147 (E.D.N.Y.2003). West may therefore still exhaust this claim in state court. This Court could stay the Petition and allow West to return to state court to satisfy the exhaustion requirement as to this remaining claim. *See Zarvela v. Artuz,* 254 F.3d 374, 380–83 (2d Cir.2001). However, West has not requested that this Court stay and hold his petition in abeyance. Moreover, the Supreme Court has held that it is an abuse of discretion to stay a mixed petition pending exhaustion where: 1) the petitioner has not shown good cause for failing to exhaust all available state court remedies; and 2) the unexhausted claim is "plainly meritless." *Rhines v. Weber,* 544 U.S. 269, 277, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). In his Petition, West provides no reason why he did not seek relief on this claim through an additional coram nobis application to the state court. Accordingly, this Court declines to dismiss the claim solely on exhaustion grounds and will instead reach the merits of all of his claims, as discussed below.

B. Merits

West argues that he was denied effective assistance of counsel by both his trial and appellate counsel.

a. *Strickland* and New York Standards on habeas review

To demonstrate ineffective assistance of counsel under *Strickland v. Washington,* a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper,* ––U.S. ––, –– – ––, 132 S.Ct. 1376, 1385–86, 182 L.Ed.2d 398 (2012); *Glover v. United States,* 531 U.S. 198, 203–04, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001); *Williams,* 529 U.S. at 393–95. Thus, West must show that his counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland,* 466

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

***5** New York's test for ineffective assistance of counsel under the state constitution differs slightly from the federal *Strickland* standard. “The first prong of the New York test is the same as the federal test; a defendant must show that his attorney's performance fell below an objective standard of reasonableness.' *Rosario v. Ercole,* 601 F.3d 118, 124 (2d Cir.2010) (citing *People v. Turner,* 5 N.Y.3d 476, 806 N.Y.S.2d 154, 840 N.E.2d 123 (N.Y.2005)). The difference is in the second prong. Under the New York test, the court need not find that counsel's inadequate efforts resulted in a reasonable probability that, but for counsel's error, the outcome would have been different. “Instead, the ‘question is whether the attorney's conduct constituted egregious and prejudicial error such that defendant did not receive a fair trial.” *Id.* at 124 (quoting *People v. Benevento,* 91 N.Y.2d 708, 674 N.Y.S.2d 629, 697 N.E.2d 584, 588 (N.Y.1998)). “Thus, under New York law the focus of the inquiry is ultimately whether the error affected the ‘fairness of the process as a whole.” *Id.* (quoting *Benevento,* 674 N.Y.S.2d 629, 697 N.E.2d at 588). “The efficacy of the attorney's efforts is assessed by looking at the totality of the circumstances and the law at the time of the case and asking whether there was ‘meaningful representation.” *Id.* (quoting *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400, 405 (N.Y.1981)).

The New York Court of Appeals views the New York constitutional standard as being somewhat more favorable to defendants than the federal *Strickland* standard. *Turner,* 806 N.Y.S.2d 154, 840 N.E.2d at 126. “To meet the New York standard, a defendant need not demonstrate that the outcome of the case would have been different but for counsel's errors; a defendant need only demonstrate that he was deprived of a fair trial overall.' *Rosario,* 601 F.3d at 124 (citing *People v. Caban,* 5 N.Y.3d 143, 800 N.Y.S.2d 70, 833 N.E.2d 213, 222 (N.Y.2005)). The Second Circuit has recognized that the New York “meaningful representation” standard is not contrary to the federal *Strickland* standard. *Id.* at 124, 126. The Second Circuit has likewise instructed that federal courts should, like the New York courts, view the New York standard as being more favorable or generous to defendants than the federal standard. *Id.* at 125.

b. Trial counsel's failure to set forth the factual basis for suppression in the omnibus motion and secure the suppression of his initial statements to the police

West asserts that he “was denied meaningful and [ ]effective representation by counsel's failure to state factual allegations inside of his omnibus motion to secure the suppression of [his] induced, provoked statements” to the police and counsel's failure to secure the suppression of those statements. The § 440 court denied relief, concluding that West failed to raise the claim on direct appeal despite the fact that he was represented by different counsel on appeal, and that in any event, trial counsel provided meaningful representation.

As an initial matter, “an adequate and independent finding of procedural default will bar federal habeas review of the federal claim,” even if, as here, the state court also rejected the claim on its merits. *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Green v. Travis,* 414 F.3d 288, 294 (2d Cir.2005). In finding this claim unpreserved for appellate review, the trial court relied upon CPL § 440.10(2)(c), which requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record upon which to base such an appeal. The purpose of the rule set forth in CPL § 440.10(2)(c) “is to prevent CPL 440.10 from being employed as a substitute for direct appeal when [the] defendant was in a position to raise an issue on appeal ... or could readily have raised it on appeal but failed to do so.” *People v. Cooks,* 67 N.Y.2d 100, 500 N.Y.S.2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

503, 491 N.E.2d 676, 678 (N.Y.1986) (citations omitted). New York courts have held that some ineffective assistance claims are "not demonstrable on the main record" and are more appropriate for collateral or post-conviction attack, through which the necessary evidentiary record can be developed. *People v. Harris,* 109 A.D.2d 351, 491 N.Y.S.2d 678, 687 (N.Y.App.Div.1985) (collecting cases); *see also People v. Brown,* 45 N.Y.2d 852, 410 N.Y.S.2d 287, 382 N.E.2d 1149, 1149–50 (N.Y.1978).

***6** Here, however, West's claim is based on the omnibus motion and the transcripts of the suppression hearing, which are part of the trial record and thus would have provided a sufficient basis to attack trial counsel's effectiveness on direct appeal. Federal courts in this Circuit have consistently held that where a state court concluded that a petitioner's ineffective assistance of counsel claim raised in a CPL § 440.10 was procedurally barred by CPL § 440.10(2)(c), and the claim was indeed fully developed in the trial record, the petitioner has also defaulted that claim on federal habeas review. *See Sweet v. Bennett,* 353 F.3d 135, 139–41 (2d Cir.2003); *McCall v. Rivera,* 965 F.Supp.2d 311, 334–35 (S.D.N.Y.2013); *Hogan v. West,* 448 F.Supp.2d 496, 506–07 (W.D.N.Y.2006). Because West has failed to assert cause for the default and prejudice, or that failure to consider the claim will result in miscarriage of justice, his claim is procedurally defaulted from review by this Court. *Sweet,* 353 F.3d at 141.

In any event, the § 440 court's alternative conclusion that West's trial counsel provided meaningful representation was not unreasonable or contrary to federal law. In the omnibus motion, defense counsel moved for the suppression of West's statements made to Sergenat Troyer and Sergeant Strangeway on the grounds that his statements were "elicited by coercion and the force of excessive police authority." Defense counsel moved in the alternative for a *Huntley* hearing.[FN2] The omnibus motion correctly noted that "[West] is not required to make any other specific factual allegations [in the motion] as to the involuntariness of his statements" to the police. CPL §§ 710.20(3), 710.60(3)(b);[FN3] *see People v. Jones,* 95 N.Y.2d 721, 723 N.Y.S.2d 761, 746 N.E.2d 1053, 1056 n. 2 (N.Y.2001) ("Sworn allegations of fact are not required in motions for suppression of either involuntarily made statements or identification testimony resulting from improper procedures." (citations omitted)); *People v. Huntley,* 259 A.D.2d 843, 687 N.Y.S.2d 747, 749–50 (N.Y.App.Div.1999). Thus, West's claim that his counsel was ineffective for failing to set forth the factual basis for his suppression claim in the omnibus motion is without merit, as under New York law, a factual basis for the claim was not required.

FN2. *People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (N.Y.1965). The term "*Huntley* hearing" is a shorthand reference to the hearing held in New York on a challenge to the admissibility of statements made to law enforcement personnel.

FN3. CPL § 710.20(3) provides that a court may suppress evidence on the ground that it "[c]onsists of a record or potential testimony reciting or describing a statement of such defendant involuntarily made." CPL § 710.60(3)(b) provides that "[t]he court may summarily deny the motion if ... [t]he sworn allegations of fact do not as a matter of law support the ground alleged; *except that this paragraph does not apply where the motion is based upon the ground specified in subdivision three or six of section 710.20.*" (Emphasis added).

West's claim that counsel was ineffective for failing to successfully secure the suppression of his statements to Sergeant Strangeway and Sergeant Troyer is also without merit. At the *Huntley* hearing, defense counsel skillfully cross-examined Sergeant Cute, who took an initial statement from West, Officer

Barber, who also initially responded to the scene, Officer Abbott, who transported West to the station, Sergeant Strangeway, who was called to the scene by Officer Cute, and Sergeant Troyer, who arrived at the scene after being notified of the incident by Sergeant Strangeway and who interviewed West at the station. Defense counsel elicited from Officer Barber, Officer Abbott, and Sergeant Strangeway that West was intoxicated at the time he made his initial inculpatory statements to Sergeant Cute. Defense counsel was also able to elicit from Sergeant Troyer that he did not feel comfortable questioning West after he was transported to the station because West's condition had deteriorated and he was "incoherent," had trouble walking, and kept falling asleep. According to Sergeant Troyer, it would have been "improper" to take his statement at that time. West was sent to the hospital for treatment and when he returned to the station, he was no longer incoherent. Sergeant Troyer proceeded to take a statement from him at that time, but testified that he did not know what had happened at the hospital or if West had gotten any sleep. Defense counsel was also able to elicit that Sergeant Troyer failed to completely fill out the form indicating that he advised West of his *Miranda* rights. Viewing the transcripts of the suppression hearing as a whole, defense counsel vigorously cross-examined the People's witnesses and effectively called into question the circumstances under which the police took several statements from West, highlighting in particular West's intoxicated state. The Sixth Amendment does not require more. Although the court ultimately denied West's motion to suppress his inculpatory statements to the police, there was nothing deficient about defense counsel's performance either in moving or arguing for the suppression of those statements. The state court did not unreasonably determine that counsel provided West meaningful representation.

***7** Construing West's claim liberally, *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), he appears to argue that, in denying his CPL § 440 motion, the trial court violated CPL §§ 440.30(5) & (7) by failing to hold an evidentiary hearing or "to develop the facts missing on the record in finding[s] of fact, conclusions of law and reasons for its determination." [FN4]

FN4. CPL § 440.30(5) provides in pertinent part that "[i]f the court does not determine the [CPL § 440.10] motion pursuant to [CPL § 440.30] subdivisions two, three or four, it must conduct a hearing and make findings of fact essential to the determination thereof." CPL § 440.30(7) provides that "[r]egardless of whether a hearing was conducted, the court, upon determining the motion, must set forth on the record its findings of fact, its conclusions of law and the reasons for its determination."

As discussed *supra,* West failed to exhaust this claim because he raised it on state-law grounds only. Moreover, West's claim is not cognizable on federal habeas review. The United States Supreme Court has recognized that the Constitution does not compel states to provide post-conviction proceedings for relief. *Lackawanna Cnty. Dist. Attorney v. Coss,* 532 U.S. 394, 402–03, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001) (citing cases). Accordingly, federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings. *See Word v. Lord,* 648 F.3d 129, 132 (2d Cir.2011) (per curiam) ("[A]lleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a postconviction mechanism for seeking relief.").

West's claim might also be construed as a request for an evidentiary hearing in this Court. "A district court has broad discretion to hear further evidence in habeas cases." *Nieblas v. Smith,* 204 F.3d 29, 31 (2d Cir.1999). "[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley,* 520 U.S. 899, 908–09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (quoting *Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)); *see also Schriro v. Landrigan,* 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

West fails, however, to specify what evidence he wishes to present. He states only that an "[e]videntiary hearing is required to develop the facts missing on the record [for the § 440 court's] determination[s]." A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

***8** Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled in part on other grounds by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); superceded in part by statute, 28 U.S.C. § 2254(e)(2) (1996). In Townsend, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. 372 U.S. at 313.

As discussed above, West has failed to assert a colorable claim for relief as to either of his ineffective assistance of trial counsel claims. Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts, he also has failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2). Accordingly, he is not entitled to an evidentiary hearing in this Court.

c. Appellate counsel's failure to argue prosecutorial misconduct

West next argues, as he did in his coram nobis petition, that his appellate counsel was ineffective for failing to argue on direct appeal that the prosecutor committed misconduct in summation when he "became an[ ] unsworn witness for the prosecution and placed his own veracity as an issue before the jury, [and] also vouched for his witness." The Appellate Division unanimously denied West relief without comment.

In its case-in-chief, the prosecution called Robin Stevens to testify regarding certain inculpatory statements West had made to Stevens in jail on the night West was arrested. Stevens testified about his own criminal history, that he knew both West and Adams, and that West was housed next to him in jail on January 1, 2009, when West was arrested. Stevens admitted that he had given a statement to the police and testified in the grand jury, but declined to identify West at trial or answer questions about the content of his police statement and grand jury testimony. Stevens

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

did not initially invoke the Fifth Amendment, instead stating that he was not worried about incriminating himself. Rather, he asserted that the incident was “[j]ust none of [his] business,” and that “[k]arma is a very bad thing.” When the prosecution then asked if his statement to Sergeant Troyer was true, Stevens stated that he would “plead the fifth on that one.” The prosecution then moved to treat Stevens as a hostile witness. Over defense counsel's objections, the court granted the prosecution's request and allowed the prosecution to ask Stevens leading questions.

***9** The prosecutor then asked Stevens two leading questions regarding the content of his statement to the police about what West had confessed to him, but Stevens refused to answer. He initially stated that he did not “want to answer,” but then stated “I plead the Fifth.” Defense counsel objected on the grounds that the prosecutor was “in effect testifying,” but the court overruled that objection on the ground that the counsel's questions “can't be considered as evidence by the jury and have to be disregarded as evidence by the jury as is part of my standard instructions.” The prosecutor then asked Stevens several additional leading questions regarding the content of his police statement, and Stevens repeatedly invoked his Fifth Amendment right to remain silent. The only substantive question Stevens answered about West concerned whether West told Stevens that he was intoxicated on alcohol and Clonazepam on the night of the incident. Stevens stated, “He was really drunk. I could smell liquor on him before he walked in the door. He was pretty wasted, he was drunk.” The prosecutor clarified that he was asking Stevens if West *told* him that he was drunk on Long Island Iced Teas and Clonazepam, and Stevens replied that he was again “plead[ing] the Fifth.”

At the conclusion of direct testimony, defense counsel moved to “strike all of the testimony” in which Stevens had invoked the Fifth Amendment. The court ruled that “[c]ertainly anything that he pled the Fifth on will be stricken and certainly the questions are not as I said evidence themselves and none of those statements are received into evidence and the jury is so instructed.”

Defense counsel then proceeded to cross-examine Stevens at length. Stevens did not invoke his Fifth Amendment right against self-incrimination at any time during crossexamination. Stevens testified that he had been incarcerated for most of his adult life, that he told the grand jury that West was a friend of his, that he had violated various orders of protection, that he sold drugs for approximately ten years, that he had trouble following laws he did not agree with, that had previously pled guilty to endangering the welfare of a child, and that he had violated probation on various occasions for smoking marijuana because he had a problem with authority figures and he did not like his probation officer. Stevens testified that he had previously been convicted for the criminal sale of a controlled substance in the third degree. He claimed that if he failed to take a plea that was offered to him in that case that he would “get smashed” because the judge, district attorney, and his own attorney did not like him. That court ultimately refused to sentence him in accordance with his plea deal because he had not been honest with his probation officer about the fact that he had withdrawn from college. Stevens also testified that he pled guilty to criminal contempt in the second degree in exchange for dropping an order of protection which prevented him from seeing his daughter.

***10** In summation, the prosecutor noted that Stevens “didn't want to be here. And he refused to confirm or deny the things he had previously told the police shortly after Pat West and he had been together in [jail].” The prosecutor continued:

> So it's only fair to [West] that you can't rely on the things I asked Robin Stevens about what he said [to the police]. You can't rely on those questions for the truth of the matters that were contained in those statements. But unless the judge tells you otherwise, and I don't think he will, you can consider what he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

did acknowledge from his statement, and the fact that he did acknowledge giving a statement to Sergeant Troyer, and the fact that he did acknowledge testifying in the grand jury when this case was indicted, and you can consider how he presented himself in this courtroom, *and you can consider how he never denied making a single statement I asked him about, simply refused to answer.*

The prosecutor further stated that although he was "not going to vouch for Robin Stevens," the jurors "don't have to leave your common sense behind on this witness either, or forget what you saw when he testified. You can and should consider how you saw him act on the witness stand, what he did say, *what he didn't say, and what logical inferences you might want to draw from all that.*"

After summation was complete and the jury had been excused, defense counsel objected to the prosecution's summation, arguing as follows:

[The prosecutor] indicated that Robin Stevens did not deny any of the questions I posed to him with regard to the statements he made previously, he just didn't answer. I would object on the grounds it would be improper to suggest [that an] inference can be made for refusal to answer based upon the right not to incriminate yourself.

The prosecutor argued in response that he had been clear that the jury could not infer that any information in his questions were true, but that the jury had a right to consider what it observed of Stevens in the courtroom. The court overruled defense counsel's objection without comment.

As noted above, West argues that appellate counsel was ineffective for failing to argue on direct appeal that the prosecutor committed misconduct in summation by becoming an unsworn witness for the prosecution, "placing his own veracity [at] issue," and vouching for Stevens. Trial counsel did not object on those grounds, and according failed to preserve such a claim for appeal. *See People v. Giuca,* 58 A.D.3d 750, 871 N.Y.S.2d 709, 711 (N.Y.App.Div.2009) ( "The defendant's contention that the prosecutor's misstatements of the law during summation deprived him of a fair trial is unpreserved for appellate review since the defendant did not object to those remarks." (citations omitted)). Instead, trial counsel argued that the prosecutor misstated the law. Appellate counsel's decision to argue the preserved claim on direct appeal that the prosecutor had misstated the law and forgo the unpreserved claim that the prosecutor committed misconduct by vouching for Stevens, assuming the role of an unsworn witness, and placing his own veracity at issue, was a reasonable trial strategy which this Court may not second-guess. After reviewing closing argument as a whole, there is no evidence that the prosecutor committed misconduct in the manner West suggests. The prosecutor specifically stated that he was not vouching for Stevens, and at no time asked the jury to pass on his personal integrity or ethics or asserted statements akin to unsworn testimony. *Cf. Floyd v. Meachum,* 907 F.2d 347, 354 (2d Cir.1990) (discussing the impropriety of the prosecution's request that the jury pass on her personal integrity and professional ethics before deliberating on the evidence, thereby implying that she personally vouched for a witness's credibility). West has failed to demonstrate that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). On the contrary, appellate counsel deftly chose to assert the stronger argument-that the prosecutor improperly advised the jury that it could make inferences based on Stevens's invocation of his right to remain silent-over the weaker argument West suggests should have been raised. Contrary to West's suggestion, appellate counsel does not have a duty to advance every nonfrivolous argument that could be made. *Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Rather, "[e]xperienced advocates since time beyond

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751–52; *Aparicio v. Artuz,* 269 F.3d 78, 99 (2d Cir.2001) (holding that it is not ineffective counsel to fail to raise meritless claims). Appellate counsel was not deficient in failing to raise this claim on direct appeal, and the Appellate Division's denial of West's ineffective assistance of appellate counsel claim was therefore not unreasonable or contrary to federal law.

d. Appellate counsel's failure to argue harsh and excessive sentence

***11** West next argues that appellate counsel was ineffective for failing to argue on direct appeal that his sentence was harsh and excessive. West raised this claim in his coram nobis petition. The Appellate Division unanimously denied West relief without comment, and the Court of Appeals denied leave to appeal.

In New York, first-degree manslaughter is a class B felony offense for which a defendant may be sentenced from 5 to 25 years' imprisonment along with 21/2 to 5 years of post-release supervision. N.Y. PENAL LAW §§ 125.20(1), 70.02(1)(a), 70.02(3)(a), 70.45(2)(f). It is undisputed that West's sentence of 21 years' imprisonment followed by 5 years' post-release supervision was within that statutory range. The Appellate Division is authorized to reduce sentences which, although legal, are "unduly harsh or severe," CPL § 470.15(6)(b); however, "[w]here a sentence is within permissible statutory ranges, it will not be disturbed unless the sentencing court abused its discretion or extraordinary circumstances exist warranting modification." *People v. Mitchell,* 289 A.D.2d 776, 734 N.Y.S.2d 353, 358 (N.Y.App.Div.2001) (citation omitted).

According to the pre-sentence investigation report, although this was West's first experience with the penal system, he had previously been involved in similar violent episodes. In April 2008, West punched a man in the face in a parking lot and later claimed that that victim and his brother had "jumped" him for no apparent reason. One month later, in the same parking lot, West punched another man two or three times until the man was unconscious and suffered numerous facial fractures. West again claimed he was acting in self-defense, and told the police, "It's not my fault I hit harder than they do." The pre-sentence investigation report also recounted that West told Stevens while they were briefly in jail together that on the night of the incident he was intoxicated and high on prescription drugs when he punched Adams and then stomped the "shit out of his head" after Adams fell to the ground. He also reportedly told Stevens that he would not be in jail if not for his wife, because she had left him and he was "really pissed off" when he encountered Adams. According to the report, Sergeant Troyer stated that West "took no responsibility and showed no remorse," and that his statements about his prior physical altercations were consistent with each other "almost word for word, that it was self-defense." The report stated that West said, "Well the guy ran into me, what was I supposed to do?" The report noted that West failed to show remorse and responsibility for his actions, and concluded:

> It appears that the only person who could have predicted this type of behavior was [West] himself. He was aware that he has a quick temper and that when he drinks he is more likely to engage in physical altercations, as evidenced by his past history. He is also aware of his physical strength as evidenced by a former statement made to the police that, "It's not my fault that I hit harder than they do." Previous to this matter [West] had struck another individual hard enough to render him unconscious and require treatment at University Hospital. [West] did nothing to seek help for his aggressive behavior making it inevitable that he would eventually cause serious lasting physical injury or death.
>
> ***12** Under these circumstances, [West's] potential for law abiding behavior is extremely poor. For the

protection of the community he needs to be removed from society. It is hoped that as he matures he will recognize that he does have aggression issues as well as drug and alcohol issues and will seek treatment for same.

After reviewing the pre-sentence investigation report and hearing impact statements as well as argument of counsel, the court characterized the incident as a "random act of brutality" by West who "barely [k]new his victim" and "certainly had no motive to attack him in this vicious way." The court considered the mitigating factors argued by defense counsel, including West's relative youth and his lack of a prior criminal record, and weighed them against the "substantial" aggravating factors, including "[t]he savage nature of the attack itself," West's "lack of regard for his victim ... at any stage of this matter, including leaving him behind in the snow after the attack simply to be found by others," "the evidence ... of similar acts of violence," and the fact that "moments after his crime against Mr. Adams, [West] was involved in another fight." The court was "particularly concerned about the lack of remorse" West showed at any stage. "Balancing these factors," the court ultimately concluded that "a severe sentence is required ... by such a senseless act of violence."

The Appellate Division's denial of West's ineffective assistance of appellate counsel claim was not unreasonable or contrary to federal law. Although appellate counsel could conceivably have argued that West's sentence was harsh and excessive, it is not likely that counsel would have succeeded, and as discussed *supra,* appellate counsel need not raise every non-frivolous argument. *Jones,* 463 U.S. at 751–52, 754; *Aparicio,* 269 F.3d at 99. There is no evidence that extraordinary circumstances warranted modification of his sentence; rather, the record supports the imposition of a lengthy sentence given West's history of violence, his awareness of his short temper and physical strength, the lack of motive and the brutality of the act, and West's lack of regard for the victim or remorse for what occurred. In addition, the sentencing court carefully weighed both aggravating and mitigating factors, and it is not likely that the Appellate Division would have found that it abused its discretion in balancing those factors. Given the court's deliberation over the sentence and the support in the record for a lengthy sentence, any argument by counsel that the Appellate Division should reduce the sentence as harsh and severe would have likely have been fruitless, and counsel is not deficient for focusing on the stronger arguments on appeal. *Mayo,* 13 F.3d at 533; *Jones,* 463 U.S. at 751–52. Therefore, the denial of West's ineffective assistance of appellate counsel claim was not unreasonable or contrary to federal law.

e. Appellate counsel's failure to argue that the trial court erred in declaring Stevens a hostile witness

***13** Finally, West argues that appellate counsel was ineffective for failing to argue on direct appeal that "[t]he trial court erred in allowing the [prosecution] to declare [Stevens,] its own witness, '[h]ostile,' thereby allowing cross-examination and impeachment which constituted prejudicial error and deprived [him] of his fundamental confrontation rights." As discussed *supra,* this claim is unexhausted, and in any event is completely without merit. Appellate counsel did in fact argue on direct appeal to the Appellate Division that the trial court erred in allowing the prosecution to declare Stevens hostile, "thereby allowing impeachment which constituted prejudicial error and deprived [West] of his fundamental confrontation rights," and further argued that the claim was preserved for review and was not harmless. The Appellate Division concluded that the trial court properly exercised its discretion in declaring Stevens hostile given his refusal at trial to answer any questions about the written statement he had provided to the police regarding the admissions West allegedly made to him. *West,* 925 N.Y.S.2d at 272. In applying for leave to appeal to the Court of Appeals, counsel similarly argued that the Appellate Division erred in concluding that the trial court properly exercised its discretion in declaring

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Stevens a hostile witness and in finding that the People's improper impeachment of Stevens was unpreserved and harmless. The Court of Appeals denied relief without comment. *West,* 17 N.Y.3d 905, 933 N.Y.S.2d 660, 957 N.E.2d 1164, 1164. Thus, West's claim that appellate counsel was ineffective in this regard is belied by the record and rejected by this Court.

To the extent West challenges the state court's implicit ruling that treating Stevens as a hostile witness did not violate his right to confrontation, that ruling was not unreasonable or contrary to federal law. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. It is well-settled that the Confrontation Clause only guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (citation and internal quotation marks omitted). The Second Circuit has recognized "that in some instances a defendant's sixth amendment right to confrontation will be denied as a result of a witness' invocation of his or her fifth amendment privilege against self-incrimination." *Bagby v. Kuhlman,* 932 F.2d 131, 135 (2d Cir.1991) (collecting cases). However, not every instance in which a witness invokes the privilege will give rise to a confrontation violation; rather, "the sixth amendment is violated only when assertion of the privilege undermines the defendant's opportunity to test the truth of the witness' direct testimony." *Id.*

***14** Here, West was not precluded from undermining Stevens's direct testimony. Direct testimony which was not stricken was limited to his criminal history and the bare fact that he had spoken to police and testified before the grand jury about the content of a conversation he had with West while they were incarcerated together shortly after West's arrest. Defense counsel was able to critically attack Stevens's credibility, eliciting an explicit lack of respect for the law as well as a detailed criminal history which rendered him incarcerated for the majority of his adult life. Stevens did not testify to anything of substance against West on direct, and to the extent that the jury could infer that he had previously incriminated West, defense counsel was able to substantially undermine any detrimental inference through cross-examination. *Pennsylvania v. Ritchie,* 480 U.S. 39, 51–52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (the right to cross-examination "includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable," and this type of evidence "can make the difference between conviction and acquittal"); *Bagby,* 932 F.2d at 137 ("a witness' invocation of the fifth amendment will not violate a defendant's right to confrontation *unless* the refusal precludes the defendant from testing the truth of the witness' prior testimony" (citation and internal quotation marks omitted)). Because Stevens's invocation of his Fifth Amendment right against self-incrimination did not preclude defense counsel from testing the very limited nature of his direct testimony, any claim by appellate counsel that West was precluded from confronting Stevens in violation of the Sixth Amendment would have been futile. *Jones,* 463 U.S. at 751–52.

## V. CONCLUSION

West is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED.**

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Slip Copy, 2014 WL 3895235 (N.D.N.Y.)
**(Cite as: 2014 WL 3895235 (N.D.N.Y.))**

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller–El,* 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Second Circuit Court of Appeals. *See* FED. R.APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

N.D.N.Y.,2014.
West v. Uhler
Slip Copy, 2014 WL 3895235 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Page 1

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Randy WILENS, Petitioner,
v.
SUPERINTENDENT OF CLINTON CORRECTIONAL FACILITY, Respondent.

No. 11–CV–1938 (JFB).
Dec. 31, 2013.

Randy Wilens, pro se.

Thomas Spota, District Attorney of Suffolk County, by Michael Herman Blakey, Riverhead, NY, for Respondent.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

***1** Randy Wilens ("Petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his October 25, 2005 conviction in state court. Under Suffolk County Indictment Number 1020–2005, Petitioner was charged with two counts of Course of Sexual Conduct Against a Child in the First Degree (N.Y. Penal Law § 130.75(1)(a)), two counts of Course of Sexual Conduct Against a Child in the Second Degree (N.Y. Penal Law § 130.80(1)(a)), three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)), and five counts of Endangering the Welfare of a Child (N .Y. Penal Law § 260.10(1)). Petitioner pled guilty to the indictment and was sentenced, as a prior felony offender, to an aggregate term of fourteen years' incarceration with five years post-release supervision ("PRS").

Petitioner now challenges his conviction, arguing that: (1) his Fourteenth Amendment due process rights were violated because he was not informed of the mandatory post-release supervision ("PRS") as a component of his sentence; (2) he received ineffective assistance of counsel when his attorney failed to advise him of PRS accompanying the sentence, failed to object to duplicate counts in the indictment, and failed to file an appeal; (3) his allocution was insufficient to support a conviction for the crimes alleged; and (4) the District Attorney committed *Brady* and *Rosario* violations by failing to disclose Family Court findings and medical reports related to the case.

For the reasons set forth herein, the Court finds that Petitioner has not demonstrated any basis for habeas relief. Most of Petitioner's claims are procedurally barred. In any event, all of Petitioner's claims fail on the merits. The Court, therefore, denies the petition in its entirety.

## I. BACKGROUND

### A. Facts

#### 1. The Plea

On August 30, 2005, Petitioner entered a plea before the Honorable Michael Mullen. Under advice of counsel, Petitioner was sworn in (P. 4),[FN1] and affirmed that he freely entered his guilty plea while waiving his constitutional and statutory trial rights. (P. 5–6.) Petitioner allocuted to his guilt on the offenses charged, admitting that: (1) at least three times within a three month period between 2002 and 2004, he subjected a female child, who was less than eleven years of age, to sexual contact and sexual intercourse for his sexual gratification (*id.* at 7–8); (2) between September 2003 and July 2004, on three occasions

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

within a three month period, at his residence in Suffolk County, he had sexual contact with a male child, who was less than eleven years of age, including one incident of oral sexual conduct (*id.* at 9–10); (3) at his residence in Suffolk County, in July 2004, he had sexual intercourse with a male, who was less than eleven years of age, for his own sexual gratification (*id.* at 11–12); (4) he had sexual contact with another male who was less than eleven years of age for his own sexual gratification (*id.* at 12–13); (5) he twice exposed himself to a female less than seventeen years of age (*id.* at 15–16); (6) in October 2004, at a house in Suffolk County, he had sexual contact with a female, who was under eleven years of age, for his own sexual gratification (*id.* at 13–14); (7) at a house in Suffolk County, in the autumn of 2004, he played pornographic video tapes for a minor under eleven years of age (*id* . at 14); (8) in the autumn of 2004, he displayed lewd images from his cell phone to a child under seventeen years of age (*id.* at 14–15); and (9) he endangered the physical, mental, and moral welfare of four children under seventeen years of age (*id.* at 16).

FN1. "P." refers to the plea transcript.

***2** The court was satisfied with the allocution and Petitioner was found guilty of all charges which consisted of: (1) two counts of Course of Sexual Conduct Against a Child in the First Degree (N.Y. Penal Law § 130.75(1)(a)); (2) two counts of Course of Sexual Conduct Against a Child in the Second Degree (N.Y. Penal Law § 130.80(1)(a)); (3) three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)); and (4) five counts of Endangering the Welfare of a Child (N.Y. Penal Law § 260.10(1)). (P. 16–17.)

2. The Sentencing

At the sentencing hearing on October 25, 2005, Petitioner was sentenced as a Persistent Felony Offender ("P.F.O.") after admitting to a prior conviction of Sodomy in the First Degree, a class "B" felony. (S.5–6.) [FN2] The court sentenced Petitioner as follows: (1) for two counts of Course of Sexual Conduct Against a Child in the Second Degree, Petitioner was sentenced to two concurrent terms of seven-years' incarceration with three-years' PRS (*id.* at 9–10); (2) for two counts of Course of Sexual Conduct Against a Child in the First Degree, Petitioner was sentenced to two concurrent terms of fourteen-years' incarceration with five-years' PRS (*id.* at 10); (3) for three counts of Sexual Abuse in the First Degree, the court sentenced Petitioner to three concurrent terms of seven-years incarceration with three-years' PRS (*id.* at 10); and (4) for five counts of Endangering the Welfare of a Child, the court sentenced Petitioner to five concurrent terms of one year of incarceration. (*Id.* at 10–11.) All terms of the sentence were ordered to run concurrently.

FN2. "S." refers to the sentencing transcript.

B. Procedural History

Petitioner filed a notice of motion for sentence reduction on November 17, 2005. His court appointed defense counsel argued that, in the interest of justice, the sentence should be reduced from 14 years, to the minimum 10 years, as the imposed sentence was harsh and excessive. (Notice of Motion for Sentence Reduction, Dec. 31, 2007, Indictment Number 1020–2005.) Petitioner also wrote a letter to the Appellate Division seeking permission to file a *pro se* supplemental brief. The Appellate Division granted the request. Through his Supplemental Brief filed October 30, 2007, Petitioner claimed that his sentence was harsh and excessive and should be reduced because (1) his plea was unknowingly made, as he was not made aware of post-release supervision accompanying the plea, and (2) his counsel was ineffective for failing to raise specific *Brady* or *Rosario* material, failing to file an appeal, and failing to inform Petitioner of PRS. (Notice of Motion for Sentence Reduction–Supplemental Brief, Oct. 30, 2007, Indictment Number 1020–2005) The Appellate Division affirmed the sentence on March 4, 2008 without an opinion. *People v. Wilens,* 49 A.D.3d 570 (N.Y.App.Div.2008). Petitioner sought leave to ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

peal from the Court of Appeals, which was denied. *People v. Wilens,* 10 N.Y.3d 965, 863 N.Y.S.2d 149, 893 N.E.2d 455 (2008).

***3** Petitioner then filed a motion under N.Y.C.P.L. § 440.10 ("Pet'r's 440 Mot.") to vacate the judgment with the Suffolk County Supreme Court, arguing that: (1) his plea was not knowingly, intelligently, and voluntarily made because he was not made aware of the PRS, thus violating his due process rights (Pet'r's 440 Mot. at 1–2); (2) he received ineffective assistance of counsel for failing to object to alleged duplicate counts on the indictment, failing to advise him of PRS, and coercing Petitioner to accept the plea agreement (*id.* at 3–4, 863 N.Y.S.2d 149, 893 N.E.2d 455); (3) the allocution was insufficient to cover the elements of the crimes (*id.* at 2, 863 N.Y.S.2d 149, 893 N.E.2d 455); and (4) the prosecutor committed *Brady* and *Rosario* violations for failing to disclose a finding of not guilty to a charge of abuse in Family Court. (*Id.* at 3–4.)

The Suffolk County Supreme Court denied the motion in full. *People v. Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty. Sept. 10, 2010). First, the court reasoned, based on the record, that Petitioner failed to show how his plea was unknowingly, unintelligently, or involuntarily made. *Id.* Furthermore, the court held that the claim was "wholly based on the record and as such not subject to review in a '440' proceeding." *Id.* (citing N.Y.C.P.L. § 440.10(2)(c); *People v. Byrdsong,* 234 A.D.2d 468, 651 N.Y.S.2d 903 (2d Dep't 1996)). Second, the court concluded that Petitioner failed to support his claim of ineffective assistance of counsel with any evidence other than a self-serving affidavit and was not borne out by the record. *Id.* (citing *People v. Mackenzie,* 224 A.D.2d 173, 637 N.Y.S.2d 128 (1st Dep't 1996)). Third, the court held that "[t]he defendant's claim that the impositions of a period of five years post release supervision was error requiring relief was again record based and not subject to review." *Id.* Fourth, the court held the alleged *Rosario* and *Brady* violations were presented without any evidence and had no merit. However, the court did not specifically address whether there was an insufficient allocution to cover the elements of the crimes (which had been raised in a one-sentence argument by Petitioner). *Id.* The Appellate Division denied Petitioner's certificate for leave to appeal. *People v. Wilens,* A.D. No.2010–10180 (2d Dep't Dec. 23, 2010). Petitioner's motion to reargue the denial of leave to appeal was again denied by the Appellate Division. *People v. Wilens,* A.D. No 2010–10180 (2d Dep't Mar. 31, 2011).

Petitioner then filed a *pro se* Petition for Writ of Habeas Corpus ("Pet'r's Habeas Pet.") on August 22, 2011, raising four grounds for relief. First, Petitioner argues that his plea violated the Due Process Clause of the Fourteenth Amendment because it was not made voluntarily, knowingly, and intelligently, as he was not made aware that PRS was a component of his sentence. (Pet'r's Habeas Pet. at 1.) Second, Petitioner argues that he had ineffective assistance of counsel because his attorney failed to: (1) advise him of the direct consequences of PRS; (2) advise him of his right to appeal; (3) file an appeal; and (4) object to duplicate counts on the indictment. (*Id.* at 3, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Third, Petitioner argues that his allocution was insufficient to support the elements of the crimes charged. (*Id.* at 6, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Finally, Petitioner alleges that the prosecution committed *Brady* and *Rosario* violations by withholding certain medical records and a finding of 'Not Guilty' of abuse in his Family Court case, which related to this criminal matter. (*Id.* at 3–4) Respondent filed a memorandum of law in opposition to the petition on July 27, 2012. ("Resp.Br.") The Court has fully considered the submissions and arguments of the parties.

## II. STANDARD OF REVIEW

***4** To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). " 'Clearly established Federal law' " is comprised of " 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: " 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.' " *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Williams,* 529 U.S. at 411). Additionally, while " 'some increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Id.* (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*' " *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir.2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)).

## III. DISCUSSION

For the reasons discussed below, this Court denies the petition for habeas corpus. As a threshold matter, the due process claim is procedurally barred because the state court found that claim to be a record-based claim that is not subject to review in a Section 440 motion. However, in an abundance of caution, the Court has analyzed the merits of every claim and concludes that Petitioner's claims are entirely without merit.

### A. Procedural Bar

#### 1. Exhaustion

***5** As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida,* 549 U.S. 327, 333, 127 S.Ct.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

1079, 166 L.Ed.2d 924 (2007), a petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)) (alteration in original and quotation marks omitted).

Passage through the state courts, in and of itself, "is not sufficient." *Picard,* 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see also Duncan,* 513 U.S. at 365–66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Jones v. Keane,* 329 F.3d 290, 294–95 (2d Cir.2003) (citation and internal quotation marks omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye v. Att'y Gen. Of N.Y.,* 696 F.2d 186, 191–92 (2d Cir.1982) (en banc). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* at 191–92 (footnote omitted).

2. State Procedural Requirements

Similar to the failure to exhaust a claim, the failure to satisfy the state's procedural requirements will deprive the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson,* 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Reyes v. Keane,* 118 F.3d 136, 140 (2d Cir.1997) (quoting *Coleman,* 501 U.S. at 735) (emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are ... to be deemed exhausted." *DiGuglielmo v. Smith,* 366 F.3d 130, 135 (2d Cir.2004). Notably, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes,* 118 F.3d at 139 (citations and internal quotation marks omitted).

***6** However, even where a plaintiff properly exhausts his claim, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (citing *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Coleman,* 501 U .S. at 744–51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray,* 518 U.S. at 162.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The procedural bar rule in the review of applications for writs of habeas corpus is based on the "comity and respect" accorded to state judgments. *House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Coleman,* 501 U.S. at 730–31.

Once it is determined that a claim is procedurally barred under state rules, a federal court may review such a claim on its merits only if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id.* at 750. A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier,* 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that in light of new reliable evidence not presented at trial, " 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt' " and would require " 'new reliable evidence ... that was not presented at trial.' " *House,* 547 U.S. at 537 (quoting *Schlup v. Delo,* 513 U.S. 324, 327 (1995)).

3. Application

"The burden of proving exhaustion lies with the habeas petitioner." *Cartagena v. Corcoran,* No. 04–CV–4329, 2009 WL 1406914, at *3 (E.D.N.Y. May 19, 2009). The Court concludes that Petitioner has not met this burden with respect to his due process claim, as it was not "fairly presented" in state court. Petitioner never sought reversal of his conviction, but rather merely sought a sentence reduction under state law. As discussed *supra,* Petitioner on direct appeal argued to reduce his sentence under N.Y.Crim. Proc. Law 470.15(2)(c) and 470.20(6), claiming that it was harsh and excessive. Courts have correctly found that a prisoner's reliance on a state procedural law granting courts discretionary authority to reduce sentences does not "fairly present" a constitutional claim in state court. *King v. Cunningham,* 442 F.Supp.2d 171, 181 (S.D.N.Y.2006) (collecting cases); *Castillo v. Abrams,* No. 88–CV–1165, 1988 WL 96026, at *1–2 (S.D.N.Y. Aug. 24, 1988) ("Asking a state court to use its discretionary authority to reduce a sentence [under New York's Criminal Procedure Laws], without more, is not enough to alert the court that the claim is of constitutional dimension.") Accordingly, Petitioner's due process claim is unexhausted, and thus, cannot be reviewed by this Court.

***7** However, Petitioner, through his § 440.10 motion to vacate, did seek reversal on the same grounds that he alleges in this petition-namely, (1) due process violations because the plea was not knowingly made; (2) ineffective assistance of counsel; (3) insufficient allocution; and (4) *Brady* and *Rosario* violations. Petitioner also argued that post-release supervision should not have been imposed. The Supreme Court of Suffolk County, through its § 440.10 order, made clear that the due process claim was procedurally barred because it was recordbased. *People v. Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty. Sept. 10, 2010). Accordingly, Petitioner's claim that his plea was not knowingly and voluntarily made is procedurally barred because the court's ruling was based on an independent and adequate state procedural rule. [FN3]

FN3. The Court did not address Petitioner's claim that his allocution was insufficient and it would appear that this claim is not cognizable on a § 440.10 motion to vacate. However, when a state court fails to address a claim, a Court must review it *de novo. See Cotto v. Fischer,* 09 CV 9813, 2012 WL 5500575, at *39 (S.D.N.Y. Aug.23, 2012). As a threshold matter, Petitioner only addressed this matter in a conclusory manner

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

without any argument as to the specific challenge being made. Thus, the issue was not fairly presented to the state court. In any event, as addressed *infra,* the Court has reviewed this claim and finds it to be plainly without merit.

In order to overcome the procedural bar, Petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750. Petitioner has not satisfied this standard. Petitioner has not provided any explanation for his failure to properly exhaust the due process claim. Moreover, Petitioner has failed to demonstrate any prejudice for his failure to exhaust, and he has not demonstrated that a fundamental miscarriage of justice will take place if the Court fails to consider the procedurally defaulted claims. *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In any event, that claim, as well as all of Petitioner's other claims, are without merit for the reasons discussed below.

B. Merits Analysis

1. Due Process Claim

Petitioner claims that his due process rights under the Fourteenth Amendment were violated because he was unaware of PRS accompanying his sentence. Therefore, he alleges that the plea was not made voluntarily, knowingly, and intelligently. As discussed below, this claim has no merit.

a. Legal Standard

"The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant ." *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (internal quotation marks and citations omitted)); *see also* *Parke v. Raley,* 506 U.S. 20, 28–29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) (plea is valid when it is both knowingly and voluntarily made). Where "a defendant is represented by counsel during the plea process, and enters his plea upon the advice of counsel, the voluntariness of the plea depends upon whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Hill,* 474 U.S. at 56 (internal quotation marks and citations omitted).

The Supreme Court has held that, under the Due Process Clause of the United States Constitution, a trial court can only accept a guilty plea which is done "voluntarily, knowingly, and intelligently, with sufficient awareness of relevant circumstances and likely consequences." *United States v. Adams,* 448 F.3d 492, 497 (2d Cir.2006) (internal quotation marks and citations omitted); *accord* *Godinez v. Moran,* 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). Although a guilty plea "is not ordinarily subject to collateral attack," it "may be collaterally attacked if it was not knowing or not voluntary...." *Salas v. United States,* 139 F.3d 322, 324 (2d Cir.1998); *see also* *U.S. ex rel Scott v. Mancussi,* 429 F.2d 104, 107 (2d Cir.1970) ("[A] conviction which is based upon an involuntary plea of guilty is inconsistent with due process of law and is subject to collateral attack by federal habeas corpus.").

***8** "A plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a rudimentary way,' and it is considered 'voluntary if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally.' " *Manzullo v. New York,* No. 07 CV 744(SJF), 2010 WL 1292302, at *5 (E.D.N.Y. Mar.29, 2010) (quoting *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.1988)). Indeed, a "plea of guilty entered by one fully aware of the direct consequences of the plea is

voluntary in a constitutional sense unless induced by threats, misrepresentations, or perhaps by promises that are by their nature improper." *Bousley v. United States,* 523 U.S. 614, 619, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal alteration, citations, and quotation marks omitted).

b. Application

Under New York law, the trial court should have advised Petitioner of the five-year mandatory PRS. In *People v. Catu,* the Court of Appeals held that "[b]ecause a defendant pleading guilty to a determinate sentence must be aware of the postrelease supervision component of that sentence in order to knowingly, voluntarily and intelligently choose among alternative courses of action, the failure of a court to advise of postrelease supervision requires reversal of the conviction." 4 N.Y.3d 242, 245, 792 N.Y.S.2d 887, 825 N.E.2d 1081 (2005).

However, under AEDPA, this Court may only grant relief if the state court "unreasonably applied clearly established Federal law." *Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (alterations omitted) (quoting 28 U.S.C. § 2254(d)(1)). " 'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Therefore, this Court cannot grant a petition for habeas corpus if the state court unreasonably applied *state* law; instead, this Court may only grant relief unless the state court unreasonably applied federal law that has been clearly defined by Supreme Court precedents (or was a result of an unreasonable determination of the facts in light of the record). *See Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (citations and internal quotation marks omitted)).

"Unfortunately for Petitioner, there is no clearly established Supreme Court precedent that a defendant must be advised of mandatory post-release supervision prior to entering a guilty plea. Many federal courts in this Circuit have recently come to this same conclusion." *Sanchez v. Keller,* 06–CIV–3370, 2007 WL 4927791, at *7 (S.D.N.Y. Dec.4, 2007) (Report and Recommendation); *see also Facen v. Cully,* 787 F.Supp.2d 278, 284 (W.D.N.Y.2011) (stating that "the Supreme Court has never held that a mandatory term of post-release supervision is a direct consequence of a criminal conviction"); *Potter v. Green,* 04–CV–1343, 2009 WL 2242342, at *6 (E.D.N.Y. July 24, 2009) ("[T]here is no clearly established Supreme Court precedent that requires a state court judge to advise a defendant of mandatory PRS before accepting a guilty plea."). In fact, as noted by the Seventh Circuit, "the Court has expressly declined to decide such an issue in the very similar context of parole." *Lockhart v. Chandler,* 446 F.3d 721, 724 (7th Cir.2006) (citing *Lane v. Williams,* 455 U.S. 624, 630 n. 9, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982)). This Court finds the analysis contained in these cases persuasive.

***9** Therefore, because the Supreme Court has not ruled directly on this issue, the failure of the state court to advise Petitioner at his plea about the mandatory PRS is not a basis for habeas relief. *See Sanchez,* 2007 WL 4927791, at *8 ("[B]ecause the Supreme Court has never addressed the issue of whether mandatory supervised release is a direct consequence of one's conviction, the trial court's failure to inform Petitioner of his mandatory PRS cannot be a violation of clearly established federal law. In other words, Petitioner's claim is without merit because there is no clearly established Supreme Court precedent for the trial court to have unreasonably applied."); *see also Lane,* 446 F.3d at 724; *Facen,* 787 F.Supp.2d at 284; *Menjivar v. Sears,* 06 CV 2854, 2007 WL 2274892, at *3

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(E.D.N.Y. Aug.7, 2007).[FN4]

FN4. As stated *supra*, even if the state court did violate New York law, Petitioner is also not entitled to relief because this claim is procedurally barred.

In addition, although this could end the Court's inquiry, the Court notes that Petitioner must also demonstrate that "there is a reasonable probability that, but for the error, he would not have entered the plea." *Zhang v. United States,* 506 F.3d 162, 168 (2d Cir.2007) (citation and internal quotation marks omitted). Petitioner provides no evidence that he would not have entered his guilty plea had the court informed him of the mandatory PRS, and it appears highly improbable that the PRS played any role in his decision to accept or reject the plea. In fact, during the sentencing hearing, Petitioner admitted that the plea bargain, struck by him and for his benefit, was "favorable." [FN5] (S. at 7.) More importantly, Petitioner was made aware of the PRS at his sentencing hearing. For each charge, the sentencing state judge, informed Petitioner of the mandatory five-year PRS accompanying the charges. (S. at 10.) At no time did Petitioner object to the PRS, indicate that he was unaware that PRS was mandated in accordance with state law, or state that he wished to withdraw his previously entered plea. Therefore, as in *Sanchez,* "Petitioner's claim-that the failure to inform him of mandatory PRS prior to the entry of his guilty plea was a violation of his due process rights-can be dismissed as harmless error, because even if he had know about the PRS, such knowledge would likely not have affected his decision." *Sanchez,* 2007 WL 4927791, at *9.

FN5. As Respondent notes, "All terms of incarceration were ordered to run concurrently, for an aggregate sentence of fourteen years for his sexual assaults and lewd behavior against eight children. Had petitioner gone to trial and been found guilty, as a second child sexual assault felony offender, petitioner faced a maximum sentence of two life terms, plus 48 years." (Resp. Opp. at 11.)

2. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of counsel, specifically that his counsel failed to object to duplicate counts on the indictment, failed to file a Notice of Appeal, and failed to advise him of the PRS accompanying the guilty plea. As discussed below, this claim is meritless.

a. Legal Standard

Under the standard promulgated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 680, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

***10** The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' " *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a " 'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.' " *Id.* (quoting *Rompilla v. Beard,* 545 U.S. 374, 408, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.' " *Id.* (quoting *Strickland,* 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord,* 77 F.3d 578, 588 n. 3 (2d Cir.1996), and " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Id.* at 588 (quoting *Strickland,* 466 U.S. at 690–91). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id.* (quoting *Strickland,* 466 U.S. at 690–91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they " 'undermine[ ] confidence in the outcome.' " *Pavel v. Hollins,* 261 F.3d 210, 216 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 694). " '[T]he question to be asked in assessing the prejudice from counsel's errors ... is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilty.' " *Henry v. Poole,* 409 F.3d 48, 63–64 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 695). " 'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.' " *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001) (quoting Strickland, 466 U .S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of Strickland, the determination of prejudice may be made with the benefit of hindsight ." *Hemstreet v. Greiner,* 491 F.3d 84, 91 (2d Cir.2007) (internal citation and quotation marks omitted).

***11** This Court proceeds to examine Petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir.2004).

b. Application

i. Failure to Object to Duplicate Counts on the Indictment

Petitioner alleges that his trial counsel failed to object to duplicate counts contained within the indictment. Specifically, Petitioner asserts that under N.Y. Penal Law § 130.75(2) and N.Y. Penal Law § 130.80(2), a defendant may not be subsequently prosecuted for any other sexual offense involving the same victim. Petitioner argues that he was charged twice for acts upon the same victim under Counts I and III, and for Counts II and IV, and that he suffered prejudice as a result of the his attorney's inaction.

First, this Court finds defense counsel's conduct was not deficient because he sought to have the indictment dismissed on any plausible grounds. Defense counsel filed a motion for the trial court to review the Grand Jury minutes and sought dismissal of the charges. The court, in response to counsel's motion, concluded that the minutes were sufficient and denied counsel's application to dismiss or reduce the charges. *People v. Wilens,* Ind. No. 1020–2005 (Sup.Ct., Suffolk Cnty. July 26, 2005).

Second, Petitioner has failed to show that these alleged duplicate counts caused any prejudice and thus fails the second prong under the *Strickland* test. The New York legislature was careful to avoid double jeopardy concerns under N.Y. Penal Law § 130 .75(2) and § 130.80(2) by enacting N.Y. Penal Law § 70.25(2)(e). N.Y. Penal Law § 70.25(2)(e) states:

> Whenever a person is convicted of course of sexual conduct against a child in the first degree as defined in section 130.75 or course of sexual conduct against a child in the second degree as defined in section 130.80 and any other crime under article one

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

hundred thirty committed against the same child and within the period charged under section 130.75 or 130.80, the sentences *must run concurrently.*

N.Y. Penal Law § 70.25(2)(e) (emphasis added). At sentencing, Petitioner was sentenced to fourteen years and seven years for Counts One and Three, respectively. For Counts Two and Four, the state judge again sentenced the Petitioner to fourteen and seven years, respectively. The sentences were to run concurrently, not consecutively. Therefore, Petitioner was not subject to prejudice, and his claim must fail.

Furthermore, by pleading guilty, the Petitioner waived any argument that counsel was ineffective for failing to challenge the indictment. *See Schwartz v. Connell,* 05 CIV. 10305, 2006 WL 3549660, at *5 (S.D.N.Y. Dec.6, 2006) ("A motion to dismiss for a duplicitous indictment is similar to a speedy trial motion in that both can result in a dismissal of charges against the defendant. Both errors, however, are rendered irrelevant in the face of defendant's plea of guilty since this admission is, in most cases, convincing factual evidence of actual guilt."); *People v. Thomas,* 2 A.D.3d 982, 768 N.Y.S.2d 519, 520 (3d Dep't 2003) (holding a claim of ineffective assistance of counsel, predicated on counsel's failure to challenge the indictment, was waived as the alleged failures did not undermine the voluntariness of defendant's guilty plea).[FN6]

FN6. The Court notes that, for the reasons discussed *infra*, Petitioner has not made any plausible argument that his guilty plea was not voluntary and intelligent that would allow him to now argue that this argument should not be waived.

ii. Failure to File a Notice of Appeal

***12** Petitioner claims that his trial counsel was ineffective because counsel did not file a Notice of Appeal. In *Roe v. Flores–Ortega,* 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), the Supreme Court applied the *Strickland* test with regard to a claim that counsel was constitutionally ineffective for failing to file a Notice of Appeal. The Court noted that it had "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Id.* at 477. However, the Court held that, in cases where the defendant "neither instructs counsel to file an appeal nor asks that an appeal not be taken," the first question is whether counsel "in fact consulted with the defendant about an appeal." *Id.* at 478. If the attorney consulted with the defendant, counsel "performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Id.* If, however, counsel has not consulted with the defendant, the relevant inquiry is "whether counsel's failure to consult with the defendant itself constitutes deficient performance." *Id.* The Court rejected a bright-line rule that counsel must always consult with a defendant regarding an appeal. *Id.* at 480. Instead, the Court held that "counsel has a constitutionally-imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal ... or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* In making this determination, courts should consider "whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Id.* Where a defendant pleads guilty, courts should consider factors such as "whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Id.* If the court determines that counsel's performance was deficient, the court must turn to the second prong of the *Strickland* rule-whether counsel's deficient performance prejudiced the defendant. "[T]o show prejudice in these circumstances, a defendant must demonstrate that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484. If so, a presumption of prejudice arises. *Id.*

In the instant case, Petitioner, in his *pro se* appellate brief, repeatedly states that he attempted to contact and inform his attorney to file an appeal, but his attempts were futile. (Pet'r's Habeas Pet. at 3.) Assuming that no such consultation occurred, the relevant question becomes whether "there is reason to think either (1) that a rational defendant would want to appeal, or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores–Ortega,* 528 U.S. at 480.

***13** Petitioner pled guilty, which "reduces the scope of potentially appealable issues" and "may indicate that the defendant seeks an end to judicial proceedings." *Id.* However, Petitioner has a right to appeal, and his attorney must respect this right. Assuming *arguendo* that counsel's performance was deficient for failing to appeal or failing to consult Petitioner about an appeal, that deficiency did not create any prejudice and fails the second prong of *Strickland.* Petitioner filed his own Notice of Appeal in a timely manner. Subsequently, Petitioner was assigned appellate counsel. Appellate counsel filed a motion with the Appellate Division to reduce Petitioner's sentence and Petitioner was able to file his own *pro se* supplemental brief. Not only did appellate counsel raise what he believed to be a meritorious issue on appeal, but Petitioner himself raised his own issues. Both motions were heard and subsequently denied. Therefore, Petitioner did not suffer any prejudice. *See id.* at 484 (rejecting rule that failure to file appeal results in prejudice *per se* because this rule "ignores the critical requirement that counsel's deficient performance must actually cause *the forfeiture of the defendant's appeal."* ) (emphasis added).

iii. Failure To Advise Him Of The Mandatory PRS Accompanying The Guilty Plea

Petitioner alleges his defense counsel was ineffective for failing to advise him of the mandatory post-release supervision, which accompanied his guilty plea. This argument fails the second prong under the *Strickland* test because Petitioner cannot show prejudice based on his lack of knowledge. Under *Strickland,* a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. Nothing in the record indicates that Petitioner would not have pled had he been informed of the mandatory PRS. *Walker v. Pearlman,* 556 F.Supp.2d 259, 265 (S.D.N.Y.2008) (holding that knowledge of a five-year PRS period would have not changed the defendant's plea).

Petitioner does allege that, had he known about the PRS, he would not have pled guilty. In fact, Petitioner was made fully aware of PRS at his sentencing hearing, and made no objection or any attempt to withdraw his guilty plea. In his *pro se* supplemental brief to the Appellate Division on appeal, Petitioner again did not seek to withdraw his guilty plea. Furthermore, as stated above, had Petitioner gone to trial and been found guilty of the charges, he faced two life sentences. In addition, any period of incarceration connected with these charges carries with them a mandatory period of post-release supervision. N.Y. Penal Law § 70.80(3). Under the circumstances, even assuming *arguendo* the allegation of ineffective assistance to be true, there is no basis to conclude that Petitioner suffered any prejudice under the second prong of *Strickland.*

3. Insufficient Allocution

***14** Petitioner alleges his allocution was insufficient in establishing the elements of the crimes of which he was convicted. For the reasons stated, the Court finds this claim to be without merit.[FN7]

FN7. The state court did not address Petitioner's contention that his allocution at his plea was insufficient, and thus, this claim is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

not entitled to AEDPA deference. *See, e.g., Bell v. Napoli,* 08 CIV 9900, 2010 WL 8039333, at *23 n. 13 (S.D.N.Y. Aug.24, 2010) (Report and Recommendation). However, even under *de novo* review, Petitioner's claim is plainly without merit.

i. Allocution Under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree)

In analyzing the transcript of the plea, it is clear that Petitioner provided a sufficient allocution for each element of the crimes charged. N.Y. Penal Law § 130.75(1) (Course of sexual conduct against a child in the first degree) reads:

> A person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration:
>
> (a) he or she engages in two or more acts of sexual conduct, which includes at least one act of sexual intercourse, oral sexual conduct, anal sexual conduct or aggravated sexual contact, with a child less than eleven years old

N.Y. Penal Law § 130.75(1). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in at least two acts of sexual conduct.

Petitioner admitted in great detail to the specific oral sexual conduct between himself and the victims, which occurred well over a three-month period. Petitioner also admitted that these victims were children under the age of eleven. In particular, during the allocution, petitioner admitted in part that, (1) within a three-month period between 2002 and 2004, on at least three occasions at his residence in Suffolk County, he subjected the female child “DM” (who was under the age of eleven) to sexual contact and sexual intercourse for Petitioner's sexual gratification (P. 7–8); and (2) within a three-month period from between September 2003 and July 2004, on at least three occasions at his residence, Petitioner had sexual contact with the male child “DM” (who was under the age of 11), including one incident of oral sexual conduct. (P. 8–12.) Petitioner's allocution covered all of the requisite elements and was sufficient to find him guilty of the charges under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree).

ii. Allocution under Under Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree)

In relevant part, N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree) reads:

> A person is guilty of course of sexual conduct against a child in the second degree when, over a period of time not less than three months in duration:
>
> (a) he or she engages in two or more acts of sexual conduct with a child less than eleven years old.

N.Y. Penal Law § 130.80(1)(a). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in two or more acts of sexual conduct with a child less than eleven years old. “Sexual conduct” means sexual intercourse, oral sexual conduct, anal sexual conduct, aggravated sexual contact, or sexual contact. N.Y. Penal Law § 130.00(10).

***15** The plea transcript provides sufficient evidence that Petitioner is guilty under N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree). As discussed supra, Petitioner admitted to sexual conduct with a child under the age of eleven. He also admitted that this conduct occurred for a period of at least three months. Moreover, he allocuted to conduct that clearly fell within the defi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

nition of oral sexual conduct. (P. 9–11 .) Thus, each element under Penal Law § 130.80(1)(a) was satisfied.

Petitioner furthers argues that dialogue between the prosecutor and himself during the plea was insufficient to support the charge because his admission was preceeded by six denials. (Pet'r's Habeas Pet. at 2.) He asserts that the state court should have, “looked further into the reasons of denials of alleged acts before accepting the insufficient pleas.” (*Id.* at 2.)

The Court disagrees. By looking at the totality of the guilty plea proceeding, instead of a few isolated lines as Petitioner suggests, it is clear that the plea was voluntary. There is no evidence that the prosecutor or anyone else threatened Petitioner to induce a coerced plea. The court simply gave Petitioner another opportunity to explain what had occurred. Subsequently, Petitioner provided a sufficient allocution and made a proper plea. In short, there is no basis to challenge the Petitioner's statements at the guilty plea, including the voluntariness of those statements.

iii. Allocution Under Penal Law § 130.65 (Sexual Abuse in the First Degree)

N.Y. Penal Law § 130.65 (Sexual Abuse in the First Degree) states that “[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact: ... [w]hen the other person is less than thirteen years old and the actor is twenty-one years old or older.” N.Y. Penal Law § 130.65.

The record is clear that the prosecution satisfied every element of this charge. Petitioner described in great detail sexual acts which satisfy subsection 4 of N.Y. Penal Law § 130.65. Petitioner, by his own admission, subjected his victims, who were all under the age of thirteen, to sexual contact. Because the Petitioner is older than twenty-one years of age, the elements are satisfied, and thus his allocution was sufficient.

iv. Allocution Under Penal Law § 260.10(1) (Endangering the Welfare of Child)

Lastly, under the N.Y. Penal Law § 260.10(1) (Endangering the Welfare of Child):

> A person is guilty of endangering the welfare of a child when:
>
> 1. He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health.

N.Y. Penal Law § 260.10(1). There is no requirement under this statute that the physical, mental or moral welfare of the child be in fact injured, and New York courts have held that actions similar to the ones admitted to by Petitioner violate the statute. *See, e .g., People v. Rice,* 17 N.Y.2d 881, 271 N.Y.S.2d 307, 218 N.E.2d 341 (1966); *People v. Dunavin,* 173 A.D.2d 1032, 1034, 570 N.Y.S.2d 369 (3d Dep't 1991) (evidence demonstrating that defendant showed minors sexually explicit film combined with touching minor's buttocks legally sufficient to establish crime of endangering welfare of child). The Court concludes that Petitioner's allocution under Penal Law § 260.10(1) (Endangering the Welfare of Child) was sufficient to satisfy all elements of the crime alleged. (P. 14–16.)

***16** In sum, Petitioner's claim that his allocution did not satisfy the elements of the crimes charged is plainly without merit.

4. *Brady* and *Rosario* Violations

Petitioner also claims *Brady* and *Rosario* violations, alleging that the prosecution withheld certain exculpatory evidence-namely, the victims' medical records and a finding of ‘Not Guilty’ in his Family

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Court case, which related to this criminal matter. (Pet. at 3–4) For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

a. Legal Standard

For the purposes of federal habeas corpus review, a habeas petition can only be granted to remedy some violation of federal law. Because the obligation to turn over *Rosario* material arises under state law, to the extent that this claim is based on a *Rosario* violation, it must fail. Thus, the only question is whether the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. *See King v. Greiner,* No. 02–CV–5810, 2008 WL 4410109, at *38 n. 41 (S.D.N.Y. Sept.26, 2008).

Under *Brady,* the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prevail on a *Brady* claim, petitioner must demonstrate that material evidence favorable to his case was not disclosed to him. *See Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Failure to disclose such material evidence merits relief only if the prosecution's failure " 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 678). Furthermore, "[t]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281.

b. Application

Petitioner argues that the outcome of his case would have been different if the prosecutor submitted medical records and a Family Court verdict of 'Not Guilty' of sexual abuse. Analyzing these claims, the Court finds them to be meritless. With regard to the Family Court adjudication, Petitioner makes conclusory statements without providing a shred of evidence before the Court beside his self-serving declaration.

The state record is devoid of any documentation from Family Court, which would be classified as exculpatory under *Brady.* Additionally, Petitioner failed to produce an affidavit from his attorney attesting to a favorable adjudication in the Family Court. In fact, Respondent submitted to the state court, in response to his Section 440 motion, court documents from Family Court indicating that the abuse petitions were granted on September 23, 2005. (Opp. to Section 440 Motion, Ex. B.)

***17** In any event, Petitioner was presumably present in Family Court during the proceedings. Therefore, he was aware of the evidence allegedly withheld, removing it from the scope of *Brady* material. Lastly, as noted above, a final Family Court disposition took place on September 23, 2005. Petitioner pled guilty in Criminal Court on August 30, 2005. There can be no argument that this disposition, which took place later in time, could have possibly influenced the outcome of his guilty plea (which had already taken place).

Similarly, the medical records at issue are neither exculpatory nor favorable to Petitioner. The medical records specifically state that the victims' medical history indicates that "inappropriate sexual contact" occurred. This statement is certainly not favorable to Petitioner. Although the records state that there were no abnormal findings *during* the exam, this has no

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

bearing on whether the victims were abused in the past by Petitioner. Moreover, the medical record qualifies the examination by stating that the alleged acts would not cause "permanent changes in the patient's physical exam." Therefore, the medical records do not exculpate Petitioner and, thus, cannot be classified as *Brady* material.[FN8]

FN8. In any event, such claims cannot provide a basis for habeas relief. The Supreme Court has never held that exculpatory material must be disclosed prior to a guilty plea. Therefore, a state court decision on that issue could not have been "contrary to clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A habeas petition may not be granted on an issue of law that has not yet been resolved. *See Friedman v. Rehal,* 618 F.3d 142, 154–55 (2d Cir.2010) (discussing *Ruiz* and holding that, because no clearly established federal law has been established as to the application of *Brady* to a guilty plea, such a claim was not cognizable on habeas review).

In sum, Petitioner's *Brady* and *Rosario* claims are without merit and do not provide a basis for habeas relief.

## IV. CONCLUSION

For the reasons set forth herein, this Court finds that Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall be issued. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

E.D.N.Y.,2014.
Wilens v. Superintendent of Clinton Correctional Facility
Slip Copy, 2014 WL 28995 (E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.